IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| RAJESH C. PATEL | ) | Case No. 16-65074 |
| | ) | |
| Debtor. | ) | Honorable Lisa Ritchey Craig |
| | ) | |
| | ) | |
| RL BB-GA RMH, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | Adv. Proc. No. |
| RAJESH C. PATEL, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT TO OBJECT TO DEBTOR'S DISCHARGE AND THE DISCHARGEABILITY OF CERTAIN DEBTS

COMES NOW RL BB-GA RMH, LLC, a Georgia limited liability company

("RL BB" or "Plaintiff") and for its Complaint to Object to Debtor's Discharge and

the Dischargeability of Certain Debts (the "Complaint"), against Rajesh C. Patel

("Debtor" or "RC"); shows the Court as follows:

<u>JURISDICTION AND VENUE</u>

1.     This Adversary Proceeding is being brought in connection with Debtor's case under Chapter 7 of Title 11, Case Number 15-53700 now pending in this Court. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This Adversary Proceeding constitutes a core proceeding as that term is defined under 28 U.S.C. § 157(b)(2)(I) and 28 U.S.C. § 157(b)(2)(J).  Plaintiff agrees to the entry of Final Judgment in this proceeding by the Bankruptcy Court.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

<u>PARTIES</u>

4.     Plaintiff RL BB is a Georgia limited liability company with its principal office at 790 NW 107 Avenue, Suite 400, Miami, Florida, 33172.

4.     Plaintiff RL BB is the owner of the RLBB Loan Documents, defined below, by virtue of assignment of same from the Branch Banking & Trust Company ("Original Lender") and from RL-BB Financial LLC ("RL BB Financial")(RL BB and RL BB Financial are collectively referred to as "RL BB")(collectively, Original Lender, RL BB Financial and RL BB are referred to herein as "Lender"). A true and correct copy of the Assignment Documents is attached here to as Exhibit A.

5.      Debtor Rajesh C. Patel is a natural person and resident of the state of Georgia.

<div align="center">DEBTOR'S INDEBTEDNESS TO RL BB</div>

6.      On December 10, 2007, RM Hotels, Inc. ("RM Hotels") executed that certain Secured Promissory Note Original Lender in the amount of $10,000,000.00, as subsequently amended or modified ("RM Hotels Note"). A true and correct copy of the RM Hotels Note is attached hereto as Exhibit B.

7.      Debtor executed, on December 7, 2007 and February 25, 2009, Unconditional Guaranties guaranteeing all indebtedness of RM Hotels, Inc. to Original Lender ("Debtor Guaranties")(collectively, the RM Hotels Note, RC Note, and Debtor Guaranties are referred to herein as the "Loan Documents"). A true and correct copy of the Debtor Guaranty dated December 27, 2007 ("2007 Guaranty") is attached hereto as Exhibit C-1 and a true and correct copy of the Debtor Guaranty dated February 25, 2009 ("2009 Guaranty") is attached hereto as Exhibit C-2, respectively.

8.      The 2007 Guaranty provided that:

> "Guarantor shall, within one hundred twenty (120) days following the last day of each calendar year during which any portion of the Secured Indebtedness…remains outstanding and unpaid, provide Lender with a current updated personal financial statement and with copies of Guarantor's federal and state income tax returns for the immediately preceding calendar year. Guarantor warrants and represents to Lender that all financial statements heretofore delivered by them to Lender are true and correct in all material respects as of the date hereof.

(2007 Guaranty, Exhibit C-1).

9.    In addition, the 2009 Guaranty provided that "as long as any Obligations remain outstanding…the undersigned shall furnish an annual updated financial statement in form satisfactory to Bank…" (2009 Guaranty, Exhibit C-2).

10.    Moreover, on January 7, 2010, the Debtor provided a personal financial statement to Original Lender, a true and correct copy of which is attached hereto as Exhibit C-3 ("Debtor PFS").

11.    RM Hotels is an Alabama corporation which was incorporated on April 5, 1996 and incorporated in Georgia on December 4, 1996. The Debtor was its Chief Executive Officer at the time of incorporation. A true and correct copy of the Certificate of Authority to Transact Business in Georgia of RM Hotels is attached hereto as Exhibit C-4.

12.    Debtor and RM Hotels failed to make payments on the RM Hotels Note.

13.    On various dates, including February 19, 2010, and April 21, 2010, counsel for Original Lender notified Debtor and RM Hotels of their defaults on the RM Hotels Note and Debtor Guaranties.

14.    On May 18, 2010, RM Hotels filed a Chapter 11 Bankruptcy Petition in that certain case styled as In Re RM Hotels, Inc., United States Bankruptcy Court, Northern District of Georgia, Case No. 10-74708-crm ("RM Bankruptcy").

15.    The RM Bankruptcy case was dismissed on August 10, 2011.

16.    On September 22, 2010, Original Lender filed suit against Debtor on, *inter alia*, the Note and Debtor Guaranties in that certain case styled as <u>BB&T v. Rajesh C. Patel</u>, United States District Court for the Northern District of Georgia ("District Court"), Case No. 1:10-cv-3046-TCB ("Patel Lawsuit"). RL BB Financial was later substituted as the Plaintiff in the Patel Lawsuit.

17.    On September 30, 2010, Original Lender assigned the Loan Documents to RL BB Financial pursuant to that certain Assignment of Loan Documents and Allonge (Exhibit A).[1]

18.    On or around October 31, 2010, the Debtor provided to RL BB Financial a personal financial statement ("October PFS"). A true and correct copy of the October PFS is attached hereto as Exhibit C-5.

19.    The October PFS states that, *inter alia*, the Debtor owns various "companies" with a current value of $2,137,894 and is owed notes receivable from "various companies I have Ownership in" of $3,125,584. (Exhibit C-4, p. 2-3).

20.    The RM Hotels Note matured on December 1, 2010.

21.    On June 8, 2011, Debtor, RM Hotels, Inc. and RL BB Financial entered into that certain Forbearance Agreement, in which Debtor agreed that, *inter alia*, "all written information furnished to RL BB as part of the negotiations that

---

[1] As set forth above, the Loan Documents were subsequently assigned to RL BB.

led to this Agreement (including financial statements, accounting records, schedules or lists of assets, tax information, documents and written information furnished by third parties on behalf of the Borrower or the Guarantor) are truthful, accurate, and not misleading in the context in which presented." ("Forbearance Agreement", a true and correct copy of which is attached hereto as Exhibit D-1, p. 4).

22.    The Forbearance Agreement also provided that "[t]he financial statement that the Borrower and the Guarantor will deliver to RL BB within ten (10) days from the Effective Date of this Agreement, are true and correct, and fairly present the financial conditions of the Borrower and the Guarantor. These financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied. As of the Effective Date of this Agreement, there are no obligations, liabilities or indebtedness (including contingent liabilities) that are material to the Borrower, the Guarantor or the Collateral that are not reflected in such financial statements. No material adverse change has occurred in the financial condition of the Borrower or the Guarantor since the date of the most recent financial statements that the Borrower and the Guarantor have delivered to RLBB." (Exhibit D-1, p. 5).

23.    On July 18, 2011, the District Court entered a $3,000,000.00 judgment in favor of RL BB Financial against Debtor ("Debtor Judgment") which

was filed under seal. A true and correct copy of the Debtor Judgment is attached hereto as Exhibit D.

24.    Debtor defaulted on the Forbearance Agreement by, *inter alia*, failing to make payments on same.

25.    Effective as of June 8, 2011 [sic], Debtor, RM Hotels, Diplomat ONH Hotels, LLC ("Diplomat ONH") and RL BB Financial entered into that certain Amended and Restated Forbearance Agreement (the "Amended Forbearance Agreement"). A true and correct copy of the Amended Forbearance Agreement is attached hereto as Exhibit "D-2."

26.    In connection with the Amended Forbearance Agreement, Debtor also executed that certain Fixed Rate Promissory Note to RL BB Financial in the original principal amount of Two Hundred Thousand and Three Hundred Dollars ($200,300.00) on July 1, 2012 ("RC Note"). A true and correct copy of the RC Note is attached hereto as Exhibit E. (collectively, the RC Note and the RM Hotels Note are referred to herein as the "Notes") (collectively, the RM Hotels Note, RC Note, and Debtor Guaranties are referred to herein as the "Loan Documents")(collectively, the amounts owed by the Debtor on the RC Judgment and the RC Note are referred to herein as the "RLBB Indebtedness").

27.    Debtor failed to make payments on the RC Note, and the RC Note matured by its terms on December 31, 2012.

28.     Debtor is indebted to RL BB on the RC Note for principal in the amount of $200,300, plus accrued interest through August 15, 2016 in the amount of $41,896.08, plus interest accruing thereafter in the amount of $27.81 per diem.

29.     On July 13, 2015, Debtor pleaded guilty to two counts of wire fraud. United States v. Patel, No. 14-cr-00082, Dkt. No. 32 (M.D. Tenn. July 13, 2015). The wire fraud involved the Debtor's fraudulent inducement of a $500,000 investment purportedly in connection with a hotel investment but instead used to pay down Debtor's personal debt. Additional counts of wire fraud, mail fraud, and money laundering were dropped in exchange for Debtor's guilty plea. Debtor served concurrent six-month terms and was released in November or December, 2016.

30.     On August 29, 2016, RL BB filed a complaint in the United States District Court for the Northern District of Georgia (the "District Court") against the Debtor and others, styled RL BB Financial, LLC v. Patel, No. 16-cv-3164 (N.D. Ga. Aug. 29, 2016) (the "2016 UFTA Action"), alleging that the Debtor had engaged in numerous fraudulent transfers, including, but not limited to, the Loan Proceeds Transfers and the Grady Transfers, as defined below.

31.     Debtor filed his Chapter 7 Bankruptcy Petition on August 30, 2016, just one day after RL BB filed the 2016 UFTA Action.

<u>Dissipation of Assets to Various Persons and Entities</u>

32.     Debtor has engaged in years of deception and fraud to enrich himself while placing his assets outside the reach of his creditors.  Debtor makes use of a complicated network of entities to accomplish this, including but not limited to his family members, and other entities currently or previously owned or controlled by Debtor or his family.  These practices led to Debtor's pleas of guilty to two counts of wire fraud for which he is was incarcerated and only recently released from prison in November or December 2016. Debtor's deceptive acts to siphon his assets out of the reach of his creditors should not be rewarded by granting debtor a discharge in bankruptcy.

33.     Upon RM Hotels' receipt of the proceeds from the RM Hotels Note ("Loan Proceeds"), RM Hotels, Debtor and the Debtor's brother, Mike Patel immediately conspired to transfer the Loan Proceeds to various entities controlled by them, as well as to their friends and relatives, without RM Hotels receiving any consideration in return.

34.     On December 20, 2007, RM Hotels, at the direction of Debtor, wired $2,000,000.00 of the Loan Proceeds to an account held by Debtor and Mike Patel. A true and correct copy of the Wire Transfer Request and Account Statement is attached hereto as Exhibit F. ("RM Hotels $2 Million Wire").

35.     On information and belief, RC and RM Hotels did not receive any consideration from Mike Patel for the RM Hotels $2 Million Wire.

36.     On the same day, RM Hotels, at the direction of Debtor, also wired $1,900,000 of the Loan Proceeds to another account that was, on information and belief, controlled by Mike Patel and Debtor (the "RM Hotels $1.9 Million Wire"). A true and correct copy of the Account Statement evidencing the RM Hotels $1.9 Million Wire is attached hereto as Exhibit G. (Collectively the RM Hotels $2 Million Wire and the RM Hotels $1.9 Million Wire are referred to herein as the "RM Hotels Transfers").

37.      Debtor proceeded to further transfer the Loan Proceeds to his relatives, friends and companies.

38.     On March 5, 2008, Debtor transferred $200,000 of the Loan Proceeds from his and Mike Patel's joint account to Jay Patel ("Jay Patel Transfer"). On information and belief, Jay Patel is Debtor's nephew. A true and correct copy of the check evidencing the Jay Patel Transfer is attached hereto as Exhibit H.

39.     On April 21, 2008, Debtor transferred $800,000 of the Loan Proceeds from his and Mike Patel's joint account to RM Kids, LLC, and on September 2, 2008,  Debtor transferred $1,060,741.88 of the Loan Proceeds from his and Mike Patel's joint account to RM Kids, LLC (collectively, "RM Kids Transfers"). A true and correct copy of the checks evidencing the RM Kids Transfers is attached hereto as Exhibit I.

40.    On information and belief, RM Kids, LLC is an entity set up to benefit the children of RC.

41.    On January 10, 2008, Debtor transferred $500,000.00 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat PB ("Diplomat PB Transfer"). A true and correct copy of the check evidencing the Diplomat PB Transfer is attached hereto as Exhibit N.

42.    On March 17, 2008, Debtor transferred $100,034.08 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat Construction, and on April 21, 2008, Mike and Debtor transferred $250,000.00 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat Construction ("Diplomat Construction Transfers"). A true and correct copy of the checks evidencing the Diplomat Construction Transfers is attached hereto as Exhibit J.

43.    On information and belief, Diplomat Construction was controlled by Mike Patel and the Debtor.

44.    On June 30, 2008, Debtor transferred $100,000.00 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat Hospitality II ("Diplomat Hospitality Transfer"). A true and correct copy of the check evidencing the Diplomat Hospitality Transfer is attached hereto as Exhibit K.

45.    On information and belief, Diplomat Hospitality is controlled by the Debtor.

46.    On July 28, 2008, RC transferred $250,000.00 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat Development ("Diplomat Development Transfer"). A true and correct copy of the check evidencing the Diplomat Development Transfer is attached hereto as Exhibit L.

47.    Diplomat Development is controlled by the Debtor.  Debtor is the member/manager of Diplomat Development.

48.    On August 29, 2008, Debtor transferred $120,000.00 of the Loan Proceeds from his and Mike Patel's joint account to Diplomat SLP ("Diplomat SLP Transfer"). A true and correct copy of the check evidencing the Diplomat SLP Transfer is attached hereto as Exhibit M.

49.    On information and belief, Diplomat SLP is controlled by Mike and/or Debtor.

50.    On information and belief, Diplomat PB is controlled by Mike and/or Debtor. (collectively, Jay Patel, Diplomat PB, Diplomat Hospitality, Diplomat Construction, Diplomat SLP and Diplomat Development are referred to herein as the "Patel Loan Proceeds Entities").

51.    On information and belief, RM Hotels and Debtor never had any intention of repaying the Note, but instead diverted and transferred the Loan

Proceeds in order to hinder, delay and defraud RM Hotels and Debtor's creditors, including RLBB, from collecting debts against RM Hotels and Debtor ("Loan Proceeds Fraudulent Transfers").

52. The above series of transactions collectively show a common fraudulent transfer scheme by RM Hotels, Debtor, Mike Patel, the Patel Loan Proceeds Entities, Debtor's entities and family members to transfer away the Loan Proceeds and to conceal RM Hotels and Debtor's assets and hide them from their creditors in order to hinder, delay and defraud Debtor's creditors, and same constitute actual fraud.

53. Debtor retained control and a concealed interest in the Loan Proceeds even after transferring same to his relatives and the Patel Loan Proceeds Entities.

## 2253 Grady Ridge Transfer

54. Prior to November 23, 2009, Debtor owned certain real property located at 2253 Grady Ridge Trail, Duluth, Georgia 30097 ("Grady Ridge Property").

55. Via Quitclaim Deed filed and recorded on November 23, 2009, Superior Court Records of Gwinnett County, Book 49816, Page 236 ("RC Grady QCD"), Debtor transferred the Grady Ridge Property to his wife, Shama R. Patel, for no consideration ("RC Grady Transfer"). A true and correct copy of the RC Grady QCD is attached hereto as Exhibit O.

56.    Via Quitclaim Deed filed and recorded on June 2, 2011, Superior Court Records of Gwinnett County, Book 50704, Page 310 ("Jay Grady QCD"), Shama R. Patel transferred one half of her alleged interest in the Grady Ridge Property to Jay R. Patel, for no consideration ("Jay Grady Transfer"). A true and correct copy of the Jay Grady QCD is attached hereto as Exhibit P.

57.    Via Quitclaim Deed filed and recorded on March 22, 2013, Superior Court Records of Gwinnett County, Book 52102, Page 688 ("Monica Grady QCD"), Jay Patel transferred his alleged one-half interest in the Grady Ridge Property to Monica Jay Patel, for no consideration ("Monica Grady Transfer")(collectively, the RC Grady Transfer, Jay Grady Transfer and Monica Grady Transfer are referred to herein as the "Grady Transfers"). A true and correct copy of the Monica Grady QCD is attached hereto as Exhibit Q.

58.    The Grady Transfers were made at a time when Debtor knew that the Note was going to mature and that Debtor would be in default under his obligations, and/or the Note was in default and matured, or collection or litigation on same was threatened or imminent, or a Judgment had been entered on same.

59.    The Grady Transfers were made with the actual intent to hinder, delay and defraud Plaintiff in that Jay Patel, Monica Patel and the Debtor transferred or participated in the transfer of assets with the intent of preventing Plaintiff from obtaining collection on Plaintiff's claims.

14

60.    Despite the Grady Transfers, the Debtor has retained a continuing concealed interest in the Grady Property because he has continues to reside at and pay the expenses for same, as admitted in his Schedules [Doc. No. 1].

## Carnegie Transfer

61.    On April 30, 2007, Carnegie Building Limited Partnership transferred that certain real property located at Land Lot 78, 14th District, Fulton County, Georgia known as the Carnegie Building ("Carnegie Property") to Diplomat Hospitality II, LLC ("Diplomat Hospitality II"), pursuant to that certain Limited Warranty Deed recorded on May 2, 2007, Deed B4ook 44929, page 668, Fulton County, Georgia records ("Diplomat Deed I"). A true and correct copy of the Diplomat Deed I is attached hereto as Exhibit R.

62.    On August 3, 2007, Diplomat Hospitality II transferred the Carnegie Property to Carnegie Hotels, LLC ("Carnegie Hotels"), pursuant to that certain Warranty Deed recorded on August 16, 2007, at Deed Book 45547, page 53, Fulton County, Georgia records ("Diplomat Deed II"). A true and correct copy of the Diplomat Deed II is attached hereto as Exhibit S.

63.    As of August 3, 2007, the Debtor was the 100% owner of Carnegie Hotels as evidenced by the Carnegie Hotels operating agreement dated August 3,

15

2007 ("Carnegie August Operating Agreement"). A true and correct copy of the Carnegie August Operating Agreement is attached hereto as Exhibit T.

64.    However, on December 31, 2007, just three weeks after the Debtor received the Loan Proceeds from the Original Lender's loan to RM Hotels, Carnegie Hotels executed a new operating agreement in which the Debtor's 100% interest in Carnegie Hotels was transferred to his wife, Shama Patel, and his sister-in-law, Hasmita Patel ("Carnegie December Operating Agreement"). A true and correct copy of the Carnegie December Operating Agreement is attached hereto as Exhibit U.

65.    On July 14, 2008, despite having allegedly transferred 100% of his interest in Carnegie Hotels to Shama and Hasmita Patel, the Debtor signed a Construction Loan Agreement on behalf of Carnegie Hotels to Empire Financial Services, Inc. as the sole member of Carnegie Hotels, LLC ("Empire Loan Agreement"). A true and correct copy of the Empire Loan Agreement is attached hereto as Exhibit V.

66.    On September 24, 2010, just two days after the Original Lender filed the Patel Lawsuit, Carnegie Hotels recorded another Security Deed to Chelsea Capital Partners, LLC ("Chelsea") to secure an alleged loan in the amount of $6,210,000.00 ("Chelsea Security Deed"). A true and correct copy of the Chelsea Security Deed is attached hereto as Exhibit W.

67.    Chelsea ostensibly was organized by Jay Patel, the son of the Debtor, and on information and belief did not provide any funds to Carnegie Hotels in exchange for the Chelsea Security Deed.   Instead, on information and belief, Carnegie Hotels executed the Chelsea Security Deed in order to further encumber the Carnegie Property so as to protect the equity in it against Debtor's creditors.

68.    Sometime before July 24, 2009, Carnegie Hotel Manager, LLC allegedly became the managing member of Carnegie Hotels, LLC, as evidenced by that certain Subordination, Nondisturbance and Attornment Agreement executed on July 24, 2009 by Carnegie Hotel Manager, LLC as the managing member of Carnegie Hotels, LLC ("Subordination Agreement"). A true and correct copy of the Subordination Agreement is attached hereto as Exhibit X.

69.    The Debtor executed an operating agreement for Carnegie Hotel Manager, LLC on July 23, 2009, showing that he was the sole member of same ("Carnegie Operating Agreement", attached hereto as Exhibit Y).

70.    Despite the Carnegie Operating Agreement, Debtor now claims that he transferred his interest in Carnegie Hotel Manager, LLC to Shama Patel and Hasmita Patel, allegedly effective January 1, 2008. See RL BB-GA RMH, LLC v. Rajesh C. Patel, et al., Case No. 16-65074, Adv. Proceeding No. 16-05307, Doc. No. 20.

17

71.     To the extent that the Debtor transferred his interest in Carnegie Hotel Manager to Hasmita Patel or Shama Patel, same was a fraudulent transfer in which the Debtor did not receive any consideration for same, and Debtor has retained a concealed interest in, and control of, Carnegie Hotel Manager.

72.     On January 12, 2012, Carnegie Hotel Manager, LLC transferred its interest in Carnegie Hotels, LLC, and by extension, the Carnegie Hotel Property, to Summit Hotel TRS 099, LLC in exchange for a payment of $2,234,217.89, plus payment of $4,013,850.81 to Chelsea Capital Partners, LLC in payment of the Chelsea Security Deed ("Carnegie Hotel Closing")(collectively, the $6,248,068.70 is referred to herein as the "Carnegie Proceeds"). A true and correct copy of the Carnegie Hotel Closing statement is attached hereto as Exhibit Z.

73.     Although Debtor as the owner of Carnegie Hotel Manager was entitled to the proceeds from the Carnegie Hotel Closing, Debtor transferred the Carnegie Proceeds to his family members and their companies without receiving any consideration in return, including, without limited to, Chelsea, Shama Patel, Sonial Patel, Mayur Patel, Jay Patel, Varsha Patel[2], and Northlake Hotels, Diplomat CT Hotels, 218 Peachtree Capital, LLC, RM Kids, LLC, Surrey Hotels, Kingston Hotels, and others ("Carnegie Transfers").

---

[2] Jay, Mayur and Sonial Patel are all children of the Debtor, and Shama is his wife. Varsha Patel is the Debtor's sister.

74.    In addition, Debtor caused Chelsea Capital to transfer at least $500,000.00 of the proceeds from the Carnegie Hotel Closing  to Shama, which she then proceeded to transfer to herself in cash and to her personal bank account in India.

75.    Debtor retained a secret interest in and continuing control of the Carnegie Proceeds and in the interests in the Carnegie entities, despite the fact that he had fraudulently transferred or purports to have transferred same to his family members and their related companies.

## The Carnegie Building Tax Credits

76.    Diplomat Hospitality II, LLC, in which Debtor held a 40% interest, originally acquired the Carnegie Building in order to develop the property into a hotel.

77.     Diplomat Hospitality II, LLC transferred the Carnegie Building in exchange for no consideration to Carnegie Hotels, when Debtor owned Carnegie Hotels.  The Carnegie Hotels operating agreement was adopted on August 3, 2007, and executed by Debtor as sole member.

78.    On July 24, 2009, Debtor reached an agreement to cause historic tax credits generated by the redevelopment of the Carnegie Building to become usable by Chevron U.S.A. Inc., a Pennsylvania corporation ("Chevron"), in exchange for multiple payments totaling approximately $3 million.

19

79.    Debtor caused Carnegie Hotels MT, LLC ("Carnegie MT") to be formed with Debtor as member and sole manager and Chevron as investor member.  The purpose of Carnegie MT was to act as master tenant of the Carnegie Building, which it would lease from Carnegie Hotels.

80.    Debtor caused Carnegie Hotel Manager to be formed with Debtor as sole manager and member.

81.    On information and belief, Debtor transferred his membership interest in Carnegie MT to Carnegie Hotel Manager.

82.    The ownership structure of Carnegie MT was designed such that historic redevelopment tax credits in the Carnegie Building were available to Chevron in exchange for contributions made by Chevron to Carnegie Manager.  To permit Chevron to take advantage of the tax credits, Carnegie MT acquired a 10% interest in Carnegie Hotels.  The tax credits would be able to be claimed by Chevron in the taxable year in which rehabilitation of the Carnegie Building was to be completed, subject to a five-year recapture period.  Chevron's payment for this arrangement was to be made in the form of contributions to Carnegie MT.

83.    On July 28, 2009, Chevron made an initial contribution of $1,028,675.00 to Carnegie MT.

84.    Upon information and belief, Debtor transferred $1,028,675.00 to his family members and their related entities, and retains a continuing interest in same.

20

85.     Upon information and belief, in or about February, 2012, Summit Hotel Properties, Inc. ("Summit"), a Maryland publicly traded corporation that has elected to be taxed as a real estate investment trust, acquired an interest in the Carnegie Building via its indirectly owned subsidiary, Summit Hotel TRS 099, LLC ("Summit TRS").

86.     In connection with the purchase, pursuant to that certain Side Letter Agreement to Amended and Restated Purchase and Sale Agreement executed as of January 12, 2012, between Carnegie Manager and Summit TRS (the "Summit Agreement"), Summit TRS agreed to make a tax reimbursement payment to Carnegie Hotel Manager within sixty days of the expiration of the five-year recapture period associated with the historic tax credits generated from the redevelopment of the Carnegie Building (the "Tax Reimbursement Payment").

87.     Debtor executed the Summit Agreement as manager of Carnegie Manager.

88.     Upon information and belief, the Summit Agreement has matured and the Tax Reimbursement Payment is due to be made to Carnegie Hotel Manager.

89.     Debtor and certain of Debtor's family members have continued to negotiate the amount and the proper recipient of the Tax Reimbursement Payment with Summit.

21

90.     Debtor did not notify Summit that he had filed a voluntary petition for bankruptcy.  Summit was unaware of the existence of Debtor's bankruptcy case until November 1, 2016.

91.     To the extent that the Debtor has fraudulently transferred his interest in Carnegie Hotel Manager to Shama Patel, Hasmita Patel, Rishi Patel[3] and/or Jay Patel, while concealing his secret interest in same, the Tax Reimbursement Payment is still property of the Estate, as the Debtor did not receive any consideration in return from Shama Patel, Hasmita Patel, Rishi Patel and/or Jay Patel in exchange for any transfer of interest in Carnegie Hotel Manager, while retaining a continuing concealed interest in same.

92.     Debtor did not schedule his interest in Carnegie Hotel Manager or his entitlement to the Tax Reimbursement Payment on his schedules filed in the Chapter 7 Case.

### **218 Peachtree Transfer**

93.     Debtor was a 50% member of Diplomat NBD Hotels, LLC a Georgia limited liability company ("Diplomat NBD"), and a shareholder and Chief Executive Officer of J.R.A. Hotels, Inc., an Alabama corporation domesticated in Georgia ("JRA").

---

[3] Hasmita Patel is the Debtor's sister-in-law and Rishi Patel is the Debtor's nephew.

94.    On July 26, 2006, Diplomat NBD and JRA jointly purchased that certain real property located at 218 Peachtree Street and 25 International Boulevard, Atlanta, Georgia ("218 Peachtree Property") for $11,300,000.00, with Diplomat NBD holding a 69% interest in the 218 Peachtree Property, and JRA holding a 31% interest in the 218 Peachtree Property.

95.    Diplomat NBD and JRA borrowed $9,927,866 from Nexity Bank to finance the acquisition of the 218 Peachtree Property ("Nexity Loan").

96.    Debtor used the rents from the 218 Peachtree Property for his own personal purposes rather than to make payments on the Nexity Loan.

97.    As a result, Alostar Bank of Commerce, the successor to Nexity Bank, threatened to foreclose on the 218 Peachtree Property.

98.    On April 9, 2012, less than a year after the Patel Judgment, Diplomat NBD and JRA transferred their interest in the 218 Peachtree Property to 218 Capital Partners, LLC ("218 Capital Partners"), an entity owned by Jay Patel and Rishi Patel, for $7.8 million, less than half of the actual value of the 218 Peachtree Property ("218 Peachtree Property Transfer").

99.    218 Capital Partners received a loan from LoanCore Capital, LLC in the amount of $11.5 million to acquire the 218 Peachtree Property ("LoanCore Loan"). Shama, Jay, Hasmita and Rishi Patel guaranteed the LoanCore Loan, using funds that the Debtor had fraudulently transferred to them.

100.    Diplomat NBD and JRA did not receive adequate consideration in exchange for their transfer of the 218 Peachtree Property to 218 Capital Partners.

101.    While 218 Capital Partners was nominally held in the name of Jay and Rishi Patel, in actuality it was controlled by the Debtor.

102.    On January 11, 2016, 218 Capital Partners sold the 218 Peachtree Property to 218 Peachtree, LLC for $20,050,000.00, and received a total of $9,087,993.00 in proceeds from the sale of the 218 Peachtree Property ("218 Peachtree Proceeds").

103.    Debtor has retained control over the 218 Peachtree Proceeds, even while they were transferred to his family members and their related companies.

### Advanced Risk Concepts

104.    On September 1, 2004, Advanced Risk Concepts, LLC, a Florida limited liability company that provided administration, marketing and underwriting for, *inter alia*, various insurance policies held by American Safety Indemnity Company, was formed ("ARC").

105.    Debtor is a member of ARC.

106.    On information and belief, Debtor is entitled to a distribution from ARC.

107.    Debtor has not disclosed his interest in ARC on his bankruptcy schedules.

## JMS Family, LP

108.    On May 7, 2003, Diplomat Development purchased that certain real property located at 6900 Midlothian Turnpike, Richmond, Virginia, 23225 from LQ Investments, II ("Midlothian Property").

109.    On March 15, 2013, Diplomat Development transferred the Midlothian Property to SHR Holdings, LLC, an entity organized by Rishi Patel, the Debtor's nephew. On information and belief, SHR Holdings, LLC is controlled by the Debtor.

110.    On information and belief, SHR Holdings, LLC did not provide any consideration to Diplomat Development in exchange for the transfer of the Midlothian Property to it.

111.    On September 24, 2015, SHR Holdings, LLC transferred its interest in the Midlothian Property to JMS Family, LP, ("JMS") a limited partnership created by the Debtor's wife, Shama Patel on February 9, 2015.

112.    In addition, on information and belief, the Debtor has transferred his interest in S&R of Greeneville, I, LLC, a Tennessee company that runs a hotel, and certain property located at 3130 E. Andrew Johnson Hwy, Greeneville, TN 37745 to JMS, without receiving any consideration in return.

113.    On information and belief, the Debtor has transferred his interest in AP Hospitality, LLC, an entity which owns real property in New Jersey, to JMS, without receiving any consideration in return.

114.    On information and belief, Debtor retains control of, and a secret interest in, JMS, as well as its interests in the Midlothian Property and S&R of Greeneville, I, LLC.

115.    Debtor merely uses JMS to hide and to conceal his assets from his creditors, and the above-referenced transfers of assets to JMS were a fraudulent attempt to transfer his assets beyond the reach of his creditors.

## **Other Asset Transfers**

116.    The Debtor has transferred numerous additional assets to his family members and others at a time when he was insolvent.

117.    The Debtor has admitted that in 2008, after executing the RM Hotels Note and the Debtor Guaranty, he "gifted" at least $25,000.00 to Jay Patel, Mayur Patel and Sonial Patel [Doc. No. 87 in Debtor's Bankruptcy Case]("$25,000.00 Cash Transfer").

118.    In addition, in 2010, Debtor "gifted" at least $374,000.00 to Jay Patel in stock in H Financial of Florida [Doc. No. 87]("H Financial Transfer").

119.   On information and belief, the Debtor did not receive any consideration in return for the $25,000.00 Cash Transfer and the H Financial Transfer.

## Company Transfers

120.   Debtor has also asserted that he transferred his interests in numerous corporations and limited liability companies to his wife, Shama Patel, and to his sister-in-law, Hasmita Patel, and to other persons after he executed the RM Hotels Note and Debtor Guaranty in this case.

121.   Debtor has asserted that he transferred away his interests in at least the following corporations and limited liability companies to Shama Patel and Hasmita Patel after executing the RM Hotels Note and Debtor Guaranty:

JRA Hotels, Inc.

Northlake Hotels, Inc.

Diplomat CT Hotels, Inc.

Diplomat 1419 VA Hotels, LLC

Diplomat NBD Hotels, LLC

Diplomat MIB Hotels, LLC

Diplomat Development Company, LLC

Birmingham Assets, Inc.

Diplomat Hospitality II, LLC

27

Diplomat Hospitality III, LLC

Diplomat Hospitality IV, LLC

Diplomat Hospitality V, LLC

Carnegie Hotels, LLC[4]

Diplomat SLP Properties, LLC

RM Hotels, Inc.

Diplomat Hotel Corporation

Diplomat PR Hotels, LLC

Birmingham Asset Management, Inc.

Richardson Hotels, LLC

Budgetel Lodging, LLC

Diplomat SLP Restaurants, LLC

Budgetel Licensing Corporation (collectively, the "Transferred Entities Interests").

122.    Debtor did not receive any consideration from Shama Patel or Hasmita Patel in return for his alleged transfer of the Transferred Entities Interests to them.

123.    Debtor retains a continuing concealed interest in either the Transferred Entities Interests, or the proceeds of same.

---

[4] Nothing herein is an admission that Debtor did in fact make such transfers.

### Alabama Transfer

124.    Debtor transferred his interest in certain real property located in Pell City, Alabama, Parcel Number 22-08-34-0-001-016.001, ("Alabama Property") in or around October 2015 to Hasmita Patel, his sister-in-law, without receiving any consideration in return ("Alabama Transfer").

125.    Debtor's transfer of his interest in the Alabama Property to Hasmita Patel was a fraudulent attempt to transfer the Alabama Property beyond the reach of his creditors. (collectively, the $25,000.00 Cash Transfer, H Financial Transfer, Transferred Entities Interests, RM Hotels Transfer, Jay Patel Transfer, Diplomat Hospitality Transfer, Diplomat Construction Transfer, Diplomat PB Transfer, Diplomat SLP Transfer, Diplomat Development Transfers, Carnegie Transfers, 218 Peachtree Transfers, Loan Proceeds Transfers, JMS Transfers, Alabama Transfer, and Grady Transfers are referred to as the "Transfers").

126.    Debtor treated RM Hotels, Diplomat Hospitality, Diplomat Construction, Diplomat PB, Diplomat SLP, Diplomat Development, Carnegie Hotels, JMS, 218 Capital, Diplomat NBD, JRA and Carnegie Hotel Manager (the "Patel Alter Ego Entities") as one and the same as Debtor and used such entities for his own personal benefit and to hide and conceal his assets from his creditors.

## **Failure to Maintain Records**

127.    Debtor claims that he does not have any records regarding the disposition of the above-referenced assets, or any financial records at all regarding his finances, companies and their various transactions.

128.    Debtor claimed at his 341 Meeting of Creditors that he had never written a check before, and instead relied on others to write checks for him.

## **Facts Common to All Transfers**

122.    At no time prior to the bankruptcy filing did Debtor communicate to Lender that he had made the transfers described in this complaint.  These transfers resulted in material changes to Debtor's financial condition, yet he did not disclose them.

123.    Debtor engaged in a fraudulent transfer scheme at a time when he was obligated to pay on the RM Hotels Note and, through the use of false financial statements, and false pretenses, at a time when he was negotiating for forbearance on the RM Hotels Note, to hinder, delay and defraud his creditors.

124.    Debtor had fraudulent intent when making the fraudulent transfers such that he intended to impair or impede his creditors' ability to collect on their debt.

125.    Debtor's fraudulent scheme constitutes actual fraud.

126.    Said transfers rendered Debtor insolvent and unable to pay his debts.

127.   On the dates of the transfers, Lender was a creditor of Debtor and Debtor was indebted to Lender.

128.   At no time prior to the bankruptcy filing did Debtor communicate to Lender that he had made the Transfers described in this complaint. These transfers resulted in material changes to Debtor's financial condition, yet he did not disclose them.

129.   Prior to said transfers, Debtor held interests and title to said property.

130.   At the time Debtor was transferring assets out of his name, he knew that he did not intend to repay Lender and/or did not have the means to repay Lender for the debts for which he was currently obligated and/or sought to be obligated.

131.   The transferees did not take said transfers in exchange for reasonably equivalent value, and said transfers were not in the ordinary course of business.

132.   At all relevant times, Debtor owed Lender in excess of three million dollars.

133.   And, on or before February 19, 2010, Debtor was in default on his debts to Lender, and had been notified thereof.

134.   The transfers constituted all, or substantially all, of Debtor's assets.

135.   Debtor's transferees are insiders or close family members related by blood or marriage or entities controlled and owned by the Debtor and/or close

family members and knew or had reasonable cause to believe that Debtor was insolvent at the time of said transfers, and that he would be rendered insolvent by the transfers.

136.   Debtor has retained possession and control of the Transferred Entities and the assets transferred by the Transfers as well as concealed a secreted interest therein.

137.   By the aforementioned misconduct, Debtor and his transferees conspired to defraud creditors.   By the same misconduct, Debtor and his transferees received the transfers in bad faith.

138.   Debtor has, without justification, failed to keep and preserve documents from which his financial condition and business transactions might be ascertained.

139.   Debtor has made numerous material misstatements on his Schedules.

## **Debtor Is Not Entitled to a Discharge or to Discharge the Debt Owed to Lender**

140.   It is axiomatic that bankruptcy is for the honest but unfortunate debtor. As has been shown above, the Debtor is neither honest nor unfortunate.   On the contrary, Debtor is attempting to use the Bankruptcy Court to achieve dishonest and fraudulent goals.

141.   Debtor owes Lender on the Debtor Judgment the principal amount of $3,000,000.00, plus post-judgment interest in the amount of $1,025,342.46 through

January 3, 2017, plus interest accruing thereafter at a "rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent" pursuant to O.C.G.A. § 7-4-12. Pursuant to the RC Note, Defendant Debtor is indebted to RLBB for principal in the amount of $200,300, plus accrued interest through August 15, 2016, in the amount of $41,896.08, plus interest accruing thereafter in the amount of $27.81 per diem. This is a liquidated amount and should be determined non-dischargeable. Alternatively, this Court should deny Debtor's discharge.

<u>CAUSES OF ACTION AND RELIEF REQUESTED</u>

<u>COUNT I:</u>
<u>ACTION TO DENY DEBTOR'S DISCHARGE UNDER § 727(a)(2)(A)
AND (B) REMOVING OR CONCEALING PROPERTY WHICH
OTHERWISE WOULD HAVE BEEN AVAILABLE TO PAY DEBTS</u>

142. Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 141 above as if the same were fully set forth herein.

143. Within one year before the petition was filed in this case, Debtor, with intent to hinder, delay or defraud a creditor removed, destroyed or concealed or permitted the transfer, removal, destruction or concealment of hisproperty, property which otherwise would have been available to pay Debtor's indebtedness to RLBB. 11 U.S.C. § 727(a)(2)(A).

144.   The Carnegie Transfers, 218 Peachtree Transfers, Loan Proceeds Transfers, $25,000.00 Cash Transfer, H Florida Transfer, Transferred Entity Interests, JMS Transfers, Alabama Transfer and the other above-described transfers operated to conceal Debtor's interest in various properties and assets, and Debtor's concealment of his interests in property and assets continued into the one-year period preceding the filing of his bankruptcy case.

145.   After the petition was filed in this case, Debtor, with intent to hinder, delay or defraud a creditor removed, destroyed or concealed or permitted the transfer, removal, destruction or concealment of his property and/or property of the Debtor's estate.  11 U.S.C. § 727(a)(2)(B).

146.   Debtor did not receive any consideration or received less than reasonably equivalent value for the above-described transfers.

147.   Debtor concealed and secretly retained a beneficial interest in the transferred properties, assets and proceeds and same continued into the one-year period before the Petition Date and has continued after the Petition Date.

148.   Accordingly, Debtor is not entitled to a discharge because he, with intent to hinder, delay or defraud a creditor removed, destroyed or concealed or permitted the transfer, removal, destruction or concealment of his property and/or property of the Debtor's estate, property which otherwise would have been available to pay the RL BB Indebtedness, both in the year before the Petition Date

and during the bankruptcy, in violation of 11 U.S.C. § 727(a)(2)(A) and (B), so as to make his Guaranty of the RM Note worthless.

<div align="center">

COUNT II
ACTION TO DENY DEBTOR'S DISCHARGE UNDER § 727(a)(3)
FOR FAILURE TO KEEP OR PRESERVE RECORDS

</div>

149.    RLBB re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 148 above as if the same were fully set forth herein.

150.    As was shown above, Debtor failed to keep or preserve books and records from which his financial condition might be ascertained in violation of 11 U.S.C. § 727(a)(3).

151.    Debtor failed to provide complete documentation of the proceeds received from, *inter alia*, the Carnegie, 218 Peachtree and Loan Proceeds Transfers or as to the Transfers.

152.    Debtor admitted at his 341 Meeting that he did not have any records relating to any of his businesses.

153.    Debtor intentionally concealed these funds to avoid payment of the RLBB Indebtedness.

154.    Such failure to keep or preserve books and records was not justified under the circumstances of this case.

155.    Accordingly, Debtor is not entitled to a discharge because, without justification, he failed to keep or preserve books and records from which his financial condition might be ascertained in violation of 11 U.S.C. § 727(a)(3).

<div align="center">

COUNT III
ACTION TO DENY DEBTOR'S DISCHARGE
FOR FALSE OATHS UNDER § 727(a)(4)

</div>

156.    RLBB re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 155 above as if the same were fully set forth herein.

157.    Debtor knowingly and fraudulently made false oaths in connection with his bankruptcy case in violation of 11 U.S.C. § 727(a)(4).

158.    In his Bankruptcy Schedules, Debtor fails to disclose his numerous fraudulent transfers of assets and retention of a concealed interest in same and his interest in the numerous entities and properties and the proceeds of same.

159.    Debtor's false oaths and accounts were and are intentional and material.

160.    Debtor made these false statements under penalty of perjury.

161.    Debtor made these numerous false oaths and accounts with reckless disregard for the truth concerning material matters in this bankruptcy case and to subvert this Court and bankruptcy law.

162.   Debtor knew or should have known that these statements made in his Petition were false.

163.   Accordingly, Debtor is not entitled to a discharge because he made false oaths in connection with his bankruptcy case in violation of 11 U.S.C. § 727(a)(4).

<div align="center">

COUNT IV
ACTION TO DENY DEBTOR'S DISCHARGE UNDER § 727(a)(5)
FOR FAILURE TO EXPLAIN LOSS OF ASSETS TO PAY DEBTS

</div>

164.   RLBB re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 163 above as if the same were fully set forth herein.

165.   As was shown above, Debtor failed to explain satisfactorily a loss of assets to meet liabilities in violation of 11 U.S.C. § 727(a)(5).

166.   Accordingly, Debtor is not entitled to a discharge because he failed to explain satisfactorily a loss of assets to meet liabilities in violation of 11 U.S.C. § 727(a)(5).

<div align="center">

COUNT V
COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT
PURSUANT TO 11 U.S.C. § 523(a)(2)(A) or (B)

</div>

167.   RLBB re-alleges and incorporates by reference the facts and allegations contained in Paragraphs 1 through 166 above as if the same were fully set forth herein.

168.    Debtor obtained money, renewal, and extensions of credit by false pretenses, by false representations and/or by actual fraud within the definition of non-dischargeability of debts contained in 11 U.S.C. § 523(a)(2).

169.    Defendant perpetrated an actual fraud upon Plaintiff by engaging in a fraudulent transfer scheme whereby he transferred away the above-referenced assets so as to render those assets beyond the reach of Plaintiff's efforts to satisfy Debtor's indebtedness to it.

170.    Defendant did so with fraudulent intent to hinder, delay or defraud his creditors, including Plaintiff.

171.    Debtor concealed and did not disclose the above-described transfers.

172.    Around the time and after maturity of the RM Hotels Note, Debtor engaged in a pattern, practice, and scheme of transferring his assets away from himself so that his personal Guaranty of the RM Hotels Note would be worthless.

173.    Such actions by Debtor made his Guaranty worthless and constitute actual fraud in that, among other things, Debtor hid and concealed changes in his financial condition and the transfer of his assets by failing to disclose them on his PFS or October PFS, which he provided to Lender, in which he stated that he still owned various "companies" with a current value of $2,137,894 and is owed notes receivable from "various companies I have Ownership in" of $3,125,584.

174.    Debtor obtained money, renewal, and extensions of credit by actual fraud by concealing the above transfers and information.

175.    Debtor, with intent to deceive Lender, made materially false statements in writing to Plaintiff, to whom Debtor is liable, respecting his financial condition, including, but not limited to, Debtor's statement in his October PFS that he still owned various "companies" with a value of $2,137,894 and is owed notes receivable from "various companies I have Ownership in" of $3,125,584.

176.    Debtor failed to provide updated personal financial statements and tax returns annually to Plaintiff and RL BB Financial after October 31, 2010, which would have informed Plaintiff and RL BB Financial of the numerous fraudulent transfers outlined above.

177.    Lender reasonably or justifiably relied on Debtor's materially false statements and forbore from collecting on the Indebtedness, extended, renewed and/or refinanced credit to Debtor as a result.

178.    In addition, the Debtor fraudulently conveyed his assets with the intent to defraud his creditors, pursuant to 11 U.S.C. § 523(a)(2)(A). Husky Intern. Electronics, Inc. v. Ritz, 136 S.Ct. 1581, 1589 (U.S., 2016).

179.    For this reason, the Defendant's debt to Plaintiff should be excepted from debtor's discharge under 11 U.S.C. § 523(a)(2)(A) and/or (B).

180.   Plaintiff has sustained loss and damage as a result of Defendant's fraud, misrepresentations and/or omissions on the Debtor Judgment in the principal amount of $3,000,000.00, plus post-judgment interest in the amount of $1,025,342.46 through January 3, 2017, plus interest accruing thereafter at a "rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent" pursuant to O.C.G.A. § 7-4-12, and on the Debtor Note, principal in the amount of $200,300, plus accrued interest through August 15, 2016, in the amount of $41,896.08, plus interest accruing thereafter in the amount of $27.81 per diem, as well as attorneys' fees and other charges or such other amounts to be shown at trial.

181.   RL BB is entitled to recover punitive and exemplary damages because Defendant's actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences.

182.   Defendant is hereby notified by RL BB that RL BB intends to enforce the provisions of the Debtor Note relative to the payment of attorneys' fees. Pursuant to the provisions of the Loan Documents and O.C.G.A. § 13-1-11, Defendant has ten (10) days from the date of service of this Complaint upon him within which to pay the sums due under the Debtor Note without also being liable

for attorneys' fees.  RL BB is entitled to judgment against Defendant for statutory

attorneys' fees pursuant to the Loan Documents and O.C.G.A. § 13-1-11.

183.  Defendant has acted in bad faith, been stubbornly litigious, or has

caused RL BB unnecessary trouble and expense.  Accordingly, RLBB is entitled to

recover against Defendant all costs and expenses of litigation, including reasonable

attorneys' fees pursuant to O.C.G.A. § 13-6-11.

<div align="center">

COUNT VI
ACTION TO DENY DISCHARGEABILITY OF PLAINTIFF'S DEBT
PURSUANT TO 11 U.S.C. § 523(a)(6)

</div>

184. Plaintiff re-alleges and incorporates by reference the allegations

contained in Paragraphs 1 through 183 above as if the same were fully set forth

herein.

185.  Debtor engaged in fraudulent transfers, fraudulent conveyances and

false representations which inflicted willful and malicious injury on Plaintiff, and,

as a result the debt owed to Plaintiff, plus interest, is non-dischargeable under §

523(a)(6) of the Bankruptcy Code.

186.  Plaintiff has sustained loss and damage as a result of Defendant's

fraudulent scheme in the principal amount of $3,000,000.00, plus post-judgment

interest in the amount of $1,025,342.46 through January 3, 2017, plus interest

accruing thereafter at a "rate equal to the prime rate as published by the Board of

Governors of the Federal Reserve System, as published in statistical release H. 15

or any publication that may supersede it, on the day the judgment is entered plus 3 percent" pursuant to O.C.G.A. § 7-4-12, and on the Debtor Note, principal in the amount of $200,300, plus accrued interest through August 15, 2016, in the amount of $41,896.08, plus interest accruing thereafter in the amount of $27.81 per diem, as well as attorneys' fees and other charges or such other amounts to be shown at trial.

187. Plaintiff is entitled to recover punitive and exemplary damages because Defendant's actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to the consequences.

188. Defendant is hereby notified by Plaintiff that Plaintiff intends to enforce the provisions of the Note relative to the payment of attorneys' fees. Pursuant to the provisions of the Loan Documents and O.C.G.A. § 13-1-11, Defendant has ten (10) days from the date of service of this Complaint upon him within which to pay the sums due under the Note without also being liable for attorneys' fees. Plaintiff is entitled to judgment against Defendant for statutory attorneys' fees pursuant to the Loan Documents and O.C.G.A. § 13-1-11.

189. Defendant has acted in bad faith, been stubbornly litigious, or has caused Plaintiff unnecessary trouble and expense. Accordingly, Plaintiff is entitled

to recover against Defendant all costs and expenses of litigation, including reasonable attorneys' fees pursuant to O.C.G.A. § 13-6-11.

<div align="center">

COUNT VII
ACTION TO DENY DEBTOR'S DISCHARGE UNDER § 727(a)(12)
FOR CONVICTION OF A FELONY

</div>

190.   RLBB re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 189 above, as if the same were fully set forth herein.

191.   On July 13, 2015, Debtor pleaded guilty to two counts of wire fraud, felonies carrying a maximum penalty of up to twenty years imprisonment.  United States v. Patel, No. 14-cr-00082, Dkt. No. 32 (M.D. Tenn. July 13, 2015)("Debtor Criminal Case").

192.   Debtor remains on probation as a result of his guilty plea in the Debtor Criminal Case.

193.   The Debtor elected to claim state and federal nonbankruptcy exemptions on his Petition [Doc. No. 1, p. 24].

194.   The Debtor's conviction of two counts of wire fraud, under the circumstances, demonstrates that the filing of his bankruptcy petition was an abuse under the provisions of 11 U.S.C. § 522, including, but not limited to, 11 U.S.C. § 522(q)(1)(A).

195.  11 U.S.C. § 522(q) is applicable to the Debtor, and Debtor has been found guilty of a felony of the kind described in 11 U.S.C. § 522(q)(1)(A), which is still pending due to Debtor's probationary status.

196.  Accordingly, Debtor is not entitled to a discharge pursuant to § 727(a)(12) because 11 U.S.C. § 522(q) is applicable to the Debtor, and Debtor has been found guilty of a felony of the kind described in 11 U.S.C. § 522(q)(1)(A), which is still pending due to Debtor's probationary status.

## COUNT VIII
## RESERVATION OF RIGHTS

197.  RLBB re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 196 above, as if the same were fully set forth herein.

198.  RLBB reserves the right to pursue any and all claims against Debtor and her coconspirators and transferees as allowed by state law and bankruptcy law. RLBB further reserves its right to amend this Complaint to assert other bases for objection to discharge of Debtor or for determination of non-dischargeability of debt.

WHEREFORE, RLBB prays that this Court enter:

1.      As to Count I, enter judgment determining that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(2)(A) & (B);

44

2.      As to Count II, enter judgment determining that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(3);

3.      As to Count III; enter judgment determining that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(4);

4.      As to Count IV, enter judgment determining that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(5);

5.      As to Count V and VI, enter a non-dischargeable judgment in favor of Plaintiff and against Debtor on the Debtor Judgment in the principal amount of $3,000,000.00, plus post-judgment interest in the amount of $1,025,342.46 through January 3, 2017, plus interest accruing thereafter at a "rate equal to the prime rate as published by the Board of Governors of the Federal Reserve System, as published in statistical release H. 15 or any publication that may supersede it, on the day the judgment is entered plus 3 percent" pursuant to O.C.G.A. § 7-4-12 and on the Debtor Note for principal in the amount of $200,300, plus accrued interest through August 15, 2016, in the amount of $41,896.08, plus interest accruing thereafter in the amount of $27.81 per diem.

6.      As to Count VII, enter judgment determining that the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(12).

7.    Enter judgment against the Debtor for punitive and exemplary damages, as well as attorney's fees and other charges or such other amounts to be shown at trial;

8.    Enter judgment awarding Plaintiff all of its expenses of litigation, including reasonable attorneys' fees; and

9.    Grant such other and further relief as this Court deems just and proper.

This 17th day of April, 2017.

                                    ROGERS LAW OFFICES

                                    /s/ Beth E. Rogers
                                    Beth E. Rogers, Georgia Bar No. 612092
                                    James F. F. Carroll, Ga Bar No. 940350
                                    The Equitable Building
                                    100 Peachtree Street, Suite 1950
                                    Atlanta, Georgia 30303
                                    770-685-6320 phone
                                    678-990-9959 fax
                                    brogers@berlawoffice.com
                                    Attorneys for RL BB

Loan Number: <u>954203981400001</u>
Borrower's Name: <u>RM HOTELS INC</u>
Buyer Reference Number: <u>7000058805</u>

<div align="center">

## ALLONGE
</div>

     **THIS ALLONGE** is made to that certain Promissory Note dated 12/10/2007, in the original principal amount of $10,000,000.00 from RM HOTELS, INC. to Branch Banking and Trust Company, a North Carolina banking corporation, as the same may have been assigned, amended, supplemented, restated or modified.

     Pay to the order of RL BB FINANCIAL, LLC, a Florida limited liability company ("**Assignee**"), without recourse or representation or warranty, express, implied or by operation of law, of any kind and nature whatsoever, except as expressly provided in the Agreement of Sale and Purchase of Loans, dated September 30, 2010 (the "**Sale Agreement**"), between the undersigned and Lennar Pacific Properties, Inc., a Delaware corporation, including, without limitation, the representations and warranties pursuant to Section 4.2 of the Sale Agreement and the indemnification obligations and other covenants, rights and remedies therein.

                                          **BRANCH BANKING AND TRUST COMPANY**, a North Carolina banking corporation

                                        By: _____

                                        Name: John E. Beasley
                                        Its:    Senior Vice President

Exhibit A

Loan Number:  954203981400001
Borrower's Name: RM HOTELS, INC.
Buyer Reference Number: 7000058805

## ASSIGNMENT OF LOAN DOCUMENTS

BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation ("**Assignor**"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns, transfers, sets over and conveys to RL BB FINANCIAL, LLC, a Florida limited liability company ("**Assignee**"), all of Assignor's right, title and interest in and to the loan documents described on **Schedule A** attached hereto, and all other documents executed in connection with the loan evidenced by such documents, as the same may have been assigned, amended, supplemented, restated or modified.

**TO HAVE AND TO HOLD** the same unto Assignee and its successors and assigns forever.

Except as expressly provided in the Agreement of Sale and Purchase of Loans, dated September 30, 2010 (the "**Sale Agreement**"), between Assignor and LENNAR PACIFIC PROPERTIES, INC., a Delaware corporation, including, without limitation, the representations and warranties pursuant to Section 4.2 of the Sale Agreement and the indemnification obligations and other covenants, rights and remedies therein, this Assignment is made without recourse or representation or warranty, express, implied or by operation of law, of any kind and nature whatsoever.

[Signature on following page]

1

Dated this _____ day of September, 2010.

<div align="right">

**BRANCH BANKING AND TRUST
COMPANY**, a North Carolina banking corporation

By: _____
Name:  John E. Beasley
Its: Senior Vice President

</div>

STATE OF OKLAHOMA            )
                            ) ss:
COUNTY OF OKLAHOMA          )

   Before me, Lorie Pierce and for said County and State, on this 30 day of
September, 2010, personally appeared John E. Beasley, to me known to be the identical person
who subscribed the name of the Assignor to the foregoing instrument as its Senior Vice President
and acknowledged before me that he executed the same as his free and voluntary act and deed,
and as the free and voluntary act and deed of BRANCH BANKING AND TRUST COMPANY,
for the uses and purposes therein set forth.

<div align="right">

_____
Notary Public

</div>

[SEAL]

*(Notary seal: LORIE PIERCE, NOTARY, #06002575, EXP. 03/08/14, PUBLIC, STATE OF OKLAHOMA)*

MIAMI 2296396.2 7883132791

## **SCHEDULE A**

1.      Loan Agreement, dated December 10, 2007, executed by RM HOTELS, INC., an Alabama corporation ("**Borrower**") and BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation ("**Lender**").

2.      Unconditional Guaranty dated December 10, 2007, executed by Rajesh C. Patel ("**Patel**") in favor of Lender.

3.      Guaranty Agreement dated February 1, 2009, executed by Patel in favor of Lender.

4.      Indemnity Agreement Regarding Hazardous Materials and Handicapped Access Laws, dated December 10, 2007, executed by Borrower and Patel in favor of Lender.

MIAMI 2296396.2 7883132791

*(Space above is for Recorder's use)*

Prepared By:
First Financial Network, Inc.
14000 Quail Springs Parkway, Suite 200
Oklahoma City, OK  73134

When Recorded Mail To:
Jon Chassen, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Suite 2500
Miami, FL  33131-5340

Loan Number:  954203981400001
Borrower's Name: RM HOTELS, INC.
Buyer Reference Number: 7000058805

STATE OF OKLAHOMA    )

OKLAHOMA COUNTY    )

## ASSIGNMENT OF SECURITY INSTRUMENT

**BRANCH BANKING AND TRUST COMPANY**, a North Carolina banking corporation ("**Grantor**"), whose address is  200  West  Second  Street,  Winston-Salem,  NC 27101-4019, Attention: Jeffrey L. McKay, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns, transfers, sets over and conveys to RL BB FINANCIAL, LLC, a Florida limited liability company ("**Grantee**"), whose mailing address is 700 NW 107th Avenue, Suite 200, Miami, Florida 33172, all of Grantor's right, title and interest in and to the Deed to Secure Debt and Security Agreement made by RM HOTELS, INC., an Alabama corporation in favor of Grantor dated December 10, 2007 and recorded on December 20, 2007, in Deed Book 46124, Page 644 of the official records of Fulton County, Georgia, as the same may have been assigned, amended, supplemented, restated or modified, together with the real property therein described, and also the indebtedness described therein and

1
*Georgia Form*

secured thereby, and all the powers, options, privileges and immunities therein contained, the notes evidencing said indebtedness having this day been transferred and assigned to the Grantee together with all of Grantor's right, title and interest in and to the Deed to Secure Debt and Security Agreement, the property therein described and the indebtedness therein secured.

**TO HAVE AND TO HOLD** the same unto Grantee and its successors and assigns forever.

Except as expressly provided in the Agreement of Sale and Purchase of Loans, dated September 30, 2010 (the "**Sale Agreement**"), between Grantor and LENNAR PACIFIC PROPERTIES, INC., a Delaware corporation, including, without limitation, the representations and warranties pursuant to Section 4.2 of the Sale Agreement and the indemnification obligations and other covenants, rights and remedies therein, this Assignment is made without recourse or representation or warranty, express, implied or by operation of law, of any kind and nature whatsoever.

<div style="margin-left:45%;">

**BRANCH BANKING AND TRUST COMPANY**, a North Carolina banking corporation

By: _____

Name: John E. Beasley

Its:    Senior Vice President

</div>

Signed, sealed and delivered
This  30  day of September, 2010
in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires:  03/08/14 _____

(Affix Seal)

<div style="text-align:center;">

LORIE PIERCE
NOTARY
# 06002575
EXP. 03/08/14
STATE PUBLIC OF OKLAHOMA

</div>

<div style="text-align:center;">

2
*Georgia Form*

</div>

MIAMI 2296556.2 7883132791

*(Space above is for Recorder's use)*

Prepared By:
First Financial Network, Inc.
14000 Quail Springs Parkway, Suite 200
Oklahoma City, OK 73134

When Recorded Mail To:
Jon Chassen, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-5340

Loan Number: 954203981400001
Borrower's Name: RM HOTELS, INC.
Buyer Reference Number: 7000058805

STATE OF OKLAHOMA    )

OKLAHOMA COUNTY    )

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

    **BRANCH BANKING AND TRUST COMPANY**, a North Carolina banking corporation ("**Grantor**"), whose address is 200 West Second Street, Winston-Salem, NC 27101-4019, Attention: Jeffrey L. McKay, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby assigns, transfers, sets over and conveys to RL BB FINANCIAL, LLC, a Florida limited liability company ("**Grantee**"), whose mailing address is 700 NW 107th Avenue, Suite 200, Miami, Florida 33172, all of Grantor's right, title and interest in and to the Assignment of Rents and Leases made by RM HOTELS, INC., an Alabama corporation in favor of Grantor dated December 10, 2007 and recorded on December 20, 2007, in Deed Book 46124, Page 673 of the records of Fulton County, Georgia, as the same

1

*Georgia Form*

may have been assigned, amended, supplemented, restated or modified, together with the real property therein described, and also the indebtedness described therein and secured thereby, and all the powers, options, privileges and immunities therein contained, the notes evidencing said indebtedness having this day been transferred and assigned to the Grantee together with all of Grantor's right, title and interest in and to the Assignment of Rents and Leases, the property therein described and the indebtedness therein secured.

**TO HAVE AND TO HOLD** the same unto Grantee and its successors and assigns forever.

Except as expressly provided in the Agreement of Sale and Purchase of Loans, dated September 30, 2010 (the "**Sale Agreement**"), between Grantor and LENNAR PACIFIC PROPERTIES, INC., a Delaware corporation, including, including, without limitation, the representations and warranties pursuant to Section 4.2 of the Sale Agreement and the indemnification obligations and other covenants, rights and remedies therein, this Assignment is made without recourse or representation or warranty, express, implied or by operation of law, of any kind and nature whatsoever.

BRANCH     BANKING     AND     TRUST
COMPANY, a North Carolina banking corporation

By: _____
Name: John E. Beasley
Its: Senior Vice President

Signed, sealed and delivered
this 30 day of September, 2010
in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires: 03/08/14 _____

(Affix Seal)

2

*Georgia Form*

Quantum Loan Number:  7000058805
Borrower Name:  RM Hotels Inc

## ALLONGE

ALLONGE to that certain Secured Promissory Note dated as of December 10, 2007 in the original principal amount of $10,000,000.00, executed by RM HOTELS, INC., an Alabama corporation, payable to the order of BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation.

Pay to the order of RL BB-GA RMH, LLC, a Georgia limited liability company.

Dated as of August 29, 2016.

**RL BB FINANCIAL, LLC,**
**a Florida limited liability company**

By: Rialto Capital Advisors, LLC,
    a Delaware limited liability company,
    its attorney-in-fact

By: _____
Name:  Lori Buckler
Title:    Authorized Signatory

Quantum Loan Number:  7000058805
Borrower Name:  RM Hotels Inc

## GENERAL ASSIGNMENT

As of the 29th day of August, 2016, **RL BB FINANCIAL, LLC, a Florida limited liability company,** having an address at 790 NW 107th Avenue, Suite 400, Miami, FL 33172, ("Assignor") hereby endorses, assigns, sells, transfers and delivers to **RL BB-GA RMH, LLC, a Georgia limited liability company**, having an address at 790 NW 107th Avenue, Suite 400, Miami, FL 33172 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to the Loan (as defined below) and all other agreements, certificates and documents entered into or delivered in connection with the Loan (as the same have heretofore been amended, modified, restated, supplemented, renewed or extended).

Additionally, Assignor hereby assigns all other documents and instruments relating to the Loan, including, without limitation, all certificates and receipts executed by Borrower, all appraisal reports, all environmental, engineering and other reports relating to the operation or condition of the property securing said Loan, and all casualty insurance policies, liability insurance policies, title insurance policies and opinions of counsel (as the same have heretofore been amended, modified, restated, supplemented, renewed or extended).

This Assignment is given in connection with, and in consideration of, Assignee's purchase of a loan ("Loan") made by BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation to RM HOTELS, INC., an Alabama corporation ("Borrower"), dated as of December 2007, in the original principal amount of $10,000,000.00 as more specifically described in the agreements, certificates and documents entered into in connection with the Loan, including but not limited to those documents listed on attached Schedule A.

Assignor agrees to execute and deliver to Assignee such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Assignment.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

Assignor has caused this Assignment to be executed as of the date first above written.

**RL BB FINANCIAL, LLC,**
**a Florida limited liability company**

By:  Rialto Capital Advisors, LLC,
     a Delaware limited liability company,
     its attorney-in-fact

By: _____
Name:  Lori Buckler
Title:    Authorized Signatory

## SCHEDULE "A"

1.    Loan Agreement, dated December 10, 2007, executed by RM HOTELS, INC., an Alabama corporation ("**Borrower**") and BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation ("**Lender**").

2.    Unconditional Guaranty dated December 10, 2007, executed by Rajesh C. Patel ("**Patel**") in favor of Lender.

3.    Guaranty Agreement dated February 1, 2009, executed by Patel in favor of Lender.

4.    Indemnity Agreement Regarding Hazardous Materials and Handicapped Access Laws, dated December 10, 2007, executed by Borrower and Patel in favor of Lender.

# Exhibit A

Exhibit B

95420398;14 01

## SECURED PROMISSORY NOTE

$10,000,000.00            Atlanta, Georgia            December 10, 2007

FOR VALUE RECEIVED, the undersigned, RM HOTELS, INC., an Alabama corporation (hereinafter referred to as the "Borrower"), promises to pay to the order of BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation (hereinafter, together with any subsequent holder(s) hereof, being referred to collectively as the "Lender"), at the office of Lender at 950 East Paces Ferry Road, Suite 2575, Atlanta, Georgia 30326, or at such other place as Lender may designate to Borrower in writing from time to time, the principal sum of TEN MILLION AND NO/100THS DOLLARS ($10,000,000.00),together with interest thereon or on so much thereof as is from time to time outstanding and unpaid, at the rate hereinafter set forth, in lawful money of the United States of America which shall, at the time of payment, be legal tender for the payment of all debts and dues, public and private, such principal and interest to be paid in the following manner, to-wit:

From and after the date hereof and continuing thereafter until the Maturity Date (as such term is hereinafter defined), and except in the event of a Default (as such term is hereinafter defined), the amount of interest per annum which is payable hereunder shall be charged at a variable rate of interest which is equal to the then prevailing LIBOR Index (as such term is hereinafter defined) plus Two and Seventy-Five One-Hundredths percentage points (2.75%) (hereinafter referred to as the "LIBOR Rate").

The initial LIBOR Rate which is chargeable hereunder shall be fixed for the period commencing on the date of this Note and ending on December 31, 2007, at the LIBOR Rate existing on the first day of the month during which the term of this Note commences. Thereafter, commencing on January 1, 2008, and on the first day of each month during the term of this Note thereafter, the rate of interest chargeable hereunder shall be redetermined and adjusted to a rate equal to the LIBOR Rate applicable to the date of any such adjustment (each such date of adjustment being hereinafter referred to as an "Interest Rate Adjustment Date"). The rate of interest chargeable to Borrower hereunder shall remain fixed at the rate of interest so determined on any such Interest Rate Adjustment Date during each one-month period commencing on any such Interest Rate Adjustment Date and ending on the day immediately preceding the next succeeding Interest Rate Adjustment Date (each such period being hereinafter referred to as an "Interest Rate Adjustment Period").

The term "LIBOR Index" as used herein shall be deemed to mean and refer to the yield of the London Inter-Bank Offered Rate for U.S. Dollar denominated deposits (commonly known as "LIBOR") having a maturity of thirty (30) days, as existing as of approximately 11:00 a.m. (London time) on the first business day during any Interest Rate Adjustment Period. In the event that the LIBOR Index

Initials: _____

1472

ceases at any time to be available, Lender shall choose and select such new index as Lender determines in its sole reasonable discretion to be based upon comparable information, and thereafter, the interest rate adjustments required to be made on any Interest Rate Adjustment Date shall be made by substituting such new index for the LIBOR Index. Borrower understands that the LIBOR Index merely serves as a basis for calculating rates of interest and that the interest rate as computed hereunder based upon the LIBOR Index is not necessarily the lowest rate charged by Lender.

Said interest shall be computed hereunder with respect to each day during the term of this Note by multiplying the outstanding principal balance hereunder at the close of business on each such day by a daily interest factor, which shall be calculated by dividing the interest rate applicable at such time by 360. Interest so computed shall accrue for each and every day (365 days per year, and 366 days per leap year) on which any indebtedness remains outstanding hereunder, including the day on which funds are initially advanced and regardless of the time of day such advance is made, and including the day on which funds are repaid unless repayment is credited prior to the close of business. Payments made in federal funds that are immediately available in the place designated for payment and received by Lender prior to 2:00 P.M. local time at said place of payment shall be credited prior to the close of business. At the option of Lender, other payments received by Lender may not be credited until immediately available to Lender in federal funds in the place designated for payment prior to 2:00 P.M. local time at said place of payment on a day on which Lender is open for business.

During the period of this Note commencing on the first day of the first full month following the date of this Note, which date is hereby stipulated to be January 1, 2007 (hereinafter referred to as the "Loan Amortization Commencement Date"), and ending on the last day of the thirty-fifth (35th) full month following the date of this Note, which date is hereby stipulated to be November 30, 2010, payments of principal and interest hereunder shall be payable by Borrower monthly, in arrears, in a fixed amount computed based upon a twenty (20) year (240 full months) amortization of the principal balance of this Note outstanding, as adjusted and reamortized from time to time based upon the adjustment and redetermination of the interest rate as hereinabove provided for. In this regard, the amount of such monthly payments of principal and interest shall be reamortized and adjusted on the first day of each three (3) month period during the Loan Amortization Period commencing on the Loan Amortization Commencement Date (each such date of reamortization being hereinafter referred to as a "Reamortization Date"), by amortizing the then outstanding principal balance of the indebtedness evidenced by this Note on each such Reamortization Date over the Remaining Amortization Period (as such term is hereinafter defined). The term "Remaining Amortization Period" shall be deemed to mean and refer to the original 240 month amortization period less the number of full months which have elapsed on any such Reamortization Date since the Loan Amortization Commencement Date

AT:818371v1

2

Initials:_____

Notwithstanding the foregoing, Borrower hereby agrees that Lender shall have the right, at Lender's sole option, to adjust the amount of the monthly payment of principal and interest which is payable hereunder more frequently than quarterly if and to the extent Lender determines such accelerated payment adjustment to be necessary to avoid a negative amortization of the outstanding principal balance of the Loan.

The first such payment of principal and interest shall be due and payable on the first day of the second full month following the Loan Amortization Commencement Date, which date is hereby stipulated to be February 1, 2008, and such payments of principal and interest shall continue on the first (1st) day of each month during the Loan Amortization Period thereafter through and including November 1, 2010. On December 1, 2010 (herein referred to as the "Maturity Date"), the entire outstanding principal balance of the indebtedness evidenced by this Note, together with any and all accrued and unpaid interest thereon, shall be immediately due and payable by Borrower in full.

Each such monthly installment of principal and interest shall be applied first to the payment of accrued and unpaid interest and the remainder to principal; provided that, at Lender's sole option, any such payments may be applied first to the payment of any accrued and unpaid late charges prior to application of such amounts to interest and principal as hereinabove provided; and further provided, that in the event of any Default under the Loan Documents (as such terms are hereinafter defined), at Lender's sole option, any such payments may be applied to amounts due and unpaid under the Loan Documents in such order of priority as Lender determines to be appropriate. Prepayment of outstanding amounts of the principal balance of this Note shall not reduce or postpone any regular installments of principal and interest which are thereafter due, but shall instead be applied against the outstanding principal balance of this Note in the inverse order of its maturity.

Borrower hereby agrees to pay, immediately upon demand by Lender, a late charge equal to five percent (5%) of any payment due hereunder if such payment is not made on or before the tenth (10th) day following the due date applicable to such payment, whether or not such tenth (10th) day falls on a day other than a business day.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by Borrower or inadvertently received by Lender, then such excess sum shall be credited as payment of principal, unless Borrower shall notify Lender, in writing, that Borrower elects to have such excess sum returned to it forthwith. It is the express intent hereof that Borrower not pay and Lender not receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be legally paid by Borrower under applicable law.

Provided that no Default then exists under this Note or under any of the other Loan Documents, then all or any portion of the unpaid principal balance of this Note may be prepaid at

AT:818371v1

3

Initials:

any time. As conditions and prerequisites to such prepayment, however, Borrower shall: (i) provide Lender with not less than ten (10) days prior written notice specifying the date upon which the contemplated prepayment is to be made (hereinafter referred to as the "Prepayment Date") and identifying the amount which is to be so prepaid; (ii) all accrued and unpaid interest on the unpaid principal balance of the Note up to and including the Prepayment Date shall be paid by Borrower with such prepayment; and (iii) all other sums then due under this Note, the Security Deed (as such term is hereinafter defined) and the other Loan Documents shall be paid by Borrower with such prepayment.

It is hereby expressly agreed that should any default be made in the payment of principal or interest as stipulated herein, or should any default be made in the performance of any of the covenants or conditions contained in the Loan Documents (hereinafter referred to collectively as a "Default"), and should such Default continue beyond the applicable cure period, if any, then, in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder or under the Loan Documents, or any of them, together with all unpaid interest accrued thereon, shall, at the option of Lender and without notice to Borrower, become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. In the event of a Default by Borrower, interest shall accrue on the outstanding principal balance of this Note from the date of any such Default hereunder for which there has not been an acceleration of the indebtedness evidenced hereby, and continuing until the Default is cured, at the rate per annum that is five percent (5.0%) in excess of the rate that would have accrued hereunder had such Default not occurred. All such interest shall be paid at the time of and as a condition precedent to the curing of any such Default. Nothing contained hereinabove, however, shall be construed or interpreted to require Lender to allow the cure of any Default which has occurred and which extends beyond the expiration date of any applicable notice and right to cure period which may be provided for in the Security Deed.

Time is of the essence of this Note. In the event this Note, or any part thereof, is collected by or through an attorney at law, Borrower agrees to pay all costs of collection, including fifteen percent (15%) of the aggregate amount of principal and interest then due and owing hereunder, as attorneys' fees.

Presentment for payment, demand, protest, and notice of demand, protest and non-payment, and all other notices are hereby waived by Borrower. No failure to accelerate the debt evidenced hereby by reason of default hereunder, acceptance of a past due installment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of Georgia; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to, or in conflict with, the foregoing. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note, shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an

AT:818371v1                                          4                          Initials:_____

agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought.

To the fullest extent permitted by applicable law, Borrower hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations, any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now provided, or which may hereafter be provided, by the Constitution and laws of the United States of America and of any state thereof, both as to itself and in and to all its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note. Borrower hereby transfers, conveys and assigns to Lender, a sufficient amount of such homestead or exemption as may be set apart in bankruptcy, to pay this Note in full, with all costs of collection, and does hereby direct any trustee in bankruptcy having possession of such homestead or exemption to deliver to Lender a sufficient amount of property or money set apart as exempt to pay the indebtedness evidenced hereby, or any renewal thereof, and does hereby appoint Lender the attorney-in-fact for Borrower to claim any and all homestead exemptions allowed by law.

Borrower hereby waives any right Borrower may have under any applicable law to a trial by jury with respect to any suit or legal action which may be commenced by or against Lender concerning the interpretation, construction, validity, enforcement or performance of this Note or any other agreement or instrument executed in connection herewith. In the event any such suit or legal action is commenced by Lender, Borrower hereby expressly agrees, consents and submits to the personal jurisdiction of any state or federal court sitting in the county where the principal office of Lender is located, provided such business location of Lender is within the State of Georgia, with respect to such suit or legal action, and Borrower also expressly consents and submits to and agrees that venue in any such suit or legal action is proper in said courts and county and Borrower hereby expressly waives any and all personal rights under applicable law or in equity to object to the jurisdiction and venue in said courts and county. The jurisdiction and venue of the courts consented and submitted to and agreed upon in this paragraph are not exclusive but are cumulative and in addition to the jurisdiction and venue of any other court under any applicable laws or in equity.

Whenever Lender in good faith believes that the prospect of payment of this Note is impaired, Lender may hold and set off against any or all outstanding principal or interest as Lender may elect, any balance or amount to the credit of Borrower in any deposit, agency, reserve, holdback or other account of any nature whatsoever maintained by or on behalf of Borrower with Lender at any of its offices, regardless of whether such accounts are general or special and regardless of whether such accounts are individual or joint.

All notices, demands, or requests provided for or permitted to be given pursuant to this Note must be in writing and shall be deemed to have been properly given or served by personal delivery or by depositing in the United States Mail, postpaid and registered or certified, return receipt requested, and addressed to the address set forth below. All notices, demands and requests shall be effective upon being deposited in the United States Mail; however, the time period in which a response to any notice, demand, or request must be given or cure effected, if any, shall commence to run from the date of receipt of the notice, demand, or request by the

AT:818371v1                                          5                           Initials:_____

addressee thereof. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, demand or request sent. By giving at least thirty (30) days' written notice hereof, Lender and Borrower shall have the right from time to time and at any time during the term of this Note to change its respective address, and shall have the right to specify as its address any other address within the United States of America. For the purposes of this Note:

The address of Borrower is:

RM Hotels, Inc.
2100 Parklake Drive, NE
Atlanta, Georgia 30345
Attention: Rajesh C. Patel

with a copy to:

Massey, Stotser & Nichols, P.C.
1780 Gadsden Highway
Birmingham, Alabama 35235
Attn: Lorrie Maples Parker, Esq.

The address of Lender is:

Branch Banking and Trust Company
950 East Paces Ferry Road, Suite 2575
Atlanta, Georgia 30326
Attn.: Mr. Mitchell L. Nies

with copy to:

Epstein Becker & Green, P.C.
945 East Paces Ferry Road, Suite 2700
Atlanta, Georgia 30326
Attn.: John W. Boykin, Esq.

If any provision of this Note or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Note and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

The indebtedness evidenced by this Note and the obligations created hereby are secured by that certain Deed to Secure Debt and Security Agreement (hereinafter referred to as the "Security Instrument") from Borrower to Lender dated of even date herewith with respect to certain property located in Fulton County, Georgia. The term "Loan Documents" as used herein shall be deemed to mean and include this Note, the Security Instrument and any and all other

AT:818371v1                                                6                              Initials: _____

documents and instruments at any time evidencing, securing or otherwise relating to the indebtedness evidenced by this Note.

This Note is intended as a contract under, and shall be construed and enforceable in accordance with, the laws of the State of Georgia.

As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, successors, legal representatives, and assigns, whether by voluntary action of the parties or by operation of law. Except as otherwise expressly set forth herein to the contrary, all defined and capitalized terms in this Note shall have the meaning and definition as set forth and provided for in the Loan Agreement.

It is agreed that Borrower may elect, by written notice to Lender, to obtain an interest rate swap from BB&T Capital Markets, and in the event such an interest rate swap is elected, upon any prepayment of this Note prior to the date of its scheduled maturity, Borrower agrees to be fully responsible for and to pay any applicable unwind fees.

[SIGNATURES CONTAINED ON FOLLOWING PAGE]

AT:818371v1

7

Initials:_____

IN WITNESS WHEREOF, Borrower has executed this Note under seal as of the date first above written.

BORROWER:

RM HOTELS, INC.
an Alabama corporation

By: _____
    Rajesh C. Patel
    Its: President

[CORPORATE SEAL]

9542039814 01

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

FOR AND IN CONSIDERATION OF the sum of TEN AND NO/100THS DOLLARS ($10.00) and other good and valuable considerations so paid or delivered to the undersigned RAJESH C. PATEL, an individual resident of the State of Georgia (hereinafter referred to as "Guarantor"), the receipt, adequacy and sufficiency whereof is hereby acknowledged by Guarantor, and for the purpose of seeking to induce BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation (hereinafter referred to as "Lender"), to extend credit to RM HOTELS, INC., an Alabama corporation (hereinafter referred to as "Borrower"), which extension of credit will be to the direct interest and financial advantage of Guarantor, Guarantor does hereby unconditionally guarantee to Lender, its successors, successors-in-title and assigns, (a) the full and prompt payment when due, whether by acceleration or otherwise, with such interest as may accrue thereon, either before or after maturity thereof, of that certain Secured Promissory Note of even date herewith, made by Borrower to the order of Lender in the principal amount of TEN MILLION AND NO/100THS DOLLARS ($10,000,000.00) (hereinafter referred to as the "Note"), together with any renewals, modifications, consolidations and extensions thereof, (b) the full and prompt payment and performance of any and all obligations of Borrower to Lender under the terms of that certain Deed to Secure Debt and Security Agreement dated of even date therewith and securing the indebtedness evidenced by the Note (hereinafter referred to as the "Security Instrument"), and (c) the full and prompt payment and performance of any and all other obligations of Borrower to Lender under any other documents or instruments now or hereafter evidencing, securing or otherwise relating to the indebtedness evidenced by the Note (the Security Instrument and said other documents and instruments being hereinafter referred to collectively as the "Loan Documents"). Guarantor does hereby agree that if the Note is not paid by Borrower in accordance with its terms, or if any and all sums which are now or may hereafter become due from Borrower to Lender under the Loan Documents are not paid by Borrower in accordance with their terms, Guarantor will immediately make such payments. Guarantor further agrees to pay Lender all expenses paid or incurred by Lender in endeavoring to collect the indebtedness of Guarantor hereunder, to enforce the obligations of Borrower guaranteed hereby, or any portion thereof, or to enforce this Guaranty, and in the event the indebtedness of Guarantor hereunder is collected by law or through an attorney at law, Guarantor agrees to pay fifteen percent (15%) of the amount then owing under the Note, as attorneys' fees.

Guarantor hereby consents and agrees that Lender may at any time, and from time to time, without notice to or further consent from Guarantor, whether with or without consideration, surrender any property or other security of any kind or nature whatsoever held by Guarantor or by any person, firm or corporation on its behalf or for its account, securing any indebtedness or liability hereby guaranteed; substitute for any collateral so held by it, other collateral of like kind, or of any kind; modify the terms of the Note or the Loan Documents; extend or renew the Note for any period; grant releases, compromises and indulgences with respect to the Note or the Loan Documents and to any persons or entities now or hereafter liable thereunder or hereunder; release any Guarantor or any other guarantor or endorser of the Note, the Security Instrument, or any other of the Loan Documents; or take or fail to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents, or any of them or any security for the payment of the indebtedness of Borrower to Lender or for the

AT:818835v1                                    1                    Initials: _____

1457

Exhibit C-1

performance of any obligations or undertakings of Borrower, nor any course of dealing with Borrower or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against Lender. The provisions of this Guaranty shall extend and be applicable to all renewals, extensions, amendments, consolidations or modifications of the Note, the Security Instrument and the other Loan Documents. This Guaranty unconditionally guarantees the performance of all obligations to Lender as set forth in the Loan Documents made on behalf of Borrower by any officer, partner or agent of Borrower.

Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender, and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by the Security Instrument; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by Guarantor as trustees for Lender and be paid over to Lender on account of the indebtedness of Borrower to Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

Guarantor hereby waives and agrees not to assert or take advantage of: (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy or any other proceeding) of Borrower or any other person or entity; (c) any defense based on the failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by Lender which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Borrower for reimbursement, or both; (e) notwithstanding the application of Official Code of Georgia Annotated § 10-7-24, any defense based upon failure of Lender to commence an action against Borrower; (f) any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know regarding Borrower; (g) acceptance or notice of acceptance of this Guaranty by Lender; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by Lender in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Note; and (l) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person, nor against securities or liens available to Lender, its successors, successors-in-title, endorsees or assigns.

Initials:

Notwithstanding the application of Official Code of Georgia Annotated § 10-7-24, Guarantor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person. In the event of a Default under the Loan Documents, or any of them, Lender shall have the right to enforce its rights, powers and remedies thereunder or hereunder or under any other instrument now or hereafter evidencing, securing or otherwise relating to the transactions contemplated hereby, in any order, and all rights, powers and remedies available to Lender in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Accordingly, Guarantor hereby authorizes and empowers Lender upon acceleration of the maturity of the Note, at its sole discretion, and without notice to Guarantor, except as may be provided in the Loan Documents, to exercise any right or remedy which Lender may have, including but not limited to, judicial foreclosure, exercise of rights of power of sale, acceptance of a deed or assignment in lieu of foreclosure, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases, as to any security, whether real, personal or intangible. If the indebtedness guaranteed hereby is partially paid by reason of the election of Lender, its successors, endorsees or assigns, to pursue any of the remedies available to Lender, or if such indebtedness is otherwise partially paid, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire balance of the indebtedness guaranteed hereby, even though any rights which Guarantor may have against Borrower may be destroyed or diminished by the exercise of any such remedy. Until all of the obligations of Borrower to Lender have been paid and performed in full, Guarantor shall have no right of subrogation to Lender against Borrower, and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any rights to participate in any security for the Note.

Guarantor hereby authorizes Lender, without notice to Guarantor, to apply all payments and credits received from Borrower or from Guarantor or realized from any security in such manner and in such priority as Lender in its sole judgment shall see fit to the indebtedness, obligations and undertakings which are the subject of this Guaranty.

The books and records of Lender showing the accounts between Lender and Borrower shall be admissible in evidence in any action or proceeding hereon.

Guarantor acknowledges that this Guaranty, the Note and the Loan Documents were executed and delivered in the State of Georgia and shall be governed and construed in accordance with the laws of the State of Georgia.

Unless such requirement is otherwise waived by Lender, Guarantor shall, within one hundred twenty (120) days following the last day of each calendar year during which any portion of the Secured Indebtedness (as such term is used and defined in the Security Instrument) remains outstanding and unpaid, provide Lender with a current updated personal financial statement and with copies of Guarantor's federal and state income tax returns for the immediately preceding calendar year.

Initials: _____

Guarantor warrants and represents to Lender that all financial statements heretofore delivered by them to Lender are true and correct in all material respects as of the date hereof.

Guarantor waives any and all homestead and exemption rights which Guarantor may have under or by virtue of the Constitution or the laws of the United States of America or of any state as against this Guaranty, any renewal hereof, or any indebtedness represented hereby, and does transfer, convey and assign to Lender a sufficient amount of such homestead or exemption as may be allowed, including such homestead or exemption as may be set apart in bankruptcy, to pay all amounts due hereunder in full, with all costs of collection, and does hereby direct any trustee in bankruptcy having possession of such homestead or exemption to deliver to Lender a sufficient amount of property or money set apart as exempt to pay the indebtedness guaranteed hereby, or any renewal thereof, and does hereby appoint Lender his attorney-in-fact, to claim any and all homestead exemptions allowed by law.

As security for the liabilities and obligations of Guarantor hereunder, Lender is hereby given a lien upon, security title to and security interest in all property of Guarantor of every kind and description now or hereafter in the possession or control of Lender for any reason, including all dividends, balances, credits, deposits, accounts, items and monies, distributions on or other rights in connection therewith (hereinafter referred to collectively as "Guarantor's Funds"). Lender may at any time, or from time to time, when any Default or Event of Default (as such terms are used and defined in the Loan Documents) occurs under any of the Loan Documents, appropriate and apply toward the payment of any such Default or Event of Default so much of the Guarantor's Funds as may be necessary to cure such Default or Event of Default. Lender shall not otherwise use any such Guarantor's Funds to pay down or pay off the Note unless said Note has matured.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by Lender or any officer or agent of Lender, except by a writing signed by a duly authorized officer of Lender. This Guaranty shall be irrevocable by Guarantor until all indebtedness guaranteed hereby has been completely repaid and all obligations and undertakings of Borrower under, by reason of, or pursuant to the Loan Documents have been completely performed.

All notices, demands, or requests provided for or permitted to be given pursuant to this Guaranty must be in writing and shall be deemed to have been properly given or served by personal delivery or by depositing in the United States Mail, postpaid and registered or certified, return receipt requested, and addressed to the addresses set forth below. All notices, demands and requests mailed shall be effective upon being deposited in the United States Mail; however, the time period in which a response to any notice, demand, or request must be given or cure effected, if any, shall commence to run from the date of receipt of the notice, demand, or request by the addressee thereof. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be notice of the notice, demand or request sent. By giving at least thirty (30) days' written notice hereof, any party hereto shall have the right from time to time and at any time during the term of this Guaranty to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America. For the purposes of this Guaranty:

AT:818835v1                                    4

Initials: _____

The address of Lender is:          Branch Banking and Trust Company
                                   950 East Paces Ferry Road, Suite 2575
                                   Atlanta, Georgia 30326
                                   Attn: Mr. Mitchell L. Nies

with a copy to:                    Epstein Becker & Green, P.C.
                                   Resurgens Plaza, Suite 2700
                                   945 East Paces Ferry Road
                                   Atlanta, Georgia 30326
                                   Attn.: John W. Boykin, Esq.

The address of Guarantor is:  Mr. Rajesh C. Patel
                                   2100 Parklake Drive, NE
                                   Atlanta, Georgia 30345

with copy to:                      Massey, Stotser & Nichols, P.C.
                                   1780 Gadsden Highway
                                   Birmingham, Alabama 35235
                                   Attn: Lorrie Maples Parker, Esq.

The provisions of this Guaranty shall be binding upon Guarantor and his successors, successors-in-title, heirs, legal representatives and assigns and shall inure to the benefit of Lender, its successors, successors-in-title, legal representatives and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Borrower or Guarantor, if individuals, or by reason of the dissolution of Borrower or Guarantor, if Borrower or Guarantor is a corporation, partnership or limited liability company. If executed by more than one person, the undersigned parties acknowledge that the obligations hereunder are the joint and several obligations of the undersigned.

If from any circumstances whatsoever fulfillment of any provisions of this Guaranty, at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then ipso facto the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Guaranty that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity. The provisions of this paragraph shall control every other provision of this Guaranty.

This Guaranty is assignable by Lender, and any assignment hereof or any transfer or assignment of the Note or portions thereof by Lender shall operate to vest in any such assignee all rights and powers herein conferred upon and granted to Lender. This Guaranty may be executed in one (1) or more counterparts, which counterparts, collectively, shall constitute a fully executed Guaranty.

AT:818835v1                              5                        Initials: _____

**[Signature Page to Unconditional Guaranty of Payment and Performance]**

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty under seal on the 10th day of December, 2007.

Signed, sealed and delivered
in the presence of:

GUARANTOR:

_____ (SEAL)
Rajesh C. Patel

_____
Notary Public
My commission expires: 11 /06/ 09

[NOTARIAL SEAL]

# BB&T

## GUARANTY AGREEMENT

BRANCH BANKING AND TRUST COMPANY
BB&T FINANCIAL, FSB

_____    02/01/2009

ROSWELL, GA

Dear Sirs:

As an inducement to Branch Banking and Trust Company and/or BB&T Financial, FSB (collectively "Bank") to extend credit to and to otherwise deal with

RM HOTELS INC

("Borrower"), and in consideration thereof, the undersigned (and each of the undersigned jointly and severally if more than one) hereby absolutely and unconditionally guarantees to Bank and its successors and assigns the due and punctual payment of any and all notes, drafts, debts, obligations and liabilities, primary or secondary (whether by way of endorsement or otherwise), of Borrower, at any time, now or hereafter, incurred with or held by Bank, together with interest, as and when the same become due and payable, whether by acceleration or otherwise, in accordance with the terms of any such notes, drafts, debts, obligations or liabilities or agreements evidencing any such indebtedness, obligation or liability including all renewals, extensions and modifications thereof. The obligation of the undersigned is a guarantee of payment and not of collection.

The undersigned is Bank's debtor for all indebtedness, obligations and liabilities for which this Guaranty is made, and Bank shall also at all times have a lien on and security interest in all stocks, bonds and other securities of the undersigned at any time in Bank's possession and the same shall at Bank's option be held, administered and disposed of as collateral to any such indebtedness, obligation or liability of the Borrower, and Bank shall also at all times have the right of set-off against any deposit account of the undersigned with Bank in the same manner and to the same extent that the right of set-off may exist against the Borrower.

It is understood that any such notes, drafts, debts, obligations and liabilities may be accepted or created by or with Bank at any time and from time to time without notice to the undersigned, and the undersigned hereby expressly waives presentment, demand, protest, and notice of dishonor of any such notes, drafts, debts, obligations and liabilities or other evidences of any such indebtedness, obligation or liability.

Bank may receive and accept from time to time any securities or other property as collateral to any such notes, drafts, debts, obligations and liabilities, and may surrender, compromise, exchange and release absolutely the same or any part thereof at any time without notice to the undersigned and without in any manner affecting the obligation and liability of the undersigned hereby created. The undersigned agrees that Bank shall have no obligation to protect, perfect, secure or insure any security interests, liens or encumbrances now or hereafter held for the indebtedness, obligations and liabilities for which this Guaranty is made.

If allowed by applicable law, the undersigned hereby subordinates any and all indebtedness of Borrower now or hereafter owed to the undersigned to all indebtedness of Borrower in favor of Bank, and agrees with Bank that the undersigned shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of the undersigned's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the security described in and encumbered by the documents evidencing the indebtedness owed by Borrower ("Loan Documents"); provided, however, that, if Bank so requests, such indebtedness shall be collected, enforced and received by the undersigned as trustee for Bank and shall be paid over to Bank on account of the indebtedness of Borrower to Bank, but without reducing or affecting any manner the liability of the undersigned under the other provisions of this Guaranty Agreement.

This obligation and liability on the part of the undersigned shall be a primary, and not a secondary, obligation and liability, payable immediately upon demand without recourse first having been had by Bank against the Borrower or any other guarantor, person, firm or corporation, and without first resorting to any property held by Bank as collateral security; and the undersigned hereby waives the benefits of all provisions of law, including but not limited to the provisions of O.C.G.A. section 10-7-24 or its successor, for stay or delay of execution or sale of property or other satisfaction of judgment against the undersigned on account of obligation and liability hereunder until judgment be obtained therefor against the Borrower and execution therein returned unsatisfied, or until it is shown that the Borrower has no property available for the satisfaction of the indebtedness, obligation or liability guaranteed hereby, or until any other proceedings can be had; and the undersigned hereby agrees to indemnify the Bank for all costs of collection, including but not limited to the costs of repossession, foreclosure, reasonable attorneys' fees, and court costs incurred by the Bank in the event that the Bank should first be required by the undersigned to resort to any property held by the Bank or in which the Bank has a security interest or is in default or execution or other satisfaction of a judgment against the Borrower on account of Borrower's obligation and liability for its indebtedness guaranteed hereby; and the undersigned further agrees that the undersigned is responsible for any obligation or debt, or portion thereof, of the Borrower to the Bank which has been paid by the Borrower to the Bank and which the Bank is subsequently required to return to the Borrower or a trustee for the Borrower in any bankruptcy or insolvency proceeding; and the undersigned further agrees that none of the undersigned shall have any right of subrogation, reimbursement or indemnity whatsoever, nor any right of recourse to security for the debts and obligations of the Borrower to Bank unless and until all of the debts and obligations of the Borrower to Bank have been paid in full. The undersigned hereby waives, to the extent avoidable under any provision of the Bankruptcy Code, any right arising upon payment by the undersigned of any obligation under this Guaranty to assert a claim against the bankruptcy estate of the Borrower.

In addition to the other waivers set forth elsewhere in this Guaranty, the undersigned also hereby waives and agrees not to assert or take advantage of (a) if allowed by applicable law, the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of the undersigned, Borrower, or any other party or entity, or the failure of Bank to file or enforce a claim against the estate (either in administration, bankruptcy or any other proceeding) of Borrower or any other party or entity; (c) any defense based upon the failure of Bank to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or the failure of Bank to give notice of any action or non-action on the part of any other party whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by Bank which destroys or otherwise impairs any subrogation rights of the undersigned to proceed against Borrower for reimbursement, or both; (e) any defense based upon failure of Bank to commence an action against Borrower or any other guarantor of the indebtedness guaranteed hereby; (f) any duty of the part of Bank to disclose to the undersigned any fact that it may know or hereafter know regarding Borrower; (g) acceptance or notice of acceptance of this Guaranty by Bank; (h) as stated above, notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed except as otherwise required in this Guaranty; (i) as set forth above, protest and notice of dishonor or of default to the undersigned or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) except as otherwise provided herein, any and all other notices whatsoever to which the undersigned might otherwise be entitled; (k) any defense based on lack of due diligence by the Bank and the collection, protection or realization upon any collateral securing the indebtedness evidenced by the Note or any of the other Loan Documents, or both; (l) any transfer by Borrower of all or any part of the security encumbered by the Loan Documents; and (m) any other legal or equitable defenses whatsoever to which the undersigned might be entitled, to the extent permitted by law, unless such defenses are based upon the willful misconduct of the Bank.

In the event of the occurrence of a "Default" or "Event of Default" otherwise relating to the indebtedness evidenced by the Note(s) or evidenced or secured by any of the other Loan Documents or any of them, or relating to the transactions contemplated by the Loan Documents or any of them in any order, all rights powers and remedies available to Bank in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. Accordingly, the undersigned hereby authorizes and empowers Bank upon the occurrence of Default or Event of Default under the Note(s) or Loan Documents, at its sole discretion, and, except as otherwise provided herein, without notice to the undersigned, to exercise and cause to be exercised any right or remedy which Bank may have, including, but not limited to, judicial foreclosure, non-judicial foreclosure or exercise of power of sale, acceptance of a deed or assignment in lieu of foreclosure, appointment of a receiver to collect rents and profits, exercise of remedies against personal property, or enforcement of any assignment of leases, rents, profits, accounts and certificates of deposit, or any other security, whether real, personal or tangible or intangible, At any public or private sale of any security or collateral for any indebtedness or any part hereof guaranteed hereby, whether by foreclosure or otherwise, Bank, may in its discretion, purchase all of any part of such security or collateral so sold or offered for sale for its own account and may apply against the amount bid therefor the balance due it pursuant to the Note(s) or any of the other Loan Documents without prejudice to Bank's remedies hereunder against the undersigned for deficiencies, if allowed by applicable law. If the indebtedness guaranteed hereby is partially paid by reason of the election of Bank, its successors, endorsees or assigns, to pursue any of the remedies available to Bank or its such indebtedness is otherwise partially paid, then this Guaranty shall nevertheless remain in full force and effect, and the undersigned shall remain liable for the entire balance of the indebtedness guaranteed hereby, even though any rights which the undersigned may have against Borrower may be destroyed or diminished by the exercise of any such remedy.

ACCOUNT# / NOTE#
9542039814    00001

**1457GA** (0804)



Initials: _____

**Exhibit C-2**

Check applicable box:

☒ This Guaranty is unlimited and applies to all indebtedness of Borrower, whether now existing or hereafter arising.

☐ This Guaranty applies to all indebtedness of Borrower evidenced by its promissory note/line number _____ dated _____ (including all extensions, renewals, and modifications thereof) in the principal amount of $ _____

☐ This Guaranty is limited to an amount of $ _____ plus accrued interest, late fees, costs of collection (including attorneys' fees) and all other obligations and indebtedness which may accrue or be incurred with respect to the Borrower's promissory note/line number _____ dated _____ (including all extensions, renewals, and modifications thereof) in the principal amount of $ _____

☐ This Guaranty is limited to an amount of $ _____ plus accrued interest, late fees, costs of collection and reasonable attorneys' fees and all other obligations and indebtedness which may accrue or be incurred with respect to the Borrower's indebtedness and obligations to Bank.

To secure the payment of all obligations of the undersigned hereunder, the undersigned hereby grants a security interest and lien in the following goods and property owned by the undersigned: _____
_____
_____
_____
_____
_____
_____
_____
_____ ("Collateral").

The undersigned hereby agrees to execute and deliver to Bank any security agreement, security deed, mortgage, UCC financing statement, or other document required by the Bank in order to protect its security interest or lien in the Collateral. This document shall constitute a security agreement under the Uniform Commercial Code of Georgia ("Code"), and in addition to having all other legal rights and remedies, the Bank shall have all rights and remedies of a secured party under the Code.

This agreement shall inure to the benefit of Bank, its successors and assigns, and the owners and holders of any of the Indebtedness, obligations and liabilities hereby guaranteed, and shall remain in force until a written notice revoking it has been received by Bank; but such revocation shall not release the undersigned from liability to Bank, its successors and assigns, or the owners and holders of any of the indebtedness, obligations and liabilities hereby guaranteed, for any indebtedness, obligation or liability of the Borrower which is hereby guaranteed and then in existence or from any renewals, additional advances, extensions or modifications thereof in whole or in part, whether such renewals, additional advances, extensions or modifications are made before or after such revocation, with or without notice to the undersigned. The undersigned waives presentment, demand, protest and notices of every kind and assents to any one or more extensions, modifications, additional advances, renewals or postponements of the time or amount of payment or any other indulgences given to Borrower. The undersigned shall be responsible for and shall reimburse the Bank for all costs and expenses and reasonable attorneys' fees incurred by the Bank in connection with the enforcement of this Guaranty or the protection or preservation of any right or claim of the Bank in connection herewith, including without limitation costs and expenses incurred by the Bank in connection with its attempts to collect the indebtedness, obligations, and liabilities guaranteed hereby. Time is of the essence of this Agreement.

If the Borrower is an organization, this instrument covers all indebtedness, obligations and liabilities to Bank purporting to be made or undertaken on behalf of such organization by any such officer or agent of said organization without regard to the actual authority of such officer or agent. The term "organization" shall include associations of all kinds and all purported corporations, partnership, limited liability companies and the like, whether correctly and legally chartered and organized.

The undersigned covenants, warrants, and represents to the Bank that: (i) this guaranty is enforceable against the undersigned in accordance with its terms; (ii) the execution and delivery of this Guaranty does not violate or constitute a breach of any agreement to which the undersigned is a party; (iii) that there is no litigation, claim, action or proceeding pending or, to the best knowledge of the undersigned, threatened against the undersigned which would materially adversely affect the financial condition of the undersigned or his ability to fulfill his obligations hereunder; (iv) that the undersigned has knowledge of the Borrower's financial condition and affairs; and (v) unless otherwise required in a Loan Agreement, if applicable, as long as any Obligations remain outstanding or as long as Bank remains obligated to make advances, the undersigned shall furnish annually an updated financial statement in a form satisfactory to Bank, which, when delivered shall be the property of Bank.

**WAIVER OF TRIAL BY JURY. UNLESS EXPRESSLY PROHIBITED BY APPLICABLE LAW, THE UNDERSIGNED HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS GUARANTY OR THE BORROWER'S NOTE(S), AND THE RELATED LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN THE UNDERSIGNED AND THE BANK OR THE BORROWER AND THE BANK. THIS PROVISION IS A MATERIAL INDUCEMENT FOR BANK TO ACCEPT THIS GUARANTY AND TO MAKE THE LOAN(S) TO THE BORROWER. FURTHER, THE UNDERSIGNED HEREBY CERTIFY THAT NO REPRESENTATIVE OR AGENT OF BANK, NOR BANK'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BANK WOULD NOT SEEK TO ENFORCE THIS WAIVER OR RIGHT TO JURY TRIAL PROVISION IN THE EVENT OF LITIGATION. NO REPRESENTATIVE OR AGENT OF BANK, NOR BANK'S COUNSEL, HAS THE AUTHORITY TO WAIVE, CONDITION OR MODIFY THIS PROVISION.**

This Guaranty is made in and shall be construed in accordance with the laws and judicial decisions of the State of Georgia. The undersigned agrees that any dispute arising out of this Guaranty shall be adjudicated in either the state or federal courts of Georgia and in no other forum. For that purpose, the undersigned hereby submits to the jurisdiction of the state and/or federal courts of Georgia. The undersigned waives any defense that venue is not proper for any action brought in any federal or state court in the State of Georgia.

NOTICE. All notices, requests, demands, waivers, and other communications given as provided in this Guaranty will be in writing, and unless otherwise specifically provided in this Guaranty, will be deemed to have been given: (i) if delivered in person, upon delivery, or (ii) if mailed by certified or registered mail, postage prepaid, return receipt requested, and addressed to either Guarantor or Bank at the addresses specified below on the second business day after deposit in the United States Mail if addressed to an address located within a State other than the State in which the notice is being mailed, or (iii) if sent by overnight express delivery service, enclosed in a prepaid envelope and addressed to Bank or Guarantor at the address provided below, on the first business day after deposit with the service, or (iv) if sent by tested telex, telegram, telecopy, facsimile, or other form of rapid transmission confirmed by mailing (as provided in this section), at substantially the same time as the rapid transmission. Either Guarantor or Bank may change its respective address as provided in this section by giving written notice of the change as provided in this section. The addresses for notice are:

Notice to Guarantor: _____     With a copy to: _____
_____     _____
_____     _____

Notice to Bank:     Branch Banking and Trust Company     With a copy to: _____
200 West Second Street     _____
Winston-Salem, North Carolina 27101     _____

## SIGNATURES ON FOLLOWING PAGE

Witness the signature and seal of each of the undersigned.

**If Guarantor is a Corporation:**

WITNESS:

_____
NAME OF CORPORATION

_____

By: _____ (SEAL)

Title: _____

By: _____ (SEAL)

Title: _____

**If Guarantor is a Partnership, Limited Liability Company, Limited Liability Partnership or Limited Liability Limited Partnership:**

WITNESS:

_____
NAME OF PARTNERSHIP, LLC, LLP OR LLLP

_____

By: _____
GENERAL PARTNER OR MANAGER (SEAL)

_____

By: _____
GENERAL PARTNER OR MANAGER (SEAL)

_____

By: _____
GENERAL PARTNER OR MANAGER (SEAL)

**If Guarantor is an Individual**

WITNESS: _____

_____
RAJESH C PATEL

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

Commission Expiration Date: 9/9/12

1457GA (0804)

# FINANCIAL REPORT

FINANCIAL STATEMENT AS OF _____ 01 / 07  / 2010 = R C & Shama Patel  - B___

| ASSETS | | LIABILITIES AND NET WORTH | |
|---|---|---|---|
| Cash on hand and in depository institutions | $ 19,261 | Accounts payable | $0 |
| Marketable securities (Schedule A) | $1,373,945 | Notes payable and other loans  (Schedule F) | $7,121,000 |
| Notes receivable (Schedule B) | $8,811,065 | Real estate mortgages (Schedule C) | $3,887,323 |
| Real estate (Schedule C) | $5,600,000 | Other liabilities (Schedule G) | $0 |
| Proprietary interests and other securities (Schedule D) | $6.075,089 | TOTAL LIABILITIES | $11,008,323 |
| | | Net worth (Total assets less total liabilities) | $11,553,305 |
| Retirement funds and other assets (Schedule E) | $284,268 | | |
| TOTAL ASSETS | $22,163,628 | TOTAL LIABILITIES AND NET WORTH | $22,561,628 |

## CONTINGENT LIABILITIES

In addition to the liabilities listed on the Financial Statement, have you endorsed, guaranteed, or become otherwise indirectly or contingently liable for the debts of others or through a pending lawsuit?       ☒ Yes        ☐ No

If "yes," complete the following:

| Name and Address of Debtor or Obligor | Name and Address of Creditor or Obligee | Description and Value of Collateral | Date Due | Current Amount |
|---|---|---|---|---|
| Various Loans For companies I have ownership in | Various Banks | Hotels , Shopping Centers , Class A Office Building Etc | Various | |
| TOTAL | | | | $76,478,238 |

1

Exhibit  C-3

## SUPPORTING SCHEDULES

Schedules must agree in total with the appropriate item contained in the Financial Statement on page 7 of this report.

## Schedule A — Marketable Securities

Indicate all debt and equity securities listed on an exchange or otherwise regularly traded in an open market. Separate debt and equity securities.  Securities of closely held corporations should be listed on Schedule D—Proprietary Interests. The description should include the name of the issuer, the principal amount or number of shares held, and the interest rate, if applicable. Small holdings may be aggregated and shown as "other" provided that they account for no more than 10 percent of marketable securities.

| Description | Market Value |
|---|---|
| Nexity Bank  - 20,000 shares @ $0.25 /share – From Wall Street Close | $5,000 |
| H Financial of Florida–Haventrust Bank FL = 55,000 Shares @ $6.10 – Book Value | $335,500 |
| Hightrust Bank Georgia   = 277,664  @ $6.81 x 50%  - Book Value | $945,445 |
| Global Trust Bank – San Jose – 10,000 Share @ $8.80 – Book Value | $88,000 |
| TOTAL | $1,373,945 |

## Schedule B ⦙ Notes Receivable

The description should include the name of the obligor, the note's maturity and terms of repayment, and a description of any collateral.  If the note is payable to you and others jointly, indicate only your beneficial interest under Current Balance.

| Description | Current Balance |
|---|---|
| From various companies I have Ownership in | $8,811,065 |
| TOTAL | $8,811,065 |

2

## Schedule C — Real Estate and Related Loans

List all real estate in which you hold a beneficial interest. Submit year-end financial statements, including profit and loss statements, for the last two years for each investment (exclude residence) in which you have an interest equal to 10 percent or more of your net worth. Also submit a cash flow statement on any investment property valued at 10 percent or more of net worth.

| Description and Location (City and State) | Owner of Property | Percent Ownership | Mortgage Holder | Maturity Date | Current Market Value* | Current Balance* |
|---|---|---|---|---|---|---|
| Primary Residence<br>Duluth, GA 30097 | Shama Patel | 100 % | BB&T | 2016 | $1,500,000 | $987,5 |
| Rental Home<br>2242 Kennedy Drive<br>Suwanee, GA | RC Patel | 100% | Southern Horizon | 2015 | $325,000 | $189,7 |
| Vacant Land & Mobile Home<br>Rt.1 Box 238, Pell City, AL | RC & Shama Patel | Joint 50 % | N.A | N.A | $125,000 | $0. |
| Vacant House Lot – 2/3 House Build<br>2253 Grady Ridge<br>Duluth, GA 30097 | Shama Patel | 100 % | Hightrust Bank | 03/2010 | $3,650,000 | $2,700,0 |
| TOTAL | | | | | $5,600,000 | $3,887,3 |

*Carry TOTAL forward to Assets - Real estate    **    Carry TOTAL forward to Liabilities - Real estate mortgages

## Schedule D — Proprietary Interests and Other Securities

List all companies, the shares of which are not listed on a securities exchange or otherwise regularly traded, in which you hold a beneficial interest. *(Submit year-end financial statements, including profit and loss and cash flow statements, for the last two years for each business interest in which you have an interest equal to 10 percent or more of your net worth.)*

| Name and Address of Company | Legal Form of Company | Nature of Business | Percent Ownership | Current Value |
|---|---|---|---|---|
| Various Companies I have ownership in | LLC's and Sub S Corps | Hotels , Real Estate Development's Etc | | $ 6,705,089 |
| TOTAL | | | | $ 6,705,089 |

3

## Schedule E - Other Assets

Include retirement funds (for example, 401K, IRA, Keogh), accounts receivable, merchandise and inventory at lower of cost or market value, machinery and equipment (less depreciation), and life insurance at its cash surrender value.

| Description | Basis for Valuation | Current Value |
|---|---|---|
| Life Insurance Policies | Cash Surrender Value-Cash Value $560K | Net after Loans $22,5000 |
| Household Furniture and personal belongings | Insurance Valuation | $250,000 |
| IRA | Statement | $11,768 |
| TOTAL | | $284,268 |

## Schedule F — Notes Payable and Other Loans

Indicate all loans or notes payable, including loans on life insurance and retirement funds (but not real estate mortgages listed in Schedule C). Loan origination information must include the original date, loan amount, and co-makers, if any, and their percent obligation. Small obligations may be aggregated and shown as "other," provided that they account for no more than 20 percent of other loans and notes payable. Indicate any debt that is contractually delinquent by an asterisk next to the current balance.

| Name and Address of Creditor and Loan Origination Information | Description and Value of Collateral | Maturity Date | Current Balance |
|---|---|---|---|
| Independent Bankers 10/15/06; original amt. $1,860,000 | Office & Personal House | 10/15/2011 | $1,863,000 |
| State Bank & Trust Company | Hightrust Bank Stock Book Values $1,362,000 | 04/01/2013 | $2,075,000 |
| | Initially secured by Haventrust Bank Ga stock – Now Unsecured | 09/30/20010 | $683,00 |
| Haven trust Bank Florida | Initially secured by Haventrust Bank Ga stock – Now partly with HTBFL Stock | 09/30/20010 | $683,000 |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $7,121,000 |

## Schedule G - Other Liabilities

4

**Cash Flow Statement***

| Sources of Cash | 2006 | 2007 | 2008 | Projected Next Year 2009 |
|---|---|---|---|---|
| Salaries, wages, commissions, and other employment income ( 1 ) | $79,350 | $140,000 | $175,000 | |
| Rents, royalties, and investments = ( 2 ) | $48,561 | $70,000 | $50,000 | |
| Income from dividends and interest = ( 3 ) | $619,636 | $675,000 | $300,000 | |
| Income and other distributions from partnerships = ( 4 ) | $780,846 | $1,250,000 | $1,450,000 | |
| Other sources** = ( 5 ) | $0.00 | $0.00 | $0.00 | |
| Total cash received | $1,528,393 | $2,135,000 | $1,975,000 | |
| **Uses of Cash** | | | | |
| Personal living expenses (rent, household) = ( 6 ) | $200,000 | $225,000 | $300,000 | |
| Fixed obligations** = ( 7 ) | $681,000 | $675,000 | $525,000 | |
| Income taxes | $19,500 | $200,000 | $25,000 | |
| Capital contributions to partnerships | $0.00 | $0.00 | $0.00 | |
| Other uses** = ( 8 ) | $0.00 | $0.00 | $0.00 | |
| Total cash outlay | $900,500 | $1,100,000 | $850,000 | |
| NET CASH FLOW (deficit) | $627,893 | $1,035,000 | $1,125,000 | |

\*    Discuss any significant changes on a separate page.

\*\*    Itemize on a separate page any items amounting to 10 percent or more of total cash received or total cash outlay.

\*\*    Fixed obligations include debt service on all loans and any budgeted capital improvement expenditures for real estate investments.  Any loan proceeds or debt service related to this transaction should be included in projections for other sources or uses.

**Privacy Act Notice**

The solicitation and collection of this information, including a Social Security Number, is authorized by those statutes that require an appropriate federal banking agency to determine the competence, experience, integrity, and financial ability of individuals proposing to serve a federally regulated financial institution in an official capacity -- that is, as a director, officer, employee, or principal shareholder.  These statutes include: 12 U.S.C. § 27 (national bank charters); 12 U.S.C. § 1464 (federal savings bank charters); 12 U.S.C. § 1815 (federal deposit insurance); 12 U.S.C. § 1817(j) (changes in control of insured depository institutions); and 12 U.S.C. § 1831(i) (agency disapproval of directors and senior executive officers of insured depository institutions or depository institution holding companies).  The provision of requested information, including a Social Security Number, is voluntary.  However, the failure to provide any requested information may result in denial, disapproval, or delay in the processing of an application or notice.

Depending on the manner in which an appropriate federal banking agency maintains solicited information, some or all of that information may be subject to the Privacy Act of 1974, 5 U.S.C. § 552a.  In such instances, disclosures of covered information may be made to:  (1) third parties to complete background checks; (2) financial institutions for supervisory purposes; (3) governmental, tribal, self-regulatory, or professional organizations when information is relevant to either a known or suspected violation of law or licensing standard or relevant and necessary to the governmental or self-regulatory organization's regulation or supervision of financial service providers; (4) the Department of Justice, a court, an adjudicative body, a party in litigation, or a witness when relevant and necessary to a legal or administrative proceeding; (5) congressional offices when the information is relevant to an inquiry initiated on behalf of its provider; (6) an agency's contractors or agents; and (7) other third parties when mandated or authorized by statute.

Additionally, while certain of the solicited information is exempt from disclosure under the Freedom of Information Act because disclosure would constitute a clearly unwarranted invasion of personal privacy, other information is not exempt. Nonexempt information will ordinarily include the names of individuals, the financial institutions that they propose to serve, the statutory context in which information has been provided, and prior bank-related employment and affiliation.

## CERTIFICATION

*If a joint financial statement is being submitted, both parties should complete the "Certification."*

I understand that the appropriate regulatory agency may conduct extensive checks into my background, experience, and related matters in conjunction with my application or filing.

I certify that the information contained in the biographical report and financial report, including all attachments, has been carefully examined by me and is true, correct, and complete. I acknowledge that any misrepresentation or omission of a material fact constitutes fraud in the inducement and may subject me to legal sanctions provided by 18 U.S.C. §§ 1001 and 1007.

Signed this 7 th  day of  January   2010

_____          _____
Signature                                                              Signature*

 Rajesh Patel                                                   Shama R Patel
Print or type name                                             Print or type name

_____          _____
Title (if applicable)                                             Title (if applicable)

Contingent Liabilities = Exhibit B
"Interagency Biographical And Financial Report"
R.C. Patel & Shaina Patel

| CO # | Name of Legal Company of Debtor or Obligor | Address of Debtor or Obligor | Name of Creditor or Obligee | Address of Creditor or Obligee | Description of Collateral | Value of Collateral | Due Date | Current Amount | R.C. Patel Liabilities | Shaina Patel Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Spectral Construction Inc. | Atlanta Airport | State Bank, TX | Irwin, TX | Hotel | $5,762,000 | 12/15/2013 | $4,780,324 | $4,780,324 | |
| 2 | J-EH Hotels, Inc. | Atlanta Downtown | Woodstock, Ga | Woodstock, Ga | Hotel | $5,653,000 | 12/1/2014 | $4,789,287 | $4,789,287 | |
| 3 | Northstar Hotels, Inc. | Chamblee, Ga | Irwin | Irwin | Hotel | $1,200,000 | 12/1/2013 | $920,000 | $920,000 | |
| 4 | Spectral Hotels, LLC | Atlanta Airport | State Bank | Woodstock, Ga | Hotel | $1,200,000 | | $966,678 | $966,678 | |
| 5 | Diamond Hotel Floor | Tucker Ga | Zions | Asian | Management Co | $1,266,784 | 4/1/2016 | $1,266,784 | $1,266,784 | |
| 6 | J-EH Family Partnership LP | Buckhead | FS | California | Family Trust | $1,250,000 | 12/1/2012 | $912,837 | $912,837 | |
| 7 | Spectral 22 Hotels, LLC | Atlanta Downtown | Irwin | California | Mixed use | $1,250,000 | 12/1/2013 | $4,789,587 | $4,789,587 | |
| 8 | Atlanta Diner | Norcross | Mason Ga | Carson | Diner | $6,100,000 | 12/1/2013 | $4,789,587 | $4,789,587 | |
| 9 | Spectral 94 Hotels, LLC | Norcross | Mason Ga | Woodstock, Ga | Raw Land Development | $3,250,000 | | $820,000 | $820,000 | |
| 10 | Spectral Real Estate, LLC | Tucker Ga | Woodstock, Ga | Woodstock, Ga | Insurance | $0 | 12/15/2014 | $1,789,345 | $1,789,345 | |
| 11 | Spectral Eatin Hotels, LLC | Tucker Ga | Stockbridge / Mason | Woodstock, Ga | Banking | $5,500,000 | 12/15/2014 | $6,231,664 | $6,231,664 | |
| 12 | Tucker Ga | Atlanta Airport | | | Operating Co | $500,000 | | $3,650,000 | $3,650,000 | |
| 13 | Spectral Dion Hotels, LLC | Tucker Ga | | | Office building | $17,500,000 | 10/15/2016 | $11,308,696 | $11,308,696 | |
| 14 | Dutch Ga | Dutch Ga | | | Operating Co | $1,300,000 | 6/1/2013 | $742,386 | $742,386 | |
| 15 | Spectral SLP Properties, LLC | B & H hotel | Madison / JP Morgan | New York | Retail Center | $9,300,000 | 4/15/2017 | $6,210,337 | $6,210,337 | |
| 16 | Spectral 94 Hotels, LLC | Atlanta Airport | Heritage Bank | Norcross, Ga | Developers | $8,500,000 | 10/15/2008 | $673,473 | $673,473 | |
| 17 | Spectral SP Hotels, LLC | Atlanta Airport | California | Carson | Pub | $1,200,000 | | $905,473 | $905,473 | |
| 18 | Spectral Development Company | Norcross | Newly | Woodstock, Ga | Developers | $1,200,000 | 1 year | $905,473 | $905,473 | |
| 19 | Spectral SLP Restaurants, LLC | Dutch Ga | Newly Bank | Woodstock, Ga | Licensed | $1,300,000 | 2 year | $720,000 | $720,000 | |
| 20 | Tucker Ga | Newly | Mason Ga Columbus, N.J | Licensed Deal Super | $1,300,000 | Past Due | $3,560,000 | $3,560,000 | |
| 21 | Birmingham Asset Management, Inc | Norcross | State Bank NJSC | Columbus St | Restaurant | $500,000 | 4/15/2013 | $7,423,646 | $7,423,646 | |
| 22 | Spectral Hospitality I, LLC | Myrtle Beach Sc | NJSC | Irwin | Operating Co | $2,500,000 | 4/15/2017 | $2,136,737 | $2,136,737 | |
| 23 | Atlanta Developer | State Bank, TX | Irwin TX | Hotel | $425,000 | | | | |
| 24 | Restaurant 111, LLC | Atlanta Developer | | | Hotel | $500,000 | | | | |
| 25 | Spectral Lamborg Core | Norcross | Budget / Trademark | | Budget / Trademark | $500,000 | | | | |
| 26 | Lambard Ga | Newland Ga | California | | Retail Center | $6,000,000 | 12/31/2011 | $6,430,000 | $6,430,000 | |
| 27 | Lambard Franchise supply System, LLC | Lambard Ga | Leased from Escrow | Galleria St | Raw Land Development | $18,500,000 | 7/5/2011 | $14,324,547 | $14,324,547 | |
| 28 | Garage Core, LLC | Lambard Ga | | Norgate St | Hotel & Escrow | $18,500,000 | | | | |
| 29 | Greenville, LLC | Greenville, Ga | Wonga Station | New York | Hotel | $4,000,000 | 6/1/2013 | $3,532,464 | $3,532,464 | |
| 30 | S & R Greenville LLC | Marietta, Ga | BB | St Mary, Florida | Hotel | $3,000,000 | 6/1/2013 | $5,000,000 | $5,000,000 | |
| 31 | Kingdom Hotels, LLC | | | | | $197,750,000 | | $16,479,393 | | |

Secretary of State
Business Information and Services
Suite 315, West Tower
2 Martin Luther King Jr. Dr.
Atlanta, Georgia 30334-1530

```
CONTROL NUMBER: 9636641
EFFECTIVE DATE: 12/04/1996
JURISDICTION  : ALABAMA
REFERENCE     : 0045
PRINT DATE    : 12/04/1996
FORM NUMBER   : 0316
```

R. C. PATEL
2100 PARKLAKE DR. N.E.
ATLANTA, GA 30345

## CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS

I, the Secretary  of State and  the  Corporation
Commissioner  of the State of Georgia, do hereby certify under the
seal of my office that

### RM HOTELS, INC.
### A FOREIGN PROFIT CORPORATION

has  been duly incorporated under the laws of the jurisdiction set
forth  above and has filed an application meeting the requirements
of  Georgia law to transact  business as a foreign  corporation in
this state.

WHEREFORE,  by the authority  vested in me  as Corporation
Commissioner,  the above named  corporation is hereby  granted, on
the  effective date stated  above, a certificate  of authority  to
transact  business in the State of Georgia as provided by Title 14
of the Official Code of Georgia Annotated.

WITNESS my hand and official seal in the City of Atlanta  and  the
State of Georgia on the date set forth above.



*Lewis A. Massey*

Lewis A. Massey
Secretary of State

2 Martin Luther King Jr. Drive
Atlanta, Georgia  30334-1530
(404) 656-2817

MAX CLELAND
Secretary of State
State of Georgia

XXX F. QUINN
Director

APPLICATION FOR CERTIFICATE OF AUTHORITY

DO NOT WRITE IN SHADED AREA - SOS USE ONLY

DOCKET # _96339050?_ PENDING CONTROL # _P16,2287_ CONTROL # _9636641_

Docket Code _316_ Name Reservation # _____ Corporation Type _FP_

Date Filed _12-4-96_ Amount Received $ _270.00_ Check/Receipt # _2146_

Jurisdiction (State/Country) Code _AL_

Examiner _____45_____ Date Completed _____

NOTICE TO APPLICANT:  PRINT PLAINLY OR TYPE REMAINDER OF THIS FORM.
INSTRUCTIONS ARE ON THE BACK OF THIS FORM.

1. __R M  HOTELS, INC__      963390501
   Corporate Name
   (Rev.) __4-6-96__                              Check One:  [X] Profit   [ ] Non-Profit
   Date Business Commenced (or Proposed) in Georgia

2. __R.C.PATEL__
   Applicant/Attorney                                      Telephone Number
   __2100    PARKLAKE    DR    NE__            __770-938-2060__
   Address
   __ATLANTA__                    __GA__              __30345__
   City                          State                Zip Code

3. __ALABAMA__              __4-5-96__              __PERPETUAL__
   Jurisdiction (Home State/Country)    Date of Incorpoartion    Period of Duration

4. __2100    PARKLAKE    DR    NE__
   Principal Office Mailing Address of Corporation
   __ATLANTA__                    __GA__              __30345__
   City                          State                Zip Code

5. __R.C.PATEL__
   Name of Registered Agent in Georgia
   __2100    PARKLAKE    DR__
   Registered Office Street Address in Georgia
   __ATLANTA__          __DEKALB__          __GA__  __30345__
   City                County              State    Zip Code

6. __R.C.PATEL__          __2460  KINGS  ARMS  POINT  ATL  303__
   Officer/CEO                    Address/City,State,Zip

   Officer/CFO __SHAMA    PATEL__    __2460  KINGS ARMS PT  ATL  30345__
   Officer/SEC                    Address/City,State,Zip

   Director                      Address/City,State,Zip

   Director                      Address/City,State,Zip

   Director                      Address/City,State,Zip

7. NOTICE:  Mail or deliver an original and one copy of this form and the Secretary of State filing fee (profit-$170, nonprofit-$70) to the Secretary of state at the above address.  A certificate of existence, certified by the home state or country within 90 days of filing in Georgia, must be filed with this application.  Photostated or faxed documents will not be accepted.

   Authorized Signature: _____    Date: _12/4/96_

# STATE OF ALABAMA

I, Jim Bennett, Secretary of State of the State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that

the domestic corporation records on file in this office disclose that RM Hotels, Inc. incorporated in Montgomery County, Montgomery, Alabama on April 10, 1996. I further certify that the records do not disclose that said RM Hotels, Inc. has been dissolved.



In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the City of Montgomery, on this day.

November 26, 1996

Date

Jim Bennett                                    Secretary of State

# FINANCIAL REPORT

FINANCIAL STATEMENT AS OF          10 / 31 / 2010 = R C Patel  - B

| ASSETS | | LIABILITIES AND NET WORTH | |
|---|---|---|---|
| Cash on hand and in depository institutions | $ 31,678 | Accounts payable | $0 |
| Marketable securities (Schedule A) | $508,000 | Notes payable and other loans  (Schedule F) | $4,621,000 |
| Notes receivable (Schedule B) | $3,125,584 | Real estate mortgages (Schedule C) | $182.510 |
| Real estate (Schedule C) | $182,500 | Other liabilities (Schedule G) | $0 |
| Proprietary interests and other securities (Schedule D) | $2,137,894 | **TOTAL LIABILITIES** | $4,803,510 |
| Retirement funds and other assets (Schedule E) | $22,500 | Net worth (Total assets less total liabilities) | $1,204,646 |
| TOTAL ASSETS | $6,008,156 | TOTAL LIABILITIES AND NET WORTH | $6,008.156 |

## CONTINGENT LIABILITIES

In addition to the liabilities listed on the Financial Statement, have you endorsed, guaranteed, or become otherwise indirectly or contingently liable for the debts of others or through a pending lawsuit?          ☒ Yes          ☐ No

If "yes," complete the following:

| Name and Address of Debtor or Obligor | Name and Address of Creditor or Obligee | Description and Value of Collateral | Date Due | Current Amount |
|---|---|---|---|---|
| Various Loans For companies I or others have | Various Banks | Hotels , Shopping Centers , Class A Office Building Etc | Various | |
| TOTAL | | | | $43,191,807 |

1

Exhibit C-4

## SUPPORTING SCHEDULES

Schedules must agree in total with the appropriate item contained in the Financial Statement on page 7 of this report.

## Schedule A ─ Marketable Securities

Indicate all debt and equity securities listed on an exchange or otherwise regularly traded in an open market. Separate debt and equity securities.  Securities of closely held corporations should be listed on Schedule D—Proprietary Interests. The description should include the name of the issuer, the principal amount or number of shares held, and the interest rate, if applicable. Small holdings may be aggregated and shown as "other" provided that they account for no more than 10 percent of marketable securities.

| Description | Market Value |
|---|---|
| Nexity Bank  - 20,000 shares @ $1.00 /share – From Wall Street Close | $20,000 |
| Hightrust Bank Georgia  = 200,00  @ $4.00 x 50%  - Book Value | $400,000 |
| Global Trust Bank – San Jose – 10,000 Share @ $8.80 – Book Value | $88,000 |
| TOTAL | $508,000 |

## Schedule B ─ Notes Receivable

The description should include the name of the obligor, the note's maturity and terms of repayment, and a description of any collateral.  If the note is payable to you and others jointly, indicate only your beneficial interest under Current Balance.

| Description | Current Balance |
|---|---|
| From various companies I have Ownership in | $3,125,584 |
| TOTAL | $3,125,584 |

2

## Schedule C — Real Estate and Related Loans

List all real estate in which you hold a beneficial interest. Submit year-end financial statements, including profit and loss statements, for the last two years for each investment (exclude residence) in which you have an interest equal to 10 percent or more of your net worth. Also submit a cash flow statement on any investment property valued at 10 percent or more of net worth.

| Description and Location (City and State) | Owner of Property | Percent Ownership | Mortgage Holder | Maturity Date | Current Market Value* | Current Balance** |
|---|---|---|---|---|---|---|
| Rental Home 2242 Kennedy Drive Suwanee, GA | RC Patel | 100% | Southern Horizon | 2015 | $325,000 | $182,510 |
| Vacant Land & Mobile Home Rt.1 Box 238, Pell City, AL | RC & Shama Patel | Joint 50 % | N.A | N.A | $125,000 | $0.00 |
| | | | | | | |
| | | | | | | |
| TOTAL | | | | | $500,000 | $182,510 |
| | | | | | | |

*Carry TOTAL forward to Assets - Real estate        **        Carry TOTAL forward to Liabilities - Real estate
   mortgages

## Schedule D — Proprietary Interests and Other Securities

List all companies, the shares of which are not listed on a securities exchange or otherwise regularly traded, in which you hold a beneficial interest. *(Submit year-end financial statements, including profit and loss and cash flow statements, for the last two years for each business interest in which you have an interest equal to 10 percent or more of your net worth.)*

| Name and Address of Company | Legal Form of Company | Nature of Business | Percent Ownership | Current Value |
|---|---|---|---|---|
| Various Companies I have ownership in | LLC's and Sub S Corps | Hotels , Real Estate Development's Etc | | $2,137,894 |
| TOTAL | | | | 2,137,894 |

## Schedule E - Other Assets

3

Include retirement funds (for example, 401K, IRA, Keogh), accounts receivable, merchandise and inventory at lower of cost or market value, machinery and equipment (less depreciation), and life insurance at its cash surrender value.

| Description | Basis for Valuation | Current Value |
|---|---|---|
| Life Insurance Policies | Cash Surrender Value-Cash Value $560K | Net after Loans $22,5000 |
| | | |
| | | |
| TOTAL | | $22,500 |

## Schedule F — Notes Payable and Other Loans

Indicate all loans or notes payable, including loans on life insurance and retirement funds (but not real estate mortgages listed in Schedule C). Loan origination information must include the original date, loan amount, and co-makers, if any, and their percent obligation. Small obligations may be aggregated and shown as "other," provided that they account for no more than 20 percent of other loans and notes payable. Indicate any debt that is contractually delinquent by an asterisk next to the current balance.

| Name and Address of Creditor and Loan Origination Information | Description and Value of Collateral | Maturity Date | Current Balance |
|---|---|---|---|
| Independent Bankers 10/15/06; original amt. $1,860,000 | Office & Personal House | 10/15/2011 | $1,863,000 |
| State Bank & Trust Company | Hightrust Bank Stock Book Values $400,000 | 04/01/2013 | $2,075,000 |
| | Initially secured by Haventrust Bank Ga stock – Now Unsecured | 09/30/20010 | $683,000 |
| Haven trust Bank Florida | Initially secured by Haventrust Bank Ga stock – and with HTBFL Stock Value $0.00 | 09/30/20010 | $683,000 |
| | | | |
| | | | |
| | | | |
| TOTAL | | | $4,621,000 |

## Schedule G - Other Liabilities

Include interest and taxes due and unpaid, other debts accrued, and other liabilities.

| Payable To | Description | Maturity Date | Current Balance |
|---|---|---|---|
| N/A | | | $0 |
| | | | $0 |

5

## Cash Flow Statement*

| Sources of Cash | 2006 | 2007 | 2008 | Projected Next Year 2010 |
|---|---|---|---|---|
| Salaries, wages, commissions, and other employment income ( 1 ) | $79,350 | $140,000 | $175,000 | |
| Rents, royalties, and investments = ( 2 ) | $48,561 | $70,000 | $50,000 | |
| Income from dividends and interest = ( 3 ) | $619,636 | $675,000 | $300,000 | |
| Income and other distributions from partnerships = ( 4 ) | $780,846 | $1,250,000 | $1,450,000 | |
| Other sources** = ( 5 ) | $0.00 | $0.00 | $0.00 | |
| Total cash received | $1,528,393 | $2,135,000 | $1,975,000 | |
| **Uses of Cash** | | | | |
| Personal living expenses (rent, household) = ( 6 ) | $200,000 | $225,000 | $300,000 | |
| Fixed obligations** = ( 7 ) | $681,000 | $675,000 | $525,000 | |
| Income taxes | $19,500 | $200,000 | $25,000 | |
| Capital contributions to partnerships | $0.00 | $0.00 | $0.00 | |
| Other uses** = ( 8 ) | $0.00 | $0.00 | $0.00 | |
| Total cash outlay | $900,500 | $1,100,000 | $850,000 | |
| NET CASH FLOW (deficit) | $627,893 | $1,035,000 | $1,125,000 | |

\*     Discuss any significant changes on a separate page.

\*\*    Itemize on a separate page any items amounting to 10 percent or more of total cash received or total cash outlay.

\*\*    Fixed obligations include debt service on all loans and any budgeted capital improvement expenditures for real estate investments. Any loan proceeds or debt service related to this transaction should be included in projections for other sources or uses.

6

**Privacy Act Notice**

The solicitation and collection of this information, including a Social Security Number, is authorized by those statutes that require an appropriate federal banking agency to determine the competence, experience, integrity, and financial ability of individuals proposing to serve a federally regulated financial institution in an official capacity – that is, as a director, officer, employee, or principal shareholder.  These statutes include:  12 U.S.C. § 27 (national bank charters); 12 U.S.C. § 1464 (federal savings bank charters); 12 U.S.C. § 1815 (federal deposit insurance); 12 U.S.C. § 1817(j) (changes in control of insured depository institutions); and 12 U.S.C. § 1831(i) (agency disapproval of directors and senior executive officers of insured depository institutions or depository institution holding companies).  The provision of requested information, including a Social Security Number, is voluntary.  However, the failure to provide any requested information may result in denial, disapproval, or delay in the processing of an application or notice.

Depending on the manner in which an appropriate federal banking agency maintains solicited information, some or all of that information may be subject to the Privacy Act of 1974, 5 U.S.C. § 552a.  In such instances, disclosures of covered information may be made to:  (1) third parties to complete background checks; (2) financial institutions for supervisory purposes; (3) governmental, tribal, self-regulatory, or professional organizations when information is relevant to either a known or suspected violation of law or licensing standard or relevant and necessary to the governmental or self-regulatory organization's regulation or supervision of financial service providers; (4) the Department of Justice, a court, an adjudicative body, a party in litigation, or a witness when relevant and necessary to a legal or administrative proceeding; (5) congressional offices when the information is relevant to an inquiry initiated on behalf of its provider; (6) an agency's contractors or agents; and (7) other third parties when mandated or authorized by statute.

Additionally, while certain of the solicited information is exempt from disclosure under the Freedom of Information Act because disclosure would constitute a clearly unwarranted invasion of personal privacy, other information is not exempt.  Nonexempt information will ordinarily include the names of individuals, the financial institutions that they propose to serve, the statutory context in which information has been provided, and prior bank-related employment and affiliation.

## CERTIFICATION

*If a joint financial statement is being submitted, both parties should complete the "Certification."*

I understand that the appropriate regulatory agency may conduct extensive checks into my background, experience, and related matters in conjunction with my application or filing.
I certify that the information contained in the biographical report and financial report, including all attachments, has been carefully examined by me and is true, correct, and complete. I acknowledge that any misrepresentation or omission of a material fact constitutes fraud in the inducement and may subject me to legal sanctions provided by 18 U.S.C. §§ 1001 and 1007.

Signed this 31 st day of  October   2010

_____          _____
Signature                                                          Signature*

 Rajesh Patel                                                   _____
Print or type name                                         Print or type name

_____          _____
Title (if applicable)                                       Title (if applicable)

7

# FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** (this "**Agreement**") is made and entered into effective as of June 8, 2011 (the "**Effective Date**"), by and among RM HOTELS, INC., an Alabama corporation ( the "**Borrower**"), RAJESH C. PATEL (the "**Guarantor**"), and RL BB FINANCIAL, INC. ("**RL BB**").

## W I T N E S S E T H:

**WHEREAS,** on December 10, 2007, the Borrower entered into a Secured Promissory Note in the original principal amount of $10,000,000.00 in favor of Branch Banking and Trust Company ("**BB&T**") with a maturity date of December 1, 2010 ((together with all renewals, modifications, increases and extensions thereof, the "**Note** "), the payment of which is secured by those documents set forth on **Exhibit "A"** attached hereto and incorporated herein by reference, and by other documents (collectively, along with the other documents executed contemporaneously herewith by the Borrower and/or the Guarantor, the "**Loan Documents**");

**WHEREAS,** the Note was subsequently modified by the Note Modification Agreement, dated February 1, 2009, and Addendum to Promissory Note, dated February 1, 2009 (collectively, the "**Modification**") which altered the payment terms of the Note;

**WHEREAS,** on December 10, 2007, the Guarantor, for and in consideration of BB&T's agreement to fund the Note, executed an Unconditional Guaranty of Payment and Performance (the "**Guaranty**"), wherein he personally and unconditionally guaranteed repayment of any obligations due from the Borrower to BB&T;

**WHEREAS,** as part of the covenants and obligations set forth in the Loan Documents, the Borrower executed a Deed to Secure Debt and Security Agreement (the "**DSD**"), wherein it conveyed to BB&T a security interest in certain real property located at 1419 Virginia Avenue, College Park, Fulton County, Georgia as described therein (collectively, the "**Property**") and in all of the Borrower's assets including, but not limited to, its accounts receivable, inventory, goods, chattel paper, instruments, documents, general intangibles and all other personal property, as more specifically described in the Loan Documents (all of the Borrower's real or personal property that is subject to RL BB's security interest is hereinafter referred to as the "**Collateral**," and the Collateral shall also secure all of the obligations of the Borrower and the Guarantor to RL BB);

**WHEREAS,** the Borrower and BB&T entered into an ISDA Master Agreement, dated December 7, 2007 (together with the Schedule thereto, the "**ISDA Master Agreement**"), pursuant to which the Borrower and BB&T thereafter entered into an interest rate derivative transaction (the "**Swap Transaction**") evidenced by a swap transaction Confirmation dated December 24, 2007 with BB&T ID # 13067NC (the "**Confirmation**," and the Confirmation, together with the ISDA Master Agreement and all documents executed in connection therewith, are collectively referred to herein as the "**Swap Agreement**");

**WHEREAS,** the Borrower acknowledges the occurrence and continuing existence of certain Events of Default under the Loan Documents, including both the Note and the ISDA

Page 1 of 23

Exhibit D-1

Master Agreement, due to the Borrower's failure to pay the Note and the Swap Agreement as and when due according to their terms, with said defaults first occurring by missing the following payments:

| Payment Due Date | Amount Due |
|---|---|
| January 1, 2010 | $21,485.77 |
| February 1, 2010 | $23,016.09 |
| March 1, 2010 | $47,437.51 |
| April 1, 2010 | $45,080.81 |

(collectively, the "**Existing Note Default**");

**WHEREAS,** on February 19, 2010, BB&T notified the Borrower, among others, of the Borrower's default and demanded that the Borrower cure its default under the terms of the Loan Documents;

**WHEREAS,** on April 21, 2010, BB&T notified the Borrower, among others, that the Borrower's failure to cure all defaults by April 26, 2010 would result in acceleration of the entire unpaid balance of the principal and interest under the Note effective as of 5:00 p.m. on April 26, 2010 and the Borrower and the Guarantor failed to cure said default in a timely manner;

**WHEREAS,** by letters dated March 3, April 2, and May 6, 2010, BB&T informed the Borrower that it had failed to make certain scheduled periodic swap payments due under the Swap Agreement totaling $92,903.45 (the "**Missed Payment Notices**"). In such letters, BB&T further advised the Borrower that if it did not cure such payment default by the grace period provided in the Swap Agreement, it would be in default under the Swap Agreement;

**WHEREAS,** the Borrower did not cure this payment default within the grace period provided in the Swap Agreement (the "**Existing Swap Default**," and, together with the Existing Note Default, sometimes hereinafter collectively referred to as the "**Existing Defaults**");

**WHEREAS,** following the Existing Defaults, on or about May 12, 2010, BB&T gave the Borrower notice (the "**Termination Notice**") that an Early Termination Date of May 12, 2010 had been designated pursuant to Section 6(a) of the ISDA Master Agreement (the "**Early Termination**");

**WHEREAS,** the Early Termination resulted in the calculation of a "Settlement Amount" pursuant to the terms outlined in Section 6(e)(i)(3) of the Swap Agreement. In the Termination Notice, BB&T gave the Borrower notice of the Settlement Amount due as a result of the Early Termination;

**WHEREAS,** as a result of the Existing Defaults and the Early Termination, the Borrower is indebted to RL BB under the Note and Swap Agreement in the amounts set forth more specifically herein;

**WHEREAS,** on May 18, 2010 the Borrower filed for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United

States Bankruptcy Court for the Northern District of Georgia (the "**Court**") in a case entitled <u>In re RM Hotels, Inc.</u>, Case No. 10-74708-CRM (the "**Bankruptcy Case**");

**WHEREAS,** on or about September 22, 2010, BB&T filed a civil action against the Guarantor in the United States District Court for the Northern District of Georgia entitled <u>Branch Banking and Trust Company v. R.C. Patel</u>, Civil Action Case No. 1:10-cv-3046-TCB (the "**Lawsuit**");

**WHEREAS,** on or about September 30, 2010, BB&T transferred and assigned to RL BB all of its right, title and interest in and to the Note, the Swap Agreement, the Guaranty, the Collateral and the Loan Documents;

**WHEREAS,** the Lawsuit remains ongoing against the Guarantor, and RL BB has reserved all of its rights to continue to pursue a judgment against the Guarantor for sums due under the Note and the Swap Agreement;

**WHEREAS,** RL BB has been forced to expend certain legal fees and other expenses in connection with the Borrower's default under the terms of the Loan Documents, and will continue to incur legal fees regarding the Borrower's default and the resolution of same; and

**WHEREAS,** RL BB, the Borrower and the Guarantor desire to enter into an agreement whereby RL BB will forbear from exercising its rights and remedies under the Loan Documents during the term of this Agreement, subject to (a) the performance by the Borrower and the Guarantor of certain obligations, as provided in this Agreement, and (b) the Borrower's and the Guarantor's strict compliance with all terms and conditions of the Loan Documents, except as modified by this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and benefits herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Incorporation of Recitals; Capitalized Terms**.  All the above-referenced recitals are specifically incorporated herein by reference.  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in the Loan Documents.

2.    **Default; Acceleration; Notice of Default**.  The Borrower and the Guarantor hereby acknowledge and agree that the Borrower is in default under the Loan Documents by reason of (i) the Borrower's failure to make the scheduled payments of principal and interest due on the Note after January 1, 2010; (ii) the Borrower's failure to make the payments due under the Swap Agreement.  In addition, the Borrower and the Guarantor acknowledge and agree that (i) the Note has been accelerated, such that the full balance due under the Note is now due and payable; and (ii) the Swap Agreement has been terminated in accordance with its terms, and the Settlement Amount is due and payable.  Moreover, the Borrower and the Guarantor acknowledge and agree that satisfactory notice of Existing Defaults has been duly and properly given to the Borrower and the Guarantor by BB&T, in accordance with the Loan Documents, such that the Borrower and the Guarantor hereby waive any other notice.

3.    **Waiver of Defenses and Presentment**.  The Borrower and the Guarantor hereby irrevocably waive any and all defenses that they may have, or claim to have, to the validity, execution or enforceability of the Note, the Swap Agreement or any of the other Loan Documents, and further waive any further notice or presentment with regard to (i) the Borrower's defaults under the terms of the Loan Documents, (ii) BB&T's acceleration of the Note, and (iii) BB&T's termination of the Swap Agreement.

4.    **Representations, Warranties and Agreements of the Borrower and the Guarantor**.  The Borrower and the Guarantor represent, warrant, and agree as follows:

(a)    Facts in Preamble and Recitals.  The facts set forth in the preamble and recitals hereto are true and correct in all material respects.

(b)    Total Balance Due.  As of the Effective Date of this Agreement, the Borrower has the following due and outstanding obligations to RL BB:

(1)    Amounts Due under the Note:

| | |
|---|---|
| • Existing Principal Balance | $9,522,970.01 |
| • Accrued Interest | $209,314.66 |
| • Fees | $64,135.00 |
| • Total Due on Note | $9,796,419.67 |

(2)    Amounts Due under the Swap Agreement:

| | |
|---|---|
| • Settlement Amount | $330,875.66 |
| • Accrued Interest | $28172.22 |
| • Total Due on Swap | $359,047.88 |

(For all purposes related to this Agreement, the total of the amounts indicated as the "Total Due on Note" and "Total Due on Swap," less and except any payment of principal that RL BB may receive subsequent to the execution of this Agreement, shall hereinafter collectively be referred to as the "**Total Balance Due**").  The Borrower and the Guarantor hereby acknowledge and agree that the balance due and outstanding under the Note and the Swap Agreement is true and correct, and herewith irrevocably waive and forever quitclaim any rights or defenses that they may have, or claim to have, as to the amounts and balances set forth in this Agreement.

(c)    Written Information.  All written information furnished to RL BB as part of the negotiations that led to this Agreement (including financial statements, accounting records, schedules or lists of assets, tax information, documents and written information furnished by third parties on behalf of the Borrower or the Guarantor) are truthful, accurate, and not misleading in the context in which presented.

(d)    Loan Documents.  The Loan Documents have not been amended or modified, except as referenced in this Agreement.  All of the representations and warranties set forth in the Loan Documents remain in full force and effect as if made on

the Effective Date of this Agreement subject to changes (i) arising due to the passage of time, or (ii) provided in writing to RL BB. No Event of Default under the Loan Documents has occurred and is continuing, except the Existing Defaults. Subject only to the automatic stay arising out of the Bankruptcy Case, the Loan Documents (as modified by this Agreement) may be enforced in accordance with their terms by RL BB against the Borrower, the Guarantor and the Collateral. The Borrower and the Guarantor claim no defense, right of offset or counterclaim against enforcement of the Loan Documents, and have no other claim against BB&T or RL BB.

(e)    Status of the Bankruptcy Case. The Borrower has carried out all of its duties as a debtor-in-possession in the Bankruptcy Case, and remains a debtor-in-possession as that term is used in 11 U.S.C. §§ 1107 and 1108. There has been no motion filed to appoint a Chapter 11 Trustee, or an Examiner with Special Powers, nor has a motion been filed to convert the case to one under Chapter 7 of the Bankruptcy Code.

(f)    Authority. The Borrower is an Alabama corporation duly formed, validly existing, and is in good standing to do business under the laws of the State of Georgia. Subject to obtaining Bankruptcy Court approval of this Agreement, the Borrower and the individual(s) executing this Agreement and the related documents on behalf of the Borrower have full power and authority to execute, deliver and perform this Agreement and the related documents. Subject to approval of the Bankruptcy Court, upon notice to all parties to the Bankruptcy Case, this Agreement and the related documents shall be the legal and binding obligations of the Borrower and the Guarantor, enforceable in accordance with their respective terms.

(g)    No Conflict; No Consent. Except as to the provisions of the Bankruptcy Code, the execution, delivery and performance of this Agreement and the related documents, and the consummation of the transactions thereby contemplated, will not conflict with (i) any law, statute or regulation to which the Borrower, the Guarantor or the Collateral and are subject; (ii) any judgment, license, order or permit applicable to the Borrower, the Guarantor or the Collateral; or (iii) any indenture, mortgage, deed to secure debt or other instrument to which the Borrower, the Guarantor or the Collateral are subject.

(h)    Financial Condition. The financial statement that the Borrower and the Guarantor will deliver to RL BB within ten (10) days from the Effective Date of this Agreement, are true and correct, and fairly present the financial conditions of the Borrower and the Guarantor. These financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied. As of the Effective Date of this Agreement, there are no obligations, liabilities or indebtedness (including contingent liabilities) that are material to the Borrower, the Guarantor or the Collateral that are not reflected in such financial statements. No material adverse change has occurred in the financial condition of the Borrower or the Guarantor since the date of the most recent financial statements that the Borrower and the Guarantor have delivered to RL BB.

WCSR 4616113v3A

(i)    <u>Ownership of Collateral</u>.  The Borrower owns the Collateral free and clear of all liens, security interest or other encumbrances, except the liens and encumbrances permitted by the Loan Documents (or otherwise disclosed to RL BB in writing).

(j)    <u>Litigation</u>.  With the exception of the Bankruptcy Case, the Lawsuit, and other actions listed on a "Schedule of Pending Litigation and Judgments" that the Borrower and the Guarantor will deliver to RL BB within ten (10) days of the Effective Date of this Agreement, which shall be incorporated into this Agreement as Exhibit 4(j), no litigation, investigation or governmental proceeding is pending, or to the actual knowledge of the Borrower and the Guarantor threatened, against or affecting the Borrower, the Guarantor or the Collateral, that might result in a material adverse change in the business, properties or operations of the Borrower or the Guarantor, or the value of the Collateral.

(k)    <u>Environmental Matters</u>.  The Borrower and the Guarantor have no knowledge of (i) any release or threatened release of any Hazardous Materials on the Property, or (ii) the existence of any Hazardous Materials located on the Property.  To the actual knowledge of the Borrower and the Guarantor, neither the Borrower, nor any tenant of any portion of the Property, has generated, stored, handled, used or disposed of any Hazardous Materials on the Property.  Neither an officer of the Borrower nor the Guarantor has received any oral or written notice of any environmental, nuisance or injury claims against the Borrower from any governmental or private entity relating in any way to the use of the Property.  To the Borrower's and the Guarantor's actual knowledge, the Borrower has complied with all Environmental Laws applicable to the Property.

(l)    <u>Disclosure</u>.  No representation or warranty made by the Borrower or the Guarantor in the Loan Documents or this Agreement contains any untrue statement of a material fact, or fails to state any material fact necessary to make the statements therein not misleading.  There is no fact known to the Borrower or the Guarantor that has, or might reasonably be anticipated to have, a material adverse effect on the business, assets, financial condition or operations of the Borrower or the Guarantor that has not been disclosed to RL BB in writing.

(m)    <u>Reliance</u>. THE BORROWER AND THE GUARANTOR (I) ARE REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF THE THEIR CHOICE IN THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT; (II) ARE FULLY AWARE AND CLEARLY UNDERSTAND ALL OF THE TERMS CONTAINED IN THIS AGREEMENT AND THE RELATED DOCUMENTS, (III) HAVE VOLUNTARILY, WITH FULL KNOWLEDGE AND WITHOUT COERCION OR DURESS OF ANY KIND, ENTERED INTO THIS AGREEMENT AND THE RELATED DOCUMENTS; (IV) ARE NOT RELYING ON ANY REPRESENTATION, EITHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, MADE BY RL BB OTHER THAN AS SET FORTH IN THIS AGREEMENT; (V) HAVE ON THEIR OWN INITIATIVE HAVE MADE PROPOSALS TO RL BB, THE TERMS OF WHICH ARE REFLECTED BY THIS AGREEMENT; AND

(VI) HAVE RECEIVED ACTUAL AND ADEQUATE CONSIDERATION TO ENTER INTO THIS AGREEMENT AND THE RELATED DOCUMENTS.

(n)    No Novation. This Agreement shall not constitute a novation of the indebtedness evidenced by the Loan Documents.

(o)    Commercially Reasonable. The Borrower and the Guarantor hereby acknowledge and agree that the terms and conditions of the Loan Documents, including, without limitation, any late fees and the default interest rate, are commercially reasonable.

(p)    Exercise of Remedies. Upon obtaining relief from the Bankruptcy Court after notice and hearing to all parties, RL BB will be authorized and legally empowered to exercise any or all of the remedies provided to it under the Loan Documents including, but not limited to, foreclosure upon, or liquidation of, the Collateral.

RL BB is relying upon the Borrower's and the Guarantor's representations, warranties and agreements in entering into this Agreement, and the Borrower and the Guarantor make these representations, warranties and agreements for the purpose of influencing the decision of RL BB with respect to the provisions of this Agreement.

5.    **Term of Forbearance**. The term of this Agreement shall commence on the Effective Date and shall terminate on December 31, 2012, unless extended to December 31, 2015, pursuant to Paragraph 6(d) herein.

6.    **Forbearance Conditions.** During the term of this Agreement, RL BB agrees to forbear from exercising any and all rights and remedies under the Loan Documents as a result of the Existing Defaults, provided that the Borrower and the Guarantor meet, or cause the Borrower to meet, the following conditions (collectively, the "**Forbearance Conditions**"):

(a)    Performance Under This Agreement. The Borrower and the Guarantor duly and punctually observe, perform and discharge each and every obligation and covenant to be performed under this Agreement, subject to all applicable notice and right to cure provisions provided herein.

(b)    Performance Under the Loan Documents. The Borrower and the Guarantor strictly comply with the terms and conditions set forth in the Loan Documents, except those terms and conditions that (i) relate to regular payments as specified in the Note and the Swap Agreement; or (ii) are prohibited as a result of the Bankruptcy Case, and no additional breach of the Loan Documents (other than the Existing Defaults) occurs.

(c)    Payment of Interest. The Borrower and the Guarantor agree that under this Agreement, the Borrower shall pay interest on the entire outstanding Total Balance Due as follows:

(i)    Beginning on the first day of the first month following the Effective Date and continuing on the first day of each month

thereafter through December 31, 2011, the Borrower shall pay interest on the outstanding Total Balance Due at the rate of three percent (3.0%);

(ii)  Beginning on January 1, 2012 and continuing on the first day of each month thereafter through December 31, 2012, the Borrower shall pay interest on the outstanding Total Balance Due at the rate of the five percent (5.0%);

(iii)  Beginning on January 1, 2013 and continuing on the first day of each month thereafter through December 31, 2015, if the Loan Obligation is extended pursuant to Paragraph 6(d), the Borrower shall pay interest on the outstanding Total Balance Due at the rate of the Wall Street Journal Prime Rate plus three percent (Prime + 3.0%), with a floor minimum rate of seven percent (7%).

(iv)  From and after the date of the closing of any transaction wherein RL BB shall subordinate its lien to that of another lender, interest shall then accrue on the Total Balance Due at the rate of the Wall Street Journal Prime Rate plus 3%, with a floor minimum rate of seven percent (7%).

(d)  Forbearance Period.  For so long as the Borrower and the Guarantor strictly comply with all of the terms, conditions and provisions of this Agreement, RL BB will forbear from exercising its rights and remedies under the Loan Documents through December 31, 2012.  If the Borrower is able to reduce the Total Balance Due as of the Effective Date by no less than $5,000,000.00 on or before December 31, 2012, then the Forbearance Period shall be extended until December 31, 2015.

(e)  Reserves for Furniture, Fixtures and Equipment.  Prior to December 31, 2011, the Borrower shall be authorized to expend any reserves that it may have compiled for purchase and replacement of furniture, fixtures and equipment (the "**FF&E Reserve**"), only for the renovation of 44 individual room units in the Property (the "**Renovated Units**").  During this period, the Borrower shall submit to RL BB, no less frequently than once a quarter,

(i)  a budget for all costs associated with renovating the Renovated Units;

(ii)  a status report on the progress of the renovation to the Renovated Units;

(iii)  all contracts into which the Borrower has entered in connection with the Renovated Units; and

(iv)  all expenditures made in furtherance of the renovation of the Renovated Units.

WCSR 4616113v3A

(f)    <u>Escrow for Taxes</u>.  Prior to December 31, 2011, RL BB shall not require the Borrower to fund any escrow for the payment of taxes due on the Property.  After December 31, 2011, the Borrower shall fund on a monthly basis an escrow account for the payment of taxes with the monthly funding to be 1/12 of the total taxes due for the preceding calendar year.

(g)    <u>Payment of Insurance</u>.  Within ten (10) days from the Effective Date of this Agreement, the Borrower shall provide to RL BB an ACCORD Statement or other document indicating the types of insurance and coverage limits that the Borrower maintains with regard to the Property.  The Borrower shall maintain insurance coverage on the Property in such amounts, with such types of coverage, and with such carriers as are commercially reasonable for a property and business operation similar to that of the Borrower, and shall identify RL BB as mortgagee loss payee on each such policy.  Within fifteen (15) days prior to the expiration of any policy coverage related to the Property, the Borrower shall provide RL BB with written evidence, in the form of a receipt or other document from the carrier or agent, that any premiums due for policies related to the Property or the Borrower's business have been paid in full.

(h)    <u>Payments of Taxes, Licenses and Permits</u>.  The Borrower shall promptly pay, as and when due, any and all taxes, assessments, permit fees, license fees, fines, or any other amounts due to any State, Federal, local or municipal governments or government agencies that are related to, or payable in connection with, the Property or the Borrower's operation of the Property, and Borrower shall provide RL BB with evidence of the payment of each such tax, assessment, permit fee, license fee or fine on a quarterly basis beginning on the first day of the first calendar quarter after the Effective Date of this Agreement and continuing on the first date of each calendar quarter thereafter.

(i)    <u>Payment of all Net Cash Flow</u>.  The Borrower shall submit to RL BB on the tenth day of the month following the Effective Date of this Agreement, and then on the tenth day of each month thereafter, all of the net operating cash flow from the Property (the "**Net Cash Flow**") for the preceding month, with said Net Cash Flow to be applied to the reduction of the Principal Balance.  Net cash flow shall be defined as:

➢    All gross income from the Property, from whatever source;

➢    *Minus,*

(i)    Interest paid under this Agreement;

(ii)    All ordinary course operating expenses associated with the Property substantially in accordance with the pro forma expense statement that the Borrower will provide to RL BB within ten (10) days from the Effective Date of this Agreement, which shall be incorporated into this Agreement as Exhibit 6(i); and

     (iii)     Payments to reserves or escrows for capital maintenance, FF&E, taxes, insurance or other items required by the terms of the Loan Documents or this Agreement.

➤    ***Equals Net Cash Flow.***

(j)    <u>Execution of a Modification of the DSD</u>.  Within ten (10) days from the Effective Date of this Agreement, Borrower shall execute a commercially reasonable modification of the DSD as RL BB deems appropriate, in its reasonable discretion.

(k)    <u>Approval of this Agreement in the Bankruptcy Case</u>.  Within ten (10) days from the Effective Date of this Agreement the Borrower shall file a Motion with the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 4001(d), that proposes to incorporate this Agreement as part of the terms of an Order resolving RL BB's pending Motion for Relief From the Automatic Stay, and shall request expedited hearing on said Motion.

(l)    <u>Resolution of the Bankruptcy Case</u>.  Within ten (10) days from the Effective Date of this Agreement, the Borrower shall file a Motion to Dismiss the Bankruptcy Case, and set a hearing on said Motion.  In the event that the Court refuses to dismiss the Bankruptcy Case after notice and a hearing, then, within twenty (20) days from the entry of the Order denying the Motion to Dismiss, the Borrower shall file and prosecute a Plan of Reorganization that incorporates all of the terms and provisions of this Agreement, and shall expeditiously pursue confirmation of said plan.  THE PARTIES INTEND THAT SUCH A DISMISSAL HAS BEEN BARGAINED FOR IN GOOD FAITH AND FOR VALUABLE CONSIDERATION, AND WILL BE WITH PREJUDICE TO THE BORROWER'S RIGHT TO FILE A SUBSEQUENT BANKRUPTCY FOR SO LONG AS RL BB HOLDS ANY FORM OF SECURITY INTEREST IN THE PROPERTY.

(m)    <u>Consent to Judgment</u>.  Within ten (10) days from the Effective Date of this Agreement, the Guarantor shall execute a Consent Order in the Lawsuit wherein he shall consent to the entry of final judgment against him in the Lawsuit in the amount of $3,000,000.00.

(n)    <u>Monthly Operating Reports</u>.  On the twentieth day of the first month following the execution of this Agreement, and continuing on the twentieth day of each month thereafter, the Borrower shall submit to RL BB by overnight courier the following documentation:

     (i)     The bank statements from the Borrower's operating, tax, payroll and other accounts;

     (ii)     Computer revenue reports detailing the gross revenues from the Property, from whatever source, and the expenses associated with the operation of the Property;

WCSR  4616113v3A

(iii)      Any monthly operating reports that the Borrower maintains or prepares in the ordinary course of its business;

(iv)      A report or spreadsheet that clearly details the Borrower's current accounts payable and current accounts receivable aging.

(o)      Consent by Franchisor.  Within twenty (20) days from the Effective Date of this Agreement, the Borrower and RL BB will negotiate in good faith with Choice Hotels International, Inc. ("**Choice Hotels**") with respect to a tri-party agreement among the parties with regard to certain aspects of the Borrower's agreement with Choice Hotels (the "Franchise Agreement"), which tri-party agreement will provide, among other things, as follows:

(i)      The terms and conditions upon which the Franchisor may terminate the Borrower's Franchise Agreement, including a cure period of no less than thirty days, with notice to the Borrower and RL BB and an opportunity for RL BB to cure, in its sole and absolute discretion, any defaults under the Franchise Agreement;

(ii)      An extension of the terms of the Franchise Agreement through and including December 31, 2015.

Notwithstanding anything provided to the contrary in this Section 6(o), the Borrower shall have the right to replace Choice Hotels as the franchisor for the Property with another national hotel franchisor that is approved by RL BB, which approval shall not be unreasonably withheld or delayed.  RL BB agrees that in the event that the Borrower undertakes so to replace Choice Hotels, and is otherwise in compliance with the provisions herein other than those with respect to Choice Hotels, the Borrower shall have a period of ninety (90) days to effect the replacement of Choice Hotels, and RL BB shall cooperate reasonably with the Borrower, at no expense to RL BB, in carrying out such replacement.

(p)      Subordinate Mortgage on Other Real Property.  Affiliates of the Guarantor control Diplomat ONH Hotels, LLC ("Diplomat ONH"), an entity that owns certain improved real property located at 3601 North Desert Drive, East Point, Georgia that is currently being operated as a Comfort Inn (the "**East Point Property**").  Within ten (10) days from the Effective Date of this Agreement, Guarantor cause such Affiliate to take all steps necessary for Diplomat ONH to convey to RL BB a subordinate security interest in the East Point Property and the rights, profits and proceeds therefrom, including, but not limited to, a deed to secure debt and any other documents necessary to properly document and perfect the conveyance of the security interest in the East Point Property. Guarantor agrees to pay any and all costs associated with the conveyance of the security interest in the East Point Property, including, but not limited to, title searches, tax searches, document preparation, recording fees, abstract fees and other costs associated with preparation and recordation of the documents.

(q)    Subordination by RL BB to a New First Mortgage on the Property.  If the Borrower is able to secure a new mortgage loan for the Property that:

(i)    Is based on commercially reasonable market terms and rates of interest, including, but not limited to:

(A)    an amortization period of not less than fifteen (15) years;

(B)    a term of not less than thirty-five (35) months;

(C)    a pre-payment penalty of five percent (5%) in the first year, and decreasing one percent (1%) each year until it is cancelled in the sixth (6th) year; and

(D)    a rate of interest equal to the greater of i) seven percent (7%) or ii) the then current market rate for commercial first mortgages on properties similar to the Property.

(ii)    Provides for a paydown of the outstanding Total Balance Due as of the Effective Date of no less than $5,000,000.00;

then, simultaneously with the receipt of such paydown, in immediately available funds, RL BB will execute such documents as are reasonably necessary for it to subordinate its security interest in the Property to a second-priority position that is junior to said new lender. RL BB acknowledges that the Borrower may use a government finance program with respect to such new financing.

(r)    No Material Adverse Change.  After the Effective Date, no material adverse change occurs in (i) any of the Guarantor's financial condition, (ii) the value of the Collateral, or (iii) the Borrower's business, prospects or financial condition.

(s)    Representations and Warranties.  No representation or warranty made by the Borrower or the Guarantor in this Agreement proves to have been false or misleading in any material respect.

(t)    Bankruptcy; Insolvency.  The Guarantor shall not (i) be finally adjudicated insolvent in any proceeding by a court or agency of competent jurisdiction, or (ii) have a receiver or trustee appointed to manage his assets or business affairs, and not have such trustee or receiver removed within one hundred twenty (120) days of appointment.

(u)    Merger; Sale of Collateral.  The Borrower does not undertake to merge its business assets and liabilities or business operations with any other person or entity, and neither the Borrower nor the Guarantor transfer, assign, pledge, encumber, hypothecate, gift, sell or otherwise convey any assets that either (i) comprise a portion of the Collateral for repayment of the Note, or (ii) have been purchased with the proceeds from the sale of the Collateral that secured repayment of the Note without prior written approval from RL BB.

(v)    <u>Maintenance of Collateral</u>.  The Collateral is maintained in its present condition.

(w)    <u>Restraint on Business</u>.  The Borrower is not enjoined, restrained or in any way prevented by court order from conducting all or a material part of its business affairs.

(x)    <u>Judgment</u>.  There is no entry by any Court of a final judgment against the Borrower or the Guarantor, other than the Lawsuit, and the other matters listed in Schedule 4(j), there is no attachment of any interest in the Collateral that is not fully discharged to the satisfaction of RL BB within thirty (30) days after the date of entry.

(y)    <u>Preexisting Debt</u>.  There is no payment by the Borrower on account of any preexisting debt to creditors, except that the Borrower may make payments in the ordinary course of business for current taxes or accounts payable as the same come due.

(z)    <u>Other Debt</u>.  There is no default in the payment, or acceleration of the maturity, of any indebtedness of the Borrower owing to any other person.

7.    **Default**.  If any one or more of the Forbearance Conditions is not satisfied, and Borrower does not cure (i) any applicable monetary default within ten (10) days after the delivery of written notice from RL BB, (ii) any applicable non-monetary default within thirty (30) days after the delivery of written notice from RL BB; or (iii) any applicable default that is of such an extraordinary nature that it cannot be cured through the exercise of commercially reasonable means within thirty (30) days, then within sixty (60) days of written notice from RL BB, this Agreement shall automatically terminate without notice to the Borrower or the Guarantor, and, subject to obtaining any necessary relief from the Bankruptcy Court, RL BB shall be free to exercise any and all rights and remedies that it may have under the Note or the other Loan Documents executed in connection therewith, whether at law or in equity.  In the event of such default, Borrower agrees to waive and release any of the protections of the automatic stay arising out of 11 U.S.C. § 362, and will consent upon demand to the entry of an order in the Bankruptcy Case providing RL BB with relief from the automatic stay, without the need for further hearing before the Court.  Any decision by RL BB not to exercise its rights upon the occurrence of an event of default is not, and shall not be construed to be, a waiver of RL BB's rights to recognize said event of default as a material breach of the terms of this Agreement in the future, nor shall it be a waiver of RL BB's rights to avail itself of its available remedies arising out of, or accruing as a result of, any such event of default.

8.    **Borrower's and Guarantor's Agreements**.  Until payment in full of the Total Balance Due and the full performance of all other obligations of the Borrower and the Guarantor to RL BB under this Agreement and the Loan Documents, unless RL BB otherwise consents in writing, the Borrower and the Guarantor will perform the following agreements:

(a)    <u>Prospects</u>.  The Borrower will deliver to RL BB on or before the tenth (10th) day of each month during the term of this Agreement a written report specifying:

(i)    the identity of each person (a "**Prospect**") with whom the Borrower has negotiated to purchase or refinance the Collateral or recapitalize the Borrower,

    (ii)      the status of the negotiations with each Prospect, and

    (iii)     the projected timetable for the consummation of the transaction proposed by each Prospect.

(b)    Loan Sale. The Borrower hereby acknowledges that RL BB can sell the Note, the Guaranty and its rights under the Swap Agreement, and transfer the Loan Documents (as modified by this Agreement) to any person designated by RL BB, on such terms and for such consideration as RL BB might determine from time to time in RL BB's absolute discretion, but only so long as such transfer does not alter or modify the terms of the agreements between the Borrower, the Guarantor, and RL BB as reflected in the Loan Documents. Within ten (10) days after each written request therefore, the Borrower and the Guarantor agree to provide to RL BB estoppel certificates executed by the Borrower and the Guarantor stating the then outstanding Total Balance Due, the status of the Borrower's performance under the Loan Documents (as modified by this Agreement) and whether the Borrower or the Guarantor assert any claims, counterclaims, defenses or other rights against RL BB or under the Loan Documents (as modified by this Agreement) and, if so, a detailed description of each such claim. The Borrower and the Guarantor specifically acknowledge that if RL BB elects to sell the Loan Documents for less than the amount owing to RL BB, any such discount will not reduce the amount owing by the Borrower and the Guarantor to RL BB or any successor in interest to RL BB.

(c)    Information. When requested by RL BB, the Borrower and the Guarantor will promptly give RL BB, and any commercially reasonable third parties designated by RL BB, access to, and permit RL BB and such third parties to inspect, the Collateral and to examine, copy and make excerpts from all books, records and documents relating to the financial condition and business affairs of the Borrower and the Collateral, at no expenses to the Borrower or the Guarantor save and except ordinary course of business office and administrative personnel and services necessary to facilitate said inspection. The Borrower and the Guarantor warrant that all information provided to RL BB and such third parties will be complete, true and correct in all material respects. RL BB will not be liable to the Borrower or the Guarantor for the commercially reasonable use made of information provided by the Borrower or the Guarantor to any third party, including, but by no means limited to, disclosure of the information to any entity that is considering purchasing the Loan Documents from RL BB.

(d)    Notice of Change. The Borrower and the Guarantor agree to give prompt written notice to RL BB of,

    (i)      any Event of Default, as defined by the Loan Documents, or default under the terms of this Agreement;

    (ii)     any occurrence that might mature into an Event of Default, whether by the passage of time, giving of notice or otherwise;

(iii)    any default under any material agreement to which the Borrower is a party or by which the Collateral is bound or the acceleration of the maturity of any indebtedness owing by the Borrower;

(iv)    all litigation affecting the Borrower or the Collateral that is not adequately covered by insurance, or which represents a potential liability in excess of Ten Thousand and No/100 Dollars ($10,000.00); and

(v)    any other matter that might result in a material adverse change in the value of the Collateral or in the financial condition of the Borrower or the Guarantor.

Such notice will describe the foregoing matters with particularity, and the actions that the Borrower or the Guarantor is taking or proposed to take with respect thereto.

(e)    <u>Waiver of Confirmation</u>. For and in consideration of the valuable accommodations and consideration that the Borrower and the Guarantor have received under this Agreement, both the Borrower and the Guarantor waiver, release and quitclaim any rights that either of them may have, under O.C.G.A. § 44-14-161, *et seq.* or otherwise, to insist that RL BB file an action to confirm any subsequent foreclosure sale of the Property as a prerequisite to RL BB's right to institute an action to collect upon the Consent Judgment entered in accordance with Paragraph 6(m) or any deficiency balance that may remain from the Total Balance Due after the foreclosure sale. The Borrower and the Guarantor herewith release, waive and quitclaim any defense to an action to collect the Total Balance Due, or any portion thereof, that arises out of, or is in any way based upon, RL BB's failure to report and confirm a subsequent foreclosure sale of the Property.

(f)    <u>Coverage of the DSD</u>. The Borrower and the Guarantor acknowledge and agree that the DSD secures repayment of the Note and all amounts due under the Swap Agreement to RL BB or its successors in interest.

9.    **Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, by facsimile transmission or by electronic mail transmission with receipt acknowledged, or (b) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, addressed as follows:

TO THE BORROWER:

RM Hotels, Inc.
c/o Diplomat Companies
2100 Park Lake Drive
Atlanta, GA  30343
Attention: Rajesh C. Patel
Facsimile No.:  (678) 987-2392
Email: rc@diplomatcompanies.com

WCSR  4616113v3A

WITH A COPY TO:

> Frank B. Wilensky, Esq.
> Macey, Wilensky, Kessler & Hennings, LLC
> 230 Peachtree Street, N.W.
> Suite 2700
> Atlanta, GA 30303-1561
> Facsimile No.: (404) 681-4355
> Email: fwilensky@maceywilensky.com

WITH A COPY TO:

> Simon H. Bloom III, Esq.
> The Bloom Law Firm, LLP
> 977 Ponce de Leon Avenue
> Atlanta, GA 30306
> Facsimile: (404) 577-7715
> Email: sbloom@bloom-law.com

WITH A COPY TO:

> David N. Minkin, Esq.
> Smith Gambrell & Russell
> 1230 Peachtree Street, N.W.
> Suite 3100
> Atlanta, GA 30309
> Facsimile: (404-685-6905
> Email: dminkin@sgrlaw.com

TO THE GUARANTOR:

> Rajesh C. Patel
> c/o Diplomat Companies
> 2100 Park Lake Drive
> Atlanta, GA  30343
> Attention: Rajesh C. Patel
> Facsimile No.:  (678) 987-2392
> Email: rc@diplomatcompanies.com

WITH A COPY TO:

> Simon H. Bloom III, Esq.
> The Bloom Law Firm, LLP
> 977 Ponce de Leon Avenue
> Atlanta, GA 30306
> Facsimile: (404) 577-7715
> Email: sbloom@bloom-law.com

WCSR 4616113v3A

WITH A COPY TO:

    David N. Minkin, Esq.
    Smith Gambrell & Russell
    1230 Peachtree Street, N.W.
    Suite 3100
    Atlanta, GA 30309
    Facsimile: (404-685-6905
    Email: dminkin@sgrlaw.com

TO RL BB:

    Rialto Capital Partners
    c/o Julie McIntosh, CRE
    750 Hammond Drive
    Building 6, Suite 300
    Atlanta, GA  30328
    Facsimile No.:  (404) 443-3625
    Email: julie.mcintosh@rialtocapital.com

WITH A COPY TO:

    John A. Thomson, Esq.
    Womble Carlyle Sandridge & Rice, PLLC
    271 17th Street, N.W.
    Suite 2400
    Atlanta, GA  30363-1017
    Facsimile No.: (404)870-4841
    Email: jthomson@wcsr.com

or addressed as such party may from time to time designate by written notice to the other parties. Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

    **10.**    __Agreement Not to Record Judgment__.  For so long as the Borrower and the Guarantor strictly comply with the terms of this Agreement, and the underlying Loan Documents, including the notice and right to cure provisions included herein, RL BB shall not file, record or enter any writ, execution or other evidence of judgment arising out of the Consent Judgment referenced in Paragraph 6(m) hereinabove on the General Execution Docket, or other index where civil judgments are recorded.  Upon a default by the Borrower or the Guarantor under any provision of this Agreement, RL BB shall be entitled to record a writ or similar document in the public records without further notice to the Borrower or the Guarantor.

    **11.**    __Guarantor's Waivers__.  The Guarantor hereby releases and waives all rights, demands, and defenses that the Guarantor may have with respect to any law or statute that requires RL BB to make demand upon, assert claims against, or collect from the Borrower or

other persons or entities, foreclose any security interest, sell Collateral, exhaust any remedies, or take any other action against the Borrower or other persons or entities prior to making demand upon, collecting from or taking action against the Guarantor with respect to the Note or the Collateral, including any such rights that the Guarantor might otherwise have under O.C.G.A. § 10-7-24.

12.    **Waiver of Notification and Right of Redemption**.  Pursuant to O.C.G.A. § 11-9-624, the Borrower and the Guarantor hereby release and waive any and all rights that they may have under the Loan Documents or the Uniform Commercial Code, as codified in the Official Code of Georgia Annotated (the "UCC"), to (a) notice of the disposition of any of the Collateral that RL BB may hereinafter seek to sell or liquidate in order to satisfy the amounts outstanding under the Note or the Swap Agreement pursuant to O.C.G.A. § 11-9-611, (b) redeem the Collateral pursuant to O.C.G.A. § 11-9-623, or (c) require the disposition of the Collateral pursuant to O.C.G.A. § 11-9-620.

13.    **Acknowledgment of Liquidation Options and Waiver of Objections**.  The Borrower and the Guarantor expressly acknowledge and agree that any one of (i) a public outcry auction, (ii) sealed bid auction, or (iii) private sale will each constitute commercially reasonable methods for the sale of any of the Collateral that RL BB may later seek to liquidate, as defined by the UCC. The Borrower and the Guarantor hereby forever waive and release any defenses, whether relating to the form, manner, or commercial reasonableness of the sale of any of the Collateral that they may have or seek to assert against RL BB with regard to any actions or proceedings by RL BB to collect from the Borrower or the Guarantor any and all balances or deficiency balances that may remain under the Loan Documents after the sale of any Collateral securing the Note.

14.    **Payment of Legal Fees and Other Expenses**.  The Borrower and the Guarantor herewith acknowledge that RL BB has incurred, and will continue to incur, certain legal fees and other expenses in connection with the Borrower's defaults under the terms of the Loan Documents, and further acknowledge that RL BB is entitled to recover all such fees and expenses in full under the terms of the Loan Documents. Any collection of legal fees under this provision is not, and shall not be construed as, a waiver of RL BB's rights to collect from the Borrower the full amount of attorneys' fees to which it may be entitled under the Loan Documents or under O.C.G.A. § 13-1-11.

15.    **Waiver and Release**.  To induce RL BB to enter into this Agreement, the Borrower and the Guarantor each acknowledge that (a) neither of them has any claim, offset, defense, damages, or cause of action of any kind, character or nature whatsoever, whether known or unknown, choate or inchoate, against BB&T or RL BB and each and every one of their respective directors, officers, employees, shareholders, representatives, legal counsel, agents, parents, divisions, subsidiaries, predecessors, successors, assigns, transferees, persons employed or engaged by any of the foregoing, and affiliates of any of the foregoing, whether past or present (collectively, the "**Released Parties**") that would reduce or diminish the Borrower's or the Guarantor's liability to RL BB pursuant to the Loan Documents, and (b) neither the Borrower nor the Guarantor has any claim, action, assertion of damage or liability or cause of action of any kind, character or nature whatsoever, whether known or unknown, choate, or inchoate, against the Released Parties, or any one of them, based upon any acts or omissions of any of the

Released Parties related to the Collateral, the Note, the Swap Agreement, the Guaranty, the Loan Documents or the administration thereof (collectively, the "**Claims**"). To the extent that the Borrower or the Guarantor claim to have previously had, or currently have, any such Claims against any of the Released Parties as described hereinabove, which the Released Parties specifically deny, whether choate or inchoate, known or unknown, in law or in equity, then the Borrower and the Guarantor do hereby waive, release, demise, quitclaim and relinquish any and all said past and present Claims, and hereby (i) unconditionally release the Released Parties from any and all loss, liability, claims, damages, actions, causes of actions, and suits of any kind and nature whatsoever arising out of, or relating in any way to, the Note, the Swap Agreement, the Guaranty, the Loan Documents or as a result of any events, actions, or omissions that occurred prior to the Effective Date, and (ii) covenant not to sue the Released Parties for past and present Claims up to the Effective Date. The waivers and releases set forth in this Section shall survive (a) the termination of this Agreement, (b) any release of the lien or security interest set forth in the Loan Documents; (c) the extinguishment of the Loan by foreclosure, power of sale, or any other action; or (d) the delivery of any deed in lieu of foreclosure.

16.    **No Third Party Beneficiaries**. The covenants, agreements, conditions, and obligations between RL BB and the Borrower set forth in this Agreement are made and imposed solely and exclusively for the benefit of RL BB and the Borrower, and their successors and assigns, and no other persons or entities including, but not limited to, the Guarantor or the Borrower's subordinated lenders, shall have any reason to require satisfaction or performance of such covenants, agreements, conditions, or obligations in accordance with their terms. No other persons shall, under any circumstances, be deemed to be a beneficiary of such covenants, agreements, or conditions, any or all of which may be freely waived in whole or in part by RL BB at any time if it, in its sole and absolute discretion, deems it advisable to do so.

17.    **No Course of Dealing**. RL BB's agreement to forbear from exercising its remedies under the Loan Documents is not, and shall not be construed as, a course of dealing or pattern of conduct that will create any commercial expectation on the part of the Borrower or the Guarantor that RL BB will grant any further forbearance with regard to its rights and remedies under the Loan Documents.

18.    **No Waiver by RL BB**. No act or failure to act on the part of RL BB heretofore shall constitute a waiver by RL BB of any right it may otherwise have under any Loan Documents and the arrangement contemplated by this Agreement, and the agreement by RL BB to the provisions of this Agreement and the other documents executed in connection with this Agreement (collectively, the "**Modification Documents**") shall constitute a waiver only to the extent specifically provided for by this Agreement or by such other Modification Documents. Any waiver so specifically provided for by this Agreement or any other Modification Documents shall be strictly construed so as to limit its application, shall not be applicable beyond the specific circumstances to which it is specifically made applicable, and shall not be applicable to any similar circumstances that may hereafter arise or of which RL BB did not at the time of execution of this Agreement have actual knowledge, even if the terms of such provision might otherwise make it appear to be so applicable. RL BB shall not at any time be deemed, by any act of omission or commission, to have waived any of its rights or remedies under this Agreement, any other Modification Documents or of any Loan Documents, except to the extent specifically provided for by this Agreement or any other Modification Documents, unless such waiver is in

WCSR 4616113v3A

writing and signed by RL BB, and then only to the extent specifically set forth in such writing. A waiver of one event shall not be construed as a continuing waiver of, or bar to, or waiver of any right or remedy in connection with any subsequent event. The granting without notice to any other party of any extension of time for the payment of any sum due hereunder or under any Loan Documents or Modification Documents, or for the performance of any covenant, condition or agreement thereof, or the taking or release of any security or additional security shall in no way release or discharge the liability of the Borrower or the Guarantor.

19.    **Controlling Law; Construction**.  This Agreement, and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws of the State of Georgia.  This Agreement shall not be construed against RL BB.

20.    **Binding Effect**.  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, administrators, legal representatives, subsidiaries, officers, employees, shareholders, members, directors, successors, assigns, and affiliates.  Whenever in this Agreement reference is made to any party or other person or entity, such reference shall be deemed to include a reference to the heirs, executors, representatives, employees, officers, directors, shareholders, members, subsidiaries, successors, assigns, and affiliates of such party.  Whenever used, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders.

21.    **Multiple Counterparts**.  This Agreement may be executed in any number of counterparts, any of which shall be deemed to be an original, and all of which taken together shall constitute one and the same Agreement.

22.    **Severability**.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, for any reason and to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

23.    **Time is of the Essence**.  Time is of the essence with respect to all provisions of this Agreement.

24.    **Modification**.  The terms of this Agreement may only be varied by the mutual agreement of the parties as reflected in writing and duly executed by the parties or their authorized legal representatives.

25.    **Conflict**.  To the extent the terms and provisions of the Loan Documents are inconsistent or conflict with the terms and provisions of this Agreement, the terms and provisions of this Agreement shall control.

26.    **Headings**.  The headings and captions used in this Agreement are provided for convenience of reference only and shall not be employed in the construction of this Agreement.

27.    **Entire Agreement**.  The parties hereto do further agree that the provisions contained in this Agreement constitute the entire agreement of the parties as of the Effective Date, and that the terms of this Agreement are contractual and not mere recitals.

[SIGNATURE PAGES FOLLOW]

WCSR 4616113v3A

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement and affixed their signs and seals as of the Effective Date.

Signed, sealed, and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

_____

Signed, sealed, and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

_____

**BORROWER:**

**RM HOTELS, INC., an Alabama Corporation**

By: _____ (SEAL)
    Name:  R C Patel

Title: Chief Executive Officer

**GUARANTOR:**

**RAJESH C. PATEL**

_____(SEAL)
Rajesh C. Patel

Page 22 of 23

Signed, sealed, and delivered in the
presence of:

_____
Unofficial Witness

_____
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

_8-17-2_____

**RL BB:**

**RL BB Financial, Inc. a Florida limited liability
company**

By:  Rialto Capital Advisors, LLC, a Delaware
     limited liability company, its attorney-in-fact

By: _____ (SEAL)
    Matthew Shulman
Its: Authorized Signatory

Signed, sealed, and delivered in the
presence of:

_____
Unofficial Witness

_____
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

_8-17-2014_____



By: _____ (SEAL)
    Todd Terwilliger
Its: Authorized Signatory

WCSR  4616113v3A

## EXHIBIT "A"

## LOAN DOCUMENTS

1.  Secured Promissory Note dated December 10, 2007, in the original principal amount of $10,000,000 from the Borrower in favor of BB&T.

2.  Deed to Secure Debt and Security Agreement dated December 11, 2007, from the Borrower in favor of BB&T and recorded on December 20, 2007, in Deed Book 46124, Page 644, Fulton County, Georgia Records.

3.  Assignment of Leases and Rents dated December 10, 2007, from the Borrower in favor of BB&T and recorded on December 20, 2007, in Deed Book 46124, Page 673, Fulton County, Georgia Records.

4.  Loan Agreement dated December 10, 2007, by and among the Borrower, the Guarantor and BB&T.

5.  UCC Financing Statement naming the Borrower, as Debtor, and BB&T, as Secured Party, recorded on December 20, 2007, in Folio 060-2007-15139, Fulton County, Georgia Records.

6.  Unconditional Guaranty of Payment and Performance dated December 10, 2007, from the Guarantor in favor of BB&T.

7.  Subordination, Non-Disturbance and Attornment Agreement dated December 10, 2007 by and among BB&T and Carlos Hernandez, as Lessee.

8.  Agreement Regarding Future Financing December 10, 2007, by and between Borrower and BB&T.

9.  Collateral Assignment of Franchise Agreement dated December 10, 2007 by Diplomat 1419 VA Hotels, LLC in favor of BB&T.

10. Collateral Assignment of Management Agreement dated December 10, 2007 from Borrower in favor of BB&T, as acknowledged by Diplomat Hotel Corporation.

11. All other documents, instruments, contracts, insurance or other agreements evidencing the Loan or entered into in connection therewith.

## <u>AMENDED AND RESTATED FORBEARANCE AGREEMENT</u>

**THIS AMENDED AND RESTATED FORBEARANCE AGREEMENT** (this "**Amended Agreement**") is made and entered into effective as of June 8, 2011 (the "**Effective Date**"), by and among RM HOTELS, INC., an Alabama corporation ( the "**Borrower**"), RAJESH C. PATEL (the "**Guarantor**"), DIPLOMAT ONH HOTELS, LLC ("**Diplomat ONH**") and RL BB FINANCIAL, INC. ("**RL BB**").

## <u>W I T N E S S E T H:</u>

**WHEREAS,** on or about June 8, 2011, the Borrower and the Guarantor entered into a "Forbearance Agreement", a copy of which is attached hereto as **Exhibit "A"** and incorporated herein by reference (the "**Forbearance Agreement**"); and

**WHEREAS,** as an accommodation to induce RL BB to enter into the Forbearance Agreement, Diplomat ONH executed and tendered to RL BB a Deed to Secure Debt wherein it conveyed to RL BB a security interest in certain improved real property located at 3601 North Desert Drive, East Point, Georgia that is currently being operated as a Comfort Inn (the "**East Point Property**"); and

**WHEREAS,** Borrower and Guarantor are currently in default under the Forbearance Agreement for, among other events of default that may, over the course of time, be known to RL BB,

    a)    Failing to pay the taxes due on the Borrower's real property located at 1419 Virginia Avenue, College Park, Fulton County, Georgia (collectively, the "**Virginia Avenue Property**"), in derogation of Paragraph 6(h) of the Forbearance Agreement; and

    b)    Failing to pay the amounts due under the Forbearance Agreement as and when due, in derogation of Paragraph 6(c) of the Forbearance Agreement;

(collectively, the "**Existing Forbearance Defaults**"). Said Existing Forbearance Defaults are continuing, and remain uncured; and

**WHEREAS,** RL BB has provided the Borrower and the Guarantor with adequate and sufficient notice of said defaults in accordance with all of the requirements of the Forbearance Agreement, such that RL BB is currently authorized to exercise all of its remedies under the Forbearance Agreement and the original loan documents between RL BB, as successor to Branch Banking and Trust Company ("**BB&T**") and the Borrower (the "**Loan Documents**"); and

**WHEREAS,** Borrower and Guarantor have requested that RL BB release its security interest in, and lien upon, the Virginia Avenue Property in order to facilitate a sale of said property to Surrey Capital, LLC ("**Surrey Capital**"), which is owned and controlled by an insider of the Guarantor; and

**WHEREAS,** Borrower and Guarantor have requested that RL BB execute a document releasing its lien and security interest in the Virginia Avenue Property; and

WCSR 7283714v6                                                   Exhibit D-2

WHEREAS, as an inducement for RL BB to release its lien on the Virginia Avenue Property, Diplomat ONH will assume the payment obligations of the Borrower under the Forbearance Agreement until the debt due to RL BB has been paid in full, in accordance with the terms of the Forbearance Agreement; and

WHEREAS, as an inducement for RL BB to release its lien on the Virginia Avenue Property, the Guarantor will execute certain documents and convey and assign to RL BB his right to receive proceeds from the sale of a restaurant property in Myrtle Beach, Horry County, South Carolina that is currently owned by RM Family Limited Partnership, LP ("RM Family") (the "Myrtle Beach Property", and, collectively with the Virginia Avenue Property and the East Point Property, the "Properties"), as well as his ownership interest in RM Family; and

WHEREAS, RL BB, the Borrower and the Guarantor desire to amend and restate certain portions of the Forbearance Agreement in order to reflect certain conditions under which RL BB will forbear from exercising its rights and remedies under the Forbearance Agreement and the Loan Documents subject to (a) the continued performance by the Borrower, Diplomat ONH and the Guarantor of certain obligations, as provided in the Forbearance Agreement and this Amended Agreement, and (b) the satisfaction by one or more of the Borrower, Diplomat ONH and the Guarantor of certain specific obligations set forth herein; and (c)the strict compliance by the Borrower, the Guarantor and Diplomat ONH with all terms and conditions of the Loan Documents, except as modified by this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and benefits herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Incorporation of Recitals; Capitalized Terms. All the above-referenced recitals are specifically incorporated herein by reference. Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in the Loan Documents.

2.     Continuing Validity of the Forbearance Agreement. Except as specifically set forth and modified herein, the provisions, terms and conditions of the Forbearance Agreement, and the Loan Documents, as adopted by the Forbearance Agreement, shall remain valid, in full force and effect and fully enforceable in accordance with their terms.

3.     Default; Acceleration; Notice of Default. The Borrower and the Guarantor hereby acknowledge and agree that the Borrower is in default under the Forbearance Agreement by reason of the Existing Forbearance Defaults. In addition, the Borrower and the Guarantor acknowledge and agree that satisfactory notice of Existing Forbearance Defaults has been duly and properly given to the Borrower and the Guarantor by RL BB, in accordance with the Forbearance Agreement, such that the Borrower and the Guarantor hereby waive any other notice.

4.     Waiver of Defenses and Presentment. The Borrower and the Guarantor hereby irrevocably waive any and all defenses that they may have, or claim to have, to the validity, execution or enforceability of the Forbearance Agreement or any of the other Loan Documents, and further waive any further notice or presentment with regard to (i) the Borrower's defaults

Page 2 of 21

under the terms of the Forbearance Agreement, and (ii) RL BB's declaration of default under the Forbearance Agreement.

5. **Representations, Warranties and Agreements of the Borrower, Diplomat ONH and the Guarantor**. The Borrower, Diplomat ONH and the Guarantor each represent, warrant, and agree as follows:

(a) **Facts in Preamble and Recitals.** The facts set forth in the preamble and recitals hereto are true and correct in all material respects.

(b) **Total Balance Due.** As of the Effective Date of this Amended Agreement, the Borrower has the following due and outstanding obligations to RL BB:

| | |
|---|---|
| • Existing Principal Balance | $10,155,468.55 |
| • Accrued Interest | $91,681.31 |
| • Fees and Disbursements | $499,877.74 |
| • Total Due on Note | $10,747,027.60 |

(the "**Total Balance Due**"). The Borrower, Diplomat ONH and the Guarantor hereby acknowledge and agree that the balance due and outstanding is true and correct, and herewith irrevocably waive and forever quitclaim any rights or defenses that they may have, or claim to have, as to the amounts and balances set forth in this Amended Agreement.

(c) **Consideration.** The Borrower, Diplomat ONH and the Guarantor specifically and affirmatively represent, warrant, acknowledge and agree that they have received good and valuable consideration in exchange for their performance of all of the terms, conditions, provisions and obligations of this Amended Agreement, and that no further accommodation, payment, transfer or assignment of property or interest in property will be necessary to make this Amended Agreement or the Forbearance Agreement, as adopted herein, fully enforceable in accordance with its terms.

(d) **Written Information.** All written information furnished to RL BB as part of the negotiations that led to this Amended Agreement (including financial statements, accounting records, schedules or lists of assets, tax information, title searches, commitment letters, proposed land sale contracts and other documents and written information furnished by third parties on behalf of the Borrower, Diplomat ONH, the Guarantor, RM Family and any other affiliates of the Borrower, Diplomat ONH and the Guarantor) are truthful, accurate, and not misleading in the context in which presented.

(e) **Loan Documents.** Neither the Forbearance Agreement nor the Loan Documents have been amended or modified, except as referenced in the Forbearance Agreement and that certain letter from John A. Thomson, Jr., as counsel for RL BB, to counsel for the Borrower, dated March 9, 2012. All of the representations and warranties set forth in the Forbearance Agreement and the Loan Documents remain in full force and effect as if made on the Effective Date of this Amended Agreement subject to changes (i) arising due to the passage of time, or (ii) provided in writing to RL BB. No Event of

WCSR 7283714v6

Default under the Forbearance Agreement has occurred and is continuing, except the Existing Forbearance Defaults. The Loan Documents (as modified by the Forbearance Agreement) may be enforced in accordance with their terms by RL BB against the Borrower, the Guarantor and the East Point Property and the Virginia Avenue Property. The Borrower and the Guarantor claim no defense, right of offset or counterclaim against enforcement of the Loan Documents or the Forbearance Agreement, and have no other claim against BB&T or RL BB.

    (f)    **Authority.** The signatories herewith represent as follows:

        (i)    The Borrower is an Alabama corporation duly formed, validly existing, and is in good standing to do business under the laws of the State of Georgia. The Borrower and the individual(s) executing this Amended Agreement and the related documents on behalf of the Borrower have full power and authority to execute, deliver and perform this Amended Agreement and the related documents. This Amended Agreement and the related documents shall be the legal and binding obligations of the Borrower, enforceable in accordance with their respective terms.

        (ii)    Diplomat ONH is a Georgia limited liability company duly formed, validly existing, and is in good standing to do business under the laws of the State of Georgia. Diplomat ONH and the individual(s) executing this Amended Agreement and the related documents on behalf of Diplomat ONH have full power and authority to execute, deliver and perform this Amended Agreement and the related documents. This Amended Agreement and the related documents shall be the legal and binding obligations of the Borrower, enforceable in accordance with their respective terms.

        (iii)    The Guarantor is competent to conduct his own affairs, and is not currently under the control or supervision of any guardian or trustee. The Guarantor has the full power and authority to execute, deliver and perform this Agreement and the related documents. This Agreement, and the related documents, shall be the legal and binding obligations of the Guarantor, enforceable in accordance with their respective terms.

    (g)    **No Conflict; No Consent.** The execution, delivery and performance of this Amended Agreement and the related documents, and the consummation of the transactions thereby contemplated, will not conflict with (i) any law, statute or regulation to which the Borrower, Diplomat ONH, the Guarantor or the Properties are subject; (ii) any judgment, license, order or permit applicable to the Borrower, Diplomat ONH, the Guarantor or the Properties; or (iii) any indenture, mortgage, deed to secure debt or other instrument to which the Borrower, Diplomat ONH, the Guarantor or the Properties are subject.

6.      **Tender of a Payoff Letter for the Surrey Capital Transaction.** In order to facilitate the sale of the Virginia Avenue Property from the Borrower to Surrey Capital, and the payment of the net proceeds from said sale to RL BB, on or before 12:00PM (Noon) on Friday, June 8, 2012, RL BB will execute a payoff letter or other necessary document (the "**Virginia Avenue Payoff Letter**") and tender this document to the closing attorney for the loan transaction by and between Surrey Capital and Citizens Trust Bank.

7.      **Tender of a Document Releasing the RL BB Lien on the Virginia Avenue Property.** In order to facilitate the sale of the Virginia Avenue Property from the Borrower to Surrey Capital, and the payment of the net proceeds from said sale to RL BB, concurrent and contemporaneously with receipt by RL BB of $4,800,000.00 in immediately available funds, wired to a bank account that RL BB will designate, RL BB will execute a quitclaim deed or other necessary release document that releases RL BB's lien on the Virginia Avenue Property (the "**Virginia Avenue Release**") and tender this document to the closing attorney for the loan transaction by and between Surrey Capital and Citizens Trust Bank.

8.      **Conditions Precedent to the Execution of the Virginia Avenue Release and the Continuing Validity of the Forbearance Agreement.** Because the Borrower and the Guarantor continue to be in default under the Forbearance Agreement, one or more of the Borrower, Diplomat ONH and the Guarantor must satisfy each of the following terms and conditions, ( collectively, the "**RL BB Conditions**"), in order for the Forbearance Agreement to remain enforceable and in effect on or before 2:00PM Eastern Daylight Standard Time ("**EDST**") on Monday, June 11, 2012:

     (i)     **Tender of Information  Regarding the Sale of the Myrtle Beach Property.** Borrower or Guarantor shall cause RM Family to provide to RL BB the following information:

          (A)     A title report on the Myrtle Beach Property from a third party title agent updated as of no earlier than June 1, 2012, satisfactory to RL BB in its sole discretion, that clearly reflects the current owner of the Myrtle Beach Property;

          (B)     A payoff letter from the holder of the each mortgage shown on the title report for the Myrtle Beach Property, satisfactory to RL BB in its sole discretion, that reflects the current balance due for each lien or encumbrance;

          (C)     A full list of either:

               1)     all partners of RM Family, and the managing partner of RM Family; or

               2)     the officers, shareholders, members or partners of any other entity that may own the Myrtle Beach Property;

(D)    A copy of the Partnership Agreement or other operating agreement for RM Family or any other entity that may own the Myrtle Beach Property, together with all amendments thereto;

(E)    A copy of any purchase and sale agreement or other contract by which RM Family, or any other entity that may own the Myrtle Beach Property, intends to sell the Myrtle Beach Property to a third party;

(F)    Any and all closing documents related to any sale of the Myrtle Beach Property to a third party; and

(G)    The identity and contact information for any third party with whom RM Family has contracted to sell the Myrtle Beach Property.

(ii)    **Tender of Information Regarding the Insurance Proceeds for the East Point Property.**  Diplomat ONH shall furnish to RL BB information and documents regarding:

(A)    A current written summary of the insurance proceeds that were available for renovation of the East Point Property, including:

1)    Which entities are holding said funds;

2)    The amount held by each such entity;

3)    The amount that remains available from each such entity to fund the renovation of the East Point Property;

(B)    The status of the agreement between Diplomat ONH, its insurer and First State Bank regarding how and under what circumstances the insurance proceeds will be disbursed to complete the renovation of the East Point Property, as well as a copy of said agreement;

(C)    The status of the renovations to the East Point Property;

(D)    The terms of the escrow arrangements with regard to the insurance proceeds and copies of the documents that set forth this agreement; and

(E)    A summary of the  insurance proceeds that have been disbursed to date.

WCSR 7283714v6

(iii)    **Resolution and Release of Liens on the East Point Property.**
Diplomat ONH shall:

    (A)    resolve and cause the lien held by State Bank and Trust
dated October 30, 2007 in the face amount of
$16,400,000.00 and recorded at Deed Book 45915, Page
302 (the "**Third Mortgage Loan**") to be satisfied and
released of record; and

    (B)    provide to RL BB written documentation that said lien has
been satisfied.

(iv)    **Contact with Officials at First State Bank.**  Diplomat ONH shall
provide to RL BB the name and phone number of the relevant
officer at First State Bank that has knowledge of the lien in favor
of First State Bank, as assignee of Horizon Mortgage Lending, Inc.
dated January 25, 2002 in the face amount of $2,000,000.00 and
recorded at Deed Book 31741, Page 319 (the "**First Mortgage
Loan**"), and shall use its continuing best efforts to work with RL
BB to obtain from First State Bank an intercreditor agreement or
other, similar arrangement with First State Bank.

(v)    **Balance Due to First State Bank on the East Point Property.**
Diplomat ONH shall provide a letter or other written
documentation from First State Bank indicating the balance due on
the First Mortgage Loan.

(vi)    **Balance Due to Florida Debt Fund on the East Point Property.**
Diplomat ONH shall provide a letter or other written
documentation from Florida Debt Fund, LLC, or any other entity
that now holds the junior mortgage obligation in favor of Florida
Debt Fund dated October 21, 2005 in the face amount of
$1,000,000.00 and recorded at Deed Book 41482, Page 582 (the
"**Second Mortgage Loan**") indicating the balance due on said
loan.

(vii)    **Assignment of a Security Interest in the Rents and Profits from
the East Point Property.**  Diplomat ONH shall execute and
provide to RL BB an assignment of the rents and profits accruing
from the East Point Property.

(viii)    **Execution of a Security Agreement for the Personal Property
at the East Point Property.**  In order to further convey and perfect
the security interest that RL BB previously received in the personal
property associated with the East Point Property (the "**East Point
Personalty**"), Diplomat ONH shall convey to RL BB a security

Page 7 of 21

agreement wherein it reaffirms its prior and existing conveyance of a security interest in the East Point Personalty.

(ix)    **Assignment of the Purchase Money Note from Surrey Capital.** Borrower shall assign to RL BB all of its right, title and interest in and to the Promissory Note from Surrey Capital to the Borrower arising out of the sale of the Virginia Avenue Property to Surrey Capital (the "**Surrey Capital Note**").

(x)    **Assignment of the Sales Proceeds from the Sale of the Myrtle Beach Property.**  Subject to RL BB's determination that the Myrtle Beach Property has value, as outlined in Paragraph (xii) hereinbelow, Guarantor shall execute such documents, and transfer such interests and liens, as RL BB deems necessary, in its sole and absolute discretion, to insure that RL BB will receive from any closing of a sale of the Myrtle Beach Property one-half of all net sales proceeds from the sale, in an amount that is no less than $250,000.00, payable directly to RL BB.

(xi)    **Evidence by Guarantor of Promissory Note.**  Guarantor shall execute a Promissory Note in favor of RL BB in the face amount of $300,000.00, payable on December 31, 2012, with interest payable on the first day of each month beginning July 1, 2012 at the rate of five percent (5%) per annum.

(xii)    **Adoption by Diplomat ONH of the Payment Obligations in the Forbearance Agreement.**  Diplomat ONH shall execute and deliver to RL BB such documents as RL BB deems necessary and appropriate, in its sole and absolute discretion, for Diplomat ONH to become the primary obligor on the payment obligations set forth in the Forbearance Agreement and assume any obligations of Borrower to make the payments due under the Forbearance Agreement.

Upon Failure of the Borrower, Diplomat ONH or the Guarantor, as appropriate, to meet any of the terms and conditions set forth hereinabove shall result in a default under this Amended Agreement.  Upon the occurrence of an event of default, RL BB shall provide Diplomat ONH, the Borrower and the Guarantor with notice of said default.  If the default remains uncured for five (5) business days after RL BB has provided notice as prescribed by this Agreement, then, among other things, the Forbearance Agreement and this Amended Agreement shall be terminated without further notice to the Borrower, Diplomat ONH or the Guarantor.

9.    <u>Term of Forbearance</u>.  If the Borrower, Diplomat ONH and the Guarantor can (i) satisfy the RL BB Conditions, and (ii) hereinafter continue to satisfy all of the terms and conditions of the Forbearance Agreement, as modified by the terms of this Amended Agreement, the term of the Forbearance Agreement shall remain the same, and shall not be amended, such that this Amended Agreement shall commence on the Effective Date and shall terminate on

December 31, 2015. If the Borrower, Diplomat ONH and the Guarantor fail to satisfy each of the RL BB Conditions on or before June 11, 2012, then the Forbearance Agreement and this Agreement shall terminate on June 12, 2012.

10.   **Forbearance Conditions.** During the term of the Forbearance Agreement, as amended by this Amended Agreement, RL BB agrees to forbear from exercising any and all rights and remedies under the Forbearance Agreement or the Loan Documents as a result of the Existing Forbearance Defaults, provided that the Borrower, Diplomat ONH and the Guarantor meet, or cause RM Family to meet, the following conditions (collectively, the "**Forbearance Conditions**"):

(a)   **Performance Under The Forbearance Agreement and this Amended Agreement.** The Borrower, Diplomat ONH and the Guarantor duly and punctually observe, perform and discharge each and every obligation and covenant to be performed under the Forbearance Agreement and this Amended Agreement, subject to all applicable notice and right to cure provisions provided herein.

(b)   **Performance Under the Loan Documents.** The Borrower and the Guarantor continue to strictly comply with the terms and conditions set forth in the Loan Documents, except those terms and conditions that are amended in the Forbearance Agreement or this Amended Agreement.

(c)   **Maintenance of the First Mortgage Loan on the East Point Property.** Diplomat ONH shall remain current on all payments due to First State Bank on the first mortgage lien on the East Point Property, and there shall be no declared event of default with regard to the First Mortgage Loan.

(d)   **Extension of the First Mortgage Loan.** On or before June 30, 2012 Diplomat ONH shall extend the term of the First Mortgage Loan, and shall provide satisfactory proof the First Mortgage Loan has been extended to RL BB.

(e)   **Maintenance of the Second Mortgage Loan on the East Point Property.** Diplomat ONH shall remain current on all payments due to Florida Debt Fund on the Second Mortgage Loan on the East Point Property, and there shall be no declared event of default with regard to the Second Mortgage Loan.

(f)   **No Setoff of the East Point Insurance Proceeds.** First State Bank, or the agent of First State Bank that is administering the insurance proceeds for the East Point Property, shall not setoff the insurance proceeds, and shall continue to disburse the proceeds in support of a complete renovation of the East Point Property.

(g)   **Payment of Interest.** The Borrower, Diplomat ONH and the Guarantor agree and reaffirm that they are each responsible, as signatories to this Amended Agreement, for the entire Total Balance Due at the rate of seven percent (7%). Said interest shall be payable to the extent that Diplomat ONH derives net operating income from the East Point Property over and above ordinary course operating expenses and the amounts necessary to pay the existing first mortgage obligation in favor of First State Bank or its assignee, including all real estate taxes due on the East Point Property. To the

extent that there is not sufficient operating income to pay said interest, said interest shall accrue and be payable in full at the termination of the Forbearance Agreement on December 31, 2015.

      (h)    **Sale of the Myrtle Beach Property.** Prior to December 31, 2012, Borrower and Guarantor shall either (A) cause RM Family, or any other entity that owns the Myrtle Beach property, to sell the Myrtle Beach Property for a sales price that yields $250,000.00 in net proceeds payable to RL BB; or (B) pay to RL BB $250,000.00 in cash.

      (i)    **Payment of the Guarantor Note.** The Guarantor shall timely make all payments due under the Guarantor Note, including payment in full at maturity.

      (j)    **Monthly Operating Reports.** On the twentieth day of the first month following the execution of this Agreement, and continuing on the twentieth day of each month thereafter, the Diplomat ONH shall submit to RL BB by overnight courier the following documentation:

      (i)    The bank statements from the Diplomat ONH's operating, tax, payroll and other accounts;

      (ii)    Revenue reports detailing the gross revenues from the East Point Property, from whatever source, and the expenses associated with the operation of the East Point Property;

      (iii)    Any monthly operating reports that Diplomat ONH maintains or prepares in the ordinary course of its business;

      (iv)    A report or spreadsheet that clearly details Diplomat ONH's current accounts payable and current accounts receivable aging.

      (k)    **No Material Adverse Change.** After the Effective Date, no material adverse change occurs in (i) the Guarantor's financial condition, (ii) the value of the Properties, or (iii) the Borrower's business, prospects or financial condition.

      (l)    **Representations and Warranties.** No representation or warranty made by the Borrower, Diplomat ONH or the Guarantor in this Amended Agreement proves to have been false or misleading in any material respect.

      (m)    **Bankruptcy; Insolvency.** Neither of the Borrower, Diplomat ONH nor the Guarantor shall:

      (i)    file for protection under the United States Bankruptcy Code or any other state law debtor relief statutes;

      (ii)    file an assignment for the benefit of creditors or other state law insolvency or debt relief proceeding;

Page 10 of 21

(iii)    be finally adjudicated insolvent in any proceeding by a court or agency of competent jurisdiction, or

(iv)    have a receiver or trustee appointed to manage its assets or business affairs, and not have such trustee or receiver removed within one hundred twenty (120) days of appointment.

(n)    **Merger; Sale of Collateral.** Diplomat ONH shall not undertake to merge its business assets and liabilities or business operations with any other person or entity, and neither Diplomat ONH nor RM Family shall transfer, assign, pledge, encumber, hypothecate, gift, sell or otherwise convey the East Point Property or the Myrtle Beach Property, or the proceeds from the sale of East Point Property or the Myrtle Beach Property without prior written approval from RL BB.

(o)    **Maintenance of Collateral.** The Properties are maintained in their present condition.

(p)    **Restraint on Business.** Neither of the Borrower, Diplomat ONH or the Guarantor is enjoined, restrained or in any way prevented by court order from conducting all or a material part of its business affairs.

(q)    **Judgment.** There is no entry by any Court of a final judgment against the Borrower, Diplomat ONH or the Guarantor other than those judgments on record as of the Effective Date of this Agreement, and there is no attachment of any interest in the Properties that is not fully discharged to the satisfaction of RL BB within thirty (30) days after the date of entry.

(r)    **Other Debt.** There is no default in the payment, or acceleration of the maturity, of any indebtedness of the Borrower or Diplomat ONH owing to any other person.

11.    **Default.** If any one or more of the Forbearance Conditions is not satisfied, the Default Provisions of the Forbearance Agreement shall be applicable to the Borrower, Diplomat ONH and the Guarantor.

12.    **Borrower's and Guarantor's Agreements.** Until payment in full of the Total Balance Due and the full performance of all other obligations of the Borrower, Diplomat ONH and the Guarantor to RL BB under this Amended Agreement, the Forbearance Agreement, the Loan Documents and the other documents and obligations executed pursuant to this Amended Agreement, unless RL BB otherwise consents in writing, the Borrower, Diplomat ONH and the Guarantor will perform the following agreements:

(a)    **Loan Sale.** The Borrower hereby acknowledges that RL BB can sell the original Note from the Borrower to BB&T (the "**Note**") the Borrower's Guaranty of said Note ( the "**Guaranty**") and its any rights that it might have under any agreement with the Borrower, Diplomat ONH or the Guarantor, and transfer the Loan Documents (as modified by this Amended Agreement) to any person designated by RL BB, on such terms and for such consideration as RL BB might determine from time to time in

RL BB's absolute discretion, but only so long as such transfer does not alter or modify the terms of the agreements between the Borrower, Diplomat ONH and the Guarantor, and RL BB as reflected in the Loan Documents. Within ten (10) days after each written request therefore, the Borrower, Diplomat ONH and the Guarantor agree to provide to RL BB estoppel certificates executed by the Borrower, Diplomat ONH and the Guarantor stating the then outstanding Total Balance Due, the status of the performance by the Borrower, Diplomat ONH and the Guarantor under the Loan Documents (as modified by this Amended Agreement) and whether the Borrower, Diplomat ONH and the Guarantor assert any claims, counterclaims, defenses or other rights against RL BB or under the Loan Documents (as modified by the Forbearance Agreement or this Amended Agreement) and, if so, a detailed description of each such claim. The Borrower, Diplomat ONH and the Guarantor specifically acknowledge that if RL BB elects to sell the Loan Documents for less than the amount owing to RL BB, any such discount will not reduce the amount owing by the Borrower, Diplomat ONH and the Guarantor to RL BB or any successor in interest to RL BB.

(b)     **Information.** When requested by RL BB, the Borrower, Diplomat ONH and the Guarantor will promptly give RL BB, and any commercially reasonable third parties designated by RL BB, access to, and permit RL BB and such third parties to inspect, the Properties and to examine, copy and make excerpts from all books, records and documents relating to the financial condition and business affairs of the Borrower, Diplomat ONH and the Guarantor and the Properties, at no expense to the Borrower, Diplomat ONH and the Guarantor save and except ordinary course of business office and administrative personnel and services necessary to facilitate said inspection. The Borrower, Diplomat ONH and the Guarantor warrant that all information provided to RL BB and such third parties will be complete, true and correct in all material respects. RL BB will not be liable to the Borrower, Diplomat ONH and the Guarantor for the commercially reasonable use made of information provided by the Borrower, Diplomat ONH and the Guarantor to any third party, including, but by no means limited to, disclosure of the information to any entity that is considering purchasing the Loan Documents from RL BB.

(c)     **Notice of Change.** The Borrower and the Guarantor agree to give prompt written notice to RL BB of,

> (i)     any Event of Default, as defined by the Forbearance Agreement, the Loan Documents, or default under the terms of this Amended Agreement;

> (ii)    any occurrence that might mature into an Event of Default, whether by the passage of time, giving of notice or otherwise;

> (iii)   any default under any material agreement to which the Borrower, Diplomat ONH or the Guarantor is a party or by which the Properties are bound or the acceleration of the maturity of any indebtedness owing by the Borrower or Diplomat ONH;

    (iv)    all litigation affecting the Borrower or Diplomat ONH that is not adequately covered by insurance, or which represents a potential liability in excess of Ten Thousand and No/100 Dollars ($10,000.00); and

    (v)    any other matter that might result in a material adverse change in the value of the Properties or in the financial condition of the Borrower or Diplomat ONH.

Such notice will describe the foregoing matters with particularity, and the actions that the Borrower, Diplomat ONH or the Guarantor are taking or propose to take with respect thereto.

13.    **Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person, by facsimile transmission or by electronic mail transmission with receipt acknowledged, or (b) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, addressed as follows:

TO THE BORROWER:

RM Hotels, Inc.
c/o Diplomat Companies
2100 Park Lake Drive
Atlanta, GA  30343
Attention: Rajesh C. Patel
Facsimile No.:  (678) 987-2392
Email: rc@diplomatcompanies.com

WITH A COPY TO:

Frank B. Wilensky, Esq.
Macey, Wilensky, Kessler & Hennings, LLC
230 Peachtree Street, N.W., Suite 2700
Atlanta, GA  30303-1561
Facsimile No.: (404) 681-4355
Email: fwilensky@maceywilensky.com

WITH A COPY TO:

Bryan M. Knight, Esq.
KNIGHT JOHNSON, LLC
One Midtown Plaza, Suite 1201
1360 Peachtree Street
Atlanta, GA  30309
Facsimile No.: (404) 228-4821
bknight@knightjohnson.com

WCSR 7283714v6

TO DIPLOMAT ONH:

> Diplomat ONH, LLC
> c/o Diplomat Companies
> 2100 Park Lake Drive
> Atlanta, GA  30343
> Attention: Rajesh C. Patel
> Facsimile No.:  (678) 987-2392
> Email: rc@diplomatcompanies.com

WITH A COPY TO:

> Bryan M. Knight, Esq.
> KNIGHT JOHNSON, LLC
> One Midtown Plaza, Suite 1201
> 1360 Peachtree Street
> Atlanta, GA  30309
> Facsimile No.: (404) 228-4821
> bknight@knightjohnson.com

TO THE GUARANTOR:

> Rajesh C. Patel
> c/o Diplomat Companies
> 2100 Park Lake Drive
> Atlanta, GA  30343
> Attention: Rajesh C. Patel
> Facsimile No.:  (678) 987-2392
> Email: rc@diplomatcompanies.com

WITH A COPY TO:

> Bryan M. Knight, Esq.
> KNIGHT JOHNSON, LLC
> One Midtown Plaza, Suite 1201
> 1360 Peachtree Street
> Atlanta, GA  30309
> Facsimile No.: (404) 228-4821
> bknight@knightjohnson.com

WCSR 7283714v6

TO RL BB:

> Rialto Capital Partners
> c/o Julie McIntosh, CRE
> 750 Hammond Drive
> Building 6, Suite 300
> Atlanta, GA 30328
> Facsimile No.: (404) 443-3625
> Email: julie.mcintosh@rialtocapital.com

WITH A COPY TO:

> John A. Thomson, Esq.
> Womble Carlyle Sandridge & Rice, LLP
> 271 17th Street, N.W., Suite 2400
> Atlanta, GA 30363-1017
> Facsimile No.: (404)870-4841
> Email: jthomson@wcsr.com

or addressed as such party may from time to time designate by written notice to the other parties. Any party by notice to the other parties may designate additional or different addresses for subsequent notices or communications.

14.    **Payment of Legal Fees and Other Expenses.**  The Borrower, Diplomat ONH and the Guarantor herewith acknowledge that RL BB has incurred, and will continue to incur, certain legal fees and other expenses in connection with the Borrower's defaults under the terms of the Loan Documents and the Forbearance Agreement, and further acknowledge that RL BB is entitled to recover all such fees and expenses in full under the terms of the Forbearance Agreement and the Loan Documents.  Any collection of legal fees under this provision is not, and shall not be construed as, a waiver of RL BB's rights to collect from the Borrower or the Guarantor the full amount of attorneys' fees to which it may be entitled under the Loan Documents or under O.C.G.A. § 13-1-11.

15.    **Waiver and Release.**  To induce RL BB to enter into this Agreement, the Borrower, Diplomat ONH and the Guarantor each acknowledge that (a) neither of them has any claim, offset, defense, damages, or cause of action of any kind, character or nature whatsoever, whether known or unknown, choate or inchoate, against BB&T or RL BB and each and every one of their respective directors, officers, employees, shareholders, representatives, legal counsel, agents, parents, divisions, subsidiaries, predecessors, successors, assigns, transferees, persons employed or engaged by any of the foregoing, and affiliates of any of the foregoing, whether past or present (collectively, the **"Released Parties"**) that would reduce or diminish the Borrower's or the Guarantor's liability to RL BB pursuant to the Forbearance Agreement and the Loan Documents, and (b) neither the Borrower nor the Guarantor has any claim, action, assertion of damage or liability or cause of action of any kind, character or nature whatsoever, whether known or unknown, choate, or inchoate, against the Released Parties, or any one of them, based upon any acts or omissions of any of the Released Parties related to the Loan Documents or the administration thereof (collectively, the **"Claims"**).  To the extent that the Borrower or the

Guarantor claim to have previously had, or currently have, any such Claims against any of the Released Parties as described hereinabove, which the Released Parties specifically deny, whether choate or inchoate, known or unknown, in law or in equity, then the Borrower and the Guarantor do hereby waive, release, demise, quitclaim and relinquish any and all said past and present Claims, and hereby (i) unconditionally release the Released Parties from any and all loss, liability, claims, damages, actions, causes of actions, and suits of any kind and nature whatsoever arising out of, or relating in any way to, the Forbearance Agreement or the Loan Documents or as a result of any events, actions, or omissions that occurred prior to the Effective Date, and (ii) covenant not to sue the Released Parties for past and present Claims up to the Effective Date. The waivers and releases set forth in this Section shall survive (a) the termination of this Amended Agreement, (b) any release of the lien or security interest set forth in the Loan Documents; (c) the extinguishment of the obligations due from the Borrower, Diplomat ONH or the Guarantor by foreclosure, power of sale, or any other action.

16.    **No Third Party Beneficiaries**.  The covenants, agreements, conditions, and obligations between RL BB and the Borrower, Diplomat ONH and the Guarantor set forth in this Agreement are made and imposed solely and exclusively for the benefit of RL BB and the Borrower, Diplomat ONH and the Guarantor, and their successors and assigns, and no other persons or entities including, but not limited to, the subordinated lenders to the Borrower, Diplomat ONH and the Guarantor, shall have any reason to require satisfaction or performance of such covenants, agreements, conditions, or obligations in accordance with their terms.  No other persons shall, under any circumstances, be deemed to be a beneficiary of such covenants, agreements, or conditions, any or all of which may be freely waived in whole or in part by RL BB at any time if it, in its sole and absolute discretion, deems it advisable to do so.

17.    **No Course of Dealing**.  RL BB's agreement to:

    (a)    continue to forbear from exercising its remedies under the Loan Documents; and

    (b)    Agree to release its lien and security interest in one or more of the Properties in exchange for less than the amount specified in the Forbearance Agreement;

is not, and shall not be construed as, a course of dealing or pattern of conduct that will create any commercial expectation on the part of the Borrower, Diplomat ONH and the Guarantor that RL BB will grant any further forbearance with regard to its rights and remedies under the Loan Documents.

18.    **No Waiver by RL BB**.  No act or failure to act on the part of RL BB heretofore shall constitute a waiver by RL BB of any right it may otherwise have under the Forbearance Agreement, any of the Loan Documents and the arrangement contemplated by this Amended Agreement, and the agreement by RL BB to the provisions of this Amended Agreement and the other documents executed in connection with this Agreement (collectively, the "**Modification Documents**") shall constitute a waiver only to the extent specifically provided for by this Amended Agreement or by such other Modification Documents. Any waiver so specifically provided for by this Amended Agreement or any other Modification Documents shall be strictly construed so as to limit its application, shall not be applicable beyond the specific circumstances

WCSR 7283714v6

to which it is specifically made applicable, and shall not be applicable to any similar circumstances that may hereafter arise or of which RL BB did not at the time of execution of this Agreement have actual knowledge, even if the terms of such provision might otherwise make it appear to be so applicable. RL BB shall not at any time be deemed, by any act of omission or commission, to have waived any of its rights or remedies under this Amended Agreement, the Forbearance Agreement, any other Modification Documents or of any Loan Documents, except to the extent specifically provided for by this Agreement or any other Modification Documents, unless such waiver is in writing and signed by RL BB, and then only to the extent specifically set forth in such writing. A waiver of one event shall not be construed as a continuing waiver of, or bar to, or waiver of any right or remedy in connection with any subsequent event. The granting without notice to any other party of any extension of time for the payment of any sum due hereunder or under any Loan Documents or Modification Documents, or for the performance of any covenant, condition or agreement thereof, or the taking or release of any security or additional security shall in no way release or discharge the liability of the Borrower or the Guarantor.

19.    **Controlling Law; Construction**. This Agreement, and the obligations of the parties hereunder, shall be interpreted, construed, and enforced in accordance with the laws of the State of Georgia. This Agreement shall not be construed against RL BB.

20.    **Binding Effect**. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, administrators, legal representatives, subsidiaries, officers, employees, shareholders, members, directors, successors, assigns, and affiliates. Whenever in this Agreement reference is made to any party or other person or entity, such reference shall be deemed to include a reference to the heirs, executors, representatives, employees, officers, directors, shareholders, members, subsidiaries, successors, assigns, and affiliates of such party. Whenever used, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to all genders.

21.    **Multiple Counterparts**. This Agreement may be executed in any number of counterparts, any of which shall be deemed to be an original, and all of which taken together shall constitute one and the same Agreement.

22.    **Severability**. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations. If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, for any reason and to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

23.    **Time is of the Essence**. Time is of the essence with respect to all provisions of this Agreement.

24.    **Modification**. The terms of this Agreement may only be varied by the mutual agreement of the parties as reflected in writing and duly executed by the parties or their authorized legal representatives.

WCSR 7283714v6

25. **Conflict**. To the extent the terms and provisions of the Loan Documents are inconsistent or conflict with the terms and provisions of this Agreement, the terms and provisions of this Agreement shall control.

26. **Headings**. The headings and captions used in this Agreement are provided for convenience of reference only and shall not be employed in the construction of this Agreement.

27. **Entire Agreement**. The parties hereto do further agree that the provisions contained in this Agreement constitute the entire agreement of the parties as of the Effective Date, and that the terms of this Agreement are contractual and not mere recitals.

[SIGNATURE PAGES FOLLOW]

WCSR 7283714v6

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement and affixed their signs and seals as of the Effective Date.

**BORROWER:**

Signed, sealed, and delivered in the presence of:

**RM HOTELS, INC.**, an Alabama Corporation

*Gail Whisnant*
Unofficial Witness

By: _____ (SEAL)

*Mary Marett*
Notary Public

Name: _____

Title: _____

[NOTARIAL SEAL]

Commission Expiration Date:

9-8-12

**GUARANTOR:**

Signed, sealed, and delivered in the presence of:

**RAJESH C. PATEL**

*Gail Whisnant*
Unofficial Witness

_____ (SEAL)

*Mary Marett*
Notary Public

Rajesh C. Patel

[NOTARIAL SEAL]

Commission Expiration Date:

9-8-1

Page 19 of 21

**ONH DIPLOMAT:**

**ONH DIPLOMAT, LLC,** an ___EA___
**limited liability company**

Signed, sealed, and delivered in the
presence of:

By: _____ (SEAL)

Name: _____

Title: _____

_Gail Whisnant_
Unofficial Witness

_Mary Marett_
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

9-8-12

WCSR 7283714v6

**RL BB:**

**RL BB Financial, Inc. a Florida limited liability company**

By: Rialto Capital Advisors, LLC, a Delaware
    limited liability company, its attorney-in-fact

Signed, sealed, and delivered in the
presence of:

_____

Unofficial Witness

_____

Notary Public

        [NOTARIAL SEAL]

Commission Expiration Date:

_8-17-20__

By: _____ (SEAL)
    Matthew Shulman
    Its: Authorized Signatory

Signed, sealed, and delivered in the
presence of:

_____

Unofficial Witness

_____

Notary Public

        [NOTARIAL SEAL]

Commission Expiration Date:

_8-17-2014_

By: _____ (SEAL)
    Todd Terwilliger  Stephen J. Tyde Jr.
    Its: Authorized Signatory

Page 20 of 21

WCSR 7283714v6

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 1 8 2011

James N. Hatten, Clerk
By: Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| RL BB FINANCIAL, LLC,    ) | |
|                  ) | |
|     Plaintiff,         ) | |
|                  ) | |
| v.                 ) | CIVIL ACTION FILE |
|                  ) | NO. 1:10-cv-3046-TCB |
| RAJESH C. PATEL,     ) | |
|                  ) | |
|     Defendant.       ) | |

## CONSENT JUDGMENT FILED UNDER SEAL

**IT APPEARING TO THIS COURT** that RL BB Financial, LLC

("Rialto") and Rajesh C. Patel ("Patel"), have been parties to an action filed in the

United States District Court for the Northern District of Georgia on or about

September 22, 2010; and

**IT FURTHER APPEARING TO THIS COURT** that Rialto and Patel

have engaged in limited discovery and conducted settlement negotiations; and

**IT FURTHER APPEARING TO THIS COURT** that Rialto and Patel

concluded those settlement negotiations and executed a Forbearance Agreement

with regard to the dispute that serves as the subject matter of the above captioned

action; and

**IT FURTHER APPEARING TO THIS COURT** that a true and correct

copy of the Forbearance Agreement between Rialto and Patel is attached hereto as

Exhibit D

Exhibit "A" and is incorporated herein by reference; and

**IT FURTHER APPEARING TO THIS COURT** that Rialto and Patel

have agreed as part of the Forbearance Agreement that Patel will consent to the

entry of Judgment against him (the "Judgment"), which will be fully enforceable as

a judgment of this Court in accordance with its terms and will be dispositive of all

of the claims in the above-captioned action; it is hereby

**ORDERED AND ADJUDGED** as follows:

(a) As a final disposition of all claims that the parties asserted in the

above-captioned action, a final Judgment is herewith entered in favor of Rialto and

against Patel in the amount of $3,000,000.00; and

(b) This Judgment shall be final and enforceable judgment of this Court,

without the need for further order, trial or hearing with regard to the relief afforded

herein or the issues presented in the above-captioned civil action; and

(c) This Judgment shall be filed under seal.

**SO ORDERED** this _18th_ day of _July_, 2011.

The Honorable Timothy C. Batten
Judge, United States District Court for
the Northern District of Georgia

*[Signatures appear on the following pages]*

- 2 -

Prepared and presented by:

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

By: _____

John A. Thomson, Jr.
State Bar No. 706760

271 17th Street, N.W.
Suite 2400
Atlanta, Georgia 30363-1017
(404) 888-7409
*Attorneys for Plaintiff RL BB Financial, LLC*

The Bloom Law Firm, LLP

By: _____

Simon H. Bloom, III

977 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306-7710
(404) 577-7710
*Attorneys for Defendant Rajesh C. Patel*

RAJESH C. PATEL, Defendant

_____

Rajesh C. Patel

## FIXED RATE
## PROMISSORY NOTE

$200,300.00                                                                July 1, 2012

FOR VALUE RECEIVED, the undersigned RAJESH C. PATEL, an individual resident of the State of Georgia (hereinafter referred to as "Maker"), promises to pay to the order of RL BB FINANCIAL, INC. (hereinafter referred to as "Payee", the legal holder from time to time of this Note, including Payee as the initial holder being hereinafter referred to as "Holder"), at the principal office of Payee at 750 Hammond Drive, Building 6, Suite 300, Atlanta, GA 30328, or at such other place as Holder may designate to Maker in writing from time to time, the principal sum of TWO HUNDRED THOUSAND THREE HUNDRED AND NO/100 DOLLARS ($200,300.00) together with interest thereon at the rate per annum on the unpaid balance until paid (including all renewals, extensions or modifications hereof, the "Note").

I.        **INTEREST ONLY**. From the date hereof and continuing on the first (1st) day of each and every month thereafter through and including December 1, 2012, consecutive monthly payments of accrued interest only based on all amounts outstanding from time to time shall be due and payable at the fixed rate of five percent (5.00%) per annum.

The entire outstanding principal balance, together with accrued but unpaid interest, shall be due on or before **December 31, 2012** (the "Maturity Date").

II.       **INTEREST COMPUTATION.**

A.        Interest shall be computed on the basis of a 360 day year and the actual number of days in the month.

B.        This Note may be prepaid at par in whole or in part at any time and without penalty, prepayment premium or fee.

C.        Each payment owed pursuant to Paragraph I of this Note shall be applied first to fees and other charges applicable hereunder or under other loan documents or payment obligations described in that certain Amended and Restated Forbearance Agreement dated June 8, 2011 by and among RM Hotels, Inc., Maker, Diplomat ONH Hotels, LLC and Holder (the "Forbearance Agreement") then to accrued interest and the remainder to principal.

III.      **GENERAL LOAN PROVISIONS.**

A.        Notwithstanding any provisions in this Note or the Forbearance Agreement, the total liability for payment legally regarded as interest shall not exceed the maximum limits imposed by the laws of the State of Georgia in effect on the date hereof, and any payment of same in excess of the amount allowed hereby shall, as of the date of such payment, automatically be deemed to have been applied to the payment of the principal indebtedness evidenced hereby, or, if same has been fully repaid,

WCSR 7365730v2

1

Exhibit E

shall be deemed to be held by Holder as additional security for all remaining indebtedness of Maker to Holder and shall be repaid to Maker upon demand after all of such indebtedness has been fully paid. Any notation or record of Holder with respect to such required application which is inconsistent with the provisions of this paragraph shall be disregarded for all purposes and shall not be binding upon either Maker or Holder.

    B.  All sums payable under this Note shall be paid in legal tender for public and private purposes, of the United States of America at the time of such payment. Time is of the essence.

    C.  This Note shall be governed by the laws of the State of Georgia.

    D.  Maker shall pay to Holder, without demand therefor, a late charge of five percent (5%) of any monthly payment of interest not received by Holder within ten (10) days of the date the payment is due.

    E.  Should Maker default in the payment, as and when due, of the indebtedness evidenced hereby beyond the expiration of any applicable grace period, or should any warranty or representation made by Maker, or by any endorser, guarantor, or other party liable hereunder or under the Forbearance Agreement prove to be materially false or misleading when made, or should Maker default in the performance of any of the covenants, terms or conditions contained in the Forbearance Agreement, then the entire unpaid principal balance of the indebtedness evidenced hereby, together with all interest accrued but unpaid thereon, and any and all sums advanced by Holder to or on behalf of Maker under the provisions of the Forbearance Agreement, shall at the option of Holder, and without further demand or notice, at once become due and payable and may be collected forthwith regardless of the stipulated date of maturity, time being of the essence of this Note. If a "Default" or "Event of Default" occurs and remains uncured beyond the applicable grace period under the terms of the Forbearance Agreement, then the entire unpaid principal balance of this Note shall bear interest at a "Default Rate" of 500 basis points over the otherwise applicable Interest Rate, or, if such increased rate of interest may not be collected from Maker under applicable law, then at the maximum increased rate of interest, if any, which may be collected from Maker under applicable law; and, at the option of Holder and without further notice to Maker, the entire principal amount outstanding hereunder and accrued interest thereon shall at once become due and payable. Failure to exercise such option shall not constitute a waiver hereunder. In the event of any uncured default in the payment of this Note, and if the same is referred to an attorney at law for collection or suit is brought hereon, Maker shall pay to Holder, in either case, all expenses and costs of collection, including, but not limited to, reasonable attorney's fees.

    F.  As used herein, a "business day" is any day which is not a Saturday, Sunday or federal holiday.

    G.  From time to time, without affecting the obligation of Maker or the legal representatives, successors or assigns of Maker to pay the outstanding principal balance of this Note and observe the covenants of Maker contained herein and in the Forbearance Agreement, without affecting the guaranty of any person, corporation, partnership or other entity for payment of the outstanding principal balance of this Note, without giving notice to or obtaining the consent of Maker, the heirs, legal representatives, successors or assigns of Maker or guarantors, and without liability on the part of Holder, Holder may, at the option of Holder, extend the time for payment of said outstanding principal balance or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, accept a renewal of this Note, modify the terms and time of payment of said outstanding principal balance or join in any extension or subordination agreement, and agree in writing with Maker to

2

modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder. No one or more of such actions prevent the exercise of any rights granted hereunder or by the laws of the State of Georgia; and Maker hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing..

       H.      Presentment, demand, notice of demand, notice of protest, notice of dishonor, notice of payment or non-payment, protest, and all other protest are hereby waived by Maker and all sureties, guarantors and endorsers hereof. Maker further waives any and all homestead and exemption rights under the laws and constitutions of the United States of America, the State of Georgia and any other state. This Note shall be the joint and several obligation of Maker and all sureties, guarantors and endorsers, and shall be binding upon them and their heirs, legal representatives, successors and assigns. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought.

       I.      As used herein, the terms "Maker" and "Holder" shall be deemed to include their respective heirs, successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law. If more than one person, firm, or entity is a Maker hereunder, then all references to "Maker" shall be deemed to refer equally to each of said persons, firms, or entities, all of whom shall be jointly and severally liable for all of the obligations of Maker hereunder.

[signatures commence on next page]

IN WITNESS WHEREOF, Maker has executed this Note under seal, as of the date first above written.

MAKER:

_____

RAJESH C. PATEL



**DIPL☺MAT**
*COMPANIES*

December 19, 2007

Attn: Leeona

Please make the following wire transfer today:

**From:**
Account Number:                    ▬0511

Account Name:                    RM Hotels, Inc.
Amount:                    $2,000,000.00 (Two Million and 00/100 Dollars)

**To:**
Receiving Bank:                    The Bankers Bank
                                   Atlanta, Georgia

ABA Routing Number:                0610-0341-5

Beneficiary Financial
Institution                        High Trust Bank Successor to Southern Horizon Bank via
                                   Name Change April 2, 2007
                                   Stockbridge, Georgia

Southern Horizon Bank
Account Number                     ▬0643

Southern Horizon Bank
ABA Routing Number                 0612-0643-2

Beneficiary Account                RC Patel
                                   Mukesh Patel

Beneficiary Account
Number                             ▬136

For Further Notification
To                                 Dianne McKoon
                                   Senior Vice President
                                   Stockbridge Branch
                                   770 692 2449  Office
                                   770 474 3455  Fax
                                   Email: Dianne@hightrustbank.com

Thank you

R. C. Patel
CEO



# HAVENTRUSTBANK

6340 Sugarloaf Parkway
Suite 100
Duluth, GA 30097
678-957-5500   Fax: 678-957-5529

ACCOUNT:               0511      1   12/31/2007
DOCUMENTS:             6

RM HOTELS INC
DBA MOTEL 6 CHAMBLEE
RM HOTELS O/P  24-100
2100 PARKLAKE DR NE
ATLANTA GA  30345-2824

30
4
2

Growing to serve you better,
come visit us at our new Snellville location

## COMM'L CHECKING ACCOUNT   0511

|  | LAST STATEMENT 11/30/07 | 27.42 |
|---|---|---|
| MINIMUM BALANCE | 27.42 | 5 CREDITS | 5,191,128.43 |
| AVERAGE BALANCE | 174,419.49 | 7 DEBITS | 4,903,070.00 |
|  | THIS STATEMENT 12/31/07 | 288,085.85 |

- - - - - - - DEPOSITS - - - - - - -

| REF #.....DATE......AMOUNT | REF #.....DATE:.....AMOUNT | REF #....DATE....AMOUNT |
|---|---|---|
| 12/20  179,095.12 | 12/24  4,000.00 | 12/24 1008,000.00 |

- - - - - - - OTHER CREDITS - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| MISCELLANEOUS CREDIT | 12/12 | 3,100.00 |
| WIRE IN EPSTEIN BECKER AND GREEN PC | 12/19 | 3,996,933.31 |

- - - - - - - CHECKS - - - - - - -

| CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT |
|---|---|---|
| 30357*12/12  3,000.00 | 30359 12/24 1000,000.00 | |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - OTHER DEBITS - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| CHK# 30357 AMT $3,000.00, NSF FEE CHARGE | 12/12 | 30.00 |
| WIRE OUT FEE | 12/19 | 20.00 |
| WIRE IN FEE | 12/19 | 20.00 |
| WIRE OUT RM HOTELS INC | 12/19 | 2,000,000.00 |
| 171169 HAVEN CONNECT TRANSFER TO INTEREST CHECKIN  0155 | 12/20 | 1,900,000.00 |
| ON 12/20/07 9:03 | | |

*** C O N T I N U E D ***

FDIC

NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION.

Exhibit G

CASHIERS CHECK # *23 862*
ISSUED IN LIEU OF THIS CHECK    DATE *3/5/08*    54-643/612

PAY TO THE
ORDER OF *JAYESH D PATEL*                    $ *200,000*

*Two hundred thousand on*                    DOLLARS

**HIGH TRUST BANK**
STOCKBRIDGE, GEORGIA

FOR *Loan To Be Paid 3/15/08*

⑊00 20000000⑊

©Clarke American    Ford Oval and Thunderbird are registered trademarks owned and licensed by Ford Motor Company    CRUSIN08 CR

0619023427
03072008
061Q-001 RAVEN TRUST BANK        >061119846<
ENT=1425 06-020692 SILVERTON BANK ATL, GA
03339175Q 03-06-08 04 Q150000016

R C PATEL
MUKESH C PATEL
2100 PARKLAKE DR , NE
ATLANTA  GA 30345

HIGH TRUST BANK
Stockbridge  GA 30281

64-643
612

0020005

4/21/2008

PAY TO THE
ORDER OF    R M Kids , LLC                                                                      $    ****$800,000.00

Eight Hundred Thousand and 00/100************************************************************    DOLLARS

R M Kids , LLC

MEMO  Transfer to Buy Mortgage Loaf 20

0911478470
04222008   HAVEN TRUST BANK     >0611119846<
0610-0014-6061020682 SILVERTON BANK ATL, GA
ENT=5111 TR#9594378900A-21-08 04 0250002482

0516511361
04222008
0610-0014-6
ENT=5114 TRC=1602 PK=13

FOR DEPOSIT ONLY
2.5000 2482

Exhibit I

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

R C PATEL
MUKESH C PATEL

HIGH TRUST BANK
Stockbridge GA 30281

64-643
612

0020019

2100 PARKLAKE DR., NE
ATLANTA GA 30345

9/2/2006

PAY TO THE
ORDER OF    RM KIDS LLC

$    **S1,060,741.88

One Million Sixty Thousand Seven Hundred Forty-One and 88/100************************    DOLLARS

RM KIDS LLC

MEMO

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

FOR DEPOSIT ONLY

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

R C PATEL
MUKESH C PATEL
2100 PARKLAKE DR., NE
ATLANTA  GA 30345

HIGH TRUST BANK
Stockbridge GA 30281

64-643
612

0020006

4/21/2008

PAY TO THE
ORDER OF   DIPLOMAT CONSTRUCTION INC.                                $   ****$250,000.00

Two Hundred Fifty Thousand and 00/100************************************************   DOLLARS

DIPLOMAT CONSTRUCTION INC.

MEMO   Loan

⑈00250000⑈

Exhibit J

0911478471
04222008   HAVEN TRUST BANK   >0611119846<
0610-0014-6061 020692 SILVERTON BANK ATL, GA
ENT=5111 TRC=0013/#70704-21-08 04 0150002731

0516511362
04222008
0610-0014-6
ENT=5114 TRC=1602 PK=13

FOR DEPOSIT ONLY

R C PATEL
MUKESH C PATEL
2100 PARKLAKE DR., NE
ATLANTA  GA 30345

HIGH TRUST BANK
Stockbridge, GA 30281

64-643
612

0020001

3/17/2008

PAY TO THE
ORDER OF    DIPLOMAT CONSTRUCTION                                          $   ****$100,034.08

One Hundred Thousand Thirty-Four and 08/100************************************************   DOLLARS

DIPLOMAT CONSTRUCTION

MEMO   LOAN

⑆0010003408⑆

03:3130822
03:82008
0510-0014-5
ENT=1216  TRC=1241  PK=13

HAVEN TRUST BANK      >061119846<
061020692 SILVERTON BANK ATL, GA
034197839  03-17-05  04:0150002731

FOR DEPOSIT ONLY

150002731

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

R C PATEL
MUKESH C PATEL
2100 PARKLAKE DR., NE
ATLANTA GA 30345

HIGH TRUST BANK
Stockbridge GA 30281

64-643
612

0020013

6/30/2008

PAY TO THE
ORDER OF    Diplomat Hospitality , #2 , LLC

$    ****$100,000.00

One Hundred Thousand and 00/100************************************    DOLLARS

Diplomat Hospitality , #2 , LLC

MEMO

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK—HOLD AT AN ANGLE TO VIEW

Exhibit K

041B156222G
07012008
0610-00014/0
ENT=1596 TRC=1650 PK=13

HAVEN TRUST BANK    >061119846<
061020692 SILVERTON BANK ATL, GA
034156374  06-30-08 07 0150015188

Item LTR101 (03.07) 120896 (10.07)

FOR DEPOSIT ONLY

1500 15188

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

R C PATEL
MUKESH C PATEL
2100 PARKLAKE DR., NE
ATLANTA GA 30345

HIGH TRUST BANK
Stockbridge GA 30281

64-643
612

0020014

7/28/2008

PAY TO THE
ORDER OF   DIPLOMAT DEVELOPMENT COMPANY LLC                    $  ****$250,000.00

Two Hundred Fifty Thousand and 00/100*************************************************   DOLLARS

DIPLOMAT DEVELOPMENT COMPANY LLC

MEMO

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK—HOLD AT AN ANGLE TO VIEW

⑊3136⑊     ⑊00 25000000⑊

ENDORSE **FOR DEPOSIT ONLY**

150004539

1212215951
C82292008-4
C0&E0-0014-6
ENT=5103-TRC=5105 PX=Q7

HAVEN TRUST BANK    061119846
06106D0692 SILVERTON BANK ATL, GA
095228786 07-28-08 04 0150004539

Exhibit L

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

R C PATEL
MUKESH C PATEL

2100 PARKLAKE DR., NE
ATLANTA GA 30345

HIGH TRUST BANK
Stockbridge GA 30281

64-643
612

0020017

8/29/2008

PAY TO THE
ORDER OF    Diplomat SLP Properties,LLC                                                          $    ****S120,000.00

One Hundred Twenty Thousand and 00/100******************************************************    DOLLARS

Diplomat SLP Properties,LLC

MEMO  REPAID LOAN

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK—HOLD AT AN ANGLE TO VIEW

⑆0020017⑆  3 1 3 6⑈                                ⑆00 1 2000000⑈

FOR DEPOSIT ONLY

HIGH TRUST BANK
SILVERTON BANK ATL, GA
0971162 52  08-29-06 06 0250005154

Exhibit M



Exhibit N

BK 4 9 8 1 6 PG 0 2 3 6

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA.

2009 NOV 23 PM 2: 03

TOM LAWLER, CLERK

316742

PT-61 # 067-2009-031410
GWINNETT CO. GEORGIA
REAL ESTATE TRANSFER TAX
$ none
TOM LAWLER CLERK OF
SUPERIOR COURT

**(Above this Line Reserved for Recording Official)**

After recording return to:

*Ms. Mary Marett*
*Diplomat Companies*
*2100 Parklake Drive*
*Atlanta, GA 30345*

### QUITCLAIM DEED

Exhibit O

STATE OF GEORGIA
GWINNETT COUNTY

THIS INDENTURE, made as of 28 th October, 2007  by and between **Rajesh C. Patel,** as party of the first part, hereinafter called "Grantor", and **Shama R. Patel,** hereinafter referred to as "Grantee" (the words "Grantor" and "Grantee" when used herein to include their respective successors and assigns where the context permits or requires).

WITNESSETH:

Grantor, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, in hand paid at and before the sealing and delivery of these presents, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed and by these presents does herby remise and quitclaim to Grantee the following described property:

*ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 158 of the 7th District of Gwinnett County, Georgia, and being Lot 952, Block E, Phase III, Pod 3, Sugarloaf Country Club, as per plat of same recorded at Plat Book 108, pages 31-34, Gwinnett County Records, which plat is incorporated into this legal description by this reference for all purposes; said property being known as 2253 Grady Ridge Trail, Duluth, Georgia.* 0106238

49816
00237

BK 4 9 8 1 6 PG 0 2 3 7

This Quit Claim Deed is given to confirm of record that Grantee is the owner of the above described property. Grantee had executed a Deed to Grantor, dated October 22, 2007, recorded at Deed Book 48373, page 885, Gwinnett County Records, in connection with a prior re-financing of the above described property; however, Grantor was intended to be the guarantor of said loan, and title should have remained solely in Grantee, and this instrument is given to confirm same of record.

TO HAVE AND TO HOLD the above-described tract or parcel of land, unto Grantee, Grantee's successors and assigns, so that neither Grantor nor Grantor's successors and assigns, nor any other person or persons claiming under Grantor shall at any time, claim or demand any right, title or interest in and to the above-described tract or parcel of land or appurtenances, or any rights thereof.

IN WITNESS WHEREOF, Grantor has caused this Indenture to be executed and sealed the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____ (Seal)
**Rajesh C. Patel**

_____
Witness

_____
Notary Public

[NOTARY SEAL]

My commission expires:

BK50704 PG0310

50704
00310

RETURN RECORDED DOCUMENT TO:

WILLIAM H. ATTRIDGE, JR.
STEVENSON, ATTRIDGE & ASSOCIATES, L.L.C.
328 ALEXANDER STREET
SUITE TWELVE
MARIETTA, GA 30060
FILE NUMBER: 11WA116/Patel

FILED AND RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY GA

2011 JUN -2  AM 8: 00

TOM LAWLER, CLERK

PT-61# 67-2011-013761
GWINNETT CO. GEORGIA
REAL ESTATE TRANSFER TAX
$ _____ none_____
TOM LAWLER CLERK OF
SUPERIOR COURT

# QUIT CLAIM DEED

STATE OF GEORGIA
COUNTY OF COBB

THIS INDENTURE, made the 6th day of MAY, 2011, , between SHAMA R. PATEL, of
the State of Georgia, as party or parties of the first part, hereinafter called "Grantor", and
SHAMA R. PATEL AND JAY R. PATEL a/k/a J.R. Patel, a/k/a Jay R. "JR" Patel,
of the State of Georgia, as party or parties of the second part, hereinafter called Grantee (the
words "Grantor" and "Grantee" to include their respective heirs, successors and assigns
where the context requires or permits).

WITNESSETH that:  Grantor, for and in consideration of the sum of one dollar ($1.00)
and other valuable considerations in hand paid at and before the sealing and delivery of these
presents, the receipt whereof is hereby acknowledged, by these presents does hereby remise,
convey and forever QUIT CLAIM unto the said Grantee.

### PLEASE SEE EXHIBIT "A" ATTACHED HERETO

TO HAVE AND TO HOLD the said described premises to Grantee, so that neither
Grantor nor any person or persons claiming under Grantor shall at any time, by any means
or ways, have, claim or demand any right to title to said premises or appurtenances, or any
rights thereof.

IN WITNESS WHEREOF, the Grantor has signed and sealed this deed, the day and year
first above written.

Signed, sealed and delivered in the
presence of:

_____
WITNESS

By: _____ (L.S.)
      SHAMA R. PATEL

Notary Public
DEC.
3
2013
(SEAL)
COBB CO. GEORGIA
NOTARY PUBLIC

_____ (L.S.)

*Exhibit P*

0042596-98

BK50704·PG0311

**Exhibit "A"**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 158 of the 7th District of Gwinnett County, Georgia, and being Lot 952, Block E, Phase III, Pod 3, Sugarloaf Country Club, as per plat of same recorded at Plat Book 108, pages 31-34, Gwinnett County Records, to which plat is incorporated into this legal description by this reference for all purposes; being improved property known as *2253 Grady Ridge Trail*, Duluth, Georgia.



Type: DEED    Book: 52102    Page: 00688

BK 52102 PG 0688

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA.

2013 MAR 22  AM 9: 21

RICHARD ALEXANDER, CLERK

303262

PLEASE RETURN TO.
Bryan M. Knight, Esq.
KNIGHT JOHNSON, LLC
One Midtown Plaza
1360 Peachtree Street
Suite 1201
Atlanta, Georgia 30309

PT-61 # 47·2013·014005
GWINNETT CO. GEORGIA
REAL ESTATE TRANSFER TAX
$ _____ none _____
RICHARD T. ALEXANDER, JR. CLERK OF
SUPERIOR COURT

CLERK  Cross-reference with
Instruments recorded in Deed
Book 128, Pg 288, Gwinnett
County, Georgia records

STATE OF GEORGIA

COUNTY OF GWINNETT

### QUIT-CLAIM DEED OF RELEASE

THIS INDENTURE, made this 6 th day of March, in the year of our Lord Two Thousand
Thirteen between

**JAY R PATEL**

As party or parties of the first part, hereinafter called Grantor, and

**MONICA JAY PATEL**

As party or parties of the second part, hereinafter called Grantees (the words "Grantor"
and "Grantees" to include their respective heirs, successors and assigns where the context
requires or permits).

### W I T N E S S E T H:

That the said party of the first part for and in consideration of the sum of ONE DOLLAR
($1.00) and other valuable consideration, cash in hand paid, the receipt of which is hereby
acknowledged, has bargained, sold and does by these presents bargain, sell, remise, release and
forever quit-claim to the said parties of the second part, their heirs and assigns, all the right, title,

0031827

Exhibit Q

14

BK 52102 PG 0689

interest, claim or demand which the said party of the first party has or may have had in and to the following described property:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 158 OF THE 7TH DISTRICT, GWINNETT COUNTY, GEORGIA, BEING LOT 952, BLOCK E, SUGARLOAF COUNTRY CLUB SUBDIVISION, POD 3,    PHASE III, AS PER PLAT RECORDED IN PLAT BOOK 108, PAGE 31-34 AND REVISED PLAT RECORDED IN PLAT BOOK 128, PAGE 288, GWINNETT COUNTY, GEORGIA RECORDS, WHICH RECORDED PLAT IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS DESCRIPTION.  SAID PROPERTY BEING KNOWN AS 2253 GRADY RIDGE TRAIL ACCORDING TO THE PRESENT SYSTEM OF NUMBERING PROPERTY IN GWINNETT COUNTY, GEORGIA. PARCEL ID NUMBER: . SUBJECT TO ANY EASEMENTS OR RESTRICTIONS OF RECORD.

TO HAVE AND TO HOLD the said described premises unto the said parties of the second part, their successors, heirs and assigns, so that neither the said party of the first part nor its successors, nor any other person claiming under it shall at any time, claim or demand any right, title or interest to the aforesaid described premises or its appurtenances.

IN WITNESS WHEREOF, the said party of the first part has hereunto set its hand and affixed its seal, the day and year above written.

GRANTORS:

JAY R PATEL

Signed, sealed and delivered
in the presence of:

_Gail Whisnant_
Unofficial Witness

_Mary Marett_
Notary Public
My commission expires

By: _____ (SEAL)
    Jay Patel
Title: _Individually_

Deed Book 44929 Pg 668
Filed and Recorded May-02-2007 02:14pm
2007-0130586
Real Estate Transfer Tax $11,150.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

After recording return to:
Calloway Title & Escrow, LLC
Attn: David W. Dudley 2-19398
4170 Ashford Dunwoody Rd. Ste. 285
Atlanta, Georgia  30319

_____
Space Above This Line for Recorder's Use

After recording, please return to:
Greenberg Traurig, LLP
3290 Northside Parkway,
Suite 400
Atlanta, GA 30327
Attn: Keith Linch, Esq.

**STATE OF GEORGIA**

**COUNTY OF FULTON**

### LIMITED WARRANTY DEED

   THIS INDENTURE is made this 30th day of April, 2007, by and between **Carnegie Building Limited Partnership**, a Georgia limited partnership, hereinafter called "Grantor", whose address is 270 Carpenter Drive, Atlanta, Georgia 30328, and **Diplomat Hospitality II, LLC**, a Georgia limited liability company, hereinafter called **"Grantee"**, whose address is 2100 Parklake Drive, NE, Atlanta, Georgia 30345 (herein, the words "Grantor" and "Grantee" to include its respective heirs, successors and assigns where the context requires or permits).

### W I T N E S S E T H:

   FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) in hand paid to Grantor by Grantee at and before the execution, sealing and delivery hereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto Grantee, and the successors, legal representatives and assigns of Grantee, all that tract or parcel of land lying and being in Land Lot 78, of the 14th District, Fulton County, Georgia, being more particularly described on **Exhibit "A"** attached hereto and incorporated herein by reference (the "Land").

*Exhibit R*

atl-fs1\611870v02

Deed Book 44929 Pg 669

**TO HAVE AND TO HOLD** said tract or parcel of land, together with all buildings, structures and other improvements affixed to the Land, and any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise appertaining to the only proper use, benefit and behoof of Grantee forever, in fee simple; and

**GRANTOR SHALL WARRANT** and forever defend the right and title to said tract or parcel of land unto Grantee, and the successors, legal representatives and assigns of Grantee, against the claims of all persons whomsoever, claiming by, through or under Grantor, but not otherwise; provided, however, that the warranties of title made by Grantor herein shall not extend to any claims arising under any matter set forth on **Exhibit "B"**, attached hereto and incorporated herein by reference; however, this reference shall not serve to reimpose the same.

**IN WITNESS WHEREOF**, Grantor, acting by and through its general partner, has executed and sealed this indenture, and delivered this indenture to Grantee, all the day and year first written above.

**GRANTOR:**

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires:

_March 31, 2008_____

(NOTARIAL SEAL)

**CARNEGIE BUILDING LIMITED PARTNERSHIP**, a Georgia limited partnership

By: Ultima Carnegie, Ltd., a Georgia corporation, its General Partner

By: _____
Robert M. Ullmann, President

(CORPORATE SEAL)

Deed Book 44929 Pg 670

## EXHIBIT "A"
## LEGAL DESCRIPTION

ALL THAT TRACT or parcel of land lying and being in Land Lot 78 of the 14th District of Fulton County, Georgia and being more particularly described as follows:

BEGINNING at a point lying on the south right-of-way of Ellis Street at the southwest intersection of said southern right-of-way and the west side of a 10 foot alley, which point is marked by a metal corner plate; thence running west 97.36 feet along the south right-of-way of Ellis Street, which right-of-way forms an interior angle of 90°32'25" with the western side of the aforesaid 10 foot alley, to a point; thence running southwest 7.00 feet along a line forming an interior angle of 135°42'35" with the line last run, to a point at the southeast corner of the intersection of the southern right-of-way of Ellis Street and the northeast right-of-way of Carnegie Way; thence running southeasterly 17.62 feet along the northeast right-of-way of Carnegie Way which right-of-way forms an interior angle of 132°20'52" with the line last run, to a point; thence running southeasterly 155.14 feet along the northeast right-of-way of Carnegie Way, which right-of-way forms an interior angle of 140°16'14" with the line last run, to a point, which point marks the northwest corner of the intersection of the northeast right-of-way of Carnegie Way and the west side of the aforesaid alley; thence running north 139.36 feet along said west side of said alley, which west side forms an interior angle of 41°07'56" with the line last run, to the POINT OF BEGINNING; as shown on the plat of survey for Carnegie Way Investors, Ltd., prepared by Eaton Pendley & Assoc., Inc., dated March 30, 1988.

TOGETHER with any and all right, title and interest, if any, of the Carnegie Way Investors, Ltd. in that certain alley (approximately ten (10) feet in width) which adjoins the above described property on the east and which runs between Ellis Street and Carnegie Way and which alley has been commonly referred to as the "Mortgage Guaranty Way".

atl-fs1\611870v02         3

Deed Book 44929 Pg 671
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

## EXHIBIT "B"
## PERMITTED EXCEPTIONS

1) All taxes for the year 2007 and subsequent years, not yet due and payable.

2) Rights of the City of Atlanta in and to the ten (10') alley adjoining property to the east of subject property pursuant to Ordinance No. 2001-22, §1, 3-14-01 and rights of the property owner adjacent to said alley on the west side thereof in and to said alley as provided under that certain Right of Way Encroachment Agreement by and between the City of Atlanta and Kelco/FB Winecoff, LLC dated July 5, 2006, filed for record July 10, 2006 at 1:36 p.m., and recorded in Deed Book 42957, Page 241, Records of Fulton County, Georgia.

3) Building Lease Agreement as evidenced by that certain Short Form of Building Lease Agreement by and between Carnegie Building Limited Partnership, a Georgia limited partnership ("Lessor") and Pactel Cellular Inc. of Georgia, a Nevada corporation now known as AirTouch Cellular of Georgia ("Lessee"), dated April 11, 1994, filed for record January 6, 1995 at 8:30 a.m., recorded in Deed Book 19138, Page 337, aforesaid Records.

4) Notification of the Designation of Property Under the City of Atlanta's Historic Preservation Ordinance, Code of Ordinances of the City of Atlanta, Section 16-20.006.E by Karen Huebner, Executive Director of Urban Design Commission, dated July 24, 1990, filed for record July 26, 1990 at 10:39 a.m., recorded in Deed Book 13595, Page 207, aforesaid Records.

5) That certain survey entitled "ALTA/ACSM Land Title Survey Diplomat Hospitality II, LLC, Nexity Bank, Chicago Title Insurance Company", prepared by A.S. Giometti & Associates, Inc., bearing the seal and certification of A.S. Giometti, Georgia Registered Land Surveyor No. 1125, dated January 12, 2007, discloses a building encroaching 0.19' to 0.25' over the easterly boundary line of subject property.

atl-fs1\611870v02

4

```
Deed Book 45547 Pg   53
Filed and Recorded Aug-16-2007 12:53pm
     2007-0235102
Real Estate Transfer Tax $12,000.00
 Cathelene Robinson
   Clerk of Superior Court
    Fulton County, Georgia
```

_____

                    Space Above This Line for Recorder's Use

After recording, please return to:
Greenberg Traurig, LLP
3290 Northside Parkway,
Suite 400
Atlanta, GA 30327
Attn: Keith Linch, Esq.

## STATE OF GEORGIA

## COUNTY OF FULTON

### GENERAL WARRANTY DEED

    **THIS INDENTURE** is made this 3rd day of August, 2007, by and between **Diplomat Hospitality II, LLC**, a Georgia limited liability company, hereinafter called "**Grantor**", and **Carnegie Hotels, LLC**, a Georgia limited liability company, hereinafter called "**Grantee**" (herein, the words "Grantor" and "Grantee" to include its respective heirs, successors and assigns where the context requires or permits).

### W I T N E S S E T H:

    **FOR AND IN CONSIDERATION** of the sum of Ten Dollars ($10.00) in hand paid to Grantor by Grantee at and before the execution, sealing and delivery hereof, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto Grantee, and the successors, legal representatives and assigns of Grantee, all that tract or parcel of land lying and being in Land Lot 78, of the 14th District, Fulton County, Georgia, being more particularly described on **Exhibit "A"** attached hereto and incorporated herein by reference (the "Land").

    **TO HAVE AND TO HOLD** said tract or parcel of land, together with all buildings, structures and other improvements affixed to the Land, and any and all of the rights, members and appurtenances thereof to the same being, belonging or in anywise

_Exhibit S_

_TL 16704855v1 8/2/2007_

Deed Book 45547 Pg    54

appertaining to the only proper use, benefit and behoof of Grantee forever, in fee simple; and

      **GRANTOR SHALL WARRANT** and forever defend the right and title to said tract or parcel of land unto Grantee (but not Grantees' successors, successors-in-title, legal representatives, or assigns, it being the express intention of Grantor and Grantee that the transmission of the covenant of warranty herein with the land is expressly prohibited, and all persons claiming through and under Grantee shall have no rights with respect to such covenant or warranty) as to the lawful claims of all persons whomsoever; subject, however, to those items reflected on Exhibit "B" attached hereto and made part hereof, to which this conveyance is made subject.

      **IN WITNESS WHEREOF**, Grantor, acting by and through its general partner, has executed and sealed this indenture, and delivered this indenture to Grantee, all the day and year first written above.

<div align="right">

**GRANTOR:**

</div>

Signed, sealed and delivered in the presence of:

**DIPLOMAT HOSPITALITY II, LLC,**
a Georgia limited liability company

_____
Unofficial Witness

By: _____ (SEAL)
    M.C. Patel, Authorized Member

_____
Notary Public

My Commission Expires:

_____

(NOTARY SEAL)

TL 16704855v1 8/2/2007            2

Deed Book 45547 Pg    55

# EXHIBIT "A"
## LEGAL DESCRIPTION

ALL THAT TRACT or parcel of land lying and being in Land Lot 78 of the 14th District of Fulton County, Georgia and being more particularly described as follows:

BEGINNING at a point lying on the south right-of-way of Ellis Street at the southwest intersection of said southern right-of-way and the west side of a 10 foot alley, which point is marked by a metal corner plate; thence running west 97.34 feet along the south right-of-way of Ellis Street, which right-of-way forms an interior angle of 90°32'25" with the western side of the aforesaid 10 foot alley, to a point; thence running southwest 7.00 feet along a line forming an interior angle of 135°42'35" with the line last run, to a point at the southeast corner or the intersection of the southern right-of-way of Ellis Street and the northeast right-of-way of Carnegie Way; thence running southeasterly 17.62 feet along the northeast right-of-way of Carnegie Way which right-of-way forms an interior angle of 133°20'52" with the line last run, to a point; thence running southeasterly 155.14 feet along the northeast right-of-way of Carnegie Way, which right-of-way forms an interior angle of 140°16'14" with the line last run, to a point, which point marks the northwest corner of the intersection of the northeast right-of-way of Carnegie Way and the west side of the aforesaid alley; thence running north 138.36 feet along said west side of said alley, which west side forms an interior angle of 41°07'56" with the line last run, to the POINT OF BEGINNING; as shown on the plat of survey for Carnegie Way Investors, Ltd., prepared by Eaton Pendley & Assoc., Inc., dated March 30, 1986.

TOGETHER with any and all right, title and interest, if any, of the Carnegie Way Investors, Ltd. in that certain alley (approximately ten (10) feet in width) which adjoins the above described property on the east and which runs between Ellis Street and Carnegie Way and which alley has been commonly referred to as the "Mortgage Guaranty Way".

TL 16704855v1 8/2/2007      3

Deed Book 45547 Pg   56
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

POOR ORIGINAL

## EXHIBIT "B"
## PERMITTED EXCEPTIONS

1) All taxes for the year 2007 and subsequent years, not yet due and payable.

2) Rights of the City of Atlanta in and to the ten (10') alley adjoining property to the east of subject property pursuant to Ordinance No. 2001-22, §1, 3-14-01 and rights of the property owner adjacent to said alley on the west side thereof in and to said alley as provided under that certain Right of Way Encroachment Agreement by and between the City of Atlanta and Kelco/FB Winecoff, LLC dated July 5, 2006, filed for record July 10, 2006 at 1:36 p.m., and recorded in Deed Book 42957, Page 241, Records of Fulton County, Georgia.

3) Building Lease Agreement as evidenced by that certain Short Form of Building Lease Agreement by and between Carnegie Building Limited Partnership, a Georgia limited partnership ("Lessor") and Pactel Cellular Inc. of Georgia, a Nevada corporation now known as AirTouch Cellular of Georgia ("Lessee"), dated April 11, 1994, filed for record January 6, 1995 at 8:30 a.m., recorded in Deed Book 19138, Page 337, aforesaid Records.

4) Notification of the Designation of Property Under the City of Atlanta's Historic Preservation Ordinance, Code of Ordinances of the City of Atlanta, Section 16-20.006.E by Karen Huebner, Executive Director of Urban Design Commission, dated July 24, 1990, filed for record July 26, 1990 at 10:39 a.m., recorded in Deed Book 13595, Page 207, aforesaid Records.

5) That certain survey entitled "ALTA/ACSM Land Title Survey Diplomat Hospitality II, LLC, Nexity Bank, Chicago Title Insurance Company", Project No. 2006-356, prepared by A.S. Giometti & Associates, Inc., bearing the seal and certification of A.S. Giometti, Georgia Registered Land Surveyor No. 1125, dated January 12, 2007, last revised February 13, 2007, discloses a building encroaching 0.19' to 0.25' over the easterly boundary line of subject property.

TL 16704855v1 8/2/2007                                    4

# OPERATING AGREEMENT

---

# Carnegie Hotels , L.L.C.

## A Georgia Limited Liability Company

### OPERATING AGREEMENT

### ADOPTED August 3 rd  , 2007

Exhibit T

# Table of Contents

ARTICLE I:  Definitions ................................................................................................ 3

ARTICLE II: Formation of Company ........................................................................... 8

ARTICLE III: Business of Company ............................................................................ 8

ARTICLE IV: Names and Addresses of Members....................................................... 8

ARTICLE V: Rights and duties of Managers................................................................ 8

ARTICLE VI: Rights and Obligations of Members ................................................... 12

ARTICLE VII: Meetings of Members......................................................................... 12

ARTICLE VIII: Indemnification ................................................................................ 13

ARTICLE IX: Contributions and Capital Accounts................................................... 14

ARTICLE X: Allocations and Distributions............................................................... 16

ARTICLE XI: Taxes.................................................................................................... 17

ARTICLE XII: Ownership Restriction and Disposition of Economic Interests........... 18

ARTICLE XIII: Admission of Assignees and Additional Members........................... 24

ARTICLE XIV: Dissociation, Dissolution and Winding Up ..................................... 25

ARTICLE XV: Amendment ........................................................................................ 27

ARTICLE XVI Miscellaneous Provisions................................................................... 27

EXHIBIT "A": Contribution Summary ...................................................................... 30

This Operating Agreement of Carnegie Hotels, LLC a limited liability company organized pursuant to the Georgia Limited Liability Company Act, shall be effective as of the 3 rd day of August , 2007, by and among the Persons executing this Operating Agreement (as Members).

# ARTICLE I
# DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings unless otherwise expressly provided herein:

**Section 1.1** "Act" shall mean the Georgia Limited Liability Company Act, as amended from time to time, and any successor thereto.

**Section 1.2** "Additional Capital Contribution" shall mean any Capital Contribution other than an Initial Capital Contribution that a Member is obligated to make in accordance with Section 9.2.

**Section 1.3** "Additional Member" shall mean a Member, other than an Initial Member or a Substitute Member, who has acquired a Membership Interest from the Company and has become a Member in accordance with Section 13.3.

**Section 1.4** "Affiliate" shall mean, with respect to any Member, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Member, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Member, (iii) any Member, Manager, officer, director, general Member, trustee, or a holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Section 1.5** "Articles" shall mean the Articles of Organization of the Company, as amended from time to time.

**Section 1.6** "Assignee" shall mean a transferee of an Economic Interest who has not been admitted as a Substitute Member.

**Section 1.7** "Capital Account" shall mean the account maintained with respect to a Member or Assignee determined in accordance with Article IX.

**Section 1.8** "Capital Contribution" shall mean any contribution to the capital of the Company of cash, property or services or the obligation to contribute cash, property or services made by or on behalf of a Member or Assignee.

**Section 1.9**  "Cash Flow" shall mean an amount equal to (a) Net Profits minus Net Losses, (b) plus (i) appreciation and other non-cash charges deducted in determining such Net Profits and Losses, (ii) the net proceeds from any refinancing of the Company's mortgages, and (iii) the net proceeds from the sale of any of the Company's Property, (c) minus (i) principal payments on all mortgages, (ii) any other cash expenditures which have not been deducted in determining the Net Profits and Losses of the Company, and (iii) any amount reasonably required to maintain sufficient working capital and a reasonable reserve for replacement.

**Section 1.10**  "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor thereto.

**Section 1.11**  "Company" shall mean Carnegie Hotels, L.L.C., a Georgia limited liability company, and any successor limited liability company.

**Section 1.12**  "Company Minimum Gain" shall mean an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains.  The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain.  For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain, and increases and decreases in Company Minimum Gain, are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**Section 1.13**  "Company Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent that no Member or Related Person bears the economic risk of loss (as defined in Section 1.752.2 of the Regulations) with respect to the liability.

**Section 1.14**  "Company Property" shall mean any Property owned by the Company.

**Section 1.15**  "Contributing Members" shall mean those Members making contributions as a result of the failure of a Delinquent Member to make the Additional Capital Contribution in accordance with Section 9.2.

**Section 1.16**  "Default Interest Rate" shall mean the higher of the applicable federal rate or the then current prime rate quoted by Haventrust Bank plus two (2) percentage points.

**Section 1.17**  "Delinquent Member" shall mean a Member who has failed to make the Additional Capital Contribution required of that Member in accordance with Section 9.2.

**Section 1.18**  "Disposition" ("Dispose") shall mean any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law) of an Economic Interest in the Company.

**Section 1.19**  "Dissociation (Dissociate)" shall mean any action or event which causes a Person to cease to be Member of the Company as described in Article XIV hereof.

**Section 1.20**  "Dissolution Event" shall mean an event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

**Section 1.21**  "Distribution" shall mean a transfer of Property made by the Company to a Member or an Assignee on account of such Member's or Assignee's Economic Interest as described in Article X.

**Section 1.22**  "Economic Interest" shall mean a Member's or Assignee's share of the Company's Net Profits, Net Losses, and Distributions of the Company's Property pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the operation, management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

**Section 1.23**  "Effective Date" shall mean the date upon which this Operating Agreement shall become effective under Section 2.2.

**Section 1.24**  "Immediate Family" shall mean a Member's spouse, children (including natural, adopted and stepchildren), grandchildren, and parents.

**Section 1.25**  "Initial Capital Contribution" shall mean the Capital Contribution agreed to be made by the Initial Members as described in Section 9.1 and set forth on Exhibit A attached hereto.

**Section 1.26**   "Initial Members" shall mean those persons identified on Exhibit A attached hereto who have executed this  Operating Agreement .

**Section 1.27**   "Manager" shall mean a Member or other Person designated by the Members to manage the affairs of the Company under Article V hereof.

**Section 1.28**  "Member" shall mean an Initial Member, Substitute Member or Additional Member of the Company as identified in Article IV of this agreement.

**Section 1.29**  "Member Minimum Gain" shall mean an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains.  The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain.  For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Member Minimum Gain on the last day of the current Taxable Year.  Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**Section 1.30**  "Member Nonrecourse Deductions" shall mean the net increase during the Taxable Year, if any, in Member Minimum Gain, reduced (but not below zero) by any distribution of proceeds that are attributable to a Member Nonrecourse Liability and allocable to an increase in such Member Minimum Gain under Section 1.704-2(i) of the Regulations.

**Section 1.31**  "Member Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under Section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

**Section 1.32**  "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right of the Member to participate in the management and operation of the business and affairs of the Company, including, but not limited to, the right to vote on, consent to, or otherwise participate in any decision, vote or action of or by the Members granted pursuant to this Operating Agreement and the Act. In the case of an Assignee, the term "Membership Interest" shall mean only the Assignee's Economic Interest in the Company.

**Section 1.33**  "Net Losses" shall mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

**Section 1.34**  "Net Profits" shall mean the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

**Section 1.35**  "Notice" shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the Company's Principal Place of Business. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at that Member's address as reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

**Section 1.36**  "Offsettable Decrease" shall mean any allocation that unexpectedly causes or increases a deficit in a Member's or Assignee's Capital Account as of the end of the Taxable Year to which the allocation relates attributable to depletion allowances under Section 1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under Section 704(e)(2) or 706 of the Code or Section 1.751-1 of the Regulations, or distributions that, as of the end of the Taxable Year, are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's or Assignee's Capital Account that reasonably are expected to occur during or (prior to) the Taxable Years in which such distributions are expected to be made (other than increases pursuant to a minimum gain chargeback pursuant to sections 10.2 and 104 hereof).

**Section 1.37** "Operating Agreement " shall mean this Operating Agreement including all amendments hereto adopted in accordance with Section 15.2 and the Act.

**Section 1.38** "Organization" shall mean any entity permitted to be a Member of a limited liability company under the Act. The term "Organization" includes, without limitation, Companies (both non-profit and other Companies), Memberships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but does not include joint tenancies and tenancies by the entirety.

**Section 1.39** "Organization Expenses" shall mean those expenses incurred in the organization of the Company, including but not limited to, the costs of preparation of this Operating Agreement and the Articles.

**Section 1.40** "Person" shall include an individual, trust, estate, or any Organization.

**Section 1.41** "Principal Place of Business" shall mean the principal office of the Company designated in Section 2.4, or any other place or places as the Manager(s) may from time to time deem advisable.

**Section 1.42** "Property" shall mean any property real, personal or mixed, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**Section 1.43** "Regulations" shall mean the permanent, temporary, proposed, or proposed and temporary regulations issued by the Department of the Treasury that are promulgated under the Code as amended.

**Section 1.44** "Related Person" shall mean a Person having a relationship to a Member that is described in Section 1.752-4(b) of the Regulations.

**Section 1.45** "Substitute Member" shall mean an Assignee who has been admitted as a Member of the Company in accordance with Section 13.2. Upon becoming a Member of the Company, such Assignee shall have all the rights of a Member as are described more fully in Section 13.2 hereof.

**Section 1.46** "Taxable Year" shall mean the taxable year of the Company as determined pursuant to Section 706 of the Code.

**Section 1.47** "Taxing Jurisdiction" shall mean the taxing jurisdiction of the Federal Government and of any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**Section 1.48** The term "transfer", as used herein, includes, but is not limited to, a gift, sale, exchange, hypothecation, assignment, pledge or other encumbrance of Ownership.

## ARTICLE II
## FORMATION OF COMPANY

**Section 2.1**  Organization.  On July 27 th, 2007, the Members organized the Company pursuant to the provisions of the Act by filing the Articles with the Secretary of State.

**Section 2.2**  Effective Date.  This Operating Agreement is effective as of the 3 rd day of August , 2007.

**Section 2.3**  Registered Agent  and Office.  The registered agent for the service of process and the registered office shall be that individual and location reflected in the Articles. The Members holding at least a majority of the Membership Interests of the Company may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State.  In the event the registered agent ceases to act as such for any reason or the location of the registered office shall change, the Manager(s) shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.  If the Manager(s) shall fail to designate a replacement registered agent or change of address of the registered office within five days after the registered agent ceased to act as such or the location of the registered office changed, as the case may be, any Manager, or Members holding a majority of the Membership Interests, may designate a replacement registered agent or file a notice of change of address.

**Section 2.4**  Principal Place of Business.  The Principal Place of Business of the Company is located at 2100 Parklake Drive, N.E., Suite A., Atlanta, Georgia 30345.  The Company may locate its principal place of business at any other place or places as the Managers from time to time deem advisable.

## ARTICLE III
## BUSINESS OF COMPANY

**Section 3.1**  Permitted Businesses.  The business of the Company shall be:

(a) Provision of hotel acquisition, building, construction, ownership, lease, purchase, development, sale, management, operations, franchising, mortgages, insurance and merchant building services to its clients.

(b)  To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

## ARTICLE IV
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

R.C.Patel ,  2100 Parklake Drive, N.E. – Atlanta Georgia 30345

# ARTICLE VI

## RIGHTS AND DUTIES OF MANAGERS

**Section 5.1**  Management.  The management of the business and affairs of the Company shall be vested in its Managers.  Except for situations in which the approval of the Members is expressly required by this Operating Agreement, the Act, or by non-waivable provisions of applicable law, any Manager shall have full and complete authority, power and discretion to manage and control the business affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  At anytime when there is more than one Manager, any one Manager may take any action permitted to be taken by a Manager, unless the approval of more than one of the Managers or the Members is expressly required pursuant to this  Operating Agreement  or the Act.

**Section 5.2**  Number, Tenure and Qualifications.  The Company shall have One Manager The number of Managers of the Company shall be fixed from time to time by the affirmative vote or action of Members holding a majority of the Membership Interests of the Company.  The Manager shall hold office until the Manager's successor shall have been elected or designated and qualified.  A Manager need not be a resident of the State of Georgia or a Member of the Company.  The name and address of the Manager of the Company is as follows:

NAME                                              ADDRESS

Rajesh C. Patel                                   2100 Parklake Drive, N.E.
                                                  Atlanta, Georgia 30345


**Section 5.3**  Certain Powers of Managers.  Subject to the limitations on the power of the Manager contained in Section 5.4 below, any Manager shall have the power and authority, on behalf of the Company:

(a) To administer the day to day affairs of the Company;

(b) To do and perform any and all other acts as may be necessary or appropriate to the conduct of the Company's business.

(c) sell all or substantially all of the Properties of the Company .

(d) merge or consolidate the Company with or into one or more limited liability companies or other business entities in accordance with Section 6.4 below; and

(e) Borrow money for the Company or, in connection therewith, encumber or grant security interests in the Company's Property to secure repayments of such borrowed sums. Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

**Section 5.4**    Limitation on Powers of Managers. Notwithstanding anything to the contrary in this Article V, no Manager shall have the power or authority to do any of the following, which shall be reserved to the Members holding the requisite Membership Interests in the Company;

(a) Amend the Operating Agreement in accordance with Section 15.1;

(b) Admit Assignees as Substitute Members in accordance with Section 13.2;

(c) Admit Additional Members in accordance with Section 13.3;

(d) Continue the Company after a Dissociation Event in accordance with Section 14.3;

**Section 5.5**    Liability for Certain Acts.  Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Member of the Company.  The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company.  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

**Section 5.6**    Managers Have No Exclusive Duty to Company.  No Manager shall be required to manage the Company as such Manager's sole and exclusive function, and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this  Operating Agreement , to share or participate in such other investments or activities of a Manager or to the income or proceeds derived therefrom.

**Section 5.7**    Property.  Any and all Company Property shall be held in the name of the Company.

**Section 5.8**    Bank Accounts.  The Managers may from time to time open bank accounts in the name of the Company.

**Section 5.9**    Records, Audits and Reports to be maintained.  At the expense of the Company, the Managers shall maintain the records and accounts of all operations and expenditures of the Company.  The Company shall maintain the following records at the Principal Place of Business;

(a) A current list of the full name and last known business or residence address of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed;

(c)  Copies of the Company's Federal, foreign, state and local income tax returns and reports, if any, for the three (3) most recent Taxable Years;

(d)  A copy of the Operating Agreement including all amendments thereto;

(e)  Copies of any financial statements of the Company for the three (3) most recent years and all information relating to the capital accounts and capital contributions of each Member.

(f)  Any other records and accounts as the Members shall require the Company to maintain and other reasonable information regarding the affairs of the L.L.C.

**Section 5.10**  Access to Records.  The records required to be maintained by the Company in this Article V, and any other books and records of the Company, wherever situated, are subject to inspection and copying at the reasonable request of, and at the expense of, any Member .

**Section 5.11**  Reports to Members.  The Manager shall furnish, or cause to be furnished, to each Member annual financial statement within sixty (60) days after the end of each fiscal year of the Company.  The Manager shall also provide all Members with those information returns required by the Code and the laws of all applicable local and foreign governments.

**Section 5.12**  Accounts.  The Manager shall maintain a record of Capital Accounts for each Member and Assignee in accordance with Article IX.

**Section 5.13**  Records of Membership Interests.  The Manager shall maintain a record of the Membership Interest held by each Member, as such Membership Interest shall be increased or decreased from time to time in accordance with this Operating Agreement .

**Section 5.14**  Resignation.  Any Manager of the Company may resign at any time by giving ten (10) days prior written notice to the Members of the Company.  The resignation of any Manager shall take effect ten (10) days following the receipt of the notice or at such later time as shall be specified in the notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.15**  Removal.  At any meeting of the Members, all or any lesser number of the Managers may be removed, with or without cause, by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.

**Section 5.16**  Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.  A Manager elected or designated to fill a vacancy shall be elected or designated for the unexpired term of such Manager's predecessor in office and shall hold office until the expiration of such term and until such Manager's successor shall be elected or designated and shall qualify or until the earlier of the death, resignation or removal of such Manager.

**Section 5.17**  Salaries.  The salaries and other compensation of the Manager(s) shall be fixed from time to time by an affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company, and no Manager shall be prevented from receiving

such salary by reason of the fact that the Manager is also a Member of the Company.

# ARTICLE VI
# RIGHTS AND OBLIGATIONS OF MEMBERS

**Section 6.1**  Member Management Rights.  Unless otherwise provided in this Operating Agreement  or by non-waivable provisions of the Act, all Members (other than Assignees) who have not dissociated shall be entitled to vote on any matter submitted to a vote of the Members.

**Section 6.2**  Liability of Members to Third Parties.  Unless otherwise provided by the Act,  no Member shall be liable under any judgment, decree, or order of a court, or in any other manner, for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any Member, Manager, agent or employee of the Company.

**Section 6.3**  Notification of Merger or Consolidation.  The Manager shall notify the Members of any merger or consolidation of the Company with or into one or more limited liability companies or other business entities formed or organized under the laws of the State of Georgia, any other state, the United States or any foreign jurisdiction, with the Company or the other business entity being the surviving entity.

# ARTICLE VII
# MEETINGS OF MEMBERS

**Section 7.1**  Meetings.  The Members shall meet at least annually, or more often as the Members may agree,  for the purpose of reviewing the operations of the Company and its financial status.  Such meetings may be in person or by telephone or video conference.   A written report of such meetings shall be placed in the permanent record book of the Company. Neither regular nor special meetings of the Members shall be required in order to conduct the business and affairs of the Company or take any action with respect thereto; provided, however, that special meetings of the Members may be called for any purpose or purposes by any Member upon ten (10) days prior written notice to each Member of the Company.  If no place for the meeting is designated as made, the place of meeting shall be the principal office of the Company in the State of Georgia.

**Section 7.2**  Manner of Acting.  The affirmative vote of Members holding at least a majority of the Membership Interests of the Company shall be the act of the Members, unless the vote or action of a greater or lesser proportion or number of the Members is otherwise required by the Act, by the Articles or by this Operating Agreement.

**Section 7.3**  Action by Members without a Meeting.  All actions with respect to the Company may be taken without a meeting of the Members; provided, however, that any action required or permitted to be taken at a special meeting of Members may be taken without a special meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote at a meeting of the Members and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records.

Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

**Section 7.4**  Waiver of Notice.  When any Notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice.  If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or Notice and at such meeting any lawful action may be taken.

# ARTICLE VIII
# INDEMNIFICATION

**Section 8.1**  Indemnification of Members, Managers, Etc.  The Company shall have the right to indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), by reason of the fact that such Person is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such claim, action, suit or proceeding to the greatest extent permitted by the Georgia Limited Liability Company Act, or any other federal or state statute.

**Section 8.2**  Non-Exclusivity of Article.  The indemnification authorized in and provided by this Article VIII shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under any statute, rule of law, provision of articles of organization,  Operating Agreement , other agreement, vote or action of Members or by the Managers, or otherwise, both as to actions in such Person's official capacity and as to actions in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Manager, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

**Section 8.3**  Insurance.  The Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise against any liability asserted against such Person incurred by such Person in any such capacity arising out of such Person's status as such, whether or not the Company is required or permitted to indemnify such Person against such liability under the provisions of this Article VIII or any statute.

# ARTICLE IX
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 9.1**   Initial Capital Contributions.   The Initial Capital Contribution of (and Economic Interest allocated to) each Member is set forth on Exhibit "A" hereto and incorporated by reference herein.  No interest shall accrue on any Initial Capital Contribution and no Member shall have the right to withdraw or be repaid any Initial Capital Contribution, or to receive any distributions from the Company, except as provided in this Operating Agreement.

**Section 9.2**   Additional Capital Contributions.   The Members recognize that the income produced by the Company may be insufficient to pay the operating expenses of the Company.  In addition to the Initial Capital Contributions of the Members, each Member shall be required to make such Additional Capital Contribution as shall be determined by Managers of the Company from time to time to be reasonably necessary to facilitate the business needs of the Company, including, but not limited to, meeting the Company's operating expenses, funding the expansion of the Company's business, and the purchasing of any property reasonably necessary to the operation of the Company's business; Upon making such a determination, the Company shall Notify to each Member upon fiscal year end with the accounting reports. Additional Capital Contributions shall be made in proportion to the Membership Interest then held by each of the Members.

**Section 9.3**  Enforcement of Additional Capital Contributions.

(a)          In the event any Member (a "Delinquent Member") fails to make the Additional Capital Contribution required of that Member, the Members shall give the Delinquent Member Notice of such failure to make such Additional Capital Contribution.   If the Delinquent Members fails to make such Additional Capital Contribution (plus any costs associated with such failure to tender the Additional Capital Contribution and interest thereon at the Default Interest Rate) within ten (10) days of the giving of Notice, the Members may take such action, including, but not limited to, enforcing the Delinquent Member's obligation to make such Additional Capital Contribution in a court of appropriate jurisdiction in the state in which the Principal Place of Business is located or the state reflected in Delinquent Member's address as set forth in Article IV.   Each Member expressly consents to the jurisdiction of such courts but only for the enforcement of the obligation to make Additional Capital Contributions under this Operating Agreement.   The Members, or any one or more of the Members, as the Members shall agree, may elect to contribute the amount of the Delinquent Member's Additional Capital Contribution, with those Members who contribute (Contributing Members to contribute additional amounts, in proportion to such Contributing Member's Membership Interest in the Company (not taking into account the Delinquent Member's Membership Interest) or in such other proportions as the Contributing Members shall agree to, that in the aggregate equal the amount of the Additional Capital Contribution not contributed by the Delinquent member and shall automatically dilute his interest in his membership on a annual basis..

(b)  The Contributing Members shall have the option to treat the amounts contributed pursuant to Section 9.3(a) as (i) a loan from the Contributing Members to the Delinquent Members bearing interest at the Default Interest Rate and secured by the Delinquent Member's Economic Interest in the Company or (ii) as an Additional Capital Contribution of such Member. In the event that the Contributing Members elect to treat his contribution as a loan to the Delinquent Member, no adjustments shall be made to such Contributing Members' Capital Accounts, and their respective shares or allocations of Net Profits, Net Losses and Cash Flow shall remain the same; provided, however, that until the Contributing Members are fully repaid, the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled.  In the event that the Contributing Members elect to treat his contribution with respect to the Delinquent Member as an Additional Capital Contribution, such Members' Capital Accounts shall be adjusted in accordance with Section 9.4 below.

(c)  Notwithstanding this Section 9.3, no obligation to make an Additional Capital Contribution or any other obligation hereunder may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**Section 9.4**  Maintenance of Capital Accounts.  The Company shall establish and maintain Capital Accounts for each Member and Assignee.  Each Member's and Assignee's Capital Account shall be increased by (1) the amount of any money actually contributed by the Member or Assignee to the capital of the Company, (2) the fair market value of any Property contributed, as determined by the Company and the contributing Member or Assignee at arm's length at the time of contribution (net of any liabilities assumed by the Company or subject to which the Company takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Profits and of any separately allocated items of income or gain except adjustments required under Section 704(c) of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).  Each Member's or Assignee's Capital Account shall be decreased by (1) the amount of any money actually distributed to the Member or Assignee by the Company, (2) the fair market value of any Property distributed to the Member or Assignee by the Company (net of liabilities of the Company assumed by the Member or Assignee or subject to which the Member or Assignee takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Losses and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).

**Section 9.5**  Distribution of Property.  If the Company at any time distributes any of its Properties to any Member or Assignee, the Capital Account of each Member or Assignee shall be adjusted to account for that Member's or Assignee's allocable share (as determined under Article X below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the Properties that were distributed at their respective fair market values immediately prior to their distribution.

**Section 9.6**  Sale or Exchange of Interest.  In the event of a sale or exchange of some or all of a Member's or Assignee's Economic Interest in the Company, the Capital Account of the

transferring Member or Assignee shall become the Capital Account of the Assignee acquiring such Economic Interest, to the extent it relates to the portion of the Economic Interest transferred.

**Section 9.7**  Compliance with Section 704(b) of the Code.  The provisions of this Article IX as they relate to the maintenance of Capital Amounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article X to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Articles X and XIV and the Capital Contributions made pursuant to this Article IX.  Notwithstanding anything herein to the contrary, this  Operating Agreement  shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution made by that Member.

# ARTICLE X
## ALLOCATIONS AND DISTRIBUTIONS

**Section 10.1**  Allocations of Net Profits and Net Losses.  Except as may be required by Section 704(c) of the Code, and Sections 10.2, 10.4, and 10.5 of this Article X, Net Profits, Net Losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to the Membership Interest each Member holds as of the first day of the Taxable Year; provided, however, that if the Membership Interest held by any Member changes during the Taxable Year, or if any Additional Members are admitted during the Taxable Year, the Net Profits and Net Losses for each month of such Taxable Year shall be allocated among the Members in proportion to the Membership Interest each Member holds as of the first day of each such month, and each Member's share of the Net Profits and Net Losses for such Taxable Year shall be equal to the sum of his share of the Profits and Losses for each month during the Taxable Year.

**Section 10.2**  Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year.  A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in Company Minimum Gain is caused by the revaluation.  A Member is not subject to this Company Minimum Gain chargeback requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability.

**Section 10.3**  Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Taxable Year shall be allocated to the Member who bears the economic risk of loss with

respect to the Member Nonrecourse Liability with respect to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(b)(4) of the Regulations.

**Section 10.4** Member Minimum Gain Chargeback. If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's share of the net decrease in the Member Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Section 1.704-2(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain and Company Minimum Gain chargeback shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

**Section 10.5** Qualified Income Offset. In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain of the Company for the Taxable Year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

**Section 10.6** Interim Distributions. The Manager(s) shall determine the Cash Flow of the Company for each fiscal year and not cumulatively, and, as so determined, the Cash Flow shall be distributed to the Members in the same proportion as the Net Profits and Net Losses are allocated between the Members under Section 10.1 above, subject to any adjustments pursuant to Article IX. The Cash Flow shall be distributed at the discretion of the Manager, but at least semi-annually.

**Section 10.7** Limitations on Distributions. No Distribution shall be declared and paid unless, after the Distribution is made, the Property of the Company is in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

# ARTICLE XI
# TAXES

**Section 11.1** Elections. The Manager may make any tax elections for the Company allowed under the Code or the tax laws of any Taxing Jurisdiction.

**Section 11.2** Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction so require, each Member requested to do by the Manager will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the

collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income.  If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax penalties and interest determined under the laws of the Taxing Jurisdiction with respect to such income.  Any such payments with respect to the income of a Member shall be treated as a distribution for purposes of Article X.  The Manager may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**Section 11.3**  Tax Matters Member.  The Members shall designate a Manager, or any Member, to act as the "tax matters Member" of the Company pursuant to Section 6231(a)(7) of the Code.  Any Manager or Member so designated shall take such action as may be necessary to cause each Member (other than a Member who acts as the tax matters Member) to become a notice Member within the meaning of Section 6223 of the Code.  Any Member who is designated tax matters Member may not take any action contemplated by Section 6222 through 6232 of the Code without the consent of the other Members.

**Section 11.4**  Accrual Method of Accounting.  The records of the Company shall be maintained on an accrual method of accounting.  It is intended that the Company will elect those accounting methods permitted under applicable law which provide the Company with the greatest tax benefits.

# ARTICLE XII
# OWNERSHIP RESTRICTION AND DISPOSITION OF ECONOMIC INTERESTS

**Section 12.1**  Limitations.  An Assignee of an Economic Interest under this Article XII shall have only those rights as described more fully in Section 13.1 hereof and shall have no right to become a Member of the Company or to participate in the management of the business affairs of the Company unless such Assignee is admitted as a Substitute Member in accordance with Section 13.2 of this Operating Agreement.

**Section 12.2**  Permitted Transaction.  The Economic Interest of any Member shall be transferable without the consent of the other Members if the transferee is a member of one Member's Immediate Family.

**Section 12.3**  Consent, Etc.  No Member or Assignee may dispose of all or a portion of such Member's or Assignee's Economic Interest, except as permitted by Section 12.2 above, unless:

(a)  prior to the transfer, the Company receives, unless waived by the Member(s) in writing, an opinion of counsel satisfactory to the Member(s) that such Disposition is not subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws and such Disposition, alone or when combined with other transactions, would not result in a termination of the Company within the meaning of Section

708 of the Code;

(b) prior to the Disposition, the Company receives from the transferee the information and agreements that the Member(s) may reasonably require, including, but not limited to any taxpayer identification number and any agreement that may be required by the Taxing Jurisdiction; and

(c) The transferring Member or Assignee shall either:

(i) First obtain the written consent of the other Members to such disposition; or

(ii) Comply with the provisions of Section 12.4 below.

**Section 12.4** Restriction during Life. No Member shall transfer any portion or his entire share of Ownership unless the Member desiring to make the transfer (hereinafter referred to as the "Seller") first offers to sell the share of Ownership he wishes to transfer in accordance with subparagraph (a) below, and such offer is not accepted.

(a) Offer by Seller. The Seller's offer to sell the share of Ownership shall be in writing and delivered to the Company and to the other Members. In the offer, the Seller shall offer to sell all the share of Ownership owned by the Seller or the portion of the share he wishes to transfer at the lesser of the purchase price offered to Seller in a bona fide offer from a third party or the price specified in section 12.6, or if there is no third party offer, at the price set by section 12.6 below, and shall state the intention, if any, of the Seller to transfer his share of ownership and the name and address of such prospective Purchaser or Lienor, the percentage of share of Ownership involved in the proposed transfer, and the terms under which transfer is to take place.

(b) Acceptance of Offer. Within thirty (30) days after receipt of such offer, the Company may, at its option, elect to purchase all or a part of the share of Ownership offered by the Seller. The Company shall exercise its election to purchase by giving written notice thereof to the Seller and to the other Members. If such offer is not accepted by the Company within said thirty (30) day period, the other Members may, within thirty (30) days after the expiration of said initial thirty (30) day period, at their option, purchase all or part of the share of Ownership offered by the Seller. The other Members shall be entitled to purchase in proportion to their ownership. The other Members shall exercise their election to purchase by giving written notice thereof to the Seller and to the Company and to the other Members. The notice of election to purchase by the Company or by the other Members, as the case may be, shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of giving such notice.

(c) Release from Restrictions. If neither the Company nor the other Members elect to purchase the Seller's share of Ownership, the Seller may make a bona fide transfer to the prospective purchaser or lienor named in the offer, such transfer to be made only in strict accordance with the terms herein stated. However, if the Seller shall fail to make such transfer within thirty (30) days following the expiration of the time hereinabove provided for the election by the other Members of the Company, the share of Ownership shall again become subject to the restrictions of this Agreement as though they had never been so offered.

(d) Termination of Employment: Any member whose employment in any capacity

with the company or its subsidiaries terminates for any reason whatsoever, voluntarily or involuntarily, shall be considered as of the date of such termination of employment to have made an offer of all of his percentage of ownership subject to the terms of this Agreement, at the purchase price stated in section 12.6 below.

**Section 12.5**    Transfer on Bankruptcy, Death or In competency. If a Member of the Company dies, is adjudged by a court of competent jurisdiction to be incompetent to handle the Member's person or property  or upon the bankruptcy of a Member, the Member or his personal representative shall notify the Company and other Members. The Company shall have the option to purchase all of such Member's ownership and if the option is exercised, the Member or the trustee of the bankrupt Member or his personal representative shall sell to the Company all the share of ownership at the price determined in accordance with section 12.6 below. If such option is exercised, the Company shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after receipt of notice of the event. If the Company does not exercise its option to purchase, then all the other Members shall have the option to purchase such share, in proportion to their ownership percentage. The other Members shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after the expiration of the initial 30-day period.

**Section 12.6**    Price of Ownership.  The price of the ownership shall be the value which is agreed upon between the selling Member or his trustee or personal representative and the purchasing party, whether it be the Company or the Members. If the parties are unable to agree upon a purchase price, the purchase price shall be determined by an appraiser who regularly conducts business appraisals. If the parties are unable to agree upon one appraiser, each shall select an appraiser and the average of the two appraisals shall be the purchase price. The parties shall divide equally the expenses of the appraiser.

**Section 12.7**    Endorsement on Ownership Statement. Statements showing exact percentage sold or encumbered hereunder, properly endorsed to the Company or to the purchasing Member, as the case may be, shall be delivered by the transferor not later than the date of closing.

**Section 12.8**  Insurance. To insure or partially insure its obligation under this Agreement to purchase from the estate of a deceased Member the percentage owned by him prior to his death, the Company shall have the option to purchase policies of insurance covering the lives of each Member in any amount deemed desirable. In the event any Member ceases to be a Member of the Company, the Company shall terminate any such insurance on such Member's life and in the event any Member increases his holdings of the percentage of the Company, the Company shall procure and maintain, if so desired by it, additional insurance on the life of such Member proportionate to the increase in the holdings of such Member.

If the Company shall receive any proceeds of any policy on the life of the Decedent, such proceeds shall be used by the Company to pay the Decedent's Personal Representative to the extent of the purchase price of the Decedent's interest, such payment to be deemed made on account of such purchase price.

**Section 12.9**    Balance of Purchase Price. If the amount of any insurance proceeds is insufficient to pay the purchase price of any Decedent's interest, then the balance of the purchase price remaining after credit for any insurance proceeds shall be payable as follows:

(50) % of the balance due to be paid shall be paid in cash, and the balance shall be represented by a promissory note executed by the purchaser payable in (18) installments, which note shall be secured by the Ownership interest of the deceased Member.

**Section 12.10** Limitation on Member's Right to Pledge Percentage. The restrictions of section 12.4 above shall not apply to encumbrances as collateral for a note or notes in favor of the company or any one or more of the other Members or in favor of a recognized lending institution, but only if the proceeds of such loan are used in their entirety to purchase percentage of the Company and the borrowing Member delivers to the Company and the other Member(s) the written commitment of the lender, in form acceptable to the Company that such lender will not dispose of such percentage without first affording the Company and the other Member(s) the right for a period of (30) days to purchase percentage at a price satisfactory to the Company and the other Member(s).

**Section 12.11** Company Restrictions After Purchase. So long as any part of the purchase price of a Members percentage sold in accordance with this Agreement remains unpaid, the Company shall not:

> A. declare or pay bonuses to its members;
> B. reorganize its structure;
> C. merge or consolidate with any other Company, or sell any of its assets except in the regular course of business;
> D. increase the salary of any officer or executive employee of the Company;
> E. allow any of its obligations to become in default; or
> F. allow any judgments against the Company or any liens against the Company's property to remain unsatisfied.

So long as any part of such purchase price remains unpaid, the Transferor, or the Personal Representative of the Decedent shall have the right to examine the books and records of the Company from time to time and to receive copies of all accounting reports and tax returns prepared for the Company. If the Company breaches any of its obligations under this paragraph, the Transferor or the Personal Representative, in addition to any other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

**Section 12.12** Purchase By Member. Whenever a Member purchases a percentage of ownership under this Agreement, such purchaser (unless he shall have paid the entire purchase price in cash) shall, following the delivery of the purchasing documents, execute and deliver at the same to the Seller as collateral security for the payment of the unpaid purchase price a formal payment resolution signed by the buyer, and approved by the other Members of the Company. The Membership Certificate shall be held in trust by the Company until the entire purchase price shall be paid. While such the Membership Certificate shall be so held as collateral security and so long as the Purchaser is not in default, the Purchaser shall be entitled to all voting rights with respect thereto. Interest earned shall not apply to reduction of the principal owed.

**Section 12.13** Purchase By Company. Whenever the Company shall, pursuant to this Agreement, be required to purchase a percentage of the Company, the Members and the Personal Representative of any Decedent shall do all things and execute and deliver all papers as may be necessary to consummate such purchase. Any note required to be given hereunder by the

Company as part of the purchase price shall be endorsed and guaranteed by the remaining or surviving Members, who shall not be discharged from such liability by reason of the subsequent extension, modification or renewal of any such note. Until all amounts due are paid,. Financing Statement (to be recorded) shall be delivered to Seller.

**Section 12.14**   Value of Purchase Price for Tax Purposes. It is understood that the purchase price, determined as set forth hereinabove, shall be the value of the purchased Ownership interest for all tax purposes. In the event such value is later increased by any federal or state taxing authority, any tax liability resulting from such increase shall be borne by the selling Member or his Personal Representative, as the case may be.

**Section 12.15**  Indebtedness of a Member. In the event that there is a purchase and sale of a Member's Ownership interest or a percentage thereof, pursuant to the provisions hereinabove, and there is any indebtedness owed by the selling Member or his estate to any party to this Agreement, then, notwithstanding the said provisions relating to the payment of the purchase price, and any amount to be paid for the Ownership interest being purchased shall be applied first to reduce and satisfy any indebtedness owed by the Selling Member or his estate to any party under this Agreement.

**Section 12.16**   Default.  In the event of a default in the payment of any installment of the purchase price, the covenants and conditions of this Agreement, or any Security Agreement given to Sellers, Sellers may declare the entire unpaid portion of the purchase price to be immediately due and payable, and may proceed to enforce payment of same and to exercise any and all rights and remedies provided by the Uniform Commercial Code as well as any other rights and remedies either at law or in equity available to them, and Seller may assign, sell or transfer all or any part of the collateral in such manner, at such price, and on such terms and conditions as Sellers, in their sole and absolute discretion, may determine. Sellers or the Company shall have the right to purchase any or all of the collateral, apply any unpaid indebtedness on account thereof, and have a claim against Purchaser for the balance of such indebtedness in addition to any and all remedies available to them at law or in equity.

**Section 12.17**  Transfer Upon Dissociation of a Member:

(a)  Voluntary Dissociation by an Individual Member.  At least thirty (30) days prior to the time that a Member voluntarily Dissociates as a Member with the consent of the other Members in accordance with Section 14.1(a), such Member shall give Notice to the other Members and to the Company of such voluntary Dissociation, and upon expiration of ninety (90) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all the Economic Interest then held by such Member. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.6 above  and shall be paid in accordance with the provisions of Section 12.19 (b) below.

(b)  Dissociation other than for Death, In competency or Voluntary Dissociation.  In the event a Member shall Dissociate as a Member of the Company for any reason other than by reason of the death or incompetency of such Member or pursuant to Section 12.17 (a) above,

then, within thirty (30) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all of such Member's Economic Interest in the Company.  The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.18 (b) below.

**Section 12.18**  Payment Period:

(a)  The aggregate purchase price due the estate, personal representative, conservator, or other legal representative of the deceased or incompetent Member for such deceased or incompetent Member's Economic Interest purchased pursuant to Section 12.5 above shall be paid in the following manner:

(i)  There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such deceased or incompetent Member.  Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the deceased or incompetent Member's estate, personal representative, conservator, or other legal representative.

(ii)  The remaining portion of the aggregate purchase price shall be paid in cash at the closing of such sale;

(b)  The aggregate purchase price due to any Dissociated Member under Section 12.6 above shall be paid in the following manner:

(i)  There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such Member.  Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the Dissociated Member.

(ii)  There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Dissociation.  Such amount is to be determined by the remaining Members of the Company.

(iii)  Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale.  The balance of the purchase price remaining after the initial payment shall be payable in five (5) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining four (4) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)  The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Dissociated Member, bearing interest at the higher of the then applicable federal rate or the prime rate of Haventrust Bank then in effect, compounded semiannually, from the date of the initial payment.  The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of

prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Economic Interest.

(c)  The date of closing with respect to the sale of a Dissociated Member's Economic Interest in the Company pursuant to Sections 12.5 and 12.17 of this Article XII shall, unless a date is agreed to by the Dissociated Member and the remaining Members, be determined by the remaining Member or Members purchasing such Economic Interest and shall take place within sixty (60) days of the death, incompetency or other Dissolution Event which causes the Member to Dissociate from the Company.

# ARTICLE XIII
# ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

**Section 13.1**  Rights of Assignees.  Notwithstanding anything to the contrary contained in this  Operating Agreement , the only rights which an Assignee of a Member pursuant to Article XII shall have are those rights associated with the Economic Interest received and such Assignee shall not receive any right to participate in the management of the business and affairs of the Company or to become a Member; provided, however, that in the event an Assignee is an existing Member of the Company, such Assignee shall receive all rights to participate in the management of the business and affairs of the Company incident to the transferred Economic Interest. An Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable to a transferred Economic Interest.

**Section 13.2**  Admission of Substitute Members.  An Assignee of an Economic Interest shall be admitted as a Substitute Member and entitled to all the rights of the Member who initially assigned the Membership Interests only with the unanimous written approval of the Members.  The Members may grant or withhold the approval of such admission in their sole and absolute discretion.  If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interests.  The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interests from any liability to the Company that may have existed prior to the approval.

**Section 13.3**  Admission of Additional Members.  From the date of formation of the Company, any Person acceptable to the Members by their unanimous written approval may become Additional Members of the Company for such consideration as the Members shall determine, subject to the terms and conditions of this Operating Agreement.  No Additional Member shall be entitled to any retroactive allocation of income, gain, loss, deduction or credit by the Company.  The Members may, at their option, at the time the Additional Member is admitted, close the Company's books (as though the Company's Taxable Year had ended) or make pro rata allocations of income, gain, loss, deduction or credit to the Additional Member for that portion of the Company's Taxable Year in which the Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder. Upon admission of an Additional Member, this  Operating Agreement  shall be amended in order to reflect such additional Member's Membership Interest in the Company.

# ARTICLE XIV
## DISSOCIATION, DISSOLUTION AND WINDING UP

**Section 14.1**  Dissociation.  A Person shall cease to be a Member upon the happening of any of the following Dissolution Events:

(a)  the withdrawal of a Member with the consent of Members holding at least a majority of the Membership Interests of the Company;

(b)  in the case of a Member who assigns all of his Membership Interest, by the affirmative vote or action of the Members who have not assigned their Membership Interests and who hold at least a majority of the non-assigned Membership Interests of the Company;

(c)  upon the Manager's receipt of Notice with respect to a Member who:

(i)  makes an assignment for the benefit of creditors;
(ii)  files a voluntary petition in bankruptcy;

(iii)  files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(iv)  files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding in the nature of the proceedings listed in (iii); or

(v)  seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member of all or any substantial part of the Member's properties:

(d)  in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or property;

(e)  in the case of a Member who is a trustee or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f)  in the case of a Member that is a separate Organization other than a company, the dissolution and commencement or winding up of the separate Organization;

(g)  in the case of a Member that is a company, the filing of articles of dissolution (or its equivalent) for the company or the revocation of its charter and the lapse of ninety (90) days after notice to the company of such revocation without a reinstatement of its charter; or

(h)  in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

**Section 14.2**  Rights of Dissociating Member.  In the event a Member Dissociates from the Company and such Dissociation causes a Dissolution and winding up of the Company under this Article, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by damages sustained by the Company as a result of the Dissolution and winding up.

**Section 14.3**  Term and Dissolution.  The Company shall be dissolved and its affairs wound up prior to such date, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

(a)  the written consent of Members holding a majority of the Membership Interests of the Company;

(b)  the Dissociation of any Member as provided in Section 14.1 of this Article, unless (i) there are at least two remaining Members or at least one remaining Member and an Additional Member or Substitute Member is admitted in accordance with Article XIII hereof and (ii) the legal existence and business of the Company is continued with the unanimous consent of the Members within 90 days after such Dissociation.

(c)  the merger of the Company where the Company is not the successor limited liability company in such merger or the consolidation of the Company with one or more limited liability companies or other entities.

(d)  The issuance of a final Certificate of Termination of the Company by the Secretary of State of the State of Georgia.

**Section 14.4**  Distribution of Assets on Dissolution.  Upon the winding up of the Company, Company Property shall be distributed in the following order:

(a)  to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

(b)  to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs.  Liquidation proceeds shall be paid within 60 days of the end of the Company's Taxable Year or, if later, within 90 days after the date of liquidation.  Such distributions shall be in cash or property or partly in both, as determined by the Members.

**Section 14.5**  Winding Up and Certificate of Termination.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property of the Company has been distributed to the Members.  Upon the completion of winding up of the Company, a Certificate of Termination shall be delivered to the Secretary of State of the State of Georgia.  The Certificate of Termination shall set forth such information as is required by the Act.

**Section 14.6**  Effect of Dissolution.  Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of, the Company business, but the Company is not

terminated, but continues until the winding up of the affairs of the Company is completed and a Certificate of Termination with respect to the Company, or the equivalent, has been issued by the Secretary of State.

<div align="center">

## ARTICLE XV
## AMENDMENT

</div>

**Section 15.1**  Amendment or Modification of  Operating Agreement .  This Operating Agreement  may be amended or modified from time to time only by a written instrument adopted by all of the Members.

<div align="center">

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

</div>

**Section 16.1**  Entire Agreement.   This  Operating  Agreement constitutes  the  entire agreement among the parties.  No party shall be bound by any terms, conditions, statements or representations, oral or written, not herein contained.  Each party hereby acknowledges that in executing this   Operating Agreement , such party has not been introduced, persuaded or motivated by any promise or representation made by any other party, unless expressly set forth herein.  All previous negotiations, statements and preliminary instruments by the parties or their representatives are merged in this Operating Agreement.

**Section 16.2**  Investment Representations.  The undersigned Members acknowledge (i) that the Membership Interests evidenced by this  Operating Agreement  have not been registered under the Securities Act of 1933, the Georgia securities laws or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering, (ii) that the Company has relied upon the fact that the Membership Interests are to be held by each Member (or Assignee) for investment, and (3) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member (or Assignee) with a view to distribution.

Accordingly, each Member hereby represents and warrants to the Company that such Member is acquiring the Membership Interest for such own Member's account for investment and not with a view to the resale or distribution thereof.  Each Member agrees not to transfer, sell or offer for sale any or portion of such Member's Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and under any applicable state securities laws or unless the holder of such Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such transfer, offer or sale.  Each Member acknowledges that the Company is under no obligation to register such Member's Membership Interest or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Membership Interest.  Furthermore, each Member realizes that such Membership Interest is unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "Affiliate" of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least

three years.

Prior to acquiring a Membership Interest in the Company, each Member has made an investigation of the Company and its business and has had made available to each such Member all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest.  Each Member considers himself or itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

**Section 16.3**  Rights of Creditors and Third Parties.  This Operating Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.  This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by the Act or other applicable statute, no such creditor or third party shall have any rights under this  Operating Agreement  or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**Section 16.4**  Interpretation.  For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement  hereby agree to the terms and conditions contained herein, as it may from time to time be amended according to its terms.  It is the express intention of the Members that this  Operating Agreement  and the Articles shall be the sole source of agreement of the parties, and, except to the extent a provision of the  Operating Agreement  expressly incorporates Federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, the Operating Agreement   shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule.  To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the  Operating Agreement  shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**Section 16.5**   Governing Law.  This Operating Agreement, and the application or interpretation hereof, shall be governed by its terms and by the laws of the State of Georgia, and specifically the Act, applied without respect to any conflicts-of-law principles.

**Section 16.6**  Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**Section 16.7**  Construction of Terms.  Whenever used in this Agreement and when required by the context, the singular number shall include the plural and the plural the singular.  Pronouns of one gender shall include all genders.

**Section 16.8**  Captions.  The captions as to contents of particular articles, sections or paragraphs contained in this  Operating Agreement  and the table of contents hereto are inserted for convenience and are in no way to be construed as part of this  Operating Agreement  or as a

limitation on the scope of the particular articles, sections or paragraphs to which they refer.

**Section 16.9**   Waivers.   The failure of any party to seek redress for violation of or to insist upon the strict performance of any agreement or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 16.10**   Rights and Remedies Cumulative.   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.   Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**Section 16.11**   Heirs, Successors and Assigns.   Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Section 16.12**   Counterparts.   This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Approved this the 3 rd day of August, 2007.

_____
R C. Patel, Member

# EXHIBIT "A"

<u>MEMBERSHIP INTERESTS</u>

R  C. Patel     100%

# OPERATING AGREEMENT

# Carnegie Hotels , L.L.C.

A Georgia Limited Liability Company
### Amended & Restated

OPERATING AGREEMENT

## ADOPTED December 31 st, 2007

Exhibit U

This Operating Agreement of Carnegie Hotels, LLC a limited liability company organized pursuant to the Georgia Limited Liability Company Act, shall be effective as of the 31 st day of December , 2007, by and among the Persons executing this Operating Agreement (as Members).

# ARTICLE I
# DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings unless otherwise expressly provided herein:

**Section 1.1** "Act" shall mean the Georgia Limited Liability Company Act, as amended from time to time, and any successor thereto.

**Section 1.2** "Additional Capital Contribution" shall mean any Capital Contribution other than an Initial Capital Contribution that a Member is obligated to make in accordance with Section 9.2.

**Section 1.3** "Additional Member" shall mean a Member, other than an Initial Member or a Substitute Member, who has acquired a Membership Interest from the Company and has become a Member in accordance with Section 13.3.

**Section 1.4** "Affiliate" shall mean, with respect to any Member, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Member, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Member, (iii) any Member, Manager, officer, director, general Member, trustee, or a holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Section 1.5** "Articles" shall mean the Articles of Organization of the Company, as amended from time to time.

**Section 1.6** "Assignee" shall mean a transferee of an Economic Interest who has not been admitted as a Substitute Member.

**Section 1.7** "Capital Account" shall mean the account maintained with respect to a Member or Assignee determined in accordance with Article IX.

**Section 1.8** "Capital Contribution" shall mean any contribution to the capital of the Company of cash, property or services or the obligation to contribute cash, property or services .

**Section 1.9** "Cash Flow" shall mean an amount equal to (a) Net Profits minus Net Losses, (b) plus (i) appreciation and other non-cash charges deducted in determining such Net Profits and Losses, (ii) the net proceeds from any refinancing of the Company's mortgages, and (iii) the net proceeds from the sale of any of the Company's Property, (c) minus (i) principal payments on all mortgages, (ii) any other cash expenditures which have not been deducted in determining the Net Profits and Losses of the Company, and (iii) any amount reasonably required to maintain sufficient working capital and a reasonable reserve for replacement.

**Section 1.10** "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor thereto.

**Section 1.11** "Company" shall mean Carnegie Hotels, L.L.C., a Georgia limited liability company, and any successor limited liability company.

**Section 1.12** "Company Minimum Gain" shall mean an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument; only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain, and increases and decreases in Company Minimum Gain, are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time. '

**Section 1.13** "Company Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent that no Member or Related Person bears the economic risk of loss (as defined in Section 1.752.2 of the Regulations) with respect to the liability.

**Section 1.14** "Company Property" shall mean any Property owned by the Company.

**Section 1.15** "Contributing Members" shall mean those Members making contributions as a result of the failure of a Delinquent Member to make the Additional Capital Contribution in accordance with Section 9.2.

**Section 1.16** "Default Interest Rate" shall mean the higher of the applicable federal rate or the then current prime rate quoted by Haventrust Bank plus ten (10) percentage points.

**Section 1.17** "Delinquent Member" shall mean a Member who has failed to make the Additional Capital Contribution required of that Member in accordance with Section 9.2.

**Section 1.18** "Disposition" ("Dispose") shall mean any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law) of an Economic Interest in the Company.

**Section 1.19** "Dissociation (Dissociate)" shall mean any action or event which causes a Person to cease to be Member of the Company as described in Article XIV hereof.

**Section 1.20** "Dissolution Event" shall mean an event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

**Section 1.21** "Distribution" shall mean a transfer of Property made by the Company to a Member or an Assignee on account of such Member's or Assignee's Economic Interest as described in Article X.

Section 1.22 "Economic Interest" shall mean a Member's or Assignee's share of the Company's Net Profits, Net Losses, and Distributions of the Company's Property pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the operation, management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

**Section 1.23** "Effective Date" shall mean the date upon which this Operating Agreement shall become effective under Section 2.2.

**Section 1.24** "Immediate Family" shall mean a Member's spouse, children (including natural, adopted and stepchildren), grandchildren, and parents.

**Section 1.25** "Initial Capital Contribution" shall mean the Capital Contribution agreed to be made by the Initial Members as described in Section 9.1 and set forth on Exhibit A attached hereto.

**Section 1.26** "Initial Members" shall mean those persons identified on Exhibit A attached hereto who have executed this Operating Agreement .

**Section 1.27** "Manager" shall mean a Member or other Person designated by the Members to manage the affairs of the Company under Article V hereof.

**Section 1.28** "Member" shall mean an Initial Member, Substitute Member or Additional Member of the Company as identified in Article IV of this agreement.

**Section 1.29** "Member Minimum Gain" shall mean an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Member Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

Section 1.30 "Member Nonrecourse Deductions" shall mean the net increase during the Taxable Year, if any, in Member Minimum Gain, reduced (but not below zero) by any distribution of proceeds that are attributable to a Member Nonrecourse Liability and allocable to an increase in such Member Minimum Gain under Section 1.704-2(i) of the Regulations.

**Section 1.31** "Member Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under Section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

Section 1.32 "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right of the Member to participate in the management and operation of the business and affairs of the Company, including, but not limited to, the right to vote on, consent to, or otherwise participate in any decision, vote or action of or by the Members granted pursuant to this Operating Agreement and the Act. In the case of an Assignee, the term "Membership Interest" shall mean only the Assignee's Economic Interest in the Company.

**Section 1.33** "Net Losses" shall mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

**Section 1.34** "Net Profits" shall mean the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes,

Section 1.35 "Notice" shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the Company's Principal Place of Business. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at that Member's address as reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

**Section 1.36** "Offsettable Decrease" shall mean any allocation that unexpectedly causes or increases a deficit in a Member's or Assignee's Capital Account as of the end of the Taxable Year to which the allocation relates attributable to depletion allowances under Section 1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under Section 704(e)(2) or 706 of the Code or Section 1.751-1 of the Regulations, or distributions that, as of the end of the Taxable Year, are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's or Assignee's Capital Account that reasonably are expected to occur during or (prior to) the Taxable Years in which such distributions are expected to be made (other than increases pursuant to a minimum gain chargeback pursuant to sections 10.2 and 104 hereof).

**Section 1.37** "Operating Agreement " shall mean this Operating Agreement including all amendments hereto adopted in accordance with Section 15.2 and the Act.

**Section 1.38** "Organization" shall mean any entity permitted to be a Member of a limited liability company under the Act. The term "Organization" includes, without limitation, Companies (both non-profit and other Companies), Memberships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but does not include joint tenancies and tenancies by the entirety.

**Section 1.39** "Organization Expenses" shall mean those expenses incurred in the organization of the Company, including but not limited to, the costs of preparation of this Operating Agreement and the Articles.

**Section 1.40** "Person" shall include an individual, trust, estate, or any Organization.

**Section 1.41** "Principal Place of Business" shall mean the principal office of the Company designated in Section 2.4, or any other place or places as the Manager(s) may from time to time deem advisable.

**Section 1.42** "Property" shall mean any property real, personal or mixed, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**Section 1.43** "Regulations" shall mean the permanent, temporary, proposed, or proposed and temporary regulations issued by the Department of the Treasury that are promulgated under the Code as amended.

**Section 1.44** "Related Person" shall mean a Person having a relationship to a Member that is described in Section 1.752-4(b) of the Regulations.

**Section 1.45** "Substitute Member" shall mean an Assignee who has been admitted as a Member of the Company in accordance with Section 13.2. Upon becoming a Member of the Company, such Assignee shall have all the rights of a Member as are described more fully in Section 13.2 hereof.

**Section 1.46** "Taxable Year" shall mean the taxable year of the Company as determined pursuant to Section 706 of the Code.

**Section 1.47** "Taxing Jurisdiction" shall mean the taxing jurisdiction of the Federal Government and of any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**Section 1.48** The term "transfer", as used herein, includes, but is not limited to, a gift, sale, exchange, hypothecation, assignment, pledge or other encumbrance of Ownership.

# ARTICLE II
## FORMATION OF COMPANY

**Section 2.1** Organization. On July 27 th, 2007, the Members organized the Company pursuant to the provisions of the Act by filing the Articles with the Secretary of State.

Section 2.2 Effective Date. This Operating Agreement is effective as of the 31 st day of December, 2007.

**Section 2.3** Registered Agent and Office. The registered agent for the service of process and the registered office shall be that individual and location reflected in the Articles. The Members holding at least a majority of the Membership Interests of the Company may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State. In the event the registered agent ceases to act as such for any reason or the location of the registered office shall change, the Manager(s) shall promptly designate a replacement registered agent or file a notice of change of address as the case may be. If the Manager(s) shall fail to designate a replacement registered agent or change of address of the registered office within five days after the registered agent ceased to act as such or the location of the registered office changed, as the case may be, any Manager, or Members holding a majority of the Membership Interests, may designate a replacement registered agent or file a notice of change of address.

Section 2.4 Principal Place of Business. The Principal Place of Business of the Company is located at 2100 Parklake Drive, N.E., Suite A., Atlanta, Georgia 30345, The Company may locate its principal place of business at any other place or places as the Managers from time to time deem advisable.

# ARTICLE III
## BUSINESS OF COMPANY

**Section 3.1** Permitted Businesses. The business of the Company shall be:

(a) Provision of hotel acquisition, building, construction, ownership, lease, purchase, development, sale, management, operations, franchising, mortgages, insurance and merchant building services to its clients.

(b) To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

# ARTICLE IV
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

R.C.Patel ,        2100 Parklake Drive, ,Atlanta Georgia 30345

Shama Patel        2100 Parklake Drive , Atlanta Georgia 30345

Hasmita Patel     2100 Parklake Drive , Atlanta Georgia 30345

# ARTICLE VI

## RIGHTS AND DUTIES OF MANAGERS

**Section 5.1** Management. The management of the business and affairs of the Company shall be vested in its Managers. Except for situations in which the approval of the Members is expressly required by this Operating Agreement, the Act, or by non-waivable provisions of applicable law, any Manager shall have full and complete authority, power and discretion to manage and control the business affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At anytime when there is more than one Manager, any one Manager may take any action permitted to be taken by a Manager, unless the approval of more than one of the Managers or the Members is expressly required pursuant to this Operating Agreement or the Act.

**Section 5.2** Number, Tenure and Qualifications. The Company shall have One Manager The number of Managers of the Company shall be fixed from time to time by the affirmative vote or action of Members holding a majority of the Membership Interests of the Company. The Manager shall hold office until the Manager's successor shall have been elected or designated and qualified. A Manager need not be a resident of the State of Georgia or a Member of the Company. The name and address of the Manager of the Company is as follows:

NAME                                                ADDRESS

Rajesh C. Patel                                2100 Parklake Drive, N.E.
                                                      Atlanta, Georgia 30345

**Section 5.3** Certain Powers of Managers. Subject to the limitations on the power of the Manager contained in Section 5.4 below, any Manager shall have the power and authority, on behalf of the Company:

(a) To administer the day to day affairs of the Company;

(b) To do and perform any and all other acts as may be necessary or appropriate to the conduct of the Company's business.

(c) sell all or substantially all of the Properties of the Company .

(d) merge or consolidate the Company with or into one or more limited liability companies or other business entities in accordance with Section 6.4 below; and

(e) Borrow money for the Company or, in connection therewith, encumber or grant security interests in the Company's Property to secure repayments of such borrowed sums. Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or

authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

**Section 5.4** Limitation on Powers of Managers. Notwithstanding anything to the contrary in this Article V, no Manager shall have the power or authority to do any of the following, which shall be reserved to the Members holding the requisite Membership Interests in the Company;

(a) Amend the Operating Agreement in accordance with Section 15.1;

(b) Admit Assignees as Substitute Members in accordance with Section 13.2;

(c) Admit Additional Members in accordance with Section 13.3;

(d) Continue the Company after a Dissociation Event in accordance with Section 14.3;

**Section 5.5** Liability for Certain Acts. Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Member of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

**Section 5.6** Managers Have No Exclusive Duty to Company. No Manager shall be required to manage the Company as such Manager's sole and exclusive function, and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement , to share or participate in such other investments or activities of a Manager or to the income or proceeds derived therefrom.

**Section 5.7** Property. Any and all Company Property shall be held in the name of the Company.

**Section 5.8** Bank Accounts. The Managers may from time to time open bank accounts in the name of the Company.

**Section 5.9** Records, Audits and Reports to be maintained. At the expense of the Company, the Managers shall maintain the records and accounts of all operations and expenditures of the Company. The Company shall maintain the following records at the Principal Place of Business;

(a) A current list of the full name and last known business or residence address of each Member;

(b)    A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed;

(c)    Copies of the Company's Federal, foreign, state and local income tax returns and reports, if any, for the three (3) most recent Taxable Years;

(d)    A copy of the Operating Agreement including all amendments thereto;

(e)    Copies of any financial statements of the Company for the three (3) most recent years and all information relating to the capital accounts and capital contributions of each Member.

(f)    Any other records and accounts as the Members shall require the Company to maintain and other reasonable information regarding the affairs of the L.L.C.

**Section 5.10** Access to Records. The records required to be maintained by the Company in this Article V, and any other books and records of the Company, wherever situated, are subject to inspection and copying at the reasonable request of and at the expense of, any Member .

**Section 5.11** Reports to Members. The Manager shall furnish, or cause to be furnished, to each Member annual financial statement within sixty (60) days after the end of each fiscal year of the Company. The Manager shall also provide all Members with those information returns required by the Code and the laws of all applicable local and foreign governments.

**Section 5.12** Accounts. The Manager shall maintain a record of Capital Accounts for each Member and Assignee in accordance with Article IX.

**Section 5.13** Records of Membership Interests. The Manager shall maintain a record of the Membership Interest held by each Member, as such Membership Interest shall be increased or decreased from time to time in accordance with this Operating Agreement .

**Section 5.14** Resignation. Any Manager of the Company may resign at any time by giving ten (10) days prior written notice to the Members of the Company. The resignation of any Manager shall take effect ten (10) days following the receipt of the notice or at such later time as shall be specified **in** the notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.15** Removal. At any meeting of the Members, all or any lesser number of the Managers may be removed, with or without cause, by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.

**Section 5.16** Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company. A Manager elected or designated to fill a vacancy shall be elected or designated for the unexpired term of such Manager's predecessor in office and shall hold office until the expiration of such term and until such Manager's successor shall be elected or designated and shall qualify or until the earlier of the death, resignation or removal of such Manager.

**Section 5.17** Salaries. The salaries and other compensation of the Manager(s) shall be fixed from

time to time by an affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company, and no Manager shall be prevented from receiving such salary by reason of the fact that the Manager is also a Member of the Company.

# ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS

**Section 6.1** Member Management Rights. Unless otherwise provided in this Operating Agreement or by non-waivable provisions of the Act, all Members (other than Assignees) who have not dissociated shall be entitled to vote on any matter submitted to a vote of the Members.

**Section 6.2** Liability of Members to Third Parties. Unless otherwise provided by the Act, no Member shall be liable under any judgment, decree, or order of a court, or in any other manner, for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any Member, Manager, agent or employee of the Company.

**Section 6.3** Notification of Merger or Consolidation. The Manager shall notify the Members of any merger or consolidation of the Company with or into one or more limited liability companies or other business entities formed or organized under the laws of the State of Georgia, any other state, the United States or any foreign jurisdiction, with the Company or the other business entity being the surviving entity.

# ARTICLE VII
## MEETINGS OF MEMBERS

**Section 7.1** Meetings. The Members shall meet at least annually, or more often as the Members may agree, for the purpose of reviewing the operations of the Company and its financial status. Such meetings may be in person or by telephone or video conference. A written report of such meetings shall be placed in the permanent record book of the Company. Neither regular nor special meetings of the Members shall be required in order to conduct the business and affairs of the Company or take any action with respect thereto; provided, however, that special meetings of the Members may be called for any purpose or purposes by any Member upon ten (10) days prior written notice to each Member of the Company. If no place for the meeting is designated as made, the place of meeting shall be the principal office of the Company in the State of Georgia.

**Section 7.2** Manner of Acting. The affirmative vote of Members holding at least a majority of the Membership Interests of the Company shall be the act of the Members, unless the vote or action of a greater or lesser proportion or number of the Members is otherwise required by the Act, by the Articles or by this Operating Agreement.

**Section 7.3** Action by Members without a Meeting. All actions with respect to the Company may be taken without a meeting of the Members; provided, however, that any action

required or permitted to be taken at a special meeting of Members may be taken without a special meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote at a meeting of the Members and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

**Section** 7.4 Waiver of Notice. When any Notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or Notice and at such meeting any lawful action may be taken.

# ARTICLE VIII
# INDEMNIFICATION

**Section 8.1** Indemnification of Members, Managers, Etc. The Company shall have the right to indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), by reason of the fact that such Person is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such claim, action, suit or proceeding to the greatest extent permitted by the Georgia Limited Liability Company Act, or any other federal or state statute.

**Section 8.2** Non-Exclusivity of Article. The indemnification authorized in and provided by this Article VIII shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under any statute, rule of law, provision of articles of organization, Operating Agreement , other agreement, vote or action of Members or **by** the Managers, or otherwise, both as to actions in such Person's official capacity and as to actions in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Manager, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

**Section 8.3** Insurance. The Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise against any liability asserted against such Person incurred by such Person in any such capacity arising out of such Person's status as such, whether or not the Company is required or permitted to indemnify such Person against such liability under the provisions of this

Article VIII or any statute.

# ARTICLE IX
# CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 9.1** Initial Capital Contributions. The Initial Capital Contribution of (and Economic Interest allocated to) each Member is set forth on Exhibit "A" hereto and incorporated by reference herein. No interest shall accrue on any Initial Capital Contribution and no Member shall have the right to withdraw or be repaid any Initial Capital Contribution, or to receive any distributions from the Company, except as provided in this Operating Agreement.

**Section 9.2** Additional Capital Contributions. The Members recognize that the income produced by the Company may be insufficient to pay the operating expenses of the Company. In addition to the Initial Capital Contributions of the Members, each Member shall be required to make such Additional Capital Contribution as shall be determined by Managers of the Company from time to time to be reasonably necessary to facilitate the business needs of the Company, including, but not limited to, meeting the Company's operating expenses, funding the expansion of the Company's business, and the purchasing of any property reasonably necessary to the operation of the Company's business; Upon making such a determination, the Company shall Notify to each Member upon fiscal year end with the accounting reports. Additional Capital Contributions shall be made in proportion to the Membership Interest then held by each of the Members.

**Section 9.3** Enforcement of Additional Capital Contributions.

(a) In the event any Member (a "Delinquent Member") fails to make the Additional Capital Contribution required of that Member, the Members shall give the Delinquent Member Notice of such failure to make such Additional Capital Contribution. If the Delinquent Members fails to make such Additional Capital Contribution (plus any costs associated with such failure to tender the Additional Capital Contribution and interest thereon at the Default Interest Rate) within ten (10) days of the giving of Notice, the Members may take such action, including, but not limited to, enforcing the Delinquent Member's obligation to make such Additional Capital Contribution in a court of appropriate jurisdiction in the state in which the Principal Place of Business is located or the state reflected in Delinquent Member's address as set forth in Article IV. Each Member expressly consents to the jurisdiction of such courts but only for the enforcement of the obligation to make Additional Capital Contributions under this Operating Agreement. The Members, or any one or more of the Members, as the Members shall agree, may elect to contribute the amount of the Delinquent Member's Additional Capital Contribution, with those Members who contribute (Contributing Members to contribute additional amounts, in proportion to such Contributing Member's Membership Interest in the Company (not taking into account the Delinquent Member's Membership Interest) or in such other proportions as the Contributing Members shall agree to, that in the aggregate equal the amount of the Additional Capital Contribution not contributed by the Delinquent member and shall automatically dilute his interest in his membership on a Monthly, quarterly or annual basis at sole discretion of the manager.

(b) The Contributing Members shall have the option to treat the amounts contributed pursuant to Section 9.3(a) as (i) a loan from the Contributing Members to the Delinquent Members bearing interest at the Default Interest Rate and secured by the Delinquent Member's Economic Interest in the Company or (ii) as an Additional Capital Contribution of such Member. In the event that the Contributing Members elect to treat his contribution as a loan to the Delinquent Member, no adjustments shall be made to such Contributing Members' Capital Accounts, and their respective shares or allocations of Net Profits, Net Losses and Cash Flow shall remain the same; provided, however, that until the Contributing Members are fully repaid, the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled. In the event that the Contributing Members elect to treat his contribution with respect to the Delinquent Member as an Additional Capital Contribution, such Members' Capital Accounts shall be adjusted in accordance with Section 9.4 below.

(b) Notwithstanding this Section 9.3, no obligation to make an Additional Capital Contribution or any other obligation hereunder may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**Section 9.4** Maintenance of Capital Accounts. The Company shall establish and maintain Capital Accounts for each Member and Assignee. Each Member's and Assignee's Capital Account shall be increased by (1) the amount of any money actually contributed by the Member or Assignee to the capital of the Company, (2) the fair market value of any Property contributed, as determined by the Company and the contributing Member or Assignee at arm's length at the time of contribution (net of any liabilities assumed by the Company or subject to which the Company takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Profits and of any separately allocated items of income or gain except adjustments required under Section 704(c) of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee). Each Member's or Assignee's Capital Account shall be decreased by (I) the amount of any money actually distributed to the Member or Assignee by the Company,

(2) the fair market value of any Property distributed to the Member or Assignee by the Company (net of liabilities of the Company assumed by the Member or Assignee or subject to which the Member or Assignee takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Losses and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).

**Section 9.5** Distribution of Property. If the Company at any time distributes any of its Properties to any Member or Assignee, the Capital Account of each Member or Assignee shall be adjusted to account for that Member's or Assignee's allocable share (as determined under Article X below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the Properties that were distributed at their respective fair market values immediately prior to their distribution.

**Section 9.6** Sale or Exchange of Interest. In the event of a sale or exchange of some or

all of a Member's or Assignee's Economic Interest in the Company, the Capital Account of the transferring Member or Assignee shall become the Capital Account of the Assignee acquiring such Economic Interest, to the extent it relates to the portion of the Economic Interest transferred.

**Section 9.7** Compliance with Section 704(b) of the Code. The provisions of this Article IX as they relate to the maintenance of Capital Amounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article X to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Articles X and XIV and the Capital Contributions made pursuant to this Article IX. Notwithstanding anything herein to the contrary, this Operating Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution made by that Member.

# ARTICLE X
# ALLOCATIONS AND DISTRIBUTIONS

**Section 10.1** Allocations of Net Profits and Net Losses. Except as may be required by Section 704(c) of the Code, and Sections 10.2, 10.4, and 10.5 of this Article X, Net Profits, Net Losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to the Membership Interest each Member holds as of the first day of the Taxable Year; provided, however, that if the Membership Interest held by any Member changes during the Taxable Year, or if any Additional Members are admitted during the Taxable Year, the Net Profits and Net Losses for each month of such Taxable Year shall be allocated among the Members in proportion to the Membership Interest each Member holds as of the first day of each such month, and each Member's share of the Net Profits and Net Losses for such Taxable Year shall be equal to the sum of his share of the Profits and Losses for each month during the Taxable Year.

**Section 10.2** Company Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year. A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in Company Minimum Gain is caused by the revaluation. A Member is not subject to this Company Minimum Gain chargeback requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed

liability.

**Section 10.3** Member Nonrecourse Deductions. Any Member Nonrecourse

Deductions for any Taxable Year shall be allocated to the Member who bears the economic risk of loss with Page 16 of 30 respect to the Member Nonrecourse Liability with respect to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(b)(4) of the Regulations.

**Section 10.4** Member Minimum Gain Chargeback. if during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's share of the net decrease in the Member Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Section 1.704-2(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain and Company Minimum Gain chargeback shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

**Section 10.5** Qualified Income Offset. In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain of the Company for the Taxable Year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

**Section 10.6** Interim Distributions. The Manager(s) shall determine the Cash Flow of the Company for each fiscal year and not cumulatively, and, as so determined, the Cash Flow shall be distributed to the Members in the same proportion as the Net Profits and Net Losses are allocated between the Members under Section 10.1 above, subject to any adjustments pursuant to Article IX. The Cash Flow shall be distributed at the discretion of the Manager, but at least semi-annually.

**Section 10.7** Limitations on Distributions. No Distribution shall be declared and paid unless, after the Distribution is made, the Property of the Company is in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

# ARTICLE XI
# TAXES

**Section 11.1** Elections. The Manager may make any tax elections for the Company allowed under the Code or the tax laws of any Taxing Jurisdiction.

**Section 11.2** Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction so require, each Member requested to do by the Manager will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax penalties and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Member shall be treated as a distribution for purposes of Article X. The Manager may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**Section 11.3** Tax Matters Member. The Members shall designate a Manager, or any Member, to act as the "tax matters Member" of the Company pursuant to Section 6231(a)(7) of the Code. Any Manager or Member so designated shall take such action as may be necessary to cause each Member (other than a Member who acts as the tax matters Member) to become a notice Member within the meaning of Section 6223 of the Code. Any Member who is designated tax matters Member may not take any action contemplated by Section 6222 through 6232 of the Code without the consent of the other Members.

**Section 11.4** Accrual Method of Accounting. The records of the Company shall be maintained on an accrual method of accounting. It is intended that the Company will elect those accounting methods permitted under applicable law which provide the Company with the greatest tax benefits.

# ARTICLE XII
# OWNERSHIP RESTRICTION AND DISPOSITION OF ECONOMIC INTERESTS

**Section 12.1** Limitations. An Assignee of an Economic Interest under this Article XII shall have only those rights as described more fully in Section 13.1 hereof and shall have no right to become a Member of the Company or to participate in the management of the business affairs of the Company unless such Assignee is admitted as a Substitute Member in accordance with Section 13.2 of this Operating Agreement.

**Section 12.2** Permitted Transaction. The Economic Interest of any Member shall be transferable without the consent of the other Members if the transferee is a member of one Member's Immediate Family.

**Section 12.3** Consent, Etc. No Member or Assignee may dispose of all or a portion of such Member's or Assignee's Economic Interest, except as permitted by Section 12.2 above, unless:

(a) prior to the transfer, the Company receives, unless waived by the Member(s) in writing, an opinion of counsel satisfactory to the Member(s) that such Disposition is not subject

to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws and such Disposition, alone or when combined with other transactions, would not result in a termination of the Company within the meaning of Section 708 of the Code;

(b) prior to the Disposition, the Company receives from the transferee the information and agreements that the Member(s) may reasonably require, including, but not limited to any taxpayer identification number and any agreement that may be required by the Taxing Jurisdiction; and

(c) The transferring Member or Assignee shall either:

(i) First obtain the written consent of the other Members to such disposition; or

(ii) Comply with the provisions of Section 12.4 below.

**Section 12.4** Restriction during Life. No Member shall transfer any portion or his entire share of Ownership unless the Member desiring to make the transfer (hereinafter referred to as the "Seller") first offers to sell the share of Ownership he wishes to transfer in accordance with subparagraph (a) below, and such offer is not accepted.

(a)     Offer by Seller. The Seller's offer to sell the share of Ownership shall be in writing and delivered to the Company and to the other Members. In the offer, the Seller shall offer to sell all the share of Ownership owned by the Seller or the portion of the share he wishes to transfer at the lesser of the purchase price offered to Seller in a bona fide offer from a third party or the price specified in section12.6, or if there is no third party offer, at the price set by section 12.6 below, and shall state the intention, if any, of the Seller to transfer his share of ownership and the name and address of such prospective Purchaser or Lienor, the percentage of share of Ownership involved in the proposed transfer, and the terms under which transfer is to take place.

(b)     Acceptance of Offer. Within thirty (30) days after receipt of such offer, the Company may, at its option, elect to purchase all or a part of the share of Ownership offered by the Seller. The Company shall exercise its election to purchase by giving written notice thereof to the Seller and to the other Members. If such offer is not accepted by the Company within said thirty (30) day period, the other Members may, within thirty (30) days after the expiration of said initial thirty (30) day period, at their option, purchase all or part of the share of Ownership offered by the Seller. The other Members shall be entitled to purchase in proportion to their ownership. The other Members shall exercise their election to purchase by giving written notice thereof to the Seller and to the Company and to the other Members. The notice of election to purchase by the Company or by the other Members, as the case may be, shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of giving such notice.

(c)     Release from Restrictions. If neither the Company nor the other Members elect to purchase the Seller's share of Ownership, the Seller may make a bona fide transfer to the prospective purchaser or lienor named in the offer, such transfer to be made only in strict accordance with the terms herein stated. However, if the Seller shall fail to make such transfer within thirty (30) days following the expiration of the time hereinabove provided for the election by the other Members of the Company, the share of Ownership shall again become subject to the restrictions of this

Agreement as though they had never been so offered.

    (d)    Termination of Employment: Any member whose employment in any capacity with the company or its subsidiaries terminates for any reason whatsoever, voluntarily or involuntarily, shall be considered as of the date of such termination of employment to have made an offer of all of his percentage of ownership subject to the terms of this Agreement, at the purchase price stated in section 12.6 below.

**Section 12.5** Transfer on Bankruptcy, Death or In competency. If a Member of the Company dies, is adjudged by a court of competent jurisdiction to be incompetent to handle the Member's person or property or upon the bankruptcy of a Member, the Member or his personal representative shall notify the Company and other Members. The Company shall have the option to purchase all of such Member's ownership and if the option is exercised, the Member or the trustee of the bankrupt Member or his personal representative shall sell to the Company all the share of ownership at the price determined in accordance with section 12.6 below, If such option is exercised, the Company shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after receipt of notice of the event. If the Company does not exercise its option to purchase, then all the other Members shall have the option to purchase such share, in proportion to their ownership percentage. The other Members shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after the expiration of the initial 30-day period.

**Section 12.6** Price of Ownership. The price of the ownership shall be the value which is agreed upon between the selling Member or his trustee or personal representative and the purchasing party, whether it be the Company or the Members. If the parties are unable to agree upon a purchase price, the purchase price shall be determined by an appraiser who regularly conducts business appraisals. If the parties are unable to agree upon one appraiser, each shall select an appraiser and the average of the two appraisals shall be the purchase price. The parties shall divide equally the expenses of the appraiser.

**Section 12.7** Endorsement on Ownership Statement. Statements showing exact percentage sold or encumbered hereunder, properly endorsed to the Company or to the purchasing Member, as the case may be, shall be delivered by the transferor not later than the date of closing.

**Section 12.8** Insurance. To insure or partially insure its obligation under this Agreement to purchase from the estate of a deceased Member the percentage owned by him prior to his death, the Company shall have the option to purchase policies of insurance covering the lives of each Member in any amount deemed desirable. In the event any Member ceases to be a Member of the Company, the Company shall terminate any such insurance on such Member's life and in the event any Member increases his holdings of the percentage of the Company, the Company shall procure and maintain, if so desired by it, additional insurance on the life of such Member proportionate to the increase in the holdings of such Member.

If the Company shall receive any proceeds of any policy on the life of the Decedent, such proceeds shall be used by the Company to pay the Decedent's Personal Representative to the extent of the purchase price of the Decedent's interest, such payment to be deemed made on account of such purchase price.

**Section 12.9** Balance of Purchase Price. If the amount of any insurance proceeds is insufficient to pay the purchase price of any Decedent's interest, then the balance of the purchase price remaining after credit for any insurance proceeds shall be payable as follows:
(50) % of the balance due to be paid shall be paid in cash, and the balance shall be represented by a promissory note executed by the purchaser payable in (18) installments, which note shall be secured by the Ownership interest of the deceased Member.

**Section 12.10** Limitation on Member's Right to Pledge Percentage. The restrictions of section 12.4 above shall not apply to encumbrances as collateral for a note or notes in favor of the company or any one or more of the other Members or in favor of a recognized lending institution, but only if the proceeds of such loan are used in their entirety to purchase percentage of the Company and the borrowing Member delivers to the Company and the other Member(s) the written commitment of the lender, in form acceptable to the Company that such lender will not dispose of such percentage without first affording the Company and the other Member(s) the right for a period of (30) days to purchase percentage at a price satisfactory to the Company and the other Member(s).

**Section 12.11** Company Restrictions After Purchase. So long as any part of the purchase price of a Members percentage sold in accordance with this Agreement remains unpaid, the Company shall not:

    A. declare or pay bonuses to its members;
    B. reorganize its structure;
    C. merge or consolidate with any other Company, or sell any of its assets except in the regular course of business;
    D. increase the salary of any officer or executive employee of the Company;
    E. allow any of its obligations to become in default; or
    F. allow any judgments against the Company or any liens against the Company's property to remain unsatisfied.

So long as any part of such purchase price remains unpaid, the Transferor, or the Personal Representative of the Decedent shall have the right to examine the books and records of the Company from time to time and to receive copies of all accounting reports and tax returns prepared for the Company. If the Company breaches any of its obligations under this paragraph, the Transferor or the Personal Representative, in addition to any other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

**Section 12.12** Purchase By Member. Whenever a Member purchases a percentage of ownership under this Agreement, such purchaser (unless he shall have paid the entire purchase price in cash) shall, following the delivery of the purchasing documents, execute and deliver at the same to the Seller as collateral security for the payment of the unpaid purchase price a formal payment resolution signed by the buyer, and approved by the other Members of the Company. The Membership Certificate shall be held in trust by the Company until the entire purchase price shall be paid. While such the Membership Certificate shall be so held as collateral security and

so long as the Purchaser is not in default, the Purchaser shall be entitled to all voting rights with respect thereto. Interest earned shall not apply to reduction of the principal owed.

**Section 12.13** Purchase By Company. Whenever the Company shall, pursuant to this Agreement, be required to purchase a percentage of the Company, the Members and the Personal Representative of any Decedent shall do all things and execute and deliver all papers as may be necessary to consummate such purchase. Any note required to be given hereunder by the Company as part of the purchase price shall be endorsed and guaranteed by the remaining or surviving Members, who shall not be discharged from such liability by reason of the subsequent extension, modification or renewal of any such note. Until all amounts due are paid,. Financing Statement (to be recorded) shall be delivered to Seller.

**Section 12.14** Value of Purchase Price for Tax Purposes. It is understood that the purchase price, determined as set forth hereinabove, shall be the value of the purchased Ownership interest for all tax purposes. In the event such value is later increased by any federal or state taxing authority, any tax liability resulting from such increase shall be borne by the selling Member or his Personal Representative, as the case may be.

**Section 12.15** Indebtedness of a Member. In the event that there is a purchase and sale of a Member's Ownership interest or a percentage thereof, pursuant to the provisions hereinabove, and there is any indebtedness owed by the selling Member or his estate to any party to this Agreement, then, notwithstanding the said provisions relating to the payment of the purchase price, and any amount to be paid for the Ownership interest being purchased shall be applied first to reduce and satisfy any indebtedness owed by the Selling Member or his estate to any party under this Agreement.

**Section 12.16** Default. In the event of a default in the payment of any installment of the purchase price, the covenants and conditions of this Agreement, or any Security Agreement given to Sellers, Sellers may declare the entire unpaid portion of the purchase price to be immediately due and payable, and may proceed to enforce payment of same and to exercise any and all rights and remedies provided by the Uniform Commercial Code as well as any other rights and remedies either at law or in equity available to them, and Seller may assign, sell or transfer all or any part of the collateral in such manner, at such price, and on such terms and conditions as Sellers, in their sole and absolute discretion, may determine. Sellers or the Company shall have the right to purchase any or all of the collateral, apply any unpaid indebtedness on account thereof, and have a claim against Purchaser for the balance of such indebtedness in addition to any and all remedies available to them at law or in equity.

**Section 12.17** Transfer Upon Dissociation of a Member:

(a) Voluntary Dissociation by an Individual Member. At least thirty (30) days prior to the time that a Member voluntarily Dissociates as a Member with the consent of the other Members in accordance with Section 14.1(a), such Member shall give Notice to the other Members and to the Company of such voluntary Dissociation, and upon expiration of ninety (90) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all the Economic Interest then held by such

Member. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.6 above and shall be paid in accordance with the provisions of Section 12.19 (b) below.

(b) Dissociation other than for Death, In competency or Voluntary Dissociation. In the event a Member shall Dissociate as a Member of the Company for any reason other than by reason of the death or incompetency of such Member or pursuant to Section 12.17 (a) above, then, within thirty (30) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all of such Member's Economic Interest in the Company. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.18 (b) below.

**Section 12.18** Payment Period:

(a) The aggregate purchase price due the estate, personal representative, conservator, or other legal representative of the deceased or incompetent Member for such deceased or incompetent Member's Economic Interest purchased pursuant to Section 12.5 above shall be paid in the following manner:

(i) There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such deceased or incompetent Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the deceased or incompetent Member's estate, personal representative, conservator, or other legal representative.

(ii) The remaining portion of the aggregate purchase price shall be paid in cash at the closing of such sale;

(b) The aggregate purchase price due to any Dissociated Member under Section 12.6 above shall be paid in the following manner:

(i) There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the Dissociated Member.

(ii) There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Dissociation. Such amount is to be determined by the remaining Members of the Company.

(iii) Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in five (5) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining four (4) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)   The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Dissociated Member, bearing interest at the higher of the then applicable federal rate or the prime rate of Haventrust Bank then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Economic Interest.

(c)  The date of closing with respect to the sale of a Dissociated Member's Economic Interest in the Company pursuant to Sections 12.5 and 12.17 of this Article XII shall, unless a date is agreed to by the Dissociated Member and the remaining Members, be determined by the remaining Member or Members purchasing such Economic Interest and shall take place within sixty (60) days of the death, incompetency or other Dissolution Event which causes the Member to Dissociate from the Company.

# ARTICLE XIII
# ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

**Section 13.1** Rights of Assignees. Notwithstanding anything to the contrary contained in this Operating Agreement , the only ri$^g$hts which an Assignee of a Member pursuant to Article XII shall have are those rights associated with the Economic Interest received and such Assignee shall not receive any right to participate in the management of the business and affairs of the Company or to become a Member; provided, however, that in the event an Assignee is an existing Member of the Company, such Assignee shall receive all rights to participate in the management of the business and affairs of the Company incident to the transferred Economic Interest. An Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable to a transferred Economic Interest.

**Section 13.2** Admission of Substitute Members. An Assignee of an Economic Interest shall be admitted as a Substitute Member and entitled to all the rights of the Member who initially assigned the Membership Interests only with the unanimous written approval of the Members. The Members may grant or withhold the approval of such admission in their sole and absolute discretion. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interests. The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interests from any liability to the Company that may have existed prior to the approval.

**Section 13.3** Admission of Additional Members. From the date of formation of the Company, any Person acceptable to the Members by their unanimous written approval may become Additional Members of the Company for such consideration as the Members shall determine, subject to the terms and conditions of this Operating Agreement. No Additional Member shall be entitled to any retroactive allocation of income, gain, loss, deduction or credit by the Company. The Members may, at their option, at the time the Additional Member is admitted, close the Company's books (as though the Company's Taxable Year had ended) or

make pro rata allocations of income, gain, loss, deduction or credit to the Additional Member for that portion of the Company's Taxable Year in which the Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder. Upon admission of an Additional Member, this Operating Agreement shall be amended in order to reflect such additional Member's Membership Interest in the Company.

# ARTICLE XIV
# DISSOCIATION, DISSOLUTION AND WINDING UP

**Section 14.1** Dissociation. A Person shall cease to be a Member upon the happening of any of the following Dissolution Events:

(a) the withdrawal of a Member with the consent of Members holding at least a majority of the Membership Interests of the Company;

(b) in the case of a Member who assigns all of his Membership Interest, by the affirmative vote or action of the Members who have not assigned their Membership Interests and who hold at least a majority of the non-assigned Membership Interests of the Company;

(c) upon the Manager's receipt of Notice with respect to a Member who:

(i) makes an assignment for the benefit of creditors;

(ii) files a voluntary petition in bankruptcy;

(iii) files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(iv) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding in the nature of the proceedings listed in (iii); or

(v) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member of all or any substantial part of the Member's properties;

(d) in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or property;

(e) in the case of a Member who is a trustee or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f) in the case of a Member that is a separate Organization other than a company, the dissolution and commencement or winding up of the separate Organization;

(g) in the case of a Member that is a company, the filing of articles of dissolution (or its equivalent) for the company or the revocation of its charter and the lapse of ninety (90) days after notice to the company of such revocation without a reinstatement of its charter; or

(h)   in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

Section 14.2 Rights of Dissociating Member. In the event a Member Dissociates from the Company and such Dissociation causes a Dissolution and winding up of the Company under this Article, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by damages sustained by the Company as a result of the Dissolution and winding up.

Section 14.3 Term and Dissolution. The Company shall be dissolved and its affairs wound up prior to such date, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

(a)   the written consent of Members holding a majority of the Membership Interests of the Company;

(b)   the Dissociation of any Member as provided in Section 14.1 of this Article, unless (i) there are at least two remaining Members or at least one remaining Member and an Additional Member or Substitute Member is admitted in accordance with Article XIII hereof and (ii) the legal existence and business of the Company is continued with the unanimous consent of the Members within 90 days after such Dissociation.

(c)   the merger of the Company where the Company is not the successor limited liability company in such merger or the consolidation of the Company with one or more limited liability companies or other entities.

(d)   The issuance of a final Certificate of Termination of the Company by the Secretary of State of the State of Georgia.

Section 14.4 Distribution of Assets on Dissolution. Upon the winding up of the Company, Company Property shall be distributed in the following order:

(a)   to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

(b)   to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's Taxable Year or, if later, within 90 days after the date of liquidation. Such distributions shall be in cash or property or partly in both, as determined by the Members.

Section 14.5 Winding Up and Certificate of Termination. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of winding up of the Company, a Certificate of Termination shall be delivered to the Secretary of State of the State of Georgia. The Certificate of Termination shall set forth such information as is required by the Act.

**Section 14.6** Effect of Dissolution. Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of, the Company business, but the Company is not terminated, but continues until the winding up of the affairs of the Company is completed and a Certificate of Termination with respect to the Company, or the equivalent, has been issued by the Secretary of State.

# ARTICLE XV
# AMENDMENT

**Section 15.1** Amendment or Modification of Operating Agreement . This Operating Agreement may be amended or modified from time to time only by a written instrument adopted by all of the Members.

# ARTICLE XVI
# MISCELLANEOUS PROVISIONS

**Section 16.1** Entire Agreement. This Operating Agreement constitutes the entire agreement among the parties. No party shall be bound by any terms, conditions, statements or representations, oral or written, not herein contained. Each party hereby acknowledges that in executing this Operating Agreement , such party has not been introduced, persuaded or motivated by any promise or representation made by any other party, unless expressly set forth herein. All previous negotiations, statements and preliminary instruments by the parties or their representatives are merged in this Operating Agreement.

**Section 16.2** Investment Representations. The undersigned Members acknowledge (i) that the Membership Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, the Georgia securities laws or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering, (ii) that the Company has relied upon the fact that the Membership Interests are to be held by each Member (or Assignee) for investment, and (3) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member (or Assignee) with a view to distribution.

Accordingly, each Member hereby represents and warrants to the Company that such Member is acquiring the Membership Interest for such own Member's account for investment and not with a view to the resale or distribution thereof. Each Member agrees not to transfer, sell or offer for sale any or portion of such Member's Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and under any applicable state securities laws or unless the holder of such Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such transfer, offer or sale. Each Member acknowledges that the Company is under no obligation to register such Member's Membership Interest or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Membership Interest. Furthermore, each Member realizes that such

Membership Interest is unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "Affiliate" of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three years.

Prior to acquiring a Membership Interest in the Company, each Member has made an investigation of the Company and its business and has had made available to each such Member all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest. Each Member considers himself or itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

**Section 16.3** Rights of Creditors and Third Parties. This Operating Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by the Act or other applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**Section 16.4** Interpretation. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions contained herein, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement and the Articles shall be the sole source of agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly incorporates Federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, the Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**Section 16.5** Governing Law. This Operating Agreement, and the application or interpretation hereof, shall be governed by its terms and by the laws of the State of Georgia, and specifically the Act, applied without respect to any conflicts-of-law principles.

**Section 16.6** Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**Section 16.7** Construction of Terms. Whenever used in this Agreement and when required by the context, the singular number shall include the plural and the plural the singular. Pronouns of one gender shall include all genders.

**Section 16.8** Captions. The captions as to contents of particular articles, sections or paragraphs contained in this Operating Agreement and the table of contents hereto are inserted for convenience and are in no way to be construed as part of this Operating Agreement or as a limitation on the scope of the particular articles, sections or paragraphs to which they refer.

**Section 16.9** Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any agreement or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 16.10** Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**Section 16.11** Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Section 16.12** Counterparts. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Approved this the 3 st day of December 2007.

R C Patel

_____
Member

Shama Patel

_____
Member

Hasmita Patel

_____
Member

Page 28 of 30

**Exhibit A**

**<u>Membership Interest</u>**

Shama Patel   50 %

Hasmita Patel 50 %

# Construction Loan Agreement

- Date of Loan: July 14, 2008
- Completion Deadline: July 1, 2010
- Borrower: Carnegie Hotels, LLC
- Real Estate: Property located in Fulton County, Georgia described on Exhibit A, attached hereto
- Project: Construction of a hotel
- Plans and Specifications: On file with Empire Financial Services, Inc.
- Payment Schedule: Based on percentage of completion as verified by Lender's inspections
- Project Budget: See Exhibit C attached hereto

| Contract Price or Cost Estimate | $29,532,000.00 |
|---|---|
| Amount of Loan | $19,150,000.00 |
| Deductions from Loan | $4,305,563.97 |
| Net Loan Proceeds | $14,844,436.03 |
| Borrower's Gross Deposit * | $10,382,000.00 |

\* Borrower credit against gross equity requirement for land cost, pre-construction costs paid, fees deferred, loan closing costs and other costs as paid and approved by Lender

This Agreement is made on the date above stated, between Borrower above named, and Empire Financial Services, Inc., herein called "Lender." Witnesseth:

## Article I.

Simultaneously herewith, Lender has made a Loan (the "Loan") to Borrower in the amount above stated for the purpose of constructing the Project and Borrower has executed and delivered to Lender a promissory note and a mortgage, security deed, or deed of trust ("Security Instrument") encumbering the Real Estate as security for the payment thereof.  In consideration of the Loan, and the covenants, warranties and representations set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Borrower and Lender, the parties covenant, agree, warrant and represent as follows:

## Article II.

Borrower hereby makes the following warranties and representations, which will be deemed continuing:

(a)     The Plans and Specifications heretofore delivered to Lender constitute a complete and final set of all Plans and Specifications currently required for the Project.

(b)     Borrower has received no notice of any alleged violation of, and, to the best knowledge of Borrower, Borrower is not in violation of any federal or municipal law

Exhibit V

or ordinance, order or requirement of the state in which the Project is located, or order or requirement of any municipal department or other governmental authority or agency having jurisdiction over the Real Estate, which violation(s) in any way relate to or affect the Project or the Real Estate.

(c)    All utilities necessary for the construction, use, operation and maintenance of the Project are available through public rights-of-way or easements or through private easements inuring to the benefit of Lender in the event of a foreclosure of the Security Instrument or a sale under the power of sale contained therein, at or within the boundaries of the Real Estate including gas, electric, water, storm sewer, sanitary sewer, and telephone facilities; and that adequate quantities and capacities of water and of sanitary sewerage and waste disposal are present and available to serve the Project.

(d)    All permits required for the construction of the Project have or will be obtained at the time required by law prior to construction of the portion of the Project covered by such permits, and copies of such permits and authorizations will be promptly delivered to Lender.

(e)    Each submission of a request for disbursement of construction loan funds ("Draw Request") constitutes an affirmation that the warranties and representations of Borrower, whether contained in this Construction Loan Agreement, the Security Instrument, or other loan documents, remain true and correct as of the date thereof unless Lender is notified to the contrary and, unless Lender is notified to the contrary prior to the disbursement of the Draw Request, or any portion thereof, constitutes an affirmation that the same remain true and correct on the date of such disbursement.

# Article III.

Borrower hereby covenants and agrees with Lender as follows:

(a)    Borrower will commence the construction of the Project as soon as possible (but not more than 30 days after date hereof), will continue it without interruption or delay, and will complete it prior to the Completion Deadline.

(b)    Construction of the Project will be done substantially in accordance with the Plans and Specifications and in compliance with all applicable ordinances, statutes, building codes, zoning requirements, environmental rules and regulations.  Without the prior written approval of Lender, no changes will be made in the Plans and Specifications where the cost, or cost savings thereof, exceeds $10,000.00 in any one instance, or $25,000.00 in the aggregate.

(c)     Borrower will perform, or caused to be performed, soil tests (including compaction), concrete tests, boring tests, steel weld tests, environmental assessments and such other testing procedures concerning the Real Estate and the Project as Lender may reasonably request and deliver complete copies of the results of any such tests and assessments promptly to Lender, whether or not such tests and assessments are specifically requested by Lender, and will permit any construction consultant and/or inspecting/supervising architect, or other agent of Lender to perform or cause to have performed any such tests, assessments or studies and to review and verify any test results which Lender may reasonably request.

(d)     Borrower will promptly correct or cause the correction of any structural or mechanical defect in the Project or any material deviation from the Plans and Specifications not previously approved by Lender.  The disbursement of construction loan funds will not constitute a waiver of Lender's right to require compliance with this covenant.

(e)     Construction will occur entirely upon the Real Estate and wholly within any applicable building restriction lines, without unpermitted encroachment upon any easement or right-of-way, and Borrower will furnish to Lender from time to time, upon request, such evidence thereof as Lender may require, including a plat or plats prepared and certified by a registered engineer or surveyor.

(f)     All labor, materials and services used in construction of the Project will be paid for promptly, and Borrower will furnish to Lender from time to time such evidence of payment thereof as Lender may require.  Upon request, Borrower will promptly obtain and provide to Lender lien releases, lien waivers, and/or lien subordinations from sub-contractors, suppliers, laborers, engineers, surveyors, architects and any other parties having lien rights, actual or inchoate, that have or could obtain priority over the Security Instrument.  If authorized, or required, by the law of the state where the Real Estate is located, Borrower will timely file and post Notice(s) of Commencement and furnish Lender with evidence of same.

(g)     Borrower will immediately deposit with Lender the amount, if any, specified above as "Borrower's Deposit," which amount together with the net proceeds of the Loan will be held by Lender and disbursed in accordance with this Agreement.

(h)     If, at any time, the undisbursed part of Borrower's Deposit and Net Loan Proceeds is insufficient in Lender's judgment to complete the Project in accordance with the Plans and Specifications, upon request of Lender, and from time to time, Borrower will immediately deposit such additional sums as in Lender's judgment are necessary for completion, the same to be held by Lender and disbursed in accordance with this Agreement.

(i)     All funds disbursed hereunder will be held by the person or persons receiving the same from Lender IN TRUST for the sole purpose of paying for labor, materials, appliances, fixtures and services used in construction of the Project and such funds will not be used for any other purpose.  Upon request of Lender, Borrower will promptly submit to Lender evidence of the proper application of such funds.

(j)     Prior to any disbursement, Lender may require an updated title examination, showing no change in title, and the cost thereof shall be paid by Borrower.

(k)     Title to all materials, appliances and fixtures delivered to the Real Estate for construction of the Project or paid for out of funds disbursed hereunder will become vested in Lender, subject to the terms of the Security Instrument, when delivered to the Real Estate or paid for out of such funds; and no such materials, appliances, or fixtures will be removed from the Real Estate without the prior written consent of Lender. Lender has no obligation to make disbursements for materials not yet incorporated into the Project.  However, with permission of Lender, and under such conditions as Lender, in its sole discretion may require, including, at a minimum, proof of storage in secure, bonded warehouse(s), the costs of off-site stored materials may be disbursed.

(l)     Lender, Lender's employees, agents, and representatives, to include, where applicable a construction consultant and/or inspecting/supervising architect, will be permitted access to the Real Estate and the Project to make such inspections as it, or they, deem appropriate, provided, however, that this provision will not be deemed to impose upon Lender any obligation to undertake such inspections or any liability for the failure to detect any defect or failure to act with respect to any defect which was or might have been disclosed by such inspection.  All inspections in excess of one per month will be billed to Borrower at Lender's customary and usual rate for extra inspections.

(m)    No portion of the Real Estate or the Project will be occupied by anyone without first obtaining certificates of occupancy and other required governmental approvals and satisfying all insurance requirements.

(n)     No work has been done and no materials have been delivered for construction of the Project prior to the execution of this Agreement except such as may be described on Exhibit B attached hereto.

(o)     Lender will be permitted, from time to time as it may desire, to inspect any and all books, records, contracts and sub-contracts of Borrower pertaining to the Project. Borrower will keep and maintain proper and accurate books, records, and accounts reflecting all items of income and expense in connection with the Project and the construction thereof, separate from any general accounting records which Borrower or any Affiliate may maintain in connection with Borrower's or any Affiliate's general

business activities, and, upon reasonable notice from Lender will make such books, records, and accounts immediately available to Lender for inspection or independent audit.  For purposes of this subparagraph, "Affiliate" means any corporation, partnership, or other entity in which Borrower, or any loan guarantor owns, directly or indirectly, a controlling interest (which shall be defined as the possession, directly or indirectly, of the power to direct or cause the direction of management and policies, whether through the ownership of partnership interest, limited liability company interest, voting securities, by contract or otherwise).

(p)     Borrower shall pay Lender interest on the Loan as herein provided, promptly, when due.  In order to insure timely payment of interest, Borrower authorizes Lender, at Lender's discretion, to draw against the Loan, on a monthly basis, such amounts as may be required for payment of any and all interest accrued, but unpaid by Borrower.

(q)     Borrower conditionally assigns to Lender all Borrower's right, title and interest in all construction contracts, architectural contracts, engineering contracts, plans, specifications, drawings, surveys, bonds, permits, licenses and other governmental approvals in order to further secure the indebtedness of Borrower to Lender, which assignment will terminate upon full performance of all obligations of Borrower under each of said documents.  Borrower will obtain consents for assignment of all contracts containing no-assignment clauses.  Nothing contained herein shall be deemed to impose upon Lender any liability for performance of any obligation of the parties under any construction document.

(r)     Borrower shall obtain and keep in force during the Loan, comprehensive general liability insurance written in the name of Borrower naming Lender as an additional insured and providing that the coverage, which shall be in an amount approved by Lender, cannot be canceled without thirty (30) days prior written notice to Lender.

(s)     Borrower shall obtain and keep in force during the Loan, builders risk insurance providing coverage equal to the full insurable value of the Real Estate as improved by the Project, providing that the insurance company will not cancel coverage without first giving Lender not less than thirty (30) days prior notice and containing all the other provisions of the standard "New York form" mortgagee endorsement.

(t)     Borrower shall remove or bond off any mechanic's or materialmen's liens filed against the Real Estate within the earlier of (i) ten (10) days after actual notice of the claim of the lien or receipt of a notice of nonpayment or (ii) fifteen (15) days after the filing thereof.

(u)     Borrower shall not transfer (i) all or any part of the Real Estate or any interest therein or (ii) any of the beneficial interests in Borrower if Borrower is not a natural

person or persons but is a corporation, limited liability company, partnership, trust or other legal entity.

(v)     Borrower will advise lender in writing within three (3) days of the initial occurrence of (i) all litigation known to Borrower, regardless of amount, affecting Borrower's interest in or any part of the Real Estate or the Project and (ii) all notices of complaints and/or charges received by Borrower or Borrower's employees, agents, or representatives, from any governmental authority with respect to the Real Estate or the Project.

# Article IV.

The methods and conditions for the disbursement of construction loan funds will be as follows:

(a)     At such time as Borrower desires to obtain, subject to the other requirements hereof, a disbursement of any portion of the construction loan funds, Borrower shall complete and deliver to Lender a Draw Request together with a letter of transmittal from Borrower to Lender requesting disbursement of that portion of the construction loan funds set forth in the Draw Request and directing that said disbursement be made to Borrower in accordance with the terms, conditions and provisions of this Agreement.  Such Draw Request shall include, with respect to any portion of such advance to be further disbursed to a general contractor, a Contractor's Application for Payment in form and substance reasonably satisfactory to Lender.

(b)     Borrower's Draw Request shall be accompanied by evidence in form and content satisfactory to Lender (including, but not limited to, certificates and affidavits of Borrower, and such other persons as Lender may require) showing:

(i)      The value at cost of that portion of the Project completed at that time;

(ii)     Those claims for work, labor, materials, and fixtures which have been paid since the next preceding Draw Request and those claims which will be paid with the proceeds of the current Draw Request;

(iii)    Copies of all bills or statements or canceled checks for any soft-cost expense for which the advance is requested shall be attached to such Draw Request;

(iv)    Where the Certificate for Payment includes amounts to be paid to a general contractor, the contractor's Application for Payment submitted therewith shall include a copy of the "Schedule of Values" under the Construction Contract and shall show the breakdown of the requisition among the line items identified therein, as well as the amount theretofore funded by Lender

with respect to each such line item.  In addition, upon request by Lender, Borrower shall provide Lender with copies of all bills or statements or canceled checks for any such hard cost expenses for which the advance is requested;

(v)     A breakdown of all disbursements to that point in time in such detail as may be required by Lender;

(vi)     That all funds previously disbursed by Lender have been applied directly to the cost of construction of the Project or such other incidental costs as Lender has approved in writing; and

(vii)     That the remaining non-disbursed portion of the construction loan funds, together with any equity previously deposited by Borrower with Lender, allocable to the Project for which such draw request is submitted, is adequate to complete the construction in accordance with the Plans and Specifications.

(c)     Borrower acknowledges and agrees that Lender is not obligated to disburse construction loan funds:

(i)     In excess of the lesser of actual hard costs incurred by Borrower or a percentage of the amount allocated to such hard costs in the Project Budget which corresponds to the percentage of completion of the Project; or

(ii)     If Lender is of the opinion that construction of the Project cannot be completed on or before the Completion Deadline or within the Project Budget; or

(iii)     If, in the opinion of Lender, the estimated remaining cost of construction of the Project exceeds the remaining undisbursed portion of the Loan allocable for payment of such costs of construction, unless Borrower has deposited the amount of such insufficiency with Lender; or

(iv)     If the Project has been damaged by fire or other casualty, unless Lender has agreed or elected to make available for the purpose of restoration and repair the net proceeds of any fire or other casualty insurance policy; or

(v)     If condemnation proceedings or any similar type of proceedings are commenced with respect to the Real Estate, unless Lender has elected to make available net condemnation proceeds to Borrower; or

(vi)     If Lender has not received the requested up-date or endorsement to the mortgagee title insurance policy; or

(vii)  If Lender has not received confirmation from any construction consultant and/or inspecting/supervising architect that the Project, to the date of disbursement request, has been constructed substantially in compliance with the Plans and Specifications, subject to any change orders approved by Lender.  In the event Lender is advised that the Project has not been constructed substantially in accordance with the Plans and Specifications, no disbursement of construction loan funds will be made until such time as any corrective work as Lender deems necessary or desirable to bring such construction into compliance with the Plans and Specifications has been completed or commenced in a manner acceptable to Lender; or

(viii)  If Borrower has not satisfied Borrower equity requirement; or

(ix)  If default has occurred or an event of default remains uncured.

# Article V.

The amounts deposited with Lender by Borrower and the Net Proceeds of the Loan will be disbursed by Lender to Borrower (or at Lender's option jointly to Borrower and such other person or persons as Lender deems desirable) to assure payment for the labor, materials, appliances and fixtures and services used in the construction of the Project as the work progresses in accordance with the Payment Schedule, provided however that Lender has the right to withhold "Retainage" in the amounts or percentages, and under the terms and conditions set forth below.  Lender has the absolute right, at its option, at any time and from time to time, to refuse to make any disbursement hereunder if Borrower is in breach of any covenant contained herein or in any other instrument securing or evidencing Borrower's indebtedness to Lender.

Retainage.  Lender will withhold from each disbursement ten percent (10%) of all amounts due to Borrower or any other contractor as retainage.

Lender will not be required to make a final disbursement, including the disbursement of retained funds, until it has made its final inspection and Borrower has delivered or caused to be delivered to Lender the following: Fire Marshall's Approval Letter (if applicable), Certificate of Occupancy, Contractor's Affidavit, an endorsement to Lender's title insurance policy without additional exceptions, evidence that no notices of lien have been filed against the Real Estate, certificates from Borrower and the Project architect evidencing that the Project has been completed substantially in accordance with the Plans and Specifications and that all mechanical and electrical systems are operational, and a complete set of the final Plans and Specifications for the Project, as built, incorporating all changes, modifications and alterations to such as were approved by Lender.

No advance or disbursement of construction loan funds hereunder will constitute a waiver of any of the conditions of Lender's obligation to make further advances or disbursements nor, in the event

Borrower is unable to satisfy any such condition, will any such advance or disbursement have the effect of precluding Lender from thereafter declaring such inability to be an event of default.

Notwithstanding any other term or condition of this Agreement, Borrower acknowledges and agrees that Lender has no obligation to make advances for any items or category of items in excess of the amount provided for such item or category of items in the Project Budget unless Lender is satisfied that the remaining undisbursed balance of the Loan is sufficient to complete the construction of the Project in accordance with the requirements of this Agreement and pay all interest, costs, and other sums required to be paid under the loan documents. Should any aspect of the Project be completed at a cost less than the amount allocated to such item or in the event that there is an excess of any line item over the actual costs incurred in connection with the work associated with such line item after such work has been completed and all such costs have been paid in full, and Lender receives evidence of such savings satisfactory to Lender, then such excess may be reallocated to any line item of construction costs (or to other line items, but only as approved by Lender in its sole discretion) at Borrower's request; provided, however, that no such allocation will be made to development fees, overhead or similar costs of Borrower and in no event will such allocation be applied to costs payable to any Borrower, unless the Project has been completed and Lender determines in its sole discretion that all costs associated with all other categories of items in the Project Budget have been paid in full. After occurrence of any default, Lender reserves the right to make advances of funds which are allocated to designated items or categories in the Project Budget for such other purposes or in such different proportions as Lender may, in its sole discretion, deem necessary or advisable.

So long as there are amounts available in the Project Budget for the purpose of funding interest, interest accruing on portions of disbursed construction loan funds will be funded by Lender, either by funding same to Borrower with immediate payment by Borrower to Lender or by Lender directly funding same to itself (as Lender determines in its sole discretion) provided, however, that nothing contained herein will be deemed to release or in any way relieve Borrower of its obligation under the note and the other loan documents to pay interest as therein provided.

## Article VI.

Prior to the time that the first monthly installment of principal and interest becomes due, Borrower shall pay Lender interest on the Loan, at the rate specified in the promissory note, on each disbursement of funds only from the time of disbursement. Such interest shall be paid monthly on the fifteenth day of each and every month commencing on the fifteenth day of the month following the Date of Loan and continuing until the first monthly installment of principal and interest becomes due. Thereafter, Borrower shall pay Lender interest on the entire amount of the Loan in accordance with the terms of the promissory note.

## Article VII.

(a)    If Borrower is an individual and dies or becomes incompetent, Lender may in its sole discretion discontinue further disbursements hereunder or may at its option continue

to make disbursements hereunder to Borrower's guardian, executor or administrator or to anyone else who is a Borrower hereunder.

(b)    In the event Borrower's equity of redemption in the Real Estate or any part thereof becomes vested in a person other than Borrower, Lender may make disbursements hereunder to the person in whom such equity of redemption is then vested.

# Article VIII.

(a)    Breach of any covenant of Borrower hereunder will be an event of default under the promissory note and the Security Instrument. Upon default, Lender may (i) exercise any of its remedies, including the acceleration of the indebtedness evidenced by the promissory note and foreclosure under terms of the Security Instrument or sale of the Real Estate under the powers contained therein and (ii) cumulatively exercise all other rights, options and privileges provided by law or in equity. Upon Borrower's default, Lender will be relieved of any and all further obligations hereunder.

(b)    If any such default occurs, Lender may, at its option, apply the undisbursed part of Borrower's Deposit and Net Loan Proceeds to the payment, pro tanto, of Borrower's indebtedness to Lender.

(c)    Additionally, by the acceptance hereof, Borrower agrees that upon the occurrence of a default and whether or not foreclosure proceedings have commenced under the Security Instrument and at Lender's request, Borrower will vacate the Real Estate and permit Lender to: (i) enter into possession of the property; (ii) perform or cause to be performed any and all work and labor necessary to complete the construction of the Project in accordance with the Plans and Specifications, with such modifications thereto as Lender will deem necessary or desirable; (iii) employ security watchmen to protect the Project; and (iv) disburse that portion of the loan proceeds and/or any equity contribution not previously disbursed to the extent necessary to complete the construction of the Project in accordance with the Plans and Specifications, and if such completion requires a larger sum than the remaining undisbursed portion of the Loan, to disburse such additional funds, all of which funds so disbursed by Lender will be deemed to have been disbursed to Borrower, will become part of the indebtedness, and will be secured by the Security Instrument. Borrower hereby appoints Lender its attorney-in-fact to complete construction of the Project in Borrower's name, with full power of substitution, and with full power to do any and all things which may be necessary or desirable to complete the Project. These powers are coupled with an interest and are irrevocable by death or otherwise.

Any language of this instrument to the contrary notwithstanding, the terms "default" and "event of default" (whether such terms are capitalized or appear in lower case) have the same meaning and

will be construed so as to be consistent with their use and meaning as set forth in the promissory note and Security Instrument given by Borrower to Lender of even date herewith.

## Article IX.

Failure of Lender to exercise any option of Lender hereunder will not be a waiver of Lender's right to exercise such option.

## Article X.

If litigation arises out of this Agreement and Lender is the prevailing party, Lender will be entitled to recover from Borrower all costs, including, without limitation, attorneys' fees.  As used in  this Agreement, "attorneys fees" or words or phrases of similar import mean reasonable attorneys fees actually incurred, as opposed to statutory fees, which limitation is applicable to all provisions for collection, payment, or reimbursement of Lender's attorneys fees found in any document evidencing or securing the indebtedness of Borrower to Lender.

## Article XI.

Lender has no obligations in connection with the construction of the Project except to advance the proceeds of the Loan as herein provided, and Lender will not be liable for the performance of any contractor, subcontractor, or supplier of materials, fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such materials, fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the improvements, or for the payment of any cost or expenses incurred in connection therewith, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender.  Any inspection by Lender, approval of Plans and Specifications or other activities in the nature thereof are for the sole benefit of Lender and for the purpose of protecting the security of Lender, and the same will in no way be construed as a representation on the part of Lender that there is compliance on the part of Borrower with the Plans and Specifications or that the construction of the improvements is free from faulty material, fixtures, equipment, and other personal property, or workmanship.  The fact that Lender makes such inspections will not relieve Borrower from its duty to independently ascertain that the Project is being completed in accordance with the Plans and Specifications and Borrower has no right to rely on any procedures required by Lender.

## Article XII

When reviewing items for approval or consent or where Lender satisfaction is required or where Borrower must adhere to or meet a Lender requirement, Lender will exercise reasonable and good faith judgment taking into consideration institutional lending practices, commercial real estate

customs, and similarly situated borrowers and lenders and similar properties in the same geographic region.

Witness Borrower's hand and seal.

**Carnegie Hotels, LLC** [Seal]
A Georgia Limited Liability Company

By: _____

R. C. Patel
Sole Member and Manager

# Joinder by Contractor

In consideration of the Lender named in the foregoing Construction Loan Agreement (herein referred to as "Agreement") making the Loan referred to therein, the undersigned contractor (who has contracted with the Borrower named in the Agreement to construct the Project) does hereby covenant and agree with Lender that:

1) The Project will be constructed in accordance with the Plans and Specifications and all applicable ordinances, statutes, building codes, zoning requirements, and environmental rules and regulations. Without the prior written approval of Lender, no changes will be made in the Plans and Specifications where the cost, or cost savings thereof exceeds $10,000.00 in any one instance or $25,000.00 in the aggregate. In the event such approval is not obtained, the construction contract with the Borrower will, for the purposes of the undersigned's obligation to continue performance thereunder for the benefit of Lender, be deemed not to have been modified by such change order.

2) Construction of the Project shall occur entirely upon the Real Estate and wholly within any applicable building restriction lines, without encroachment upon any easement or right-of-way.

3) All labor, materials and services used in the construction of the Project shall be paid for promptly, and the undersigned contractor will furnish to Lender from time to time such evidence of payment as Lender may require, to include, without limitation, payment acknowledgments and lien waivers/releases/subordinations.

4) All funds disbursed under the Agreement which the undersigned contractor may receive will be held by the undersigned contractor in trust for the sole purpose of paying for labor, material, appliances, fixtures and services used in the construction of the Project and such funds shall not be used for any other purpose. Upon request of Lender, the undersigned contractor will from time to time submit to Lender evidence of the proper application of such funds.

5) Title to all materials, appliances and fixtures delivered to the Real Estate for construction of the Project or paid for out of funds disbursed under the Agreement become vested in Lender, subject to the terms of the Security Instrument, when delivered to the Real Estate or paid for out of Loan funds. All such materials, appliances and fixtures paid for out of Loan funds shall be promptly delivered to the Real Estate (or, with Lender's permission, placed in secured, off-site storage) and no such materials, appliances or fixtures shall be removed from the Real Estate without the prior written consent of Lender.

6) In the event of a default by Borrower under any of the loan documents, the undersigned shall, at Lender's request, continue performance on Lender's behalf under the construction contract with the Borrower in accordance with the terms thereof, provided that the undersigned will be reimbursed in accordance with the construction contract for all work, labor and materials rendered on Lender's behalf.

7) The undersigned further acknowledges the assignment to Lender of the construction contract and other construction documents without the delegation to Lender of the Borrower's responsibilities thereunder.

8) The undersigned will not terminate nor delay in performing its obligations under the construction contract, or suspend the construction contract on account of default by the Borrower unless it has given the Lender (a) concurrent notice, if notice to Borrower is required; or (b) five (5) days prior written notice of its intent to terminate, delay, or suspend performance, if no notice to Borrower is required or the contract notice period is less than five (5) days.

9) The undersigned hereby certifies that all necessary permits for the construction of the improvements have been or will be obtained. ~~supplied by owner~~ *MJM*

10) The undersigned shall maintain ~~builder's risk insurance~~, public liability insurance and workmen's compensation insurance in amounts and types and with companies acceptable to Lender.

11) The officer executing this instrument on behalf of the undersigned hereby personally certifies that the general contractor has full authority under all state or local laws and regulations to perform all of its obligations under the construction contract with the Borrower in accordance with the terms thereof, and where applicable, is licensed as a general contractor in the jurisdiction where the work will be done.

Witness the hand and seal of the contractor, this ___1___ day of July, 2008.

Enterprise General Contractors [Seal]

By: _Matthew J Wolff_____

Its _Vice President_____

# Joinder by Guarantor

Pursuant to the terms of Guarantor's Unconditional Guaranty of Payment and Performance, dated July __14__, 2008, Guarantor ratifies and confirms the covenants, obligations, and undertakings of the Borrower as set forth in this Construction Loan Agreement and acknowledges that his respective guarantee of performance encompasses all such covenants, obligations, and undertakings.

Witness the hand and seal of Guarantor, this __14__ day of July, 2008.

Guarantor:

_____ [Seal]

**R. C. Patel**

# Exhibit A

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 78 OF THE 14th DISTRICT, CITY OF ATLANTA, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET (R/W VARIES) AND THE WESTERN LINE OF A 10-FOOT ALLEY, WHICH POINT IS MARKED BY A METAL CORNER PLATE, AND RUNNING THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET NORTH 88 DEGREES 58 MINUTES 02 SECONDS WEST A DISTANCE OF 97.34 FEET TO A PK NAIL FOUND; THENCE, CONTINUING ALONG SAID RIGHT-OF-WAY LINE OF ELLIS STREET SOUTH 46 DEGREES 50 MINUTES 33 SECONDS WEST A DISTANCE OF 7.00 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE OF ELLIS STREET SOUTH 00 DEGREES 48 MINUTES 35 SECONDS EAST A DISTANCE OF 17.62 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK AT THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT OF WAY LINE OF ELLIS STREET (R/W VARIES) AND THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES); THENCE, ALONG THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY SOUTH 40 DEGREES 32 MINUTES 42 SECONDS EAST A DISTANCE OF 155.14 FEET TO A POINT AT THE INTERSECTION FORMED BY THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES) AND THE WESTERN LINE OF A 10-FOOT ALLEY; THENCE, LEAVING THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY AND FOLLOWING ALONG THE WESTERN LINE OF SAID 10-FOOT ALLEY NORTH 00 DEGREES 35 MINUTES 33 SECONDS EAST A DISTANCE OF 138.36 FEET TO A POINT MARKED BY A METAL CORNER PLATE ON THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET (R/W VARIES) AND THE POINT OF BEGINNING; BEING IMPROVED PROPERTY KNOWN AS *THE CARNEGIE BUILDING*, AND ALSO KNOWN NOS. 131-133 AND 141, CARNEGIE WAY, ATLANTA, GEORGIA, ACCORDING TO THE PRESENT SYSTEM OF NUMBERING IN USE IN ATLANTA, GEORGIA.

*Together with all appurtenant easement rights of said tract in and to the adjacent 10' alley, located to the east of the above described property, including any non-exclusive rights and easements as reserved for the benefit of said land in that certain Grant of Easement from A. G. Rhodes to Asa G. Candler, et. al., dated February 17, 1913, recorded at Deed Book 355, page 304, Fulton County Records.*

Said Tract is as more fully shown by that certain ALTA/ACSM Land Title Survey for *CARNEGIE HOTELS, LLC, Plantation Title & Abstract Company, Chicago Title Insurance Company, et. al.,* dated August 31, 2007, by A. S. GIOMETTI & ASSOCIATES, INC., sealed by A. S. GIOMETTI, Georgia RLS # 1125, WHICH PLAT OF SURVEY IS INCORPORATED HEREIN BY THIS REFERENCE FOR ALL PURPOSES.



# Exhibit B

The following work has been done on the Property and/or the following services have been provided in connection with the proposed construction:

Interior demolition. Other work: NONE



# Sources and Uses of Funds

*Diplomat Development Company - Developer*

*Hotel Indigo  Atlanta  Downtown*

*As of 20 th June 2008*

## Uses of Funds

| Acc Code | | Amount |
|---|---|---|
| 100 | Land, Building , Lease buyout , Closing Costs | $ 11,150,000.00 |
| 200 | Interst Carry Costs to date | $ 469,000.00 |
| 300 | Tad and Historic Application and consultant Fees | $ 105,000.00 |
| 400 | Demolition cost per plans and specs | $ 790,000.00 |
| 500 | Hard Construction cost per plans and specs | $ 10,326,500.00 |
| 600 | Hard Construction Contingency @ 3 % | $ 309,700.00 |
| 700 | Signage | $ 25,000.00 |
| 800 | FF&E and Operating Supplies & Equipment | $ 2,643,000.00 |
| 900 | FF&E and Operating Supplies & Equip Contigency @ 10 % | $ 264,300.00 |
| 1000 | Finance carrying Costs | $ 1,267,500.00 |
| 1100 | Developer Fees @ 5 % on Base Construction | $ 761,000.00 |
| 1200 | Project wide Contigency | $ 300,000.00 |
| 1300 | Project Management | $ 300,000.00 |
| 1400 | Pre Opening Expenses | $ 175,000.00 |
| 1500 | Architect, designer and engineering | $ 75,000.00 |
| 1600 | Tax Consultants | $ 200,000.00 |
| 1700 | City of Atlanta Impact Fees and Tap Fees | $ 85,000.00 |
| 1800 | Insurance General Liability and Builders Risk | $ 38,000.00 |
| 1900 | Feasibility , Appraisal & Third party reports | $ 90,000.00 |
| 2000 | Loan Fees lenders , Brokers | $ 25,000.00 |
| 2100 | Working Capital | $ 105,000.00 |
| 2200 | Permit Fees Building | $ 100,000.00 |
| 2300 | Security During Construction | $ 9,000.00 |
| 2400 | Legal & Other | $ 25,000.00 |
| 2500 | Legal & Other | $ 75,000.00 |
| 2600 | Soft Costs Contigency | $ 25,000.00 |
| **Total Use of Funds** | | **$29,532,000** |

## Sources of Funds

| | Amount | % |
|---|---|---|
| Debt | $ 19,150,000 | 64.85% |
| Other Equity | $ 9,347,499 | 31.65% |
| Cash at closing | $ 1,034,501 | 3.50% |
| **Total Sources of Funds** | **$ 29,532,000** | **100.00%** |

## Cash Summary

| | Amount |
|---|---|
| Total Source of Funds | $ 29,532,000 |
| Less | |
| Loan Proceeds Empire | $ 19,150,000 |
| **Cash Injection Required By Developer / Borrower / Spl** | **$ 10,382,000** |

## Cash Injection Spend to date

| Acc Code | | Amount |
|---|---|---|
| 100 | Land, Building , Lease buyout , Closing Costs Less Debt | $ 5,865,000.00 |
| 200 | Interst Carry Costs to date | $ 474,133.59 |
| 300 | Tad and historic Application and consultant Fees | $ 87,174.68 |
| 400 | Demolition cost per plans and specs | $ 1,281,487.50 |
| 500 | Hard Construction cost per plans and specs | |
| 600 | Hard Construction Contingency @ 3 % | |
| 700 | Signage | |
| 800 | FF&E and Operating Supplies & Equipment | |
| 900 | FF&E and Operating Supplies & Equip Contigency @ 10 % | |
| 1000 | Finance carrying Costs | $ 761,000.00 |
| 1100 | Developer Fees @ 5 % on Base Construction (Deferred) | |
| 1200 | Project wide Contigency | |
| 1300 | Project Management - (Deferred) | |
| 1400 | Pre Opening Expenses | |
| 1500 | Architect, designer and engineering | $ 175,000.00 |
| 1600 | Tax Consultants | $ 214,203.14 |
| 1700 | City of Atlanta Impact Fees and Tap Fees | $ 97,783.29 |
| 1800 | Insurance General Liability and Builders Risk | $ 78,646.62 |
| 1900 | Feasibility , Appraisal & Third party reports | $ 73,150.00 |
| 2000 | Loan Fees lenders , Brokers | $ 74,330.00 |
| 2100 | Working Capital | |
| 2200 | Permit Fees Building | $ 1,000.00 |
| 2300 | Security During Construction | |
| 2400 | Legal & Other | $ 135,190.68 |
| 2500 | Legal & Other | $ 30,000.00 |
| 2600 | Soft Cost Contigency | |
| | TAD Funding | |
| | Historic Tax Credit | |
| **Cash Injection Spend to date** | | **$ 9,347,499.00** |

Ex.C



Ph:(770)439-5556
Fax:(770)439-8553
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fambrough Drive; Powder Springs, GA 30127

6/4/2008

**EXHIBIT #2**

Indigo 10326K.xls

## BUDGET SUMMARY

| | Items | | By G.C. |
|---|---|---|---|
| 100 | General Conditions | $ | 645,000.00 |
| 200 | Site Work | $ | - |
| 300 | Concrete | $ | 212,500.00 |
| 400 | Masonry | $ | - |
| 500 | Metals | $ | 252,000.00 |
| 600 | Wood | $ | 158,000.00 |
| 700 | Therm.&Moist. Prot. | $ | 258,500.00 |
| 800 | Doors & Windows | $ | 1,021,000.00 |
| 900 | Finishes | $ | 1,968,000.00 |
| 1000 | Specialties | $ | 231,500.00 |
| 1100 | Equipment | $ | - |
| 1200 | Furnishings | $ | 85,000.00 |
| 1300 | Special Construction | $ | - |
| 1400 | Conveying Systems | $ | 905,000.00 |
| 1500 | Mechanical | $ | 3,295,000.00 |
| 1600 | Electrical | $ | 1,295,000.00 |
| | Total Price: | $ | 10,326,500.00 |

| | | | |
|---|---|---|---|
| 155 | Price Per Unit | $ | 66,622.58 |
| 100526 | Price Per Square Foot | $ | 102.72 |

Budget Summary

1 of 9

(770)439-5556
Fax: (770)439-6553
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fambrough Drive
Powder Springs, GA 30127

6/4/2008

Indigo 10326K.xls
200

## Site Work - 200

| Items | By G.C. | Notes |
|---|---|---|
| Soil Testing | | |
| Clearing | | |
| Demolition | | |
| Soil Compaction | | |
| Termite Control | | |
| Rough Grading | | |
| Final Grading | | |
| Site Drainage Detention | | |
| Paving & Surfacing | | |
| Fencing | | |
| Signage | | |
| Landscaping | | |
| Irrigation | | |
| Curb & Gutter | | |
| Sanitary Sewer Lateral | | |
| Domestic Water & BFP | | |
| Fire Main & DDC | | |
| Dumpster Pad & Shed | | |
| Retaining Walls | | |
| Brick Paving or Stamped | | |
| Bores | | |
| Erosion Control | | |
| Sidewalks | | |
| Car Bumpers | | |
| Patio | | |
| Subtotal (200) | $ 0.00 | |

(770)439-5566
Fax: (770)439-6563
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fembrough Drive
Powder Springs, GA 30127

6/4/2008

Indigo 10326K.xls
300-400-500

### Concrete - 300

| Items | By G.C. | Notes |
|---|---|---|
| Formwork & Place Finish | $ 5,000.00 | |
| Expansion  Joints | $ 2,000.00 | |
| Rebar & Welded Wire | $ 3,000.00 | |
| Cast In Place Con. | $ 10,000.00 | Level Lobby |
| Precast Concrete | None | |
| Lightweight Concrete | $ 90,000.00 | Level Floors |
| Foundations | $ 15,000.00 | |
| Concrete Test | $ 2,000.00 | |
| Con. Placement | $ 5,000.00 | |
| Grout | $ 7,000.00 | |
| Coring Holes | $ 65,000.00 | |
| Access Hole & Sidewalk | $ 8,500.00 | |
| **Subtotal (300)** | **$ 212,500.00** | |

### Masonry - 400

| Items | By G.C. | Notes |
|---|---|---|
| Split Face Block | None | |
| Mortar Block Fill | None | |
| Unit Masonry | None | |
| Cast Stone Couping | None | |
| Stonework | None | |
| Brick | None | |
| **Subtotal (400)** | **$ 0.00** | |

### Metal - 500

| Items | By G.C. | Notes |
|---|---|---|
| Struct. Metal Fram. | None | |
| Metal Joist | $ 8,500.00 | |
| Metal Deck | $ 3,500.00 | |
| Light Gauge | $ 90,000.00 | |
| Metal Stairs / Rails | $ 45,000.00 | |
| Structural Steel | $ 105,000.00 | |
| Canopy | None | |
| Lobby Floor | | |
| **Subtotal (500)** | **$ 252,000.00** | |

(770)439-5556                    ENTERPRISE GENERAL CONTRACTORS                    6/4/2008
Fax: (770)439-6653                        4071 Fambrough Drive
www.enterprisegc.com                    Powder Springs, GA 30127

Indigo 10326K.xls
600-700

## Wood & Plastic - 600

| Items | By G.C. | Notes |
|---|---|---|
| Rough Carpentry Lab. | $ 3,000.00 | Blocking |
| Rough Carpentry Mat. | $ 5,000.00 | Blocking |
| Sheathing for Roof Deck | None | |
| TJI/Joist | None | |
| Prefab Wood Trusses | None | |
| Wood Stairs | None | |
| Trim Package | $ 50,000.00 | Lobby Only |
| Lobby & Public Cabinets | $ 100,000.00 | |
| Front Desk | Included | |
| Cabinets | Included | |
| Bar Sinks, Cabinet, & Tops | | Owner |
| | | |
| Subtotal (600) | $ 158,000.00 | |

## Thermal & Moisture Protection - 700

| Items | By G.C. | Notes |
|---|---|---|
| Waterproofing | None | |
| Insulation | $ 65,000.00 | |
| Roof & Deck Insulation (Flat Roof) | $ 100,000.00 | Allowance |
| Flashing & Sheet Metal | $ 15,000.00 | Allowance |
| Sealants/Caulk | $ 3,500.00 | |
| Gutters & Downspouts | None | |
| Hatches | None | |
| Roof Eyebrow | None | |
| Roll Roofing | None | |
| Firestopping (All) | $ 45,000.00 | |
| Fire Proof Red Iron | $ 30,000.00 | |
| Standing Seam | None | |
| Siding Mat. & Labor | None | |
| EIFS | None | |
| House Wrap | None | |
| 30 Year Architect Shingles | None | |
| | | |
| Subtotal (700) | $ 258,500.00 | |

(770)439-5556
Fax: (770)439-6553
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fambrough Drive
Powder Springs, GA 30127

6/4/2008

Indigo 10326K.xls
800-900

### Doors & Windows 800

| Items | By G.C. | |
|---|---|---|
| Doors & Frames | $ 505,000.00 | |
| Door Hardware | Included | |
| Windows | $ 248,000.00 | |
| Mirrors | $ 5,000.00 | Exercise Only |
| Electronic Locks (Ilco) | | Owner |
| Automatic Front Doors | $ 15,000.00 | |
| Skylights | None | |
| Storefront | $ 43,000.00 | |
| Shower Doors | $ 205,000.00 | |
| Subtotal (800) | $ 1,021,000.00 | |

### Finishes - 900

| Items | By G.C. | |
|---|---|---|
| Drywall | $ 485,000.00 | |
| Guest Bath Tile | $ 360,000.00 | |
| Pool Area Tile | None | |
| Lobby Tile | $ 65,000.00 | |
| Vinyl Tile | $ 19,000.00 | |
| Resilient Tile Flooring | None | |
| Wood Flooring | $ 288,000.00 | Vinyl Plank |
| Carpet/Pad Materials | | Owner |
| Carpet/Pad Labor | | Owner |
| Special Flooring | $ 69,000.00 | Rubber Floor |
| Wall Base Vinyl / Rubber | $ 7,000.00 | |
| Stair Dressing | $ 20,000.00 | Allowance |
| Acoustical Lay-In Ceiling | $ 65,000.00 | |
| Exterior Paint & Stairs | $ 125,000.00 | Allowance |
| Painted Floors | None | |
| Int. Paint/Doors&Bath | $ 425,000.00 | |
| Knock Down Paint | Included | |
| Wallpaper Labor | | Owner |
| Wallpaper Material | | Owner |
| Ceilings-Imperial QT | Included | |
| Exterior Board | None | |
| Clouds | $ 20,000.00 | |
| Shaft Walls | | |
| Subtotal (900) | $ 1,968,000.00 | |

(770)439-6556
Fax: (770)439-6553
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fambrough Drive
Powder Springs, GA 30127

6/4/2008

Indigo 10326K.xls
1000-1100-1200

## Specialties - 1000

| Items | By G.C. | Notes |
|---|---|---|
| Fountain | None | |
| Toilet Cubicles | None | |
| Louvers & Vents | None | |
| Wall & Corner Guards | $ 10,000.00 | Allowance |
| Fireplaces | None | |
| Flagpole (1) | None | |
| Shelving | $ 13,000.00 | |
| Bath Accessories | $ 38,000.00 | |
| Wardrobe Specialties | | Owner |
| Granite | $ 8,000.00 | Lobby Desk Only |
| Cultured Marble | $ 124,000.00 | |
| Window Sills | None | |
| Fire Extinguishers | $ 14,500.00 | |
| Operable Wall | None | |
| Pedimat | None | |
| Canvas Canopies | $ 24,000.00 | |
| **Subtotal (1000)** | **$ 231,500.00** | |

## Equipment - 1100

| Items | By G.C. | Notes |
|---|---|---|
| Cooking Equipment | | Owner |
| **Subtotal (1100)** | **$ 0.00** | |

## Furnishings - 1200

| Items | By G.C. | Notes |
|---|---|---|
| Furniture | | Owner |
| Furniture Installation | $ 85,000.00 | |
| **Subtotal (1200)** | **$ 85,000.00** | |

(770)439-6556
Fax (770)439-6563
www.enterprisegc.com

ENTERPRISE GENERAL CONTRACTORS
4071 Fambrough Drive
Powder Springs, GA 30127

6/4/2008

Indigo 10326K.xls
1300-1400

## Special Construction - 1300

| Items | By G.C. | Notes |
|---|---|---|
| Swimming Pool | None | |
| Whirlpool | None | |
| Sauna | None | |
| Pool Fence | None | |
| Pool House | None | |
| Pool Apron | None | |
| | | |
| Subtotal (1300) | $ 0.00 | |

## Conveying Systems - 1400

| Items | By G.C. | Notes |
|---|---|---|
| Laundry Chutes | None | |
| Elevators | $ 845,000.00 | |
| Lower Basement Elevator | $ 60,000.00 | |
| | | |
| Subtotal (1400) | $ 905,000.00 | |

Deed Book 49391 Pg 692
Filed and Recorded Sep-24-2010 12:22pm
2010-0351114
Georgia Intangible Tax Paid 10.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

After recording, please return to:
Chelsea Capital Partners, LLC
Attn: Jay Patel
5721 Lott Grove Drive
Lilburn, GA 30247

Cross-reference: Deed Book
46984, Page 582, Fulton
County, Georgia Records

Intangibles Recording Tax Not
Applicable. Term of 35 months.

STATE OF GEORGIA
COUNTY OF FULTON

SECOND PRIORITY
DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS INDENTURE is made this JUNE 15, 2010, by and between CARNBANE HOTELS, LLC, a Georgia limited liability company ("Grantor"), and CHELSEA CAPITAL PARTNERS, LLC, a Georgia limited liability company ("Grantee").

WITNESSETH:

FOR AND IN CONSIDERATION of the loan to Grantor by Grantee resulting in the indebtedness which is hereinafter more particularly described, and in order to secure that loan and payment of the note evidencing the same, Grantor hereby grants, bargains, conveys, transfers, assigns and sells unto Grantee:

ALL THAT TRACT OR PARCEL OF LAND described on Exhibit "A", attached hereto and incorporated herein by reference, hereinafter called the "Property";

TOGETHER WITH:    (i) all buildings, structures and other improvements now or hereafter located on the Property or on any part or parcel of the Property, hereinafter called the "Improvements"; (ii) all and singular the tenements, hereditaments, easements and appurtenances belonging to the Property or in anywise appertaining to the Property, and the reversion or reversions, remainder or remainders thereof; (iii) all leases, undertakings to lease, contracts in rent, usufructs and other agreements for use, occupancy or possession now or hereafter in force with respect to the Property or any part or parcel of the Property or any of the Improvements, and any and all other agreements, contracts, licenses, permits and arrangements now or hereafter affecting the Property or any part or parcel of the Property or any of the Improvements, whether written or oral and whether now or hereafter made or executed and delivered, hereinafter collectively called the "Leases"; (iv) all rents, issues, income, revenues and profits now or hereafter accruing from, and all accounts and contract rights now or hereafter arising in connection with, the Property or any part or parcel of the Property or any of the Improvements, including without limitation all rents, issues, income, revenues and profits accruing from, and all accounts and contract rights arising in connection with, the Leases, together with all monies and proceeds now or hereafter due or payable with respect thereto or on account thereof, and all security deposits, damage deposits and other funds paid by any lessee, sublessee, tenant, subtenant, licensee,

ATL 77,709,080v1

Exhibit W

RCBK-RISHA000035

Deed Book 49391 Pg 693

permittee or other obligee under any of the Leases, whether paid in a lump sum or installments, all of which are hereinafter collectively called the "Rents"; (v) all minerals, flowers, crops, trees, timber, shrubbery and other emblements now or hereafter located on the Property or under the Property or on or under any part or parcel of the Property; (vi) all estates, rights, title and interest in the Property, or in any part or parcel of the Property; (vii) all equipment, machinery, apparatus, fittings, furniture, furnishings, computers, pass-codes, and personal property of every kind or description whatsoever now or hereafter located on the Property or on any part or parcel of the Property or in or on any of the Improvements, and used in connection with the operation or maintenance of the Property or any of the Improvements, all accessions and additions to and replacements of the foregoing and all proceeds (direct and remote) of the foregoing, including without limitation all plumbing, heating, lighting, ventilating, refrigerating, water-heating, incinerating, air-conditioning and heating, and sprinkling equipment and systems, and all screens, awnings and signs; (viii) all fixtures (including all trade, domestic and ornamental fixtures) now or hereafter on the Property or on any part or parcel of the Property or in or on any of the Improvements, whether actually or constructively attached or affixed, including without limitation all plumbing, heating, lighting, ventilating, refrigerating, water-heating, incinerating, air-conditioning and heating, and sprinkling fixtures, and all screens, awnings and signs which are fixtures; (ix) all building materials, supplies, goods, machinery and equipment delivered to the Property and placed on the Property for the purpose of being affixed to or installed or incorporated or otherwise used in or on the Property or any part or parcel of the Property or any of the Improvements, and all accessions and additions to and replacements of the foregoing and all proceeds (direct or remote) of the foregoing; (x) all payments, awards, judgments and settlements (including interest thereon) to which Grantor may be or become entitled as a result of the exercise of the right of eminent domain with respect to the Property or any part or parcel of the Property or any of the Improvements; (xi) all books, records, reservations, rooms agreements, policies of insurance which insure against loss or damage to any and all property described herein and all proceeds from and payments under such policies; and (xii) all franchises, franchise agreements, management agreements, names, tradenames, signs, marks and trademarks under which any business located on the Property is operated or known. The Property and all of the foregoing are hereinafter sometimes collectively called the "Premises".

TO HAVE AND TO HOLD the Premises to the only proper use, benefit and behoof of Grantee, forever, in fee simple.

GRANTOR WARRANTS that Grantor has good and marketable fee simple title to the Premises, that Grantor is lawfully seized and possessed of the Premises, that Grantor has the right to convey the Premises, subject to all matters of record and/or set forth on Exhibit "B" attached hereto and made a part hereof (collectively, the "Permitted Exceptions") and (i) that certain Deed to Secure Debt, (ii) that certain Assignment of Lessor's Interest in Leases (together with the Senior Security Deed and any and all other documents evidencing the first priority loan being herein collectively, the "Senior Loan Documents"), each executed by Grantor on July 14, 2008 in favor of Empire Financial Services, Inc. ("Senior Lender"), and that Grantor shall otherwise forever warrant and defend the title to the Premises unto Grantee against the claims of all persons whomsoever.

THIS INSTRUMENT IS A DEED passing legal title pursuant to the laws of the State of Georgia governing deeds to secure debt, and is also a security agreement granting a present and containing security interest and security title in the portion of the Premises constituting personal property or fixtures, and a financing statement filed as a fixture filing, pursuant to the Uniform Commercial Code of the State of Georgia, and it is not a mortgage. This deed to secure debt and security agreement is made and intended to secure payment and performance of: (i) an indebtedness of Grantor to Grantee evidenced by that certain Second Priority Real Estate Note on or about the date hereof, made by Grantor and payable to the order of Grantee, in the original principal amount of SIX MILLION AND NO/100 DOLLARS ($6,120,000.00), bearing interest and default interest and payable as therein provided in installments, the final installment of which is due and payable on May 15, 2013, if not sooner paid, hereinafter called the "Note"; (ii) any and all renewal or renewals, extension or extensions, modification or modifications of the Note, and substitution or substitutions for the Note, either in whole or in part; (iii) all advances, if any, made by Grantee pursuant to the terms of this deed to secure debt and security agreement; (iv) all expenses incident to the collection of the indebtedness secured by this deed to secure debt and security agreement; (v) all duties and obligations of

ATL 17,709,080v1                                    2

RCBK-RISHA000036

Deed Bank 49391 Pg 695

event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws in force governing the taxation of the Indebtedness or the manner of collecting such taxes so as to adversely affect Grantee, Grantor will promptly pay any such tax on or before the date it is due if, in the opinion of counsel for Grantee, Grantee is not prohibited by any such law, order, rule or regulation from requiring such payment by Grantor. If, in the opinion of counsel for Grantee, Grantee is prohibited by any such law, order, rule or regulation from requiring such payment by Grantor, then, at Grantee's option, Grantor shall be in default under this Security Deed as if an event of default had occurred, and Grantee may exercise any or all of the rights and remedies Grantee has upon the occurrence of a default under this Security Deed.

Section 1.03.    Grantee's Acts on Behalf of Grantor.  In the event Grantor shall either fail or refuse to pay or cause to be paid, as the same shall become due and payable, any item (including all items specified in Section 1.02 hereof) which Grantor is required to pay hereunder or which Grantor may pay to cure a default under this Security Deed, or in the event Grantor shall either fail or refuse to do or perform any act which Grantor is obligated to do or perform under this Security Deed or which Grantor may deem it necessary to cure a default under this Security Deed, or in the event Grantee shall be required, or shall find it necessary or desirable in Grantee's discretion, to defend, enforce or protect any of the rights and benefits accruing to Grantee under any provision of this Security Deed (including, without limitation, Grantee's interest in the Premises, insurance and condemnation proceeds and the Rents,) then Grantee, at Grantee's option, may make such payment or do or perform such act on behalf of Grantor, or proceed in any manner to defend, enforce or protect any such rights and benefits. All such payments made by Grantee and all costs and expenses incurred by Grantee in doing or performing all such acts shall be and shall become part of the Indebtedness and shall bear interest at the rate per annum four (4) percentage points in excess of the highest rate of interest then being charged with respect to any portion of the Indebtedness from the date paid or incurred by Grantee, and the interest thereon shall also be part of the Indebtedness.

Section 1.04.    Further Assurances  Grantor shall at any time, and from time to time, upon request by Grantee, make, execute and deliver, or cause to be made, executed and delivered, any and all other and further instruments, documents, certificates, agreements, letters, representations and other writings as may be necessary or desirable, in the opinion of Grantee, in order to effectuate, complete, correct, perfect or continue and preserve the liability and obligation of Grantor for payment of the Indebtedness and the lien, security interest and security title of Grantee under this Security Deed. Grantor shall, upon request by Grantee, certify in writing to Grantee, or to any proposed assignee of this Security Deed, the amount of principal and interest then owing on the Indebtedness and whether or not any setoffs or defenses exist against all or any part of the Indebtedness.

Section 1.05.    Rents and Leases.  Grantor shall fully and faithfully perform all of the duties and obligations of the lessor, landlord or owner of the Premises under the Leases and observe, satisfy and comply with all of the terms, covenants, conditions, agreements, requirements, restrictions and provision of the Leases, and do all acts otherwise necessary to maintain and preserve the Rents and prevent any diminishment or impairment of the value of the Leases or the Rents or the interest of Grantor or Grantee therein or thereunder. Without the prior written consent of Grantee, Grantor shall not further assign the Rents or the Leases, shall not terminate, alter, modify, or amend in any respect, or accept the surrender of, any of the Leases, and shall not collect Rents for more than one (1) month in advance. Grantor shall procure and deliver to Grantee upon request estoppel letters or certificates from each lessee, tenant, occupant in possession and other user of the Premises or any part thereof, as required by and in form and substance satisfactory to Grantee, and shall deliver to Grantee a recordable assignment of all of Grantor's interest in all Leases, which assignment shall be in form and substance satisfactory to Grantee, together with proof of due service of a copy of such assignment on each lessee, tenant, occupant in possession or other user of the Premises or any part thereof. The foregoing provisions are hereafter called the "Rent Assignment"

Section 1.06.    Maintenance and Repair.  Grantor shall maintain the Premises in good condition and repair, shall not commit or suffer any actual or threatened waste to the Premises, and shall comply with, or cause to be complied with, all statutes, ordinances, rules, regulations and directives of any

ATL 17,700,089v1

4

RCBK-RISHA000037

Deed Book 49391 Pg  696

governmental authority relating to the Premises or any part thereof or the use or occupancy of the Premises or any part thereof. No part of the Premises, including but not limited to any of the Improvements, shall be removed, demolished or materially altered without the prior written consent of Grantee. If at any time during the continuance of the Indebtedness any addition, alteration, change, repair, reconstruction or other work on the Premises, of any nature, structural or otherwise, becomes necessary or desirable because of damage to or destruction of the Premises or any part thereof, the entire expense thereof, regardless of when the same shall be incurred or become due, shall be the sole obligation and responsibility of Grantor, and Grantor shall pay the entire expense thereof promptly when due. Grantor shall not initiate, join in, consent to or acquiesce in any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the use which may be made of the Premises or any part thereof.

Section 1.07.    Insurance.  Grantor shall keep the Premises insured against loss or damage by fire and such other casualties and risks as the Grantee may require from time to time.  The insurance maintained by Grantor shall include rental, rental value and business interruption insurance.  Such policies shall be written by such companies, in such amounts and under such forms of policies as Grantee may approve. Such policies shall insure Grantee's interest in the Premises, name Grantee as an insured party thereunder, provide that losses thereunder shall be payable to Grantee pursuant to such forms of loss payable clauses as Grantee may approve and provide that no cancellation or reduction in coverage shall be effective unless the insurer first gives Grantee thirty (30) days prior written notice.  Irrespective of the insurance required and approved by Grantee hereunder, the security interest of Grantee hereunder shall cover all policies of insurance which insure against loss or damage to the Premises, and the proceeds from any and all such policies.  In the event of a foreclosure and sale by Grantee of the Premises, the purchaser of the Premises shall succeed to all rights of Grantor in and to such policies, including the right to the refund of unearned premiums and to dividends thereunder, and Grantee may, at Grantee's election, assign and deliver the policies to such purchaser without any warranty or representation, express or implied, and without recourse.  In the event of damage to or destruction of the Premises or any part thereof, Grantee may adjust, settle or compromise claims under such policies, and the proceeds therefrom shall be paid to Grantee.  Grantee, at Grantee's option and in Grantee's sole discretion, may either (i) apply the proceeds or any part thereof to payment of the Indebtedness, in such order as Grantee may determine, or (ii) require Grantor to repair, replace or reconstruct the Premises or any part thereof and disburse the proceeds to Grantor to be applied against the costs and expenses thereof as incurred or paid by Grantor, pursuant to a disbursement procedure, and under such other terms and conditions, as shall be acceptable to Grantee.

Section 1.08.    Inspection.  Grantor shall permit any person designated by Grantee to visit and inspect the Premises, to examine the books of account and other records of Grantor with respect to the Premises, and to discuss the affairs, finances and accounts of Grantor with and to be advised as to the same by Grantor or a knowledgeable and duly authorized representative of Grantor, all at such reasonable times and intervals as Grantee may desire.

Section 1.09.    Subrogation.  Grantee shall be subrogated to all right, title, equity, liens and claims of all persons to whom Grantee has paid or pays money in settlement of claims, liens, encumbrances or charges or in the acquisition of any right or title for Grantee's benefit under this Security Deed or for the benefit and account of Grantor.

ARTICLE II
EVENTS OF DEFAULT

The following shall constitute events of default by Grantor hereunder:

Section 2.01.    Payment of Indebtedness.  If Grantor should fail to pay the Indebtedness or any part thereof when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or at a time fixed by reason of acceleration of the due date thereof or otherwise.

ATL 17,709,082v1

5

RCBK-RISHA000038

Deed Book 49391 Pg 697

Section 2.02.    Other Payments and Terms.  If Grantor should fail to make any payment (other than on the Indebtedness) required hereunder, or if Grantor should fail fully and completely to perform its duties and obligations under, or should violate or breach or fail fully and completely to observe, satisfy or comply with any of the terms, covenants, conditions, agreements, requirements, restrictions or provisions set forth in, this Security Deed or any other instrument, document, agreement, letter or other writing now or hereafter evidencing or securing the Indebtedness or any portion thereof, or heretofore, concurrently herewith or in the future executed by Grantor in favor of Grantee in connection with any transaction which resulted in the Indebtedness.

Section 2.03.    Seizure or Levy.  If the Premises or any part thereof should be seized or levied upon under legal process or a receiver should be appointed for the Premises or any part thereof.

Section 2.04.    Liens.  If any Federal tax lien or any claim of lien for labor or services performed or rendered or alleged to have been performed or rendered, or for materials supplied or furnished or alleged to have been supplied or furnished, or for architectural or engineering services performed or rendered or alleged to have been performed or rendered, in connection with the improvement of or with respect to the Premises should be filed of record against Grantor or the Premises and not be removed from record by payment or posting of bond within thirty (30) days from the date of such filing.

Section 2.05.    Priority Claim.  If any claim of priority over this Security Deed, other than with respect to the Senior Loan Documents, should be asserted in any legal or equitable proceeding, and not be dismissed with prejudice within sixty (60) days after the filing thereof.

Section 2.06.    Insolvency or Bankruptcy.  If Grantor becomes insolvent as defined in the Georgia Uniform Commercial Code or makes an assignment for the benefit of creditors; or if any action is brought by Grantor seeking its dissolution or liquidation of its assets or seeking the appointment of a trustee, interim trustee, receiver or other custodian for any of its property; or if Grantor commences a voluntary proceeding under the Federal Bankruptcy Code; or if any reorganization or arrangement proceeding is instituted by Grantor for the settlement, readjustment, composition or extension of any of its debts upon any terms; or if any action or petition is otherwise brought by Grantor seeking similar relief or alleging that it is insolvent or unable to pay its debts as they mature, or if any action is brought against Grantor seeking its dissolution or liquidation of any of its assets, or seeking the appointment of a trustee, interim trustee, receiver or other custodian for any of its property, and any such action is consented to or acquiesced in by Grantor or is not dismissed within thirty (30) days after the date upon which it was instituted; or if any proceeding under the Federal Bankruptcy Code is instituted against Grantor and (i) an order for relief is entered in such proceeding or (ii) such proceeding is consented to or acquiesced in by Grantor or is not dismissed within thirty (30) days after the date upon which it was instituted; or if any reorganization or arrangement proceeding is instituted against Grantor for the settlement, readjustment, composition or extension of any of its debts upon any terms, and such proceeding is consented to or acquiesced in by Grantor or is not dismissed within thirty (30) days after the date upon which it was instituted; or if any action or petition is otherwise brought against Grantor seeking similar relief or alleging that it is insolvent, unable to pay its debts as they mature or generally not paying its debts as they become due, and such action or petition is consented to or acquiesced in by Grantor or is not dismissed within thirty (30) days after the date upon which it was brought.

Section 2.07.    Judgments.  If any judgment should be rendered against Grantor and such judgment should not be paid in full and satisfied, or appealed from within the time allowed for appeals and be paid in full and satisfied when it becomes final.

Section 2.08.    Dissolution or Liquidation.  Should Grantor be dissolved or partitioned.

RCBK-RISHA000039

Deed Book 49391 Pg  69A

## ARTICLE III.
### REMEDIES AND POWER OF SALE

Upon the occurrence of an event of default, Grantor shall be in default hereunder. If Grantor shall be in default hereunder, Grantee may, at its option and election and without notice to Grantor, do any one or more of the following:

**Section 3.01.** *Acceleration of Indebtedness.* Grantee may immediately declare all or any portion of the Indebtedness to be immediately due and payable, whereupon the same shall be and shall become due and payable forthwith without presentment, demand, protest or notice of any kind, all of which are expressly waived by Grantor.

**Section 3.02.** *Entry and Possession.* Grantee may enter upon the Premises or any part thereof and take possession thereof, excluding therefrom Grantor and all agents, employees and representatives of Grantor; employ a manager of the Premises or any part thereof; hold, store, use, operate, manage, control, maintain and lease the Premises or any part thereof; conduct business thereon; make all necessary and appropriate repairs, renewals and replacements; insure or keep the Premises insured; and carry out or enter into agreements of any kind with respect to the Premises.

**Section 3.03.** *Collection of Rents.* Grantee may collect and receive all Rents, and apply the same to the Indebtedness, after deducting therefrom all costs, charges and expenses of taking, holding, managing and operating the Premises, including the reasonable fees and expenses of Grantee's attorneys and agents.

**Section 3.04.** *Payments.* Grantee may pay any sum or sums deemed necessary or appropriate by Grantee to protect the Premises or any part thereof or Grantee's interest therein.

**Section 3.05.** *Other Remedies.* Grantee may exercise all rights and remedies contained in any other instrument, document, agreement or other writing now or hereafter evidencing or securing the Indebtedness or any part thereof, or heretofore, concurrently herewith, or in the future executed by Grantor in favor of Grantee in connection with any transaction resulting in the Indebtedness or any part thereof, including, without limiting the generality of the foregoing, the Note and the Rent Assignment.

**Section 3.06.** *Appointment of Receiver.* Grantee may make application to any court and be entitled to the appointment of a receiver to take charge of the Premises or any part thereof without alleging or proving, or having any consideration given to, the insolvency of Grantor, the value of the Premises as security for the Indebtedness or any other matter usually incident to the appointment of a receiver.

**Section 3.07.** *UCC Remedies.* With respect to the personal property and fixtures in which a security interest is herein granted, at Grantee's option, Grantee may exercise any or all of the rights accruing to a secured party under this instrument, the Uniform Commercial Code (O.C.G.A. §§11-9-101 et seq.) and any other applicable law. Grantor shall, if Grantee requests, assemble all such personal property and make it available to Grantee at a place or places, to be designated by Grantee, which shall be reasonably convenient to Grantor and Grantee. Any notice required to be given by Grantee of a public or private sale, lease or other disposition of the personal property or any other intended action by Grantee may be personally delivered to Grantor or may be deposited in the United States mail with postage prepaid duly addressed to Grantor at the address shown in the paragraph herein captioned "Notices", or at any other address theretofore designated by Grantor in writing to Grantee, at least five (5) business days prior to such proposed action, and shall constitute reasonable and fair notice to Grantor of any such action.

**Section 3.08.** *Power of Sale.* Grantee may sell the Premises, or any part or parcel thereof or any interest of Grantor therein separately, at Grantee's discretion, with or without taking possession thereof, at a public sale or public sales before the Courthouse door of the County in which the Premises or any part thereof is located, to the highest bidder for cash, after first giving notice of the time, place and terms of such sale or sales by advertisement published once a week for four weeks (without any regard for the number of

ATL 17,709.080v1

7

RCBK-RISHA000040

Deed Book 49391 Pg 699

days between the date the first such notice is published and the date on which any such sale commences) in the newspaper in which advertisements of sheriff's sales are published in such county. Such advertisement so published shall be notice to Grantor, and Grantor hereby expressly waives all other notices. Grantee may bid and purchase at any such sale, and Grantee, as agent and attorney-in-fact for Grantor and in Grantor's name, may execute and deliver to the purchaser or purchasers at any such sale a sufficient conveyance of the Premises, or the part or parcel thereof or the interest therein which is sold. Grantee's conveyance may contain recitals as to the occurrence of any event of default under this Security Deed, and such recitals shall be presumptive evidence that all preliminary acts prerequisite to any such sale and conveyance were in all respects duly complied with. The recitals made by Grantee shall be binding and conclusive upon Grantor, and the sale and conveyance made by Grantee shall divest Grantor of all right, title, interest and equity that Grantor may have or have had in, to and under the Premises, or the part or parcel thereof or the interest therein which is sold, and shall vest the same in the purchaser or purchasers at such sale or sales. Grantee may hold one or more sales hereunder until the Indebtedness has been satisfied in full. Grantor hereby constitutes and appoints Grantee as Grantor's agent and attorney-in-fact to make such sale or sales, to execute and deliver such conveyance or conveyances, and to make such recitals, and Grantor hereby ratifies and confirms all of the acts and doings of Grantee as Grantor's agent and attorney-in-fact hereunder. Grantee's agency and power as attorney-in-fact hereunder are coupled with an interest, cannot be revoked by bankruptcy, insolvency, incompetency, death, dissolution or otherwise, and shall not be exhausted until the Indebtedness has been satisfied in full. The proceeds of each sale by Grantee hereunder shall be applied first to the costs and expenses of the sale and of all proceedings in connection therewith (including without limitation the fees and expenses of Grantee's attorneys in connection therewith), then to the payment of the balance of the Indebtedness, and the remainder, if any, shall be paid to Grantor or to the parties entitled thereto by law. If the proceeds of any sale are not sufficient to pay the Indebtedness in full, Grantee shall determine, at Grantee's option and in Grantee's discretion, the portions of the Indebtedness to which the proceeds (after deducting therefrom the costs and expenses of the sale and all proceedings in connection therewith) shall be applied and in what order the proceeds shall be so applied. Grantor covenants and agrees that, in the event of any sale pursuant to the agency and power herein granted, Grantor shall be and become a tenant holding over and shall deliver possession of the Premises, or the part thereof or interest therein sold, to the purchaser or purchasers at the sale or be summarily dispossessed in accordance with the provisions of law applicable to tenants holding over.

All of the foregoing rights and remedies are cumulative of and in addition to, and not restrictive of or in lieu of, any right or remedy provided for by statute, or now or hereafter existing at law or in equity. Grantee may, at Grantee's election and at Grantee's sole discretion, exercise each and every such right and remedy concurrently or separately or in any combination.

## ARTICLE IV.
## ADDITIONAL PROVISIONS

The following terms and conditions shall constitute additional covenants and agreements by Grantee:

Section 4.01.    Commercial Transaction. The interest of Grantee under this Security Deed and the liability and obligation of Grantor for the payment of the Indebtedness arise from a "commercial transaction" within the meaning of O.C.G.A. §44-14-260(1). Accordingly, pursuant to O.C.G.A. §44-14-263, Grantor waives any and all rights which Grantor may have to notice prior to seizure by Grantee of any interest in personal property of Grantor which constitutes part of the Premises, whether such seizure is by writ of possession or otherwise.

Section 4.02.    Applicable Law. This agreement shall be governed by, construed under and interpreted and enforced in accordance with the laws of the State of Georgia.

Section 4.03.    Forbearance. Grantee shall not be deemed to waive any of Grantee's rights or remedies under this Security Deed unless such waiver is expressed in writing and signed by or on behalf of Grantee. No delay, omission or forbearance by Grantee in exercising any of Grantee's rights or remedies shall

ATL 17,705,090v1

8

RCBK-RISHA000041

Deed Book 49391 Pg   700

operate as a waiver of such rights or remedies.  A waiver in writing on one occasion shall not be construed as a waiver of any right or any remedy on any future occasion.

Section 4.04.   Time.  Time is and shall be the essence of this Security Deed and the covenants and agreements by Grantor.

Section 4.05.   Captions.  Any captions or headings preceding the text of separate sections, paragraphs and subparagraphs hereof are solely for reference purposes and shall not affect the meaning, construction, interpretation or effect of the text.

Section 4.06.   Notices.  All notices, requests, demands and other communications under this Security Deed or the Note or the Rent Assignment shall be in writing and shall be deemed to have been duly given: (i) to Grantor when personally delivered to any manager or officer of Grantor, (ii) to Grantee when personally delivered to Grantee, or (iii) two (2) business days after deposited in the United States Mail, certified mail with return receipt requested and with all postage prepaid, addressed as follows:

(a) To Grantor:     CARNEGIE HOTELS, LLC, 2100 Parklake Drive, Atlanta, GA 30145

(b) To Grantee:     CHELSEA CAPITAL PARTNERS, LLC, 5728 Lent Grove Drive, Lilburn, GA 30247

Either party may, by written notice to the other, designate a different address for receiving notices hereunder; provided, however, that no change in Grantor's address for receiving notices hereunder shall be effective until Grantee has actually received notice thereof.  The foregoing address of Grantor constitutes the mailing address of the debtor, and the foregoing address of Grantee constitutes an address of the secured party from which information concerning the security interest may be obtained, as required by O.C.G.A. §11-9-402.

Section 4.07.   Severability.  Wherever possible, each provision of this Security Deed shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Security Deed shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Deed.

Section 4.08.   Definitions.  The word "Grantor" as used herein shall include the legal representatives, successors and assigns of Grantor as if so specified at length throughout this Security Deed, and all covenants, agreements, duties, obligations, liabilities and responsibilities of Grantor shall be binding upon and enforceable against the legal representatives, successors and assigns of Grantor.  The word "Grantor" as used herein shall also include all parties executing this Security Deed as Grantor, and each of them, who shall be jointly and severally liable under this Security Deed, should more than one Grantor execute this Security Deed; and shall include the masculine and feminine genders, regardless of the sex of Grantor or any of them, and shall include partnerships, corporations and other legal entities.  The word "Grantee" as used herein shall include the transferees, successors, legal representatives and assigns of Grantee as if so specified at length throughout this Security Deed, and all rights of Grantee under this Security Deed shall inure to the benefit of the transferees, successors, legal representatives and assigns of Grantee.

Section 4.09.   WAIVERS.  GRANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT GRANTOR MAY HAVE UNDER THE CONSTITUTION OF THE STATE OF GEORGIA OR THE CONSTITUTION OF THE UNITED STATES OF AMERICA TO NOTICE OR TO A JUDICIAL HEARING PRIOR TO THE EXERCISE OF ANY RIGHT OR REMEDY PROVIDED TO GRANTEE BY THIS SECURITY DEED, AND WAIVES GRANTOR'S RIGHTS, IF ANY, TO SET ASIDE OR INVALIDATE ANY SALE UNDER POWER DULY CONSUMMATED IN ACCORDANCE WITH THE PROVISIONS OF THIS SECURITY DEED ON THE GROUND (IF SUCH BE THE CASE) THAT THE SALE WAS CONSUMMATED WITHOUT PRIOR NOTICE OR JUDICIAL HEARING OR BOTH.  GRANTOR FURTHER HEREBY EXPRESSLY WAIVES ALL HOMESTEAD EXEMPTION RIGHTS, IF ANY, WHICH GRANTOR OR GRANTOR'S FAMILY MAY HAVE PURSUANT TO THE CONSTITUTION OF THE UNITED STATES, THE STATE OF GEORGIA OR ANY OTHER STATE OF THE UNITED

ATL 17,705,085v1

9

RCBK-RISHA000042

Deed Book 49391 Pg 701

STATES, IN AND TO THE PREMISES AS AGAINST THE COLLECTION OF THE INDEBTEDNESS, OR ANY PART THEREOF. ALL WAIVERS BY GRANTOR IN THIS PARAGRAPH HAVE BEEN MADE VOLUNTARILY, INTELLIGENTLY AND KNOWINGLY BY GRANTOR, AFTER GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO BE INFORMED BY COUNSEL OF GRANTOR'S CHOICE AS TO POSSIBLE ALTERNATIVE RIGHTS. GRANTOR'S EXECUTION OF THIS SECURITY DEED SHALL BE CONCLUSIVE EVIDENCE OF THE WAIVER AND THAT SUCH WAIVER HAS BEEN VOLUNTARILY, INTELLIGENTLY AND KNOWINGLY MADE.

Section 4.10.   **SECOND PRIORITY SECURITY DEED.** THIS SECURITY DEED AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE TO THE INDEBTEDNESS OWED BY GRANTOR PURSUANT TO THE SENIOR LOAN DOCUMENTS IN FAVOR OF EMPIRE FINANCIAL SERVICES, INC., JULY 14, 2008 (See Deed to Secure Debt at Deed Book 46984, Page 582, Fulton County, Georgia Records and all documents and instruments executed and/or recorded in connection therewith) FOR SO LONG AS THE LOAN REFERENCED THEREIN REMAINS OUTSTANDING.

IN WITNESS WHEREOF, Grantor has set its hand and seal, all the day and year first written above.

Signed, sealed and delivered in the presence of:

Unofficial Witness   Jay R. Patel

Notary Public
My Commission Expires:

(NOTARIAL SEAL)

GRANTOR:

CARNEGIE HOTELS, LLC, a Georgia limited liability company

By: _____
Manager   R. C. Patel

672, 17,709,080/v3

10

RCBK-RISHA000043

Deed Book 49391 Pg 702
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

## EXHIBIT A

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 78 OF THE 14th DISTRICT, CITY OF ATLANTA, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET (R/W VARIES) AND THE WESTERN LINE OF A 10-FOOT ALLEY, WHICH POINT IS MARKED BY A METAL CORNER PLATE, AND RUNNING THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET NORTH 88 DEGREES 58 MINUTES 02 SECONDS WEST A DISTANCE OF 97.34 FEET TO A PK NAIL FOUND; THENCE, CONTINUING ALONG SAID RIGHT-OF-WAY LINE OF ELLIS STREET SOUTH 46 DEGREES 50 MINUTES 33 SECONDS WEST A DISTANCE OF 7.00 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK; THENCE CONTINUING ALONG SAID RIGHT-OF-WAY LINE OF ELLIS STREET SOUTH 00 DEGREES 48 MINUTES 35 SECONDS EAST A DISTANCE OF 17.62 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK AT THE INTERSECTION FORMED BY THE SOUTHERLY RIGHT OF WAY LINE OF ELLIS STREET (R/W VARIES) AND THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES); THENCE, ALONG THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY SOUTH 40 DEGREES 33 MINUTES 42 SECONDS EAST A DISTANCE OF 155.14 FEET TO A POINT AT THE INTERSECTION FORMED BY THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES) AND THE WESTERN LINE OF A 10 FOOT ALLEY; THENCE, LEAVING THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY AND FOLLOWING ALONG THE WESTERN LINE OF SAID 10-FOOT ALLEY NORTH 00 DEGREES 35 MINUTES 33 SECONDS EAST A DISTANCE OF 138.36 FEET TO A POINT MARKED BY A METAL CORNER PLATE ON THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET (R/W VARIES) AND THE POINT OF BEGINNING; BEING IMPROVED PROPERTY KNOWN AS THE CARNEGIE BUILDING, AND ALSO KNOWN NOS. 131-133 AND 141, CARNEGIE WAY, ATLANTA, GEORGIA, ACCORDING TO THE PRESENT SYSTEM OF NUMBERING IN USE IN ATLANTA, GEORGIA.

TOGETHER WITH ALL APPURTENANT EASEMENT RIGHTS OF SAID TRACT IN AND TO THE ADJACENT 10' ALLEY, LOCATED TO THE EAST OF THE ABOVE DESCRIBED PROPERTY, INCLUDING ANY NONEXCLUSIVE RIGHTS AND EASEMENTS AS RESERVED FOR THE BENEFIT OF SAID LAND IN THAT CERTAIN GRANT OF EASEMENT FROM A. G. RHODES TO ASA G. CANLER, ET. AL., DATED FEBRUARY 17, 1913, RECORDED AT DEED BOOK 355, PAGE 304, FULTON COUNTY RECORDS.

SAID TRACT IS AS MORE FULLY SHOWN BY THAT CERTAIN ALTA/ACSM LAND TITLE SURVEY FOR CARNEGIE HOTELS, LLC, PLANTATION TITLE & ABSTRACT COMPANY, CHICAGO TITLE INSURANCE COMPANY, ET. AL., DATED AUGUST 31, 2007, BY A. S. GIOMETTI & ASSOCIATES, INC., SEALED BY A. S. GIOMETTI, GEORGIA RLS # 1125, WHICH PLAT OF SURVEY IS INCORPORATED HEREIN BY THIS REFERENCE FOR ALL PURPOSES.

11

RCBK-RISHA000044

Counterpart signature page to Closing Statement

SELLER:

CARNEGIE HOTEL MANAGER, LLC

By:_____
Name: R.C. Patel
Title: Manager

RCBK-RISHA000045

Counterpart signature page to Closing Statement

PURCHASER:

SUMMIT HOTEL TRS 090, LLC

By: Summit Hotel TRS, Inc., its sole member

By: _____
Name: Christopher Eng
Title: Secretary

RCBK-RISHA000046

Counterpart signature page to Closing Statement

DISBURSEMENT AGENT:

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By: _____
Name: _____
Title: _____



**Chevron**

Nadine Barroca
Vice President

Chevron TCI, Inc.
345 California Street, 30th Floor
San Francisco, CA 94104
Tel 415 733 4508
Fax 415 733 4591
chevrontci@chevron.com
Nbarroca@chevron.com

January 11, 2012

Summit Hotel TRS 099, LLC
2701 S. Minnesota Avenue
Suite 6
Sioux Falls, South Dakota 57105
Attn: Chris Eng, Esq.

and

Carnegie Hotel Manager LLC
c/o R. C. Patel
2100 Parklake Drive, N.E.
Atlanta, Georgia 30345

Re:   Purchase and Sale of Courtyard by Marriott hotel located at 133 Carnegie Way,
Atlanta, Georgia (the "Hotel")

Ladies and Gentlemen:

We understand that pursuant to that certain Amended & Restated Purchase and Sale
Agreement dated as of November 7, 2011, as amended by that certain First Amendment to
Amended & Restated Purchase and Sale Agreement dated December 7, 2011 (as amended, the
"Purchase Agreement") by and between Carnegie Hotel Manager, LLC, a Georgia limited
liability company, as seller ("Seller"), and Summit Hotel OP, LP, a Delaware limited partnership
("Summit OP") as purchaser, certain interests of Summit OP having been assigned to Summit
Hotel TRS 099, LLC, a Delaware limited liability company (the "TRS"), a wholly owned
subsidiary of Summit OP, Seller agreed to convey one hundred percent (100%) of its
membership interests in Carnegie Hotel MT, LLC, a Georgia limited liability company (the
"Master Tenant") to the TRS such interest is 0.01% of the membership interest in the Master
Tenant. The remaining 99.99% of the membership interests in the Master Tenant are owned by
the undersigned. The Master Tenant operates the Courtyard by Marriott hotel located at 133
Carnegie Way, Atlanta, Georgia (the "Hotel"). The transfer of 0.01% of the membership
interests in the Master Tenant to the TRS pursuant to Exhibit A attached hereto, is hereinafter
referenced as the "Transfer." Reference is further made to the Operating Agreement (the
"Operating Agreement") dated as of July 27, 2009 of the Master Tenant. Capitalized terms used
but not defined herein shall have the meanings ascribed thereto in the Operating Agreement.

Consent of Investor Member
37973252

RCBK-RISHA000048

Deed Book 48218 Pg    642
Filed and Recorded Jul-27-2009 02:24pm
2009-0216226
Georgia Intangible Tax Paid $0.00
Cathelene Robinson
Clerk of Superior Court
Fulton County, Georgia

| | |
|---|---|
| Upon recording, return to:<br><br>Michelle Ruberto Fonseca, Esq.<br>Holland & Knight LLP<br>1000 Chapel View Blvd., Suite 200<br>Cranston, RI 02920 | Please cross-index to:<br>Deed to Secure Debt<br>recorded at Deed Book<br>**46984, page 582,** Fulton<br>County Records (the<br>"Mortgage") |

## SUBORDINATION, NONDISTURBANCE
## AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into as of July 24, 2009 by and among CARNEGIE HOTEL MT, LLC, a Georgia limited liability company ("Lessee"); CARNEGIE HOTELS, LLC, a Georgia limited liability company ("Owner"); EMPIRE FINANCIAL SERVICES, INC., a Georgia corporation (together with any permitted successors or assigns, the "Lender"); and CHEVRON U.S.A. INC., a Pennsylvania corporation ("Investor").

### RECITALS

WHEREAS, Owner is the owner of a building located in Atlanta, Georgia and commonly known as the Carnegie Building (the "Building"), which Owner is in the process of rehabilitating; and

WHEREAS, Owner is the owner of the certain tract(s) of land upon which the Building is located, together with certain other improvements and all appurtenances, easements, rights of way and other rights belonging to or in any way pertaining thereto or to the Building, more particularly described on Exhibit A attached hereto (collectively, the "Land" and, together with the Building, the "Property"); and

WHEREAS, Owner intends to rehabilitate the Building in a manner that qualifies for the historic rehabilitation tax credit allowed for qualified rehabilitation expenditures incurred in connection with the "certified rehabilitation" of a "certified historic structure" (the "Historic Tax Credit") pursuant to the Section 47 of the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of prior or succeeding law (the "Code"); and

# 6371309_v5

Exhibit X

WHEREAS, Lessee has been formed to lease the Property including the rehabilitated Building from Owner pursuant to the terms of that certain Lease dated July 24, 2009, between Owner, as landlord, and Lessee, as lessee (the "Lease"); and

WHEREAS, pursuant to that certain Operating Agreement of Lessee dated July 24, 2009 (the "Lessee's Operating Agreement"), Investor has acquired a 99.99% interest in Lessee and has made or will make a substantial investment therein; and

WHEREAS, Owner and Lessee have executed or will execute that certain HTC Pass-Through Agreement (the "Pass-Through Agreement") dated July 24, 2009 pursuant to which Owner will elect under Section 50 of the Code to pass-through to Lessee the Historic Tax Credit to which Owner is otherwise entitled as a result of the rehabilitation of the Building; and

WHEREAS, Lender is the lender under that certain Construction Loan Agreement dated as of July 14, 2008, by and between Lender and Owner relating to a loan by Lender to Owner, as amended (the "Mortgage Loan"), which Mortgage Loan is secured by means of a first lien mortgage or deed of trust on the Property (the "Mortgage") and other related security documents and financing statements given by Owner in favor of Lender, as amended (collectively, the "Mortgage Loan Documents"), with the Mortgage Loan Documents recorded in Fulton County, Georgia, being listed in Exhibit "B"; and

WHEREAS, the Mortgage Loan Documents require that Lender consent to any lease of the Property; and

WHEREAS, Investor has required that Lender provide certain assurances as to non-disturbance of Lessee's rights under the Lease.

NOW, THEREFORE, in consideration of the forgoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Lender hereby agrees as follows:

1.    Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Lease.  In addition to the defined terms set forth in the Recitals to this Agreement, the following defined terms used herein shall have the meanings specified below:

"Transfer" means (a) the institution of any foreclosure, trustee's sale or other like proceeding, (b) the appointment of a receiver for Owner or the Property, (c) the exercise of rights to collect rents under the Mortgage Loan Documents or an assignment of rents, (d) the recording by Lender or its successor or assignee of a deed in lieu of foreclosure for the property, or (e) any transfer or abandonment of possession of the Property to Lender or its successor or assigns in connection with any proceedings affecting Owner under the Bankruptcy Code, 11 U.S.C. §101 et seq.

"Transferee" means Lender, its successors and assigns, any designee of Lender or any other party taking title to the Property in connection with a Transfer.

2.     Consent and Acknowledgment.  Lender hereby consents to the Lease and to the acquisition by Investor of an interest in the Lessee and to the execution of the Lessee's Operating Agreement and related documents, and agrees that the execution and delivery thereof by Owner and/or the Lessee, as the case may be, shall not constitute a default under the Mortgage Loan. Owner acknowledges that the Mortgage Loan matures on June 30, 2011 and that Lender has no obligation or present intention to extend the maturity date of the Mortgage Loan.

3.     Subordination.  So long as Lender complies with the provisions of this Agreement, the Mortgage is and shall unconditionally be and remain at all times a lien or charge upon the Property prior and superior to the Lease and all rights and privileges of Lessee thereunder, or any subtenant thereunder, and the Lease, and all rights and privileges of Lessee or any subtenant are hereby unconditionally subjected and made subordinate to the lien or charge of the Mortgage.

4.     Lender's Exercise of Remedies: Non-Disturbance.

(a)     Subject to Section 4(b) hereof, provided (a) Lessee complies with this Agreement, (b) Lessee is not in default under the terms of the Lease and no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default under the Lease, (c) the Lease is in full force and effect, both as of the date Lender commences a Transfer and at all times thereafter, and (d) Lessee shall be in possession of the Property, no default under the Mortgage and no Transfer will disturb Lessee's possession under the Lease and the Lease will not be affected or terminated thereby.

(b)     Lender may terminate the Lease solely if the Lessee is in default thereunder. Prior to commencing any action to effect a termination of the Lease upon a default by Lessee thereunder, Lender shall first give written notice to Investor of its intention to terminate the Lease and Investor will have fifteen (15) days as to a payment default and a reasonable time, not to exceed sixty (60) days, as to a non-payment default from the date of Investor's receipt of such written notice, to cause Lessee to cure any defect in Lessee's compliance with the Lease, such that upon such cure the Lessee would be entitled to the non-disturbance of the Lease.

(c)     Nothing in the Mortgage Loan Documents or any replacement documents with any Transferee will prohibit Investor's right to collect the Priority Return (as such terms are defined in the Lessee's Operating Agreement) from Lessee, Owner, Carnegie Hotel Manager, LLC, a Georgia limited liability company (the "Lessee's Managing Member") and/or any guarantor of such obligations to Investor.

(d)     No event of default under the Mortgage Loan Documents or any replacement documents with any Transferee will result from (i) the exercise of the "Put" or the "Call Option" as described in the Purchase Agreement of even date herewith between Investor and Lessee's Managing Member or (ii) the removal of the Lessee's Managing Member by Investor pursuant to the Lessee's Operating Agreement.

(e)     After a Transfer, if Owner has not yet received approval of Part 3 of the Historic Preservation Certification Application – Request for Certification of Completed Work, Lender agrees to take all reasonable actions requested by Lessee and Investor to obtain such approval (at

# 6371309_v5

- 3 -

the sole expense of Lessee or Investor), including, without limitation, the execution of the Part 3 application and providing access to the Property for inspection by the National Parks Service and any similar state agency.

(f)    The provisions of this Agreement binding on Lender shall also be binding on any Transferee.

5.    Attornment.

(a)    Lessee shall attorn to any Transferee, including Lender if Lender becomes a Transferee, as the landlord under the Lease, provided such Transfer complies with the provisions of this Agreement. Said attornment is subject to the limitation of Transferee's obligations set forth in Section 5(b) below and shall be effective and self-operative without the execution of any further instruments upon Transferee succeeding to the interest of the landlord under the Lease. Within ten (10) days after receipt of a written request therefor from a Transferee, Lessee agrees to provide such Transferee with a written confirmation of its attornment and any other matter set forth in this Agreement.

(b)    Upon a Transfer of the Property to a Transferee, which Transfer complies with the provisions of this Agreement, the Lease will be recognized as a direct lease from Transferee to Lessee upon such Transfer for the balance of the term thereof. In the event that the Lease is recognized as a direct lease from a Transferee as aforesaid, then the liability of a Transferee under the Lease shall exist only so long as such Transferee is the owner of the Property, and such liability shall not continue or survive with respect to claims accruing after further transfer of ownership. A Transferee shall not be: (i) liable for any act or omission of any prior landlord (including Owner), (ii) subject to any offsets or counterclaims which Lessee may have against a prior landlord (including Owner), unless expressly provided for herein, (iii) bound by any prepayment of Base Rent which Lessee may have made in excess of the amounts then due for the next succeeding month, unless specifically approved in writing by Lender, or be liable or responsible for any security deposit or other sums which Lessee may have paid under the Lease unless such deposit or other sums have been physically delivered to Transferee, (iv) bound by any notices given by Lessee to Owner of which it did not also receive notice, (v) required after a fire, casualty or condemnation of the Property to repair or rebuild the same to the extent that such repair or rebuilding requires funds in excess of the insurance or condemnation proceeds specifically allocable to the Property and arising out of such fire, casualty or condemnation which have actually been received by a Transferee, and then only to the extent required by the terms of the Lease, (vi) bound by any modification to the Lease made without Lender's consent, or (vii) required to undertake or complete any of Landlord's Work. Lessee shall not make any payment of Rent or Additional Rent under the Lease more than thirty (30) days in advance of the date such payment is due.

6.    Notice and Cure Rights.

(a)    Lessee and Owner each agrees, simultaneously with the giving of any notice under the Lease, to give a duplicate copy thereof to Lender. Should either Owner or Lessee default in respect of any of the provisions of the Lease, Lender shall have the right, but not the obligation, to cure such default, and either Lessee or Owner, as the case may be, shall accept

performance by or on behalf of Lender as though, and with the same effect as if, it had been done or performed by the defaulting party. Lender will have a period of time after the service of such notice upon it within which to cure the default specified in such notice, or cause it to be cured, which is the same period for cure, if any, as is given under the Lease in respect of the specified default after the giving of any required notice thereunder.

(b)     Lender and Owner each agrees, simultaneously with the giving of any notice with respect to the Mortgage Loan, to give a duplicate copy thereof to Lessee and to Investor. Should (i) Owner default in respect of any of the provisions of the Mortgage Loan or (ii) Owner or Lessee default in respect of any of the provisions of the Lease, Investor shall have the right, but not the obligation, to cure such default or cause it to be cured, and Lender and Owner, as the case may be, shall accept performance by or on behalf of Investor as though, and with the same effect as if it had been done or performed by Owner or Lessee, as the case may be. Lessee and Investor each will have a period of time (co-terminously) after the service of such notice upon it within which to cure or cause to be cured the default specified in such notice, or cause it to be cured, which is the same period for cure, if any, as is given under the Mortgage Loan Documents in respect of the specified default after the giving of any required notice thereunder.

7.     Lender Estoppel

(a)     As of the date hereof, the Note has an unpaid principal balance of $12,121,989.94, including, but not limited to, accrued and unpaid interest of $50,554.34, and interest has been paid through June 30, 2009.

(b)     No default exists with regard to the payment of any principal, interest or any other amount due under the Note or the Mortgage.

(c)     To the Lender's knowledge no default exists as to the performance of any of the other terms or conditions of the Note or the Mortgage, nor is there any uncured default or event which with the passage of time would constitute a default with respect to the Note or the Mortgage.

8.     Miscellaneous.

(a)     This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, their successors and assigns (including all Transferees); provided, however, that in the event of the assignment or transfer of the interest of a Transferee, all obligations and liabilities of such Transferee under this Agreement shall terminate, and thereupon all such obligations and liabilities shall be the responsibility of the party to whom the Transferee's interest is assigned or transferred; and provided further that the interest of Lessee under this Agreement may not be assigned or transferred except to the extent the assignment of Lessee's interest in the Lease is permitted under the Lease.

(b)     This Agreement is the whole and only agreement among the parties hereto with regard to the subordination of the Lease to the lien or charge of the Mortgage, and shall supersede and cancel all other subjection or subordination agreements, including, but not limited to, those provisions, if any, contained in the Lease that provide for the subjection or subordination of said Lease to a deed of trust or to a mortgage or mortgages, or other similar

# 6371309_v5                                  - 5 -

Deed Book 48218 Pg 647

mortgage loan documents. This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.

(c)   This Agreement shall be governed by, construed, applied and enforced in accordance with the laws of the State of Georgia. The invalidity, legality or enforceability of any provision of this Agreement shall not affect or impair the validity, legality or enforceability of the remainder of this Agreement, and to this end, the provisions of this Agreement are declared to be severable.

(d)   In the event any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Agreement, or to recover damages for the breach thereof, the party prevailing in any such action or proceeding shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees, costs and expenses incurred by the prevailing party.

(e)   The Lease may not be modified or amended so as to reduce the rent or other payments due Owner thereunder or shorten the Term provided thereunder or so as to adversely affect in any other respect to any material extent the rights of Lender, nor shall the Lease be canceled or surrendered, without the consent, in each instance, of Lender.

(f)   Any notices required hereunder will be in writing and will be either given by U.S. registered or certified mail, return receipt requested, with postage prepaid (except in the event of a postal disruption, by strike or otherwise, in the United States), or sent by telex or facsimile promptly confirmed in writing, or sent by personal delivery by a nationally recognized courier service for next day delivery. The current addresses and telecopy numbers of the parties to which any notice provided for herein shall be sent, are as follows:

If to Owner:

Carnegie Hotel, LLC
c/o Diplomat Companies
2100 Parklake Drive NE, Suite A
Atlanta, GA 30345
Attention: Prakash I. Patel
Facsimile: (770) 938-0444

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA 30308
Attention: Philip J. Marzetti, Esq.
Facsimile: (404) 685-5258

# 6371309_v5

- 6 -

Deed Book 48218 Pg 648

If to Lessee:

Carnegie Hotel MT, LLC
c/o Diplomat Companies
2100 Parklake Drive NE, Suite A
Atlanta, GA 30345
Attention: Prakash I. Patel
Facsimile: (770) 938-0444

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA 30308
Attention: Philip J. Marzetti, Esq.
Facsimile: (404) 685-5258

If to Investor:

Chevron U.S.A. Inc.
345 California Street, 30th Floor
San Francisco, CA 94104
Attention: Nadine R. Barroca
Facsimile: (415) 733-4591

With copies to:

CityScape Capital Group, LLC
116 Village Blvd., Suite 200
Princeton, NJ 08540
Attention: William L. Hoffman, Esq., Managing Director
Facsimile: (609) 951-2247

and

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Attention: William F. Machen, Esq.
Facsimile: (617) 523-6850

Deed Book 48218 Pg 649

If to Lender:

Empire Financial Services, Inc.
121 Executive Parkway
Milledgeville, GA 31061
Attention: J. David Dyer, Jr.
Facsimile: (478) 452-2950

With a copy to:

Reynolds, Reynolds & Duncan, LLC
2115 11th Street
PO Box 2863
Tuscaloosa, AL 35403
Attention: Robert P. Reynolds, Esq.
Facsimile: (205) 391-0911

Any party may designate another addressee (and/or change its address or telecopy number) for notices hereunder by a notice given pursuant to this Section 8(f). Notices delivered personally or by facsimile will be effective upon delivery to an authorized representative of the party at the designated address; notices sent by mail in accordance with the above paragraph will be effective upon execution by the addressee of the return receipt requested.

(g)     This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

IN WITNESS WHEREOF, the parties have hereunto set their signatures and seals to this Subordination, Non-Disturbance and Attornment Agreement as of the date first above written.

**[SIGNATURE PAGES FOLLOW]**

# 6371309_v5                          - 8 -

Deed Book 48218 Pg 650

*(Signature page to Subordination, Non-Disturbance and Attornment Agreement)*

**OWNER:**

**CARNEGIE HOTELS, LLC**, a Georgia
limited liability company (SEAL)

Signed, sealed and delivered
in the presence of:

_Kevin Conlon_____
Witness

_Carolyn R Adams_____
Notary Public

By:   Carnegie Hotel Manager, LLC, a
Georgia limited liability company,
its  Managing Member

By: _____
R.C. Patel, Manager

My Commission expires:

_08-29-2010_____

[Notary Seal]



CAROLYN R ADAMS
NOTARY PUBLIC
CHEROKEE COUNTY, GEORGIA
MY COMMISSION EXPIRES AUGUST 29, 2010

**LESSEE:**

**CARNEGIE HOTEL MT, LLC**, a
Georgia limited liability company (SEAL)

Signed, sealed and delivered
in the presence of:

_Kevin Conlon_____
Witness

_Carolyn R Adams_____
Notary Public

By:   Carnegie Hotel Manager, LLC, a
Georgia limited liability company,
its Managing Member

By: _____
R.C. Patel, Manager

My Commission expires:

_08-29-2010_____

[Notary Seal]

CAROLYN R ADAMS
NOTARY PUBLIC
CHEROKEE COUNTY, GEORGIA
MY COMMISSION EXPIRES AUGUST 29, 2010

**[ADDITIONAL SIGNATURE PAGE FOLLOWS]**

# 6371309_v5

- 9 -

Deed Book 48218 Pg 651

*(Signature page to Subordination, Non-Disturbance and Attornment Agreement)*

Signed, sealed and delivered
in the presence of:

_Phyllis Mayette_
Witness

_Carolyn R Adams_
Notary Public

My Commission expires:

_08-29-2010_

[Notary Seal]

**LENDER:**

**EMPIRE FINANCIAL SERVICES, INC.**, a
Georgia corporation (SEAL)

By: _Charli Qu_

Its: _President_

**[ADDITIONAL SIGNATURE PAGE FOLLOWS]**

# 6371309_v5                        - 10 -

Deed Book 48218 Pg 652

*(Signature page to Subordination, Non-Disturbance and Attornment Agreement)*

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Notary Public

My Commission expires:

**1-12-2013**

[NOTARY SEAL: CHARLES HALL JR. COMM. # 1830440 NOTARY PUBLIC - CALIFORNIA SAN FRANCISCO COUNTY COMM. EXPIRES JAN. 12, 2013]

**INVESTOR:**

**CHEVRON U.S.A. INC.**, a Pennsylvania
corporation (SEAL)

By: _____
        Alan E. Levine
        Attorney in fact

STATE OF CALIFORNIA                    )
                                                          ) ss.:
COUNTY OF SAN FRANCISCO      )

On July 22, 2009 before me, Charles Hall, Jr. personally appeared Alan E. Levine, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

[NOTARY SEAL: CHARLES HALL JR. COMM. # 1830440 NOTARY PUBLIC - CALIFORNIA SAN FRANCISCO COUNTY COMM. EXPIRES JAN. 12, 2013]

WITNESS my hand and official seal.

_____
Charles Hall, Jr.

PLACE NOTARY SEAL ABOVE

# 6371309_v5                                        - 11 -

## Exhibit A

*A  LEASEHOLD INTEREST or  ESTATE IN REAL PROPERTY DESCRIBED AS:*

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 78 OF THE 14th DISTRICT, CITY OF ATLANTA, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION FORMED BY THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET (R/W VARIES) AND THE WESTERN LINE OF A 10-FOOT ALLEY, AND RUNNING THENCE ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET SOUTH 89 DEGREES 53 MINUTES 17 SECONDS WEST A DISTANCE OF 97.34 FEET TO A PK NAIL FOUND; THENCE ALONG THE MITRE AT THE INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET AND THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES) THE FOLLOWING CALLS AND DISTANCES: SOUTH 45 DEGREES 41 MINUTES 52 SECONDS WEST A DISTANCE OF 7.00 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK; SOUTH 01 DEGREES 57 MINUTES 16 SECONDS WEST A DISTANCE OF 17.62 FEET TO A POINT MARKED BY A DRILL HOLE IN THE CONCRETE SIDEWALK; THENCE ALONG THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY, SOUTH 41 DEGREES 47 MINUTES 44 SECONDS EAST A DISTANCE OF 155.14 FEET TO A POINT AT THE INTERSECTION FORMED BY THE NORTHEASTERLY RIGHT OF WAY LINE OF CARNEGIE WAY (R/W VARIES) AND THE WESTERN LINE OF A 10-FOOT ALLEY; THENCE, LEAVING THE NORTHEASTERLY RIGHT-OF-WAY LINE OF CARNEGIE WAY AND FOLLOWING ALONG THE WESTERN LINE OF SAID 10-FOOT ALLEY NORTH 00 DEGREES 40 MINUTES 57 SECONDS EAST A DISTANCE OF 138.36 FEET TO A POINT MARKED BY A METAL CORNER PLATE ON THE SOUTHERLY RIGHT-OF-WAY LINE OF ELLIS STREET, WHICH IS THE POINT OF BEGINNING; BEING IMPROVED PROPERTY KNOWN AS *THE CARNEGIE BUILDING*, IN ATLANTA, GEORGIA.

*Together with all appurtenant easement rights of said tract in and to the adjacent 10' alley, located to the east of the above described property, including any non-exclusive rights and easements as reserved for the benefit of said land in that certain Grant of Easement from A. G. Rhodes to Asa G. Candler, et. al., dated February 17, 1913, recorded at Deed Book 355, page 304, Fulton County Records.*

# 6371309_v5

Deed Book 48218 Pg 654

## Exhibit B

### *Mortgage Loan Documents*

(a)     Deed to Secure Debt from Carnegie Hotels, LLC, to Empire Financial Services, Inc., dated July 14, 2008, filed July 16, 2008 at 3:13 P.M., recorded at Deed Book 46984, page 582, Fulton County Records; and,

(b)     Assignment of Leases and Rents from Carnegie Hotels, LLC, to Empire Financial Services, Inc., dated July 14, 2008, filed July 16, 2008, recorded at Deed Book 46984, page 603, Fulton County Records; and,

(c)     Assignment of Fees and Income from Carnegie Hotels, LLC, to Empire Financial Services, Inc., dated July 14, 2008, filed July 16, 2008, recorded at Deed Book 46984, page 614, Fulton County Records; and,

(d)     Assignment of Valet & Self Parking Storage Agreements from Carnegie Hotels, LLC, to Empire Financial Services, Inc., dated July 14, 2008, filed July 16, 2008, recorded at Deed Book 46984, page 623, Fulton County Records; and,

(e)     UCC-RE  from Carnegie Hotels, LLC, to Empire Financial Services, Inc., filed July 16, 2008, recorded at Deed Book 46984, page 634, Fulton County Records; and,

(f)     UCC-1 from Carnegie Hotels, LLC, to Empire Financial Services, Inc., filed July 16, 2008, in Fulton County, and recorded as No. 060-2008-07341, Clerks Cooperative Records.

# OPERATING AGREEMENT

# Carnegie Hotel Manager, LLC
## A Georgia Limited Liability Company

## OPERATING AGREEMENT

## ADOPTED July 23, 2009

Exhibit Y

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| Article I | Definitions | 1 |
| Article II | Formation of Company | 6 |
| Article III | Business of Company | 6 |
| Article IV | Names and Addresses of Members | 6 |
| Article V | Rights and Duties of Managers | 7 |
| Article VI | Rights and Obligations of Members | 10 |
| Article VII | Meetings of Members | 10 |
| Article VIII | Indemnification | 11 |
| Article IX | Contributions and Capital Accounts | 12 |
| Article X | Allocations and Distributions | 14 |
| Article XI | Taxes | 15 |
| Article XII | Ownership Restriction and Disposition of Economic Interests | 16 |
| Article XIII | Admission of Assignees and Additional Members | 22 |
| Article XIV | Dissociation, Dissolution and Winding Up | 23 |
| Article XV | Amendment | 25 |
| Article XVI | Miscellaneous Provisions | 25 |

This Operating Agreement of Carnegie Hotel Manager, LLC, a limited liability company organized pursuant to the Georgia Limited Liability Company Act, shall be effective as of the 23 day of July, 2009, by and among the Persons executing this Operating Agreement (as Members).

# ARTICLE I
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings unless otherwise expressly provided herein:

**Section 1.1** "Act" shall mean the Georgia Limited Liability Company Act, as amended from time to time, and any successor thereto.

**Section 1.2** "Additional Capital Contribution" shall mean any Capital Contribution other than an Initial Capital Contribution that a Member is obligated to make in accordance with Section 9.2.

**Section 1.3** "Additional Member" shall mean a Member, other than an Initial Member or a Substitute Member, who has acquired a Membership Interest from the Company and has become a Member in accordance with Section 13.3.

**Section 1.4** "Affiliate" shall mean, with respect to any Member, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Member, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Member, (iii) any Member, Manager, officer, director, general Member, trustee, or a holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Section 1.5** "Articles" shall mean the Articles of Organization of the Company, as amended from time to time.

**Section 1.6** "Assignee" shall mean a transferee of an Economic Interest who has not been admitted as a Substitute Member.

**Section 1.7** "Capital Account" shall mean the account maintained with respect to a Member or Assignee determined in accordance with Article IX.

**Section 1.8** "Capital Contribution" shall mean any contribution to the capital of the Company of cash, property or services or the obligation to contribute cash, property or services made by or on behalf of a Member or Assignee.

**Section 1.9** "Cash Flow" shall mean an amount equal to (a) Net Profits minus Net Losses, (b) plus (i) appreciation and other non-cash charges deducted in determining such Net Profits and Losses, (ii) the net proceeds from any refinancing of the Company's mortgages, and (iii) the net proceeds from the sale of any of the Company's Property, (c) minus (i) principal

1

payments on all mortgages, (ii) any other cash expenditures which have not been deducted in determining the Net Profits and Losses of the Company, and (iii) any amount reasonably required to maintain sufficient working capital and a reasonable reserve for replacement.

**Section 1.10** "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor thereto.

**Section 1.11** "Company" shall mean Carnegie Hotel Manager, LLC, a Georgia limited liability company, and any successor limited liability company.

**Section 1.12** "Company Minimum Gain" shall mean an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain, and increases and decreases in Company Minimum Gain, are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**Section 1.13** "Company Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent that no Member or Related Person bears the economic risk of loss (as defined in Section 1.752.2 of the Regulations) with respect to the liability.

**Section 1.14** "Company Property" shall mean any Property owned by the Company.

**Section 1.15** "Contributing Members" shall mean those Members making contributions as a result of the failure of a Delinquent Member to make the Additional Capital Contribution in accordance with Section 9.2.

**Section 1.16** "Default Interest Rate" shall mean the higher of the applicable federal rate or the then current prime rate quoted by Resurgens Bank plus two (2) percentage points.

**Section 1.17** "Delinquent Member" shall mean a Member who has failed to make the Additional Capital Contribution required of that Member in accordance with Section 9.2.

**Section 1.18** "Disposition" ("Dispose") shall mean any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law) of an Economic Interest in the Company.

**Section 1.19** "Dissociation" or "Dissociate" shall mean any action or event which causes a Person to cease to be Member of the Company as described in Article XIV hereof.

2

**Section 1.20** "Dissolution Event" shall mean an event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

**Section 1.21** "Distribution" shall mean a transfer of Property made by the Company to a Member or an Assignee on account of such Member's or Assignee's Economic Interest as described in Article X.

**Section 1.22** "Economic Interest" shall mean a Member's or Assignee's share of the Company's Net Profits, Net Losses, and Distributions of the Company's Property pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the operation, management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

**Section 1.23** "Effective Date" shall mean the date upon which this Operating Agreement shall become effective under Section 2.2.

**Section 1.24** "Immediate Family" shall mean a Member's spouse, children (including natural, adopted and stepchildren), grandchildren, siblings and parents.

**Section 1.25** "Initial Capital Contribution" shall mean the Capital Contribution agreed to be made by the Initial Members as described in Section 9.1 and set forth on Exhibit A attached hereto.

**Section 1.26** "Initial Members" shall mean those persons identified on Exhibit A attached hereto who have executed this Operating Agreement .

**Section 1.27** "Manager" shall mean a Member or other Person designated by the Members to manage the affairs of the Company under Article V hereof.

**Section 1.28** "Member" shall mean an Initial Member, Substitute Member or Additional Member of the Company as identified in Article IV of this agreement.

**Section 1.29** "Member Minimum Gain" shall mean an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately preceding Taxable Year with the Member Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

3

Section 1.30    "Member Nonrecourse Deductions" shall mean the net increase during the Taxable Year, if any, in Member Minimum Gain, reduced (but not below zero) by any distribution of proceeds that are attributable to a Member Nonrecourse Liability and allocable to an increase in such Member Minimum Gain under Section 1.704-2(i) of the Regulations.

Section 1.31    "Member Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under Section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

Section 1.32    "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right of the Member to participate in the management and operation of the business and affairs of the Company, including, but not limited to, the right to vote on, consent to, or otherwise participate in any decision, vote or action of or by the Members granted pursuant to this Operating Agreement and the Act. In the case of an Assignee, the term "Membership Interest" shall mean only the Assignee's Economic Interest in the Company.

Section 1.33    "Net Losses" shall mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

Section 1.34    "Net Profits" shall mean the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes

Section 1.35    "Notice" shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the Company's Principal Place of Business. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at that Member's address as reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

Section 1.36    "Offsettable Decrease" shall mean any allocation that unexpectedly causes or increases a deficit in a Member's or Assignee's Capital Account as of the end of the Taxable Year to which the allocation relates attributable to depletion allowances under Section 1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under Section 704(e)(2) or 706 of the Code or Section 1.751-1 of the Regulations, or distributions that, as of the end of the Taxable Year, are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's or Assignee's Capital Account that reasonably are expected to occur during or (prior to) the Taxable Years in which such distributions are expected to be made (other than increases pursuant to a minimum gain chargeback pursuant to sections 10.2 and 104 hereof).

4

**Section 1.37** "Operating Agreement " shall mean this Operating Agreement including all amendments hereto adopted in accordance with Section 15.2 and the Act.

**Section 1.38** "Organization" shall mean any entity permitted to be a Member of a limited liability company under the Act. The term "Organization" includes, without limitation, Companies (both non-profit and other Companies), Memberships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but does not include joint tenancies and tenancies by the entirety.

**Section 139** "Organization Expenses" shall mean those expenses incurred in the organization of the Company, including but not limited to, the costs of preparation of this Operating Agreement and the Articles.

**Section 1.39** "Person" shall include an individual, trust, estate, or any Organization.

**Section 1.40** "Principal Place of Business" shall mean the principal office of the Company designated in Section 2.4, or any other place or places as the Manager(s) may from time to time deem advisable.

**Section 1.41** "Property" shall mean any property real, personal or mixed, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**Section 1.42** "Regulations" shall mean the permanent, temporary, proposed, or proposed and temporary regulations issued by the Department of the Treasury that are promulgated under the Code as amended.

**Section 1.43** "Related Person" shall mean a Person having a relationship to a Member that is described in Section 1.752-4(b) of the Regulations.

**Section 1.44** "Substitute Member" shall mean an Assignee who has been admitted as a Member of the Company in accordance with Section 13.2. Upon becoming a Member of the Company, such Assignee shall have all the rights of a Member as are described more fully in Section 13.2 hereof.

**Section 1.45** "Taxable Year" shall mean the taxable year of the Company as determined pursuant to Section 706 of the Code.

**Section 1.46** "Taxing Jurisdiction" shall mean the taxing jurisdiction of the Federal Government and of any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**Section 1.47** The term "transfer", as used herein, includes, but is not limited to, a gift, sale, exchange, hypothecation, assignment, pledge or other encumbrance of Ownership.

5

# ARTICLE II
# FORMATION OF COMPANY

**Section 2.1**     Organization.   On May 28, 2009, the Members organized the Company pursuant to the provisions of the Act by filing the Articles with the Secretary of State.

**Section 2.2**     Effective Date.   This Operating Agreement is effective as of the 23 day of July, 2009.

**Section 2.3**     Registered Agent and Office.   The registered agent for the service of process and the registered office shall be that individual and location reflected in the Articles. The Members holding at least a majority of the Membership Interests of the Company may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State. In the event the registered agent ceases to act as such for any reason or the location of the registered office shall change, the Manager(s) shall promptly designate a replacement registered agent or file a notice of change of address as the case may be. If the Manager(s) shall fail to designate a replacement registered agent or change of address of the registered office within five days after the registered agent ceased to act as such or the location of the registered office changed, as the case may be, any Manager, or Members holding a majority of the Membership Interests, may designate a replacement registered agent or file a notice of change of address.

**Section 2.4**     Principal Place of Business.   The Principal Place of Business of the Company is located at 2100 Parklake Drive, N.E., Suite A., Atlanta, Georgia 30345. The Company may locate its principal place of business at any other place or places as the Managers from time to time deem advisable.

# ARTICLE III
# BUSINESS OF COMPANY

**Section 3.1**     Permitted Businesses.   The business of the Company shall be:

(a)     Hotel acquisition, building, construction, ownership, lease, purchase, development, sale, management, operations, franchising, mortgages, insurance and merchant building services.

(b)     To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

# ARTICLE IV
# NAME AND ADDRESS OF MEMBER

The name and address of the Member is as follows:

R.C. Patel, 2100 Parklake Drive, N.E. - Atlanta Georgia 30345

6

# ARTICLE V
# RIGHTS AND DUTIES OF MANAGERS

**Section 5.1** <u>Management</u>.   The management of the business and affairs of the Company shall be vested in its Managers. Except for situations in which the approval of the Members is expressly required by this Operating Agreement, the Act, or by non-waivable provisions of applicable law, any Manager shall have full and complete authority, power and discretion to manage and control the business affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At anytime when there is more than one Manager, any one Manager may take any action permitted to be taken by a Manager, unless the approval of more than one of the Managers or the Members is expressly required pursuant to this Operating Agreement or the Act.

**Section 5.2** <u>Number, Tenure and Qualifications</u>.   The Company shall have One Manager. The number of Managers of the Company shall be fixed from time to time by the affirmative vote or action of Members holding a majority of the Membership Interests of the Company. The Manager shall hold office until the Manager's successor shall have been elected or designated and qualified. A Manager need not be a resident of the State of Georgia or a Member of the Company. The name and address of the Manager of the Company is as follows:

| NAME | ADDRESS |
|------|---------|
| R.C. Patel | 2100 Parklake Drive, N.E. Atlanta, Georgia 30345] |

**Section 5.3** <u>Certain Powers of Managers</u>.   Subject to the limitations on the power of the Manager contained in Section 5.4 below, any Manager shall have the power and authority, on behalf of the Company:

(a)     To administer the day to day affairs of the Company;

(b)     To do and perform any and all other acts as may be necessary or appropriate to the conduct of the Company's business;

(c)     sell all or substantially all of the Properties of the Company;

(d)     merge or consolidate the Company with or into one or more limited liability companies or other business entities in accordance with Section 6.4 below; and

(e)     Borrow money for the Company or, in connection therewith, encumber or grant security interests in the Company's Property to secure repayments of such borrowed sums. Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

7

**Section 5.4**   Limitation on Powers of Managers.   Notwithstanding anything to the contrary in this Article V, no Manager shall have the power or authority to do any of the following, which shall be reserved to the Members holding the requisite Membership Interests in the Company;

    (a)   Amend the Operating Agreement in accordance with Section 15.1;

    (b)   Admit Assignees as Substitute Members in accordance with Section 13.2;

    (c)   Admit Additional Members in accordance with Section 13.3;

    (d)   Continue the Company after a Dissociation Event in accordance with Section 14.3;

**Section 5.5**   Liability for Certain Acts.   Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Member of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

**Section 5.6**   Managers Have No Exclusive Duty to Company.   No Manager shall be required to manage the Company as such Manager's sole and exclusive function, and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of a Manager or to the income or proceeds derived therefrom.

**Section 5.7**   Property.   Any and all Company Property shall be held in the name of the Company.

**Section 5.8**   Bank Accounts.   The Managers may from time to time open bank accounts in the name of the Company.

**Section 5.9**   Records, Audits and Reports to be maintained.   At the expense of the Company, the Managers shall maintain the records and accounts of all operations and expenditures of the Company. The Company shall maintain the following records at the Principal Place of Business;

    (a)   A current list of the full name and last known business or residence address of each Member;

    (b)   A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed;

8

(c)     Copies of the Company's Federal, foreign, state and local income tax returns and reports, if any, for the three (3) most recent Taxable Years;

(d)     A copy of the Operating Agreement including all amendments thereto;

(e)     Copies of any financial statements of the Company for the three (3) most recent years and all information relating to the capital accounts and capital contributions of each Member.

(f)     Any other records and accounts as the Members shall require the Company to maintain and other reasonable information regarding the affairs of the Company.

**Section 5.10** <u>Access to Records</u>.  The records required to be maintained by the Company in this Article V, and any other books and records of the Company, wherever situated, are subject to inspection and copying at the reasonable request of, and at the expense of, any Member.

**Section 5.11** <u>Reports to Members</u>.  The Manager shall furnish, or cause to be furnished, to each Member annual financial statement within sixty (60) days after the end of each fiscal year of the Company. The Manager shall also provide all Members with those information returns required by the Code and the laws of all applicable local and foreign governments.

**Section 5.12** <u>Accounts</u>.  The Manager shall maintain a record of Capital Accounts for each Member and Assignee in accordance with Article IX.

**Section 5.13** <u>Records of Membership Interests</u>.  The Manager shall maintain a record of the Membership Interest held by each Member, as such Membership Interest shall be increased or decreased from time to time in accordance with this Operating Agreement.

**Section 5.14** <u>Resignation</u>.  Any Manager of the Company may resign at any time by giving ten (10) days prior written notice to the Members of the Company. The resignation of any Manager shall take effect ten (10) days following the receipt of the notice or at such later time as shall be specified in the notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.15** <u>Removal</u>.  At any meeting of the Members, all or any lesser number of the Managers may be removed, with or without cause, by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.

**Section 5.16** <u>Vacancies</u>.  Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company. A Manager elected or designated to fill a vacancy shall be elected or designated for the unexpired term of such Manager's predecessor in office and shall hold office until the expiration of such term and until such Manager's successor shall be elected or designated and shall qualify or until the earlier of the death, resignation or removal of such Manager.

Section 5.17   Salaries.  The salaries and other compensation of the Manager(s) shall be fixed from time to time by an affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company, and no Manager shall be prevented from receiving such salary by reason of the fact that the Manager is also a Member of the Company.

# ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS

Section 6.1   Member Management Rights.   Unless otherwise provided in this Operating Agreement or by non-waivable provisions of the Act, all Members (other than Assignees) who have not dissociated shall be entitled to vote on any matter submitted to a vote of the Members.

Section 6.2   Liability of Members to Third Parties.  Unless otherwise provided by the Act, no Member shall be liable under any judgment, decree, or order of a court, or in any other manner, for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any Member, Manager, agent or employee of the Company.

Section 6.3   Notification of Merger or Consolidation.  The Manager shall notify the Members of any merger or consolidation of the Company with or into one or more limited liability companies or other business entities formed or organized under the laws of the State of Georgia, any other state, the United States or any foreign jurisdiction, with the Company or the other business entity being the surviving entity.

# ARTICLE VII
## MEETINGS OF MEMBERS

Section 7.1   Meetings.  The Members shall meet at least annually, or more often as the Members may agree, for the purpose of reviewing the operations of the Company and its financial status. Such meetings may be in person or by telephone or video conference. A written report of such meetings shall be placed in the permanent record book of the Company. Neither regular nor special meetings of the Members shall be required in order to conduct the business and affairs of the Company or take any action with respect thereto; provided, however, that special meetings of the Members may be called for any purpose or purposes by any Member upon ten (10) days prior written notice to each Member of the Company. If no place for the meeting is designated, the place of meeting shall be the principal office of the Company in the State of Georgia.

Section 7.2   Manner of Acting.  The affirmative vote of Members holding at least a majority of the Membership Interests of the Company shall be the act of the Members, unless the vote or action of a greater or lesser proportion or number of the Members is otherwise required by the Act, by the Articles or by this Operating Agreement.

Section 7.3   Action by Members without a Meeting.  All actions with respect to the Company may be taken without a meeting of the Members; provided, however, that any action required or permitted to be taken at a special meeting of Members may be taken without a special meeting if the action is evidenced by one or more written consents describing the action

10

taken, signed by each Member entitled to vote at a meeting of the Members and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

> **Section 7.4** <u>Waiver of Notice</u>. When any Notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or Notice and at such meeting any lawful action may be taken.

## ARTICLE VIII
## INDEMNIFICATION

> **Section 8.1** <u>Indemnification of Members, Managers, Etc.</u> The Company shall have the right to indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), by reason of the fact that such Person is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such claim, action, suit or proceeding to the greatest extent permitted by the Georgia Limited Liability Company Act, or any other federal or state statute.

> **Section 8.2** <u>Non-Exclusivity of Article</u>. The indemnification authorized in and provided by this Article VIII shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under any statute, rule of law, provision of articles of organization, Operating Agreement, other agreement, vote or action of Members or by the Managers, or otherwise, both as to actions in such Person's official capacity and as to actions in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Manager, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

> **Section 8.3** <u>Insurance</u>. The Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise against any liability asserted against such Person incurred by such Person in any such capacity arising out of such Person's status as such, whether or not the Company is required or permitted to indemnify such Person against such liability under the provisions of this Article VIII or any statute.

11

# ARTICLE IX
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 9.1** <u>Initial Capital Contributions</u>. The Initial Capital Contribution of (and Economic Interest allocated to) each Member is set forth on Exhibit "A" hereto and incorporated by reference herein. No interest shall accrue on any Initial Capital Contribution and no Member shall have the right to withdraw or repaid any Initial Capital Contribution, or to receive any distributions from the Company, except as provided in this Operating Agreement.

**Section 9.2** <u>Additional Capital Contributions</u>. The Members recognize that the income produced by the Company may be insufficient to pay the operating expenses of the Company. In addition to the Initial Capital Contributions of the Members, each Member shall be required to make such Additional Capital Contribution as shall be determined by Managers of the Company from time to time to be reasonably necessary to facilitate the business needs of the Company, including, but not limited to, meeting the Company's operating expenses, funding the expansion of the Company's business, and the purchasing of any property reasonably necessary to the operation of the Company's business; upon making such a determination, the Company shall Notify each Member at fiscal year end with the accounting reports. Additional Capital Contributions shall be made in proportion to the Membership Interest then held by each of the Members.

**Section 9.3** <u>Enforcement of Additional Capital Contributions</u>.

(a) In the event any Member (a "Delinquent Member") fails to make the Additional Capital Contribution required of that Member, the Members shall give the Delinquent Member Notice of such failure to make such Additional Capital Contribution. If the Delinquent Members fails to make such Additional Capital Contribution (plus any costs associated with such failure to tender the Additional Capital Contribution and interest thereon at the Default Interest Rate) within ten (10) days of the giving of Notice, the Members may take such action, including, but not limited to, enforcing the Delinquent Member's obligation to make such Additional Capital Contribution in a court of appropriate jurisdiction in the state in which the Principal Place of Business is located or the state reflected in Delinquent Member's address as set forth in Article IV. Each Member expressly consents to the jurisdiction of such courts but only for the enforcement of the obligation to make Additional Capital Contributions under this Operating Agreement. The Members, or any one or more of the Members, as the Members shall agree, may elect to contribute the amount of the Delinquent Member's Additional Capital Contribution, with those Members who contribute (Contributing Members to contribute additional amounts, in proportion to such Contributing Member's Membership Interest in the Company, not taking into account the Delinquent Member's Membership Interest) or in such other proportions as the Contributing Members shall agree to, to that in the aggregate equal the amount of the Additional Capital Contribution not contributed by the Delinquent member and shall automatically dilute his interest in his membership on a annual basis.

(b) The Contributing Members shall have the option to treat the amounts contributed pursuant to Section 9.3(a) as (i) a loan from the Contributing Members to the Delinquent Members bearing interest at the Default Interest Rate and secured by the Delinquent Member's Economic Interest in the Company or (ii) as an Additional Capital Contribution of such Member.

12

In the event that the Contributing Members elect to treat his contribution as a loan to the Delinquent Member, no adjustments shall be made to such Contributing Members' Capital Accounts, and their respective shares or allocations of Net Profits, Net Losses and Cash Flow shall remain the same; provided, however, that until the Contributing Members are fully repaid, the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled. In the event that the Contributing Members elect to treat his contribution with respect to the Delinquent Member as an Additional Capital Contribution, such Members' Capital Accounts shall be adjusted in accordance with Section 9.4 below.

(c)     Notwithstanding this Section 9.3, no obligation to make an Additional Capital Contribution or any other obligation hereunder may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**Section 9.4**     Maintenance of Capital Accounts.     The Company shall establish and maintain Capital Accounts for each Member and Assignee. Each Member's and Assignee's Capital Account shall be increased by (1) the amount of any money actually contributed by the Member or Assignee to the capital of the Company, (2) the fair market value of any Property contributed, as determined by the Company and the contributing Member or Assignee at arm's length at the time of contribution (net of any liabilities assumed by the Company or subject to which the Company takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Profits and of any separately allocated items of income or gain except adjustments required under Section 704(c) of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee). Each Member's or Assignee's Capital Account shall be decreased by (1) the amount of any money actually distributed to the Member or Assignee by the Company, (2) the fair market value of any Property distributed to the Member or Assignee by the Company (net of liabilities of the Company assumed by the Member or Assignee or subject to which the Member or Assignee takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Losses and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).

**Section 9.5**     Distribution of Property.     If the Company at any time distributes any of its Properties to any Member or Assignee, the Capital Account of each Member or Assignee shall be adjusted to account for that Member's or Assignee's allocable share (as determined under Article X below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the Properties that were distributed at their respective fair market values immediately prior to their distribution.

**Section 9.6**     Sale or Exchange of Interest.     In the event of a sale or exchange of some or all of a Member's or Assignee's Economic Interest in the Company, the Capital Account of the transferring Member or Assignee shall become the Capital Account of the Assignee acquiring such Economic Interest, to the extent it relates to the portion of the Economic Interest transferred.

13

**Section 9.7** <u>Compliance with Section 704(b) of the Code</u>.  The provisions of this Article IX as they relate to the maintenance of Capital Amounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article X to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Articles X and XIV and the Capital Contributions made pursuant to this Article IX. Notwithstanding anything herein to the contrary, this Operating Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution made by that Member.

# ARTICLE X
# ALLOCATIONS AND DISTRIBUTIONS

**Section 10.1** <u>Allocations of Net Profits and Net Losses</u>.  Except as may be required by Section 704(c) of the Code, and Sections 10.2, 10.4, and 10.5 of this Article X, Net Profits, Net Losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to the Membership Interest each Member holds as of the first day of the Taxable Year; provided, however, that if the Membership Interest held by any Member changes during the Taxable Year, or if any Additional Members are admitted during the Taxable Year, the Net Profits and Net Losses for each month of such Taxable Year shall be allocated among the Members in proportion to the Membership Interest each Member holds as of the first day of each such month, and each Member's share of the Net Profits and Net Losses for such Taxable Year shall be equal to the sum of his share of the Profits and Losses for each month during the Taxable Year.

**Section 10.2** <u>Company Minimum Gain Chargeback</u>.  If there is a net decrease in Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year. A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in Company Minimum Gain is caused by the revaluation. A Member is not subject to this Company Minimum Gain chargeback requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability.

**Section 10.3** <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for any Taxable Year shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Liability with respect to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(b)(4) of the Regulations.

14

**Section 10.4**   Member Minimum Gain Chargeback.  If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's share of the net decrease in the Member Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Section 1.704-2(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain and Company Minimum Gain chargeback shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

**Section 10.5**   Qualified Income Offset.  In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain of the Company for the Taxable Year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

**Section 10.6**   Interim Distributions.  The Manager(s) shall determine the Cash Flow of the Company for each fiscal year and not cumulatively, and, as so determined, the Cash Flow shall be distributed to the Members in the same proportion as the Net Profits and Net Losses are allocated between the Members under Section 10.1 above, subject to any adjustments pursuant to Article IX. The Cash Flow shall be distributed at the discretion of the Manager, but at least semi-annually.

**Section 10.7**   Limitations on Distributions.  No Distribution shall be declared and paid unless, after the Distribution is made, the Property of the Company is in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

### ARTICLE XI
### TAXES

**Section 11.1**   Elections.  The Manager may make any tax elections for the Company allowed under the Code or the tax laws of any Taxing Jurisdiction.

**Section 11.2**   Taxes of Taxing Jurisdictions.  To the extent that the laws of any Taxing Jurisdiction so require, each Member requested to do by the Manager will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income. If the Member fails to provide such agreement, the Company may

15

withhold and pay over to such Taxing Jurisdiction the amount of tax penalties and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Member shall be treated as a distribution for purposes of Article X. The Manager may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**Section 11.3** <u>Tax Matters Member</u>. The Members shall designate a Manager, or any Member, to act as the "tax matters Member" of the Company pursuant to Section 6231(a)(7) of the Code. Any Manager or Member so designated shall take such action as may be necessary to cause each Member (other than a Member who acts as the tax matters Member) to become a notice Member within the meaning of Section 6223 of the Code. Any Member who is designated tax matters Member may not take any action contemplated by Section 6222 through 6232 of the Code without the consent of the other Members. The initial "tax matters Member" shall be R.C. Patel.

**Section 11.4** <u>Accrual Method of Accounting</u>. The records of the Company shall be maintained on an accrual method of accounting. It is intended that the Company will elect those accounting methods permitted under applicable law which provide the Company with the greatest tax benefits.

<div align="center">

**ARTICLE XII**
**OWNERSHIP RESTRICTION AND DISPOSITION OF**
**ECONOMIC INTERESTS**

</div>

**Section 12.1** <u>Limitations</u>. An Assignee of an Economic Interest under this Article XII shall have only those rights as described more fully in Section 13.1 hereof and shall have no right to become a Member of the Company or to participate in the management of the business affairs of the Company unless such Assignee is admitted as a Substitute Member in accordance with Section 13.2 of this Operating Agreement.

**Section 12.2** <u>Permitted Transaction</u>. The Economic Interest of any Member shall be transferable without the consent of the other Members if the transferee is a member of one Member's Immediate Family.

**Section 12.3** <u>Consent, Etc</u>. No Member or Assignee may dispose of all or a portion of such Member's or Assignee's Economic Interest, except as permitted by Section 12.2 above, unless:

(a)     prior to the transfer, the Company receives, unless waived by the Member(s) in writing, an opinion of counsel satisfactory to the Member(s) that such Disposition is not subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws and such Disposition, alone or when combined with other transactions, would not result in a termination of the Company within the meaning of Section 708 of the Code;

<div align="center">16</div>

(b)     prior to the Disposition, the Company receives from the transferee the information and agreements that the Member(s) may reasonably require, including, but not limited to any taxpayer identification number and any agreement that may be required by the Taxing Jurisdiction; and

(c)     The transferring Member or Assignee shall either:

(i)     First obtain the written consent of the other Members to such disposition; or

(ii)     Comply with the provisions of Section 12.4 below.

**Section 12.4**  Restriction during Life.  No Member shall transfer any portion or his entire share of Ownership unless the Member desiring to make the transfer (hereinafter referred to as the "Seller") first offers to sell the share of Ownership he wishes to transfer in accordance with subparagraph (a) below, and such offer is not accepted.

(a)     Offer by Seller.  The Seller's offer to sell the share of Ownership shall be in writing and delivered to the Company and to the other Members. In the offer, the Seller shall offer to sell all the share of Ownership owned by the Seller or the portion of the share he wishes to transfer at the lesser of the purchase price offered to Seller in a bona fide offer from a third party or the price specified in section12.6, or if there is no third party offer, at the price set by section 12.6 below, and shall state the intention, if any, of the Seller to transfer his share of ownership and the name and address of such prospective Purchaser, the percentage of share of Ownership involved in the proposed transfer, and the terms under which transfer is to take place.

(b)     Acceptance of Offer.  Within thirty (30) days after receipt of such offer, the Company may, at its option, elect to purchase all or a part of the share of Ownership offered by the Seller. The Company shall exercise its election to purchase by giving written notice thereof to the Seller and to the other Members. If such offer is not accepted by the Company within said thirty (30) day period, the other Members may, within thirty (30) days after the expiration of said initial thirty (30) day period, at their option, purchase all or part of the share of Ownership offered by the Seller. The other Members shall be entitled to purchase in proportion to their ownership. The other Members shall exercise their election to purchase by giving written notice thereof to the Seller and to the Company and to the other Members. The notice of election to purchase by the Company or by the other Members, as the case may be, shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of giving such notice.

(c)     Release from Restrictions.  If neither the Company nor the other Members elect to purchase the Seller's share of Ownership, the Seller may make a bona fide transfer to the prospective purchaser named in the offer, such transfer to be made only in strict accordance with the terms herein stated. However, if the Seller shall fail to make such transfer within thirty (30) days following the expiration of the time hereinabove provided for the election by the other Members of the Company, the share of Ownership shall again become subject to the restrictions of this Agreement as though they had never been so offered.

17

(d)     Termination of Employment.  Any member whose employment in any capacity with the company or its subsidiaries terminates for any reason whatsoever, voluntarily or involuntarily, shall be considered as of the date of such termination of employment to have made an offer of all of his percentage of ownership subject to the terms of this Agreement, at the purchase price stated in section 12.6 below.

**Section 12.5**   Transfer on Bankruptcy, Death or Incompetency.  If a Member of the Company dies, is adjudged by a court of competent jurisdiction to be incompetent to handle the Member's person or property or upon the bankruptcy of a Member, the Member or his personal representative shall notify the Company and other Members. The Company shall have the option to purchase all of such Member's ownership and if the option is exercised, the Member or the trustee of the bankrupt Member or his personal representative shall sell to the Company all the share of ownership at the price determined in accordance with section 12.6 below. If such option is exercised, the Company shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after receipt of notice of the event. If the Company does not exercise its option to purchase, then all the other Members shall have the option to purchase such share, in proportion to their ownership percentage. The other Members shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after the expiration of the initial 30-day period.

**Section 12.6**   Price of Ownership.  The price of the ownership shall be the value which is agreed upon between the selling Member or his trustee or personal representative and the purchasing party, whether it be the Company or the Members. If the parties are unable to agree upon a purchase price, the purchase price shall be determined by an appraiser who regularly conducts business appraisals. If the parties are unable to agree upon one appraiser, each shall select an appraiser and the average of the two appraisals shall be the purchase price. The parties shall divide equally the expenses of the appraiser.

**Section 12.7**   Endorsement on Ownership Statement.   Statements showing exact percentage sold or encumbered hereunder, properly endorsed to the Company or to the purchasing Member, as the case may be, shall be delivered by the transferor not later than the date of closing.

**Section 12.8**   Insurance.   To insure or partially insure its obligation under this Agreement to purchase from the estate of a deceased Member (a "Decedent") the percentage owned by him prior to his death, the Company shall have the option to purchase policies of insurance covering the lives of each Member in any amount deemed desirable. In the event any Member ceases to be a Member of the Company, the Company shall terminate any such insurance on such Member's life and in the event any Member increases his holdings of the percentage of the Company, the Company shall procure and maintain, if so desired by it, additional insurance on the life of such Member proportionate to the increase in the holdings of such Member.

If the Company shall receive any proceeds of any policy on the life of the Decedent, such proceeds shall be used by the Company to pay the Decedent's Personal Representative to the extent of the purchase price of the Decedent's interest, such payment to be deemed made on account of such purchase price.

18

**Section 12.9**  Balance of Purchase Price.  If the amount of any insurance proceeds is insufficient to pay the purchase price of any Decedent's interest, then the balance of the purchase price remaining after credit for any insurance proceeds shall be payable as follows: 50% of the balance due to be paid shall be paid in cash, and the balance shall be represented by a promissory note executed by the purchaser payable in (18) equal monthly installments, which note shall be secured by the Ownership interest of the deceased Member.

**Section 12.10**  Limitation on Member's Right to Pledge Percentage.  The restrictions of section 12.4 above shall not apply to encumbrances as collateral for a note or notes in favor of the company or any one or more of the other Members or in favor of a recognized lending institution, but only if the proceeds of such loan are used in their entirety to purchase a percentage ownership of the Company and the borrowing Member delivers to the Company and the other Member(s) the written commitment of the lender, in form acceptable to the Company that such lender will not dispose of such percentage without first affording the Company and the other Member(s) the right for a period of (30) days to purchase a percentage ownership at a price satisfactory to the Company and the other Member(s).

**Section 12.11**  Company Restrictions After Purchase.  So long as any part of the purchase price of a Member's percentage sold in accordance with this Agreement remains unpaid, the Company shall not:

    A.    declare or pay bonuses to its members;

    B.    reorganize its structure;

    C.    merge or consolidate with any other Company, or sell any of its assets except in the regular course of business;

    D.    increase the salary of any officer or executive employee of the Company;

    E.    allow any of its obligations to become in default; or

    F.    allow any judgments against the Company or any liens against the Company's property to remain unsatisfied.

So long as any part of such purchase price remains unpaid, the Transferor, or the Personal Representative of the Decedent shall have the right to examine the books and records of the Company from time to time and to receive copies of all accounting reports and tax returns prepared for the Company. If the Company breaches any of its obligations under this paragraph, the Transferor or the Personal Representative, in addition to any other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

**Section 12.12**  Purchase By Member.  Whenever a Member purchases a percentage of ownership under this Agreement, such purchaser (unless he shall have paid the entire purchase price in cash) shall, following the delivery of the purchasing documents, execute and deliver at the same to the Seller as collateral security for the payment of the unpaid purchase price a formal payment resolution signed by the buyer, and approved by the other Members of the Company. The Membership Certificate shall be held in trust by the Company until the entire purchase price

shall be paid. While such the Membership Certificate shall be so held as collateral security and so long as the Purchaser is not in default, the Purchaser shall be entitled to all voting rights with respect thereto. Interest earned shall not apply to reduction of the principal owed.

Section 12.13 Purchase By Company. Whenever the Company shall, pursuant to this Agreement, be required to purchase a percentage of the Company, the Members and the Personal Representative of any Decedent shall do all things and execute and deliver all papers as may be necessary to consummate such purchase. Any note required to be given hereunder by the Company as part of the purchase price shall be endorsed and guaranteed by the remaining or surviving Members, who shall not be discharged from such liability by reason of the subsequent extension, modification or renewal of any such note. Until all amounts due are paid, a Uniform Commercial Code Financing Statement (to be recorded) shall be delivered to Seller.

Section 12.14 Value of Purchase Price for Tax Purposes. It is understood that the purchase price, determined as set forth hereinabove, shall be the value of the purchased Ownership interest for all tax purposes. In the event such value is later increased by any federal or state taxing authority, any tax liability resulting from such increase shall be borne by the selling Member or his Personal Representative, as the case may be.

Section 12.15 Indebtedness of a Member. In the event that there is a purchase and sale of a Member's Ownership interest or a percentage thereof, pursuant to the provisions hereinabove, and there is any indebtedness owed by the selling Member or his estate to any party to this Agreement, then, notwithstanding the said provisions relating to the payment of the purchase price, and any amount to be paid for the Ownership interest being purchased shall be applied first to reduce and satisfy any indebtedness owed by the Selling Member or his estate to any party under this Agreement.

Section 12.16 Default. In the event of a default in the payment of any installment of the purchase price, the covenants and conditions of this Agreement, or any Security Agreement given to Sellers, Sellers may declare the entire unpaid portion of the purchase price to be immediately due and payable, and may proceed to enforce payment of same and to exercise any and all rights and remedies provided by the Uniform Commercial Code as well as any other rights and remedies either at law or in equity available to them, and Seller may assign, sell or transfer all or any part of the collateral in such manner, at such price, and on such terms and conditions as Sellers, in their sole and absolute discretion, may determine. Sellers or the Company shall have the right to purchase any or all of the collateral, apply any unpaid indebtedness on account thereof, and have a claim against Purchaser for the balance of such indebtedness in addition to any and all remedies available to them at law or in equity.

Section 12.17 Transfer Upon Dissociation of a Member:

(a) Voluntary Dissociation by an Individual Member. At least thirty (30) days prior to the time that a Member voluntarily Dissociates as a Member with the consent of the other Members in accordance with Section 14.1(a), such Member shall give Notice to the other Members and to the Company of such voluntary Dissociation, and upon expiration of ninety (90) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests in the Company or on

20

such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all the Economic Interest then held by such Member. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.6 above and shall be paid in accordance with the provisions of Section 12.18 (b) below.

(b)    Dissociation other than for Death, Incompetency or Voluntary Dissociation.  In the event a Member shall Dissociate as a Member of the Company for any reason other than by reason of the death or incompetency of such Member or pursuant to Section 12.17 (a) above, then, within thirty (30) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all of such Member's Economic Interest in the Company. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.18 (b) below.

**Section 12.18** Payment Period:

(a)    The aggregate purchase price due the estate, personal representative, conservator, or other legal representative of the deceased or incompetent Member for such deceased or incompetent Member's Economic Interest purchased pursuant to Section 12.5 above shall be paid in the following manner:

(i)    There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such deceased or incompetent Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the deceased or incompetent Member's estate, personal representative, conservator, or other legal representative.

(ii)    The remaining portion of the aggregate purchase price shall be paid in cash at the closing of such sale;

(b)    The aggregate purchase price due to any Dissociated Member under Section 12.6 above shall be paid in the following manner:

(i)    There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the Dissociated Member.

(ii)    There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Dissociation. Such amount is to be determined by the remaining Members of the Company.

(iii)    Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in five (5) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the

21

remaining four (4) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)    The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Dissociated Member, bearing interest at the higher of the then applicable federal rate or the prime rate of Resurgens Bank then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Economic Interest.

(c)    The date of closing with respect to the sale of a Dissociated Member's Economic Interest in the Company pursuant to Sections 12.5 and 12.17 of this Article XII shall, unless a date is agreed to by the Dissociated Member and the remaining Members, be determined by the remaining Member or Members purchasing such Economic Interest and shall take place within sixty (60) days of the death, incompetency or other Dissolution Event which causes the Member to Dissociate from the Company.

# ARTICLE XIII
# ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

**Section 13.1**    Rights of Assignees.  Notwithstanding anything to the contrary contained in this Operating Agreement, the only rights which an Assignee of a Member pursuant to Article XII shall have are those rights associated with the Economic Interest received and such Assignee shall not receive any right to participate in the management of the business and affairs of the Company or to become a Member; provided, however, that in the event an Assignee is an existing Member of the Company, such Assignee shall receive all rights to participate in the management of the business and affairs of the Company incident to the transferred Economic Interest. An Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable to a transferred Economic Interest.

**Section 13.2**    Admission of Substitute Members.  An Assignee of an Economic Interest shall be admitted as a Substitute Member and entitled to all the rights of the Member who initially assigned the Membership Interests only with the unanimous written approval of the Members. The Members may grant or withhold the approval of such admission in their sole and absolute discretion. If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interests. The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interests from any liability to the Company that may have existed prior to the approval.

**Section 13.3**    Admission of Additional Members.  From the date of formation of the Company, any Person acceptable to the Members by their unanimous written approval may become Additional Members of the Company for such consideration as the Members shall determine, subject to the terms and conditions of this Operating Agreement. No Additional

LEGAL_US_E # 84309912.1

Member shall be entitled to any retroactive allocation of income, gain, loss, deduction or credit by the Company. The Members may, at their option, at the time the Additional Member is admitted, close the Company's books (as though the Company's Taxable Year had ended) or make pro rata allocations of income, gain, loss, deduction or credit to the Additional Member for that portion of the Company's Taxable Year in which the Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder. Upon admission of an Additional Member, this Operating Agreement shall be amended in order to reflect such additional Member's Membership Interest in the Company.

## ARTICLE XIV
## DISSOCIATION, DISSOLUTION AND WINDING UP

**Section 14.1**  <u>Dissociation</u>.  A Person shall cease to be a Member upon the happening of any of the following Dissolution Events:

(a)     the withdrawal of a Member with the consent of Members holding at least a majority of the Membership Interests of the Company;

(b)     in the case of a Member who assigns all of his Membership Interest, by the affirmative vote or action of the Members who have not assigned their Membership Interests and who hold at least a majority of the non-assigned Membership Interests of the Company;

(c)     upon the Manager's receipt of Notice with respect to a Member who:

(i)      makes an assignment for the benefit of creditors;

(ii)     files a voluntary petition in bankruptcy;

(iii)    files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(iv)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding in the nature of the proceedings listed in (iii); or

(v)     seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member of all or any substantial part of the Member's properties:

(d)     in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or property;

(e)     in the case of a Member who is a trustee or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

23

(f)     in the case of a Member that is a separate Organization other than a company, the dissolution and commencement or winding up of the separate Organization;

(g)     in the case of a Member that is a company, the filing of articles of dissolution (or its equivalent) for the company or the revocation of its charter and the lapse of ninety (90) days after notice to the company of such revocation without a reinstatement of its charter; or

(h)     in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

**Section 14.2**     Rights of Dissociating Member.  In the event a Member Dissociates from the Company and such Dissociation causes a Dissolution and winding up of the Company under this Article, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by damages sustained by the Company as a result of the Dissolution and winding up.

**Section 14.3**     Term and Dissolution.  The Company shall be dissolved and its affairs wound up prior to such date, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

(a)     the written consent of Members holding a majority of the Membership Interests of the Company;

(b)     the Dissociation of any Member as provided in Section 14.1 of this Article, unless (i) there are at least two remaining Members or at least one remaining Member and an Additional Member or Substitute Member is admitted in accordance with Article XIII hereof and (ii) the legal existence and business of the Company is continued with the unanimous consent of the Members within 90 days after such Dissociation.

(c)     the merger of the Company where the Company is not the successor limited liability company in such merger or the consolidation of the Company with one or more limited liability companies or other entities.

(d)     The issuance of a fatal Certificate of Termination of the Company by the Secretary of State of the State of Georgia.

**Section 14.4**     Distribution of Assets on Dissolution.  Upon the winding up of the Company, Company Property shall be distributed in the following order:

(a)     to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

(b)     to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's Taxable Year or, if later, within 90 days after the date of liquidation. Such distributions shall be in cash or property or partly in both, as determined by the Members.

LEGAL_US_E # 84309912.1

**Section 14.5** <u>Winding Up and Certificate of Termination</u>. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefore has been made, and all of the remaining Property of the Company has been distributed to the Members. Upon the completion of winding up of the Company, a Certificate of Termination shall be delivered to the Secretary of State of the State of Georgia. The Certificate of Termination shall set forth such information as is required by the Act.

**Section 14.6** <u>Effect of Dissolution</u>. Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of, the Company business, but the Company is not terminated, but continues until the winding up of the affairs of the Company is completed and a Certificate of Termination with respect to the Company, or the equivalent, has been issued by the Secretary of State.

<h3 style="text-align:center">ARTICLE XV<br>AMENDMENT</h3>

**Section 15.1** <u>Amendment or Modification of Operating Agreement</u>. This Operating Agreement may be amended or modified from time to time only by a written instrument adopted by all of the Members.

<h3 style="text-align:center">ARTICLE XVI<br>MISCELLANEOUS PROVISIONS</h3>

**Section 16.1** <u>Entire Agreement</u>. This Operating Agreement constitutes the entire agreement among the parties. No party shall be bound by any terms, conditions, statements or representations, oral or written, not herein contained. Each party hereby acknowledges that in executing this Operating Agreement, such party has not been introduced, persuaded or motivated by any promise or representation made by any other party, unless expressly set forth herein. All previous negotiations, statements and preliminary instruments by the parties or their representatives are merged in this Operating Agreement.

**Section 16.2** <u>Investment Representations</u>. The undersigned Members acknowledge (i) that the Membership Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, the Georgia securities laws or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering, (ii) that the Company has relied upon the fact that the Membership Interests are to be held by each Member (or Assignee) for investment, and (3) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member (or Assignee) with a view to distribution.

Accordingly, each Member hereby represents and warrants to the Company that such Member is acquiring the Membership Interest for such own Member's account for investment and not with a view to the resale or distribution thereof. Each Member agrees not to transfer, sell or offer for sale any or portion of such Member's Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and

<div style="text-align:center">25</div>

under any applicable state securities laws or unless the holder of such Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such transfer, offer or sale. Each Member acknowledges that the Company is under no obligation to register such Member's Membership Interest or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Membership Interest. Furthermore, each Member realizes that such Membership Interest is unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "Affiliate" of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three years.

Prior to acquiring a Membership Interest in the Company, each Member has made an investigation of the Company and its business and has had made available to each such Member all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest. Each Member considers himself or itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

**Section 16.3** <u>Rights of Creditors and Third Parties</u>. This Operating Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by the Act or other applicable statute, no such creditor or third party shall have *any* rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**Section 16.4** <u>Interpretation</u>. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions contained herein, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement and the Articles shall be the sole source of agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly incorporates Federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, the Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**Section 16.5** <u>Governing Law</u>. This Operating Agreement, and the application or interpretation hereof, shall be governed by its terms and by the laws of the State of Georgia, and specifically the Act, applied without respect to any conflicts-of-law principles.

LEGAL_US_E # 84309912.1

**Section 16.6**  <u>Execution of Additional Instruments</u>.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**Section 16.7**  <u>Construction of Terms</u>.  Whenever used in this Agreement and when required by the context, the singular number shall include the plural and the plural the singular. Pronouns of one gender shall include all genders.

**Section 16.8**  <u>Captions</u>.  The captions as to contents of particular articles, sections or paragraphs contained in this Operating Agreement and the table of contents hereto are inserted for convenience and are in no way to be construed as part of this Operating Agreement or as a limitation on the scope of the particular articles, sections or paragraphs to which they refer.

**Section 16.9**  <u>Waivers</u>.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any agreement or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 16.10** <u>Rights and Remedies Cumulative</u>.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**Section 16.11** <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Section 16.12** <u>Counterparts</u>.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

Approved this the _23rd_ day of _July_, 2009.

_____
R.C. Patel, Member

27

## EXHIBIT "A"

MEMBERSHIP INTERESTS                INITIAL CAPITAL CONTRIBUTION

R.C. Patel        100%                        $4,000,000.00

Exhibit

28

**FINAL**

## CARNEGIE HOTEL
## CLOSING STATEMENT

| | |
|---|---|
| SELLER: | CARNEGIE HOTEL MANAGER, LLC, a Georgia limited liability company |
| PURCHASER: | SUMMIT HOTEL TRS 099, LLC, a Delaware limited liaiblity company |
| LENDER: | EMPIRE FINANCIAL SERVICES, INC. |
| ESCROW AGENT: | Fidelity National Title Insurance Company |
| CLOSING DATE: | January 12, 2012 |

---

### Seller's Prorations and Credits

| Line# | | | | | |
|---|---|---|---|---|---|
| 1 | **Purchase Price** | | | $ | 28,500,000.00 |
| 2 | | | | | |
| 3 | Assumption of Loan by Purchaser | | | $ | (19,011,021.89) |
| 4 | | | | | |
| 5 | *Empire Payoff and Fees Payable by Seller:* | | | | |
| 6 | Protective Advance | $ | 1,122,082.55 | | |
| 7 | Accrued Interest to Lender | $ | 35,808.43 | | |
| 8 | Loan Modification Fee | $ | 250,000.00 | | |
| 9 | Appraisal Reimbursement to Lender | $ | 7,500.00 | | |
| 10 | ***Total Empire Lender Payoff and Fees Payable by Seller*** | | | $ | (1,415,390.98) |
| 11 | | | | | |
| 12 | *Loan Payoffs:* | | | | |
| 13 | Enterprise General Contractors Payoff | $ | 300,000.00 | | |
| 14 | Chelsea Capital Partners, LLC Payoff | $ | 4,013,850.81 | | |
| | Chevron U.S.A., Inc. Payoff (Principal: $946,570; Acc. | | | | |
| 15 | Int.: $22,481) | $ | 969,051.00 | | |
| 16 | Unpaid Fees and Expenses for Chevron Loan | $ | 135,365.75 | | |
| 17 | Chevron Priority Return | $ | 88,398.00 | | |
| 18 | ***Total Other Loan Payoffs*** | | | $ | (5,506,665.56) |
| 19 | | | | | |
| 20 | *Title Fees and Expenses:* | | | | |
| 21 | Owner's Title Policy Premium | $ | 23,166.00 | | |
| 22 | Leasehold Title Policy Premium | $ | 6,949.80 | | |
| 23 | Title Examination and Expenses | $ | 1,425.00 | | |
| 24 | Estimated Recording Fees | $ | 85.00 | | |
| 25 | Payoff of Vesta Holdings Fi.Fa | $ | 1,537.20 | | |
| 26 | ***Total Title Fees and Expenses*** | | | $ | (33,163.00) |
| 27 | | | | | |
| 28 | *Brokerage Commissions:* | | | | |
| 29 | CB Richard Ellis, Inc. | $ | 427,500.00 | | |
| 30 | ***Total Brokerage Commissions*** | | | $ | (427,500.00) |
| 31 | | | | | |
| 32 | *January 2012 Rent Prorations:* | | | | |
| 33 | Master Lease Rent | $ | - | | |
| 34 | Café Intermezzo Lease Rent | $ | 3,064.52 | | |

Exhibit Z

**FINAL**

| | | | | |
|---|---|---|---|---|
| 35 | Verizon Lease Receivable | $ | 1,178.17 | |
| 36 | **Total January 2012 Rent Prorations Credited to Purchaser** | | | $ (4,242.68) |
| 37 | | | | |
| 38 | *Other Seller Credits and Prorations:* | | | |
| 39 | Purhcaser Reimbursement of Working Capital | $ | (75,000.00) | |
| 40 | Purchaser Reimbursement of Replacement Reserve | $ | (91,012.00) | |
| 41 | Purchaser Reimbursement of Utility Deposits | $ | (15,040.00) | |
| 42 | Deductions Related to Punch List Items | $ | 26,350.00 | |
| 43 | Deductions Related to D&S Glass, Inc. Estimate | $ | 22,500.00 | |
| 44 | **Total other Seller Credits and Prorations** | | | $ 132,202.00 |
| 45 | | | | |
| 46 | *Other Fees, Expenses and Holdbacks:* | | | |
| 47 | Legal Fees to Smith, Gambrell & Russell, LLP | | POC | |
| 48 | **Total Other Fees and Expenses** | | | $            - |
| 49 | | | | |
| 50 | **Total Due to Seller at Closing** | | | **$ 2,234,217.89** |

---

### Purchaser's Prorations and Credits

| | | | | |
|---|---|---|---|---|
| 51 | **Purchase Price** | | | $ 28,500,000.00 |
| 52 | | | | |
| 53 | Assumption of Loan by Purchaser | | | $ (19,011,021.89) |
| 54 | | | | |
| 55 | Deposit Held by Escrow Agent | | | $ (250,000.00) |
| 56 | | | | |
| 57 | *Purchaser's Fees and Expenses:* | | | |
| 58 | CT Corporation Invoice | $ | 2,848.60 | |
| 59 | Intangible Tax on Empire Security Deed | $ | 25,000.00 | |
| 60 | Premium for Title Insurance Endorsements | $ | 3,864.00 | |
| 61 | Interest Payable on Empire Loan (1/12/12 - 1/31/12) | $ | 65,627.09 | |
| 62 | Legal Fees to Reynolds, Reynolds & Little related to Empire Loan | $ | 6,136.00 | |
| 63 | Commissions to Woodley Investments, LLC | $ | 285,000.00 | |
| 64 | Legal Fees to Hunton & Williams, LLP | | POC | |
| 65 | **Total Purchaser's Fees and Expenses** | | | $ 388,475.69 |
| 66 | | | | |
| 67 | *January 2012 Rent Prorations:* | | | |
| 68 | Master Lease Rent | $ | - | |
| 69 | Café Intermezzo Lease Rent | $ | (3,064.52) | |
| 70 | Verizon Lease Receivable | $ | (1,178.17) | |
| 71 | **Total January 2012 Rent Prorations Credited to Purchaser** | | | $ (4,242.68) |
| 72 | | | | |
| 73 | *Purchaser's Other Prorations and Credits:* | | | |
| 74 | Reimbursement of Working Capital | $ | 75,000.00 | |
| 75 | Reimbursement of Replacement Reserve | $ | 91,012.00 | |
| 76 | Reimbursement of Utility Deposits | $ | 15,040.00 | |
| 77 | Credit for Punchlist Items | $ | (26,350.00) | |
| 78 | Credit for D&S Glass, Inc. Estimate | $ | (22,500.00) | |
| 79 | **Total Purchaser's Other Prorations and Credits** | | | $ 132,202.00 |
| 80 | | | | |

FINAL

| | | | |
|---|---|---|---|
| 81 | **Total Due from Purchaser at Closing** | $ | **9,755,413.12** |
| 82 | | | |
| 83 | Plus Purchaser's Deposit | $ | 250,000.00 |
| 84 | | | |
| 85 | **Total Amount Received by Escrow Agent** | $ | **10,005,413.12** |

## NOTES TO CARNEGIE HOTEL CLOSING STATEMENT

1. The parties agree to cooperate in correcting any post-closing adjustments involving mathematical or other errors on this Closing Statement.

2. Seller hereby acknowledges that the recording fees as shown on this Closing Statement (Line 24) constitute estimates only. In the event of any overpayment of such amounts, Escrow Agent shall promptly refund any excess balance to Seller; however, in the event of an underpayment of said amounts, Seller shall promptly upon request of Escrow Agent remit any additional amounts which may be necessary to fully reimburse Escrow Agent for the foregoing expenditures actually incurred by Escrow Agent.

3. Seller and Purchaser hereby agree that any adjustments for income (or loss) related to the Property shall be performed as a post-closing adjustment between the parties. In addition, to the extent that any amounts on this Closing Statement are estimates, adjustments as between Seller and Purchaser shall be made post-closing. All such post-closing adjustment shall occur within thirty (30) days after such information becomes available, and in any event no later than March 1, 2012.

4. Seller hereby directs Escrow Agent to disburse the Total Due to Seller (Line 50) directly to Smith, Gambrell & Russell, LLP in accordance with the wire transfer instructions attached hereto.

5. The parties hereby acknowledge and agree that the transaction closed under this Closing Statement is the same transaction contemplated by that certain Amended and Restated Purchase and Sale Agreement by and between Carnegie Hotel Manager, as seller, and Summit Hotel OP, LP, predecessor-in-interest to Summit Hotel TRS 099, LLC, as purchaser, dated November 7, 2011, as amended by that certain First Amendment to Amended and Restated Purchase and Sale Agreement dated December 7, 2012 (the "Agreement).

6. The undersigned parties hereby acknowledge that they have each examined and approved the figures contained in this Closing Statement. Each such party further acknowledges receipt of a fully executed counterpart of this Closing Statement and authorizes the making of disbursements listed herein by the Escrow Agent.

**Counterpart signature page to Closing Statement**

SELLER:

CARNEGIE HOTEL MANAGER, LLC

By:_____
Name: R.C. Patel
Title:  Manager

**Counterpart signature page to Closing Statement**

PURCHASER:

SUMMIT HOTEL TRS 099, LLC

By: Summit Hotel TRS, Inc., its sole member

By: _____
Name:   Christopher Eng
Title:  Secretary

**Counterpart signature page to Closing Statement**

DISBURSEMENT AGENT:

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By:

Name:

Title:

**RECONCILIATION**

| | | |
|---|---:|---:|
| Total Received from Purchaser | $ 9,755,413.12 | |
| Total Deposit held by Escrow Agent | $   250,000.00 | |
| **Total Funds Available for Disbursement** | | $ 10,005,413.12 |

Payable to Empire Financial Services
| | | |
|---|---:|---:|
| Protective Advance | $ 1,122,082.55 | |
| Accrued Interest to Lender | $      35,808.43 | |
| Interest Payable on Empire Loan (1/12/12 - 1/31/1 | $      65,627.09 | |
| Loan Modification Fee | $    250,000.00 | |
| Appraisal Reimbursement to Lender | $        7,500.00 | |
| | | $  1,481,018.07 |

Payable to Chevron U.S.A.
| | | |
|---|---:|---:|
| Chevron U.S.A., Inc. Payoff (Principal: $946,570; / | $    969,051.00 | |
| Unpaid Fees and Expenses for Chevron Loan | $    135,365.75 | |
| Chevron Priority Return | $      88,398.00 | |
| | | $  1,192,814.75 |

Payable to Escrow Agent
| | | |
|---|---:|---:|
| Owner's Title Policy Premium | $      23,166.00 | |
| Leasehold Title Policy Premium | $        6,949.80 | |
| Premium for Title Insurance Endorsements | $        3,864.00 | |
| Title Examination and Expenses | $        1,425.00 | |
| Estimated Recording Fees | $             85.00 | |
| Intangible Tax on Empire Security Deed | $      25,000.00 | |
| Payoff of Vesta Holdings Fi.Fa | $        1,537.20 | |
| | | $       62,027.00 |

Payable to Chelsea Capital Partners
| | | |
|---|---:|---:|
| Chelsea Capital Partners, LLC Payoff | $ 4,013,850.81 | $  4,013,850.81 |

Payable to Enterprise General Contractors
| | | |
|---|---:|---:|
| Enterprise General Contractors Payoff | $    300,000.00 | $     300,000.00 |

Other Seller Fees and Expenses
| | | |
|---|---:|---:|
| Legal Fees to Smith, Gambrell & Russell, LLP | POC | |
| | | $                  - |

Purchaser Fees and Expenses
| | | |
|---|---:|---:|
| CT Corporation Invoice | $        2,848.60 | |
| Legal Fees to Reynolds, Reynolds & Little related | $        6,136.00 | |
| Legal Fees to Hunton & Williams, LLP | POC | |
| | | $         8,984.60 |

Payable to Brokers
| | | |
|---|---:|---:|
| CB Richard Ellis, Inc. | $    427,500.00 | |
| Commissions to Woodley Investments, LLC | $    285,000.00 | |
| | | $     712,500.00 |

| | | |
|---|---|---:|
| **Total Disbursements** | | $  7,771,195.23 |

Total Available for Distribution to Seller      $   2,234,217.89

**Total Due to Seller at Closing**      **$   2,234,217.89**

difference      $       -
*(should be none)*