**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| RAJESH C. PATEL, | § | Case No. 16-65074-lrc |
| | § | |
| _____Debtor._____ | § | |
| | § | |
| ASVIN PATEL, | § | |
| | § | |
| Movant, | § | |
| v. | § | CONTESTED MATTER |
| | § | |
| RAJESH C. PATEL, | § | |
| | § | |
| _____Respondent._____ | § | |

## <u>NOTICE OF HEARING</u>

**PLEASE TAKE NOTICE** that Asvin Patel has filed a *Motion For Relief from the Automatic Stay and Related Relief* (the "**Motion**"). The Motion is on file with the Clerk of the Court at the address set forth below and is available for review between 8:00 a.m. and 4:00 p.m. or online anytime at http://ecf.ganb.uscourts.gov (registered users) or at http://pacer.psc.uscourts.gov (unregistered users) or a copy may be obtained from counsel identified below.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold a hearing (the "**Hearing**") to consider the Motion at **10:00 a.m.** on **January 5, 2022,** in **Courtroom 1204,** U.S. Courthouse, Richard B. Russell Federal Building, **75 Ted Turner Drive, S.W. Atlanta, Georgia 30303.** Given the current public health crisis, hearings may be telephonic only. Please check the "Important Information Regarding Court Operations During COVID-19

Outbreak" tab at the top of the GANB Website prior to the hearing for instructions on whether to appear in person or by phone.

Your rights may be affected by the Court's ruling on the Motion. You should read the Motion carefully and discuss it with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in the Motion, or if you want the Court to consider your views, then you and/or your attorney should attend the Hearing. You may also file a written response to the Motion with the Clerk at the address stated below, but you are not required to do so. The address of the Clerk's Office is: Clerk, U.S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive Street, SW, Atlanta, Georgia 30303. You should also mail a copy of your response to the undersigned at the addresses stated below.

Dated:  December 13, 2021.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

*Counsel for Asvin Patel*

2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| RAJESH C. PATEL, | § | Case No. 16-65074-lrc |
| | § | |
| _____Debtor._____ | § | |
| | § | |
| ASVIN PATEL, | § | |
| | § | |
| Movant, | § | |
| v. | § | CONTESTED MATTER |
| | § | |
| RAJESH C. PATEL, | § | |
| | § | |
| _____Respondent._____ | § | |

**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
**AND RELATED RELIEF**

**COMES NOW** Asvin Patel ("**Asvin**" or "**Movant**"), by and through counsel, and respectfully files this *Motion for Relief from Automatic Stay and Related Relief* (the "**Motion**") for confirmation that the stay does not apply to the Accounting Proceeding (as defined herein) or, in the alternative, relief from the automatic stay to pursue certain litigation now pending in the Superior Court of Dekalb County, Georgia, captioned Asvin Patel and Ashok Ranchod ("**Ashok**") v. Diplomat NBD Hotels, L.L.C. ("**Diplomat**"), Rejesh C. Patel, and Mukesh Patel ("**Mukesh**" and bearing Case No. 19CV7280 (the "**Accounting Proceeding**"). In support thereof, Movant respectfully shows as follows:

**JURISDICTION AND VENUE**

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157. Venue of this proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The predicates for the relief requested herein are Sections 105 and 362 of the United States Bankruptcy Code (the "**Bankruptcy Code**") and Bankruptcy Rules 4001 and 9014.

3.       The above captioned bankruptcy case (the "**Bankruptcy Case**") case was initiated by Rajesh C. Patel, Debtor (the "**Debtor**" or "**Rajesh**") in the Bankruptcy Case, filing a petition on August 30, 2016, under Chapter 7 of Title 11 of the Bankruptcy Code (the "**Petition Date**").

## RESERVATION OF RIGHTS

4.       Asvin files this Motion and seeks relief from this Court with a full reservation of rights, including, but not limited to, the right to amend, supplement, or modify this Motion.  Asvin appears in this Court out of an abundance of caution and makes a limited appearance for the purpose of clarifying that the automatic stay does not apply to the Accounting Proceeding for an accounting related to Diplomat and/or or that any stay should be lifted to allow the Accounting Proceeding to continue. Asvin does not consent to the jurisdiction of this Court to hear or resolve any matter other than the instant motion and expressly reserves any and all jurisdictional objections to any claim which may be made against Asvin herein and specifically reserves his rights to have claims heard by a jury.

## RELIEF SOUGHT

5.       Asvin asserts that the stay does not apply to the Accounting Proceeding for an accounting related to Diplomat. Out of an abundance of caution, Asvin seeks relief from the automatic stay to continue the Accounting Proceeding and further requests that the 10-day stay of

an Order granting this Motion pursuant to Bankruptcy Rule 4001(a)(3), if applicable, be waived

to allow such Order to be deemed effective immediately on the date of entry.

## FACTUAL BACKGROUND

6.    Asvin and Ashok did not receive timely notice of the Bankruptcy Case and neither

was listed as a creditor in the Bankruptcy Case.

7.    Asvin and Ashok were investors in and members of Diplomat and Rajesh Patel and

Mukesh Patel were the Managing Members of Diplomat and, as such, owed fiduciary duties to

Diplomat as well as Asvin and Ashok as investors and members of Diplomat. For purposes of

clarification, the assets of Diplomat were sold in 2012 to 218 Capital Partners, which is managed

by the sons of the managers of Diplomat incident to a transaction in which the membership

interests of Asvin and Ashok in Diplomat were rolled into 218 Capital Partners.

8.    As the Managing Members of Diplomat, Rajesh and Mukesh were required to

provide reasonable access to the records of Diplomat. More specifically, the Operating Agreement

of Diplomat NBD Hotels contains provisions that impose a requirement upon the Rajesh and

Mukesh, as its managers, to maintain Diplomat's books and records and other financial documents

and information and to make such materials available to the members of Diplomat (including

Asvin and Ashok) upon request.

9.    On numerous occasions after the Petition Date, Asvin and Ashok requested to

review the books and records of Diplomat. Rajesh and Mukesh failed and refused to permit such

inspection. More specifically, on June 20, 2019, Asvin and Ashok made, through counsel, a written

request that Rajesh and Mukesh provide true and complete information regarding the state of the

3

business and financial condition of Diplomat. As of the date of this Motion, Rajesh and Mukesh have failed and refused to permit the requested inspection of the records of Diplomat.

10.     The conduct of the Debtor after the Petition Date in failing to comply with his fiduciary duties to provide information related to Diplomat has damaged and continues to cause damage to the Movant.

11.     As a result of the failure of Rajesh and Mukesh to cause Diplomat to produce the requested information, Asvin and Ashok commenced the Accounting Proceeding on July 12, 2019, to obtain the production of information related to Diplomat. A true and correct copy of the complaint in the Accounting Proceeding is attached as **Exhibit A**. Neither Asvin nor Ashok were aware of the Bankruptcy Case as of the commencement of the Accounting Proceeding.   A copy of the Operating Agreement referenced in Paragraph 8 is attached to the Complaint as Exhibit A and the correspondence referenced in Paragraph 9 above is attached to the Complaint as Exhibit B.

12.     The Debtor did not file a suggestion of bankruptcy in the Accounting Proceeding or file any pleading asserting that the Accounting Proceeding should be stayed as to Rajesh. Instead, Rajesh and Mukesh strenuously opposed the relief sought in the Accounting Proceeding. After approximately two years of contentious litigation, it was clear that Aswin and Ashok would prevail in the Accounting Proceeding.

13.     As an apparent last resort to avoid fiduciary duties requiring the production of information related to Diplomat, the Debtor asserted for the first time in October, 2021, that the stay precluded the continuance of the Accounting Proceeding as to the Debtor.

4

14.     At this juncture, as a result of the failure of Rajesh and Mukesh to produce the requested information related to Diplomat, Movant does not have sufficient information to determine the damage caused to its interest in Diplomat or whether its interest in Diplomat is continuing to be damaged.

## ARGUMENT AND CITATION TO AUTHORITY

### A. The Accounting Proceeding is Not a Proceeding Protected by the Automatic Stay.

15.     The Accounting Proceeding, at its core, is a proceeding for an accounting by a non-debtor, Diplomat. To the extent that the Debtor is included in the Accounting Proceeding, it is in the capacity of the Debtor as a managing member of Diplomat with fiduciary duties to produce information on behalf of Diplomat.

16.     11 U.S.C.A. § 362 (a)(1) provides that the stay prohibits "commencement or continuation . . . of a . . . proceeding against the debtor that was or could have been commenced before the commencement of the case . . ., or to recover a claim against the debtor that arose before the commencement of the case . . . ." "The purpose of the automatic stay provisions of the Bankruptcy Code is to facilitate the orderly resolution of claims against the estate by protecting the debtor from piecemeal dismemberment." *SkyTop Enters., LLC v. Citrus Tower Blvd. Imaging Ctr., LLC (In re Citrus Tower Blvd. Imaging Ctr., LLC),* 460 B.R. 334, 339 (Bankr. N. D. Ga. 2011) (citation omitted)(noting that, given such "purpose, courts have noted that Congress envisioned circumstances 'where it would be more appropriate to permit proceedings to continue in their original place of origin when no great prejudice to the bankruptcy estate will result'"). Notably, such purpose would not be served under the current circumstances since the Accounting Proceeding does not involve a proceeding that could have

5

been commenced before the Petition Date or seek the resolution of a claim arising prior to the Petition Date. Instead, Accounting Proceeding seeks the production of information related to a non-debtor, Diplomat, incident to requests that arose after the Petition Date.

17.     To be clear, the Accounting Proceeding is not a proceeding that was or could have been commenced before the Petition Date as it is based on a failure to comply with a request that was made after the Petition Date for information related to a non-debtor, Diplomat. Further, the Accounting Proceeding is not an action to recover a claim against the Debtor that arose before the Petition Date as the Accounting Proceeding seeks information related to a non-debtor and the production of information in accordance with fiduciary duties after the Petition Date and only seeks damages to the extent of any failure to perform after the Petition Date.

18.     Under the circumstances, the Accounting Proceeding is not a proceeding that should be subject to any stay.

**B.     Cause Exists To Grant Relief From Stay Under 11 U.S.C. § 362(d)(1)**

19.      If this Court concludes that the Accounting Proceeding could be subject to the stay as to the Debtor, sufficient and adequate grounds exist to grant relief from the automatic stay for cause.

20.     Pursuant to U.S.C. § 362(d)(1), a bankruptcy court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." The Bankruptcy Code does not define what constitutes "cause," and thus what "constitutes 'cause' is based on the totality of the circumstances in the particular case." *In re Robertson*, 244 B.R. 880, 882 (Bankr. N.D. Ga. 2000) (citation omitted)(holding that cause existed to lift stay to permit injured party to proceed with state court action for the purpose of determining

the liability of the debtor). Furthermore, actions that "are only remotely related to the case under Title 11 or which involve rights of third parties often will be permitted to proceed in another forum." 2 Collier on Bankruptcy § 362.07[3].

21.     In determining whether to lift the stay to permit litigation to proceed, courts have adopted a three-prong test that considers whether: a) the bankruptcy estate or the debtor would incur any great prejudice from the prosecution of the litigation; b) the hardship to the non-debtor party by maintenance of the stay considerably outweighs the hardship to the debtor of permitting the pending litigation to go proceed; and c) the non-debtor party has a likelihood of prevailing on the merits. *See In re Robertson*, 244 B.R. 880, 882 (Bankr. N.D. Ga. 2000)(citation omitted)(noting that cause "for lifting the automatic stay 'might include the lack of any connection with or interference with the pending bankruptcy case'"). "'Even a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case.'" *Tribune Media Servs. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 129 (Bankr. D. Del. 2009)(citation omitted).

22.     Here, each of the factors weigh in favor of granting relief from any applicable stay. As an initial matter, there is a lack of connection with or interference with the Bankruptcy Case that was filed in 2016. Indeed, the Accounting Proceeding is barely even remotely related to the Bankruptcy Case as the only connection with the Bankruptcy Case is the failure of the Debtor— after the Petition Date—to perform his fiduciary duty to provide information related to a non-debtor, Diplomat. More specifically, the Accounting Proceeding involves rights of third parties and relates to the production of information related to a non-debtor, Diplomat, after the Petition Date and, as such, does not even relate to the pre-petition claims process in the Bankruptcy.

7

23.     Notably, cause exists to grant relief from stay since Asvin and Ashok are due an accounting from Diplomat, or Rajesh and Mukesh on behalf of Diplomat, as a result of obligations and owe fiduciary duties that require the production of information related to Diplomat. In the first instance, allowing the Accounting Proceeding to continue will not result in great prejudice the estate of the Debtor as it would only require a non-debtor, Diplomat, or Rajesh and Mukesh on behalf of Diplomat, to comply with duties to provide information related to a non-debtor, Diplomat. At this late stage in the Bankruptcy Case, it is unclear how the Debtor would be prejudiced at all. On the other hand, Movant has already suffered significant harm as a result of the failure of Diplomat, or Rajesh and Mukesh on behalf of Diplomat, to produce the requested information related to Diplomat and will be further prejudiced by further delay. Indeed, the hardship to the Movant by maintenance of the stay considerably outweighs any hardship to the Debtor of permitting the Accounting Proceeding to proceed. Furthermore, the rights and responsibilities of the non-debtor defendants in the Accounting Proceeding case can be adjudicated therein, but would not be addressed in the Bankruptcy Case and, as such, continued pursuit of the Accounting Proceeding also avoids Movant having to pursue duplicative litigation in multiple courts to cause the production of information related to a non-debtor, Diplomat. Given that Movant has a high likelihood of prevailing on the merits of the Accounting Proceeding, relevant factors weigh in favor of relief from the stay and, as such, the Motion should be granted.

24.     Movant further notes that the advanced nature of the Accounting Proceeding, judicial economy, and involvement of non-debtor third parties in the Accounting Proceeding are critical elements that weigh in favor of granting relief from stay. The Accounting Proceeding is the best option to provide an efficient and complete consideration of all the issues and parties in a

8

process that guarantees the constitutional rights of due process and a trial by jury. Notably, the Debtor has not indicated that there are any preliminary bankruptcy issues that should be determined before the Accounting Proceeding is litigated to a conclusion and Movant is not aware of any. Not only will neither the Debtor nor the bankruptcy estate be prejudiced if Movant is allowed to proceed with Accounting Proceeding, but the Debtor and the estate will not incur a greater financial burden and may actually incur less costs by litigating the Accounting Proceeding rather than resolving the accounting issue related to a non-debtor entity in the Bankruptcy Court. The claims in the Accounting Proceeding involve issues related to an accounting from Diplomat arising under Georgia state law. Since the state court judge in the Accounting Proceeding is more familiar with the laws in Georgia, the applicability of the specialized expertise of a non-bankruptcy forum favors this Court granting relief from any stay. The hardships that will result if relief from the stay is denied are apparent. If relief from the stay is not granted, Movant would be forced to try the Accounting Proceeding twice, once against the Debtor in the Bankruptcy Court at a time when the Bankruptcy Case has been substantially administered and a second time in the state court against the non-debtor defendants. Notwithstanding the potential impact from any damage caused by further delay of the production of information related to Diplomat, a denial of relief from the stay would deny Movant his constitutional right to a trial by jury.

25.    Moreover, relief under 362(d)(1) is appropriate since the interests of Asvin and Ashok in Diplomat are not adequately protected as a result of the failure of Diplomat, or Rajesh and Mukesh on behalf of Diplomat, to provide an adequate accounting. The lack of adequate protection justifies relief from stay under 362(d)(1).

26.     The totality of circumstances and equities support the determination that any applicable stay should be modified to allow the Accounting Proceeding to continue. Indeed, an evaluation of the Accounting Proceeding and a balancing of the hardships weighs in favor of granting the Motion to provide relief from the stay and, as such, Movant contends that cause exists to grant relief from any stay under 362(d)(1). Accordingly, to the extent applicable, Movant respectfully requests that this Court lift any stay as to the Debtor and allow the Accounting Proceeding to proceed.

27.     Furthermore, good cause exists for this Court to find that the Order granting this Motion should not be stayed by Rule 4001(a)(3) of the Bankruptcy Code, if applicable.

D.     **Movant is Entitled to Adequate Protection**.

28.     To the extent that this Court is not inclined to lift the automatic stay, Movant requests adequate protection of interests of the Movant in Diplomat. At a minimum, the Debtor should be required to provide the information related to Diplomat as requested by Asvin and Ashok to allow for the protection of their interests in Diplomat.

**WHEREFORE**, Movant prays that the Court enter an Order that:

1.     Grants this Motion;

2.     Shall not be subject to the 10-day stay provided for by Bankruptcy Rule 4001(a)(3) such that the Order shall be deemed effective immediately on the date of the Order;

3.     Confirms that the stay is not applicable to the Accounting Proceeding or, in the alternative, grants Movant relief from the automatic stay to allow the Movant to continue the Accounting Proceeding and exercise any and all rights and remedies under state and applicable law with regard to Diplomat;

10

4.      To the extent that this Court does not grant relief from the Automatic Stay, that this

Court grant Movant adequate protection with respect to the interests of Movant in Diplomat; and

5.      Grants Movant such other and further relief as the Court deems just and proper.

Dated:  December 13, 2021.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

*Counsel for Asvin Patel*

11

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| RAJESH C. PATEL, | § | Case No. 16-65074-lrc |
| | § | |
| Debtor. | § | |
| | § | |
| ASVIN PATEL, | § | |
| | § | |
| Movant, | § | |
| v. | § | CONTESTED MATTER |
| | § | |
| RAJESH C. PATEL, | § | |
| | § | |
| Respondent. | § | |

The undersigned hereby certifies that a true and correct copy of the *Motion For Relief from the Automatic Stay and Related Relief* was served via the Court's ECF system to all parties registered with the system who have filed appearances and requested notices and by mailing a copy of the same via first class mail with adequate postage affixed thereon to ensure proper delivery as indicated below:

Frank B. Wilensky, Esq.
5500 Interstate North Parkway
Suite 435
Atlanta, Georgia 30328
Counsel for the Debtor

Neil C. Gordon, Trustee
Arnall Golden Gregory LLP
171 17th Street, Suite 2100
Atlanta, Georgia 30363
Chapter 7 Trustee

Rajesh Patel, Debtor
2253 Gradyridge Trail
Duluth, Georgia 30097

    Dated: December 13, 2021.

        Respectfully submitted,

        LAW OFFICES OF HENRY F. SEWELL JR., LLC

        ***/s/ Henry F. Sewell, Jr.***
        Henry F. Sewell, Jr.
        Georgia Bar No. 636265
        2964 Peachtree Road NW, Suite 555
        Atlanta, GA 30305
        (404) 926-0053
        hsewell@sewellfirm.com

        *Counsel for Asvin Patel*

2

# EXHIBIT A

FILED 7/12/2019 4:47 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

ASVIN PATEL and ASHOK
RANCHOD,

    Plaintiffs,

v.

DIPLOMAT NBD HOTELS, L.L.C.,
RAJESH C. PATEL, and MUKESH
PATEL,

    Defendants.

Civil Action File
No. ___19CV7280___

### COMPLAINT FOR ACCESS TO AND INSPECTION
### OF BOOKS AND RECORDS PURSUANT TO
### <u>O.C.G.A. § 14-11-313(3), AND FOR ACCOUNTING</u>

Plaintiffs Asvin Patel and Ashok Ranchod, by and through their undersigned counsel, bring this Complaint for Access to and Inspection of Books and Records Pursuant to O.C.G.A. § 14-11-313(3) and for Accounting against Defendants Diplomat NBD Hotels, L.L.C., Rajesh C. Patel, and Mukesh Patel, and state as follows:

### Nature of the Action

1.

Plaintiffs Asvin Patel and Ashok Ranchod were initial investors in and members of Defendant Diplomat NBD Hotels at the formation of the entity in 1999. In 2012, Diplomat NBD Hotels sold all of its assets to Defendant 218

Capital Partners (managed by sons of Diplomat NBD Hotels' managers), and

Plaintiffs' membership in Diplomat NBD Hotels rolled over into 218 Capital

Partners. Through this lawsuit, Plaintiffs seek to obtain access to the books and

records, and other financial information, of Diplomat NBD Hotels that Plaintiffs

were members of. To date, Plaintiffs have made repeated requests for access to the

books and records of Diplomat NBD Hotels. Despite these repeated requests,

Defendants have failed and refused to allow Plaintiffs full access to the books and

records to which Plaintiffs are lawfully entitled. Accordingly, Plaintiffs seek the

entry of an Order permitting Plaintiffs to inspect the books and records of these

companies, and to subsequently perform an accounting of those books and records.

In addition to the causes of action set forth in this Complaint, Plaintiffs believe that

other viable causes of action against Defendants will be discovered through the

inspection and production of the companies' books and records. As such, Plaintiffs

expressly reserve the right to amend this Complaint based upon the information

discovered through the inspection and accounting sought herein.

## The Parties

### 2.

Plaintiff Asvin Patel is a citizen and resident of the State of New Jersey.

### 3.

Plaintiff Ashok Ranchod is a citizen and resident of the State of Texas.

4.

Defendant Diplomat NBD Hotels, L.L.C. is a limited liability company organized under the laws of the State of Georgia with its principal office located at 2100 Parklake Drive, N.E., Suite A, Atlanta, Georgia 30345-2824. Diplomat NBD Hotels can be served with this lawsuit through its registered agent, R.C. Patel, at 2100 Parklake Drive, N.E., Atlanta, Georgia 30345.

5.

Upon information and belief, Defendant Rajesh C. Patel resides at 2253 Grady Ridge Trail, Duluth, Georgia 30097, where he may be lawfully served with process, and is subject to the jurisdiction of this Court.

6.

Upon information and belief, Defendant Mukesh Patel resides at 2860 Cravey Drive, N.E., Atlanta, Georgia 30345, where he may be lawfully served with process, and is subject to the jurisdiction of this Court.

7.

Defendants Rajesh Patel and Mukesh Patel are the Managing Members of Defendant Diplomat NBD Hotels, and owe fiduciary duties to Diplomat NBD Hotels and to Plaintiffs, as investors and members of Diplomat NBD Hotels, pursuant to O.C.G.A. § 14-11-305.

8.

As the Managing Members of Diplomat NBD Hotels, Defendants Rajesh Patel and Mukesh Patel must, in accordance with both Diplomat NBD Hotel's Operating Agreement and O.C.G.A. § 14-11-313, provide Plaintiffs with reasonable access to Diplomat NBD Hotels' records.

## Jurisdiction and Venue

9.

This Court has jurisdiction over this action pursuant to Article 6, Section 4 of the Georgia Constitution and O.C.G.A. § 14-11-313.

10.

Venue is proper in this Court pursuant to pursuant to Article 6, Section 2, Paragraphs 4 and 6 and O.C.G.A. § 14-11-313.

11.

In addition, jurisdiction and venue are proper in this Court under the facts and circumstances set forth herein.

## Factual Background

### 1.    Plaintiffs' investment in Diplomat NBD Hotels

12.

In or around 1999, Plaintiff Asvin Patel invested $100,000 for a 10% membership interest in Diplomat NBD Hotels.

13.

Also in or around 1999, Plaintiff Ashok Ranchod invested $100,000 for a
10% membership interest in Diplomat NBD Hotels.

14.

The purpose of the formation of Diplomat NBD Hotels was to build and
operate an Amerisuites Hotel near the Atlanta airport.

15.

The construction of the hotel had substantial cost overages and required
additional investments from Diplomat NBD Hotels' investors. Plaintiff Asvin Patel
invested an additional $180,000, and Plaintiff Ashok Ranchod invested an
additional $115,000.

16.

Diplomat NBD Hotels operated the hotel through 2006. In or around April
2006, Diplomat NBD Hotels sold the hotel. With the proceeds from the sale, the
majority members of Diplomat NBD Hotels decided that they would pursue an
IRC Sec. 1031 Tax Deferred Exchange and acquire a replacement property.

17.

In the Seller Final Closing Statement for the sale of the hotel, dated April 12,
2006, a line item shows $148,500 due and owing to Plaintiff Asvin Patel. The
$148,500 was never paid to Mr. Patel.

18.

In or around 2007, Diplomat NBD Hotels completed the IRC 1031 Deferred

Tax Exchange for a parking facility located at 218 Peachtree Street, Atlanta,

Georgia 30303.

19.

In or around April 2012, a sale occurred of Diplomat NBD Hotels' assets to

218 Capital Partners, LLC. This was structured as a sale but was effectively a

refinance transaction.

**2.    Plaintiffs' demand access to and inspection of the books and records of Diplomat NBD Hotels**

20.

The Operating Agreements of Diplomat NBD Hotels contains provisions

that impose a requirement upon the individual Defendants (as managers of these

entities) to maintain the entity's books and records, and other financial documents

and information, and to make those materials available to the members of

Diplomat NBD Hotels (including Plaintiffs) upon request. (A true and correct copy

of the Diplomat NBD Hotels' Operating Agreement is attached as Exhibit A.)

21.

In addition, O.C.G.A. § 14-11-313 (which applies to Diplomat NBD Hotels

and the individual Defendants as the managing members of this entity) requires the

individual Defendants, as the managing members of Diplomat NBD Hotels, to

maintain the entity's books and records, and other financial documents and

information, and to make those materials available to the members of the corporate

entity (including Plaintiffs), upon request.

22.

On numerous occasions, Plaintiffs have requested to review the books and

records of Diplomat NBD Hotels. The individual Defendants have failed and

refused to permit such inspection.

23.

On June 20, 2019, Plaintiffs made a written request, pursuant to O.C.G.A. §

14-11-313(2), through their legal counsel, that Defendants Rajesh Patel and

Mukesh Patel, as Managing Members of Diplomat NBD Hotels, provide true and

complete information regarding the state of the business and financial conditions of

Diplomat NBD Hotels. Specifically, Plaintiffs requested to inspect the following

categories of documents and information:

- All corporate organization documents; operating agreements; evidence of

  good standing; minutes of meetings of members, managers, or officers;

  corporate resolutions, actions, and consents, and other official corporate

  documents of any kind, together with any amendments thereto.

- The detailed general ledger for Diplomat NBD Hotels, LLC and financial

  statements, closing statements, balance sheets, tax returns and referenced

schedules, and all supporting documentation, accounting work papers, correspondence and drafts.

- All documents and communications documenting, referencing, relating, or pertaining to the capital contributions made by each member in Diplomat NBD Hotels, LLC and any loans made by any members to Diplomat NBD Hotels, LLC.

- All documents and communications documenting, referencing, relating, or pertaining to any and all disbursements, compensation, wages, commissions, fees, or remuneration of any kind made to any member (or member's family) or manager of Diplomat NBD Hotels, LLC.

- Any and all documents and communications documenting, referencing, relating, or pertaining to any and all indebtedness incurred at any time by Diplomat NBD Hotels, LLC.

- All information relevant to the state of the business and financial condition of Diplomat NBD Hotels, LLC.

- Any and all documents and communications documenting, referencing, relating, or pertaining to the sale of the Diplomat Amerisuites Hotel in April 2006.

- Any and all documents and communications documenting, referencing, relating, or pertaining to the purchase of the parking facility located at 218 Peachtree Street, Atlanta, Georgia 30303.

- Any and all documents and communications documenting, referencing, relating, or pertaining to the sale of Diplomat NBD Hotels, LLC's assets to 218 Capital Partners LLC.

(A true and correct copy of the June 20, 2019 letter is attached as Exhibit B.)

24.

Plaintiffs are entitled, as members of Diplomat NBD Hotel, to receive from Defendants the documents listed above pursuant to O.C.G.A. § 14-11-313(2) and the terms and provisions of the entity's Operating Agreement.

25.

To date, Defendants have failed and refused to permit Plaintiffs to inspect the records listed above.

**Count I – Access to Records and Information**
**Pursuant to O.C.G.A. § 14-11-313(3)**
**(against all Defendants)**

26.

Plaintiffs reallege and incorporate by reference the foregoing allegations, as if fully set forth herein.

27.

Plaintiffs have repeatedly requested and demanded that the individual

Defendants, in accordance with the Operating Agreement of Diplomat NBD Hotels

and O.C.G.A. § 14-11-313(2), provide Plaintiffs with access to the books and

records of the entities.

28.

Despite these requests, Defendants have failed and refused to provide

Plaintiffs with access to the books and records of Diplomat NBD Hotels.

29.

Through this Complaint, Plaintiffs hereby again demand access to and

reasonable inspection of the books and records of Diplomat NBD Hotels.

30.

O.C.G.A. § 14-11-313 provides that a member of a Georgia limited liability

company (such as Plaintiffs) has an absolute right to inspect the books and records

of the company. That end, O.C.G.A. § 14-11-313(2) provides that Plaintiffs may

"inspect and copy **any** limited liability company record upon reasonable request

during ordinary business hours." (emphasis added).

31.

O.C.G.A. § 14-11-313(2)(B) provides that Plaintiffs may:

(B) Obtain from time to time upon reasonable demand:

-10-

(i) True and complete information regarding the state of the business and financial condition of the limited liability company;
(ii) Promptly after becoming available, a copy of the limited liability company's federal, state, and local income tax returns, if any, for each year; and
(iii) Other information regarding the affairs of the limited liability company as is just and reasonable[.]

32.

Where, as here, a limited liability company has refused to allow the inspection, a member may utilize the summary procedures set out in paragraph (3) of O.C.G.A. § 14-11-313, which provides in pertinent part that:

If the limited liability company refuses to permit the inspection authorized by paragraph (2) of this Code section, the member demanding inspection may apply to the superior court for the county in which the registered office of the limited liability company is located, upon such notice as the court may require, for an order directing the limited liability company to show cause why an order permitting such inspection by the applicant should not be granted. The court shall hear the parties summarily, by affidavit or otherwise, and if the limited liability company fails to establish that the applicant is not entitled to such inspection, the court shall grant an order permitting such inspection, subject to any limitations which the court may prescribe, and grant such other relief, including costs and reasonable attorneys' fees, as the court may deem just and proper.

33.

Based on the foregoing, Plaintiffs are entitled to an order directing Defendants to appear before this Court for a summary hearing to show cause as to why an order permitting inspection of the books and records of Diplomat NBD Hotels should not be granted.

-11-

34.

Based on the foregoing, Plaintiffs are entitled to an order permitting

Plaintiffs to inspect the books and records of Diplomat NBD Hotels.

35.

In addition, Plaintiffs are entitled to an award of their reasonable attorney's

fees and costs incurred pursuant to O.C.G.A. § 14-11-313(3).

### Count II – Equitable Accounting
### (against Defendant Diplomat NBD Hotel)

36.

Plaintiffs reallege and incorporate by reference the foregoing allegations, as

if fully set forth herein.

37.

Because of Defendants' refusal to provide Plaintiffs with access to the books

and records of Diplomat NBD Hotels, Plaintiffs cannot fully determine the extent

of Defendants' unlawful conduct and resulting damages and losses that Plaintiffs

have sustained.

38.

By reason of the foregoing, Plaintiffs are entitled to an expedited accounting

of the books and records of Diplomat NBD Hotels for all the business and financial

transactions of the entities, from the date of organization to the present.

39.

By reason of the foregoing, Plaintiffs seek an order compelling Defendants

to allow, and to cooperate with, an accounting of the books and records of

Diplomat NBD Hotels by a Certified Public Accountant approved by this Court,

with the costs paid by Defendants.

## **Count III – Reservation of Claims**

40.

Plaintiffs reallege and incorporate by reference the foregoing allegations, as

if fully set forth herein.

41.

Due to Defendants' refusal to provide Plaintiffs with access to the books and

records of Diplomat NBD Hotels, Plaintiffs cannot fully determine the extent of

Defendants' unlawful conduct and the resulting damages and losses that Plaintiffs

have sustained.

42.

Through Defendants' obstruction and wrongful refusal to furnish Plaintiffs

with documents and information in breach of the Operating Agreement of

Diplomat NBD Hotels, and Georgia law, Plaintiffs reasonably believe that

Defendants are concealing contract breaches and tortious misconduct.

43.

Plaintiffs reserve the right to amend this Complaint to assert contract, tort, and any and all other claims should a good faith basis for such claims arise from the inspection of the books and records, related accounting, or the discovery conducted in this action.

## Count IV – Attorney's Fees
### (against all Defendants)

44.

Plaintiffs reallege and incorporate by reference the foregoing allegations, as if fully set forth herein.

45.

Defendants have acted in bad faith, been stubbornly litigious, and have subjected Plaintiffs to unnecessary trouble and expense such as to justify an award of attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

46.

The individual Defendants are not entitled to be indemnified and/or held harmless by Diplomat NBD Hotels for any expenses of litigation involved in this action by reason of their gross negligence, willful misconduct, and/or breach of fiduciary duty to Diplomat NBD Hotels and to Plaintiffs.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that the Court grant them the following relief against Defendants:

1.  An Order directing Defendants to appear before this Court and show cause as to why an order permitting inspection by the Plaintiffs of the books and records of Diplomat NBD Hotels, including the documents set forth in Paragraph 23, should not be granted;

2.  An Order declaring Plaintiffs' rights to immediately inspect the books and records of Diplomat NBD Hotels, and receive from Defendants the documents set forth in Paragraph 23;

3.  An Order compelling Defendants to account, disclose, and produce the business books and records of Diplomat NBD Hotels in sufficient detail and in a timely manner as determined by this Court;

4.  An Order compelling Defendants to allow and fully cooperate with an audit of the business books and records of Diplomat NBD Hotels by a Certified Public Accountant approved by this Court with the costs paid by Defendants and without indemnification for such costs by Diplomat NBD Hotels;

5.  An award of Plaintiffs' expenses of litigation including reasonable attorney's fees and costs, jointly and severally, solely against the

individual Defendants and without indemnification by Diplomat NBD

Hotels;

6.      That there be a trial by jury on all issues in this case allowed by law;

and

7.      An award of such other and further relief as this Court deems fair and

proper.

This 12th day of July, 2019.

SLOTKIN LAW FIRM, LLC


*/s/ F. Robert Slotkin, Jr.*
F. ROBERT SLOTKIN, JR.
Georgia Bar No. 653001
VINCENT S. DATTILO
Georgia Bar No. 676891

118 E. Maple Street
Decatur, Georgia 30030
(404) 228-4099 (voice)
(404) 370-1161 (fax)
bobby@slotkinlawfirm.com
vincent@slotkinlawfirm.com


THE WATTS FIRM, LLC


*/s/ Meredith S. Watts*
MEREDITH S. WATTS
Georgia Bar No. 362080

2675 Paces Ferry Road, Suite 260
Atlanta, Georgia 30339
(678) 910-0251 (voice)
meredith@thewattsfirm.com

*Attorneys for Plaintiffs*

# EXHIBIT A

# OPERATING AGREEMENT

# Diplomat NBD Hotels, L.L.C.
### A Georgia Limited Liability Company

### OPERATING AGREEMENT

### ADOPTED October 29th, 1999

Diplomat NBD Hotels Operating Agreement

# Table of Contents

ARTICLE I:  Definitions ................................................................................................ 3

ARTICLE II: Formation of Company ........................................................................ 8

ARTICLE III: Business of Company ......................................................................... 8

ARTICLE IV: Names and Addresses of Members.................................................. 9

ARTICLE V: Rights and duties of Managers.......................................................... 9

ARTICLE VI: Rights and Obligations of Members ............................................... 12

ARTICLE VII: Meetings of Members...................................................................... 13

ARTICLE VIII: Indemnification ............................................................................... 14

ARTICLE IX: Contributions and Capital Accounts.............................................. 15

ARTICLE X: Allocations and Distributions........................................................... 17

ARTICLE XI: Taxes................................................................................................... 19

ARTICLE XII: Ownership Restriction and Disposition of Economic Interests........................... 20

ARTICLE XIII: Admission of Assignees and Additional Members............................................ 26

ARTICLE XIV: Dissociation, Dissolution and Winding Up ................................. 26

ARTICLE XV: Amendment....................................................................................... 29

ARTICLE XVI Miscellaneous Provisions............................................................... 29

EXHIBIT "A": Contribution Summary .................................................................. 33

Diplomat NBD Hotels Operating Agreement

This   Operating Agreement of Diplomat NBD Hotels, L.L.C., a limited liability company organized pursuant to the Georgia Limited Liability Company Act, shall be effective as of the 29th day of October, 1999, by and among the Persons executing this Operating Agreement (as Members).

# ARTICLE I
# DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings unless otherwise expressly provided herein:

**Section 1.1**   "Act" shall mean the Georgia Limited Liability Company Act, as amended from time to time, and any successor thereto.

**Section 1.2**   "Additional Capital Contribution" shall mean any Capital Contribution other than an Initial Capital Contribution that a Member is obligated to make in accordance with Section 9.2.

**Section 1.3**   "Additional Member" shall mean a Member, other than an Initial Member or a Substitute Member, who has acquired a Membership Interest from the Company and has become a Member in accordance with Section 13.3.

**Section 1.4**   "Affiliate" shall mean, with respect to any Member, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Member, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Member, (iii) any Member, Manager, officer, director, general Member, trustee, or a holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence.  For purposes of this definition, the term "controls", "is controlled by" or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Section 1.5**   "Articles" shall mean the Articles of Organization of the Company, as amended from time to time.

**Section 1.6**   "Assignee" shall mean a transferee of an Economic Interest who has not been admitted as a Substitute Member.

**Section 1.7**   "Capital Account" shall mean the account maintained with respect to a Member or Assignee determined in accordance with Article IX.

**Section 1.8**   "Capital Contribution" shall mean any contribution to the capital of the Company of cash, property or services or the obligation to contribute cash, property or services made by or on behalf of a Member or Assignee.

**Section 1.9**   "Cash Flow" shall mean an amount equal to (a) Net Profits minus Net

Diplomat NBD Hotels Operating Agreement

Losses, (b) plus (i) appreciation and other non-cash charges deducted in determining such Net Profits and Losses, (ii) the net proceeds from any refinancing of the Company's mortgages, and (iii) the net proceeds from the sale of any of the Company's Property, (c) minus (i) principal payments on all mortgages, (ii) any other cash expenditures which have not been deducted in determining the Net Profits and Losses of the Company, and (iii) any amount reasonably required to maintain sufficient working capital and a reasonable reserve for replacement.

**Section 1.10**  "Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor thereto.

**Section 1.11**  "Company" shall mean Diplomat NBD Hotels, L.L.C., a Georgia limited liability company, and any successor limited liability company.

**Section 1.12**  "Company Minimum Gain" shall mean an amount determined by first computing for each Company Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains.  The amount of Company Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain.  For any Taxable Year, the net increase or decrease in Company Minimum Gain is determined by comparing the Company Minimum Gain on the last day of the immediately preceding Taxable Year with the Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Company Minimum Gain, and increases and decreases in Company Minimum Gain, are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

**Section 1.13**  "Company Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent that no Member or Related Person bears the economic risk of loss (as defined in Section 1.752.2 of the Regulations) with respect to the liability.

**Section 1.14**  "Company Property" shall mean any Property owned by the Company.

**Section 1.15**  "Contributing Members" shall mean those Members making contributions as a result of the failure of a Delinquent Member to make the Additional Capital Contribution in accordance with Section 9.2.

**Section 1.16**  "Default Interest Rate" shall mean the higher of the applicable federal rate or the then current prime rate quoted by Haven Trust Bank plus two (2) percentage points.

**Section 1.17**  "Delinquent Member" shall mean a Member who has failed to make the Additional Capital Contribution required of that Member in accordance with Section 9.2.

**Section 1.18**  "Disposition" ("Dispose") shall mean any sale, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law) of an Economic Interest in the

Diplomat NBD Hotels Operating Agreement

Company.

**Section 1.19** "Dissociation (Dissociate)" shall mean any action or event which causes a Person to cease to be Member of the Company as described in Article XIV hereof.

**Section 1.20** "Dissolution Event" shall mean an event, the occurrence of which will result in the dissolution of the Company under Article XIV unless the Members agree to the contrary.

**Section 1.21** "Distribution" shall mean a transfer of Property made by the Company to a Member or an Assignee on account of such Member's or Assignee's Economic Interest as described in Article X.

**Section 1.22** "Economic Interest" shall mean a Member's or Assignee's share of the Company's Net Profits, Net Losses, and Distributions of the Company's Property pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the operation, management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision of the Members.

**Section 1.23** "Effective Date" shall mean the date upon which this Operating Agreement shall become effective under Section 2.2.

**Section 1.24** "Immediate Family" shall mean a Member's spouse, children (including natural, adopted and stepchildren), grandchildren, and parents.

**Section 1.25** "Initial Capital Contribution" shall mean the Capital Contribution agreed to be made by the Initial Members as described in Section 9.1 and set forth on Exhibit A attached hereto.

**Section 1.26** "Initial Members" shall mean those persons identified on Exhibit A attached hereto who have executed this Operating Agreement.

**Section 1.27** "Manager" shall mean a Member or other Person designated by the Members to manage the affairs of the Company under Article V hereof.

**Section 1.28** "Member" shall mean an Initial Member, Substitute Member or Additional Member of the Company as identified in Article IV of this agreement.

**Section 1.29** "Member Minimum Gain" shall mean an amount determined by first computing for each Member Nonrecourse Liability any gain the Company would realize if it disposed of the Company Property subject to that liability for no consideration other than full satisfaction of the liability, and then aggregating the separately computed gains. The amount of Member Minimum Gain includes such minimum gain arising from a conversion, refinancing, or other change to a debt instrument, only to the extent a Member is allocated a share of that minimum gain. For any Taxable Year, the net increase or decrease in Member Minimum Gain is determined by comparing the Member Minimum Gain on the last day of the immediately

Diplomat NBD Hotels Operating Agreement

preceding Taxable Year with the Member Minimum Gain on the last day of the current Taxable Year. Notwithstanding any provision to the contrary contained herein, Member Minimum Gain and increases and decreases in Member Minimum Gain are intended to be computed in accordance with Section 704 of the Code and the Regulations issued thereunder, as the same may be issued and interpreted from time to time.

Section 1.30  "Member Nonrecourse Deductions" shall mean the net increase during the Taxable Year, if any, in Member Minimum Gain, reduced (but not below zero) by any distribution of proceeds that are attributable to a Member Nonrecourse Liability and allocable to an increase in such Member Minimum Gain under Section 1.704-2(i) of the Regulations.

Section 1.31  "Member Nonrecourse Liability" shall mean any debt or obligation of the Company to the extent the liability is nonrecourse under state law, and on which a Member or Related Person bears the economic risk of loss under Section 1.752-2 of the Regulations because, for example, the Member or Related Person is the creditor or a guarantor.

Section 1.32  "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right of the Member to participate in the management and operation of the business and affairs of the Company, including, but not limited to, the right to vote on, consent to, or otherwise participate in any decision, vote or action of or by the Members granted pursuant to this Operating Agreement and the Act. In the case of an Assignee, the term "Membership Interest" shall mean only the Assignee's Economic Interest in the Company.

Section 1.33  "Net Losses" shall mean the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

Section 1.34  "Net Profits" shall mean the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the cash method of accounting adopted by the Company and as reported separately or in the aggregate, as appropriate, on the informational tax return of the Company filed for Federal income tax purposes.

Section 1.35  "Notice" shall be in writing. Notice to the Company shall be considered given when mailed by first class mail postage prepaid addressed to any Manager in care of the Company at the address of the Company's Principal Place of Business. Notice to a Member shall be considered given when mailed by first class mail postage prepaid addressed to the Member at that Member's address as reflected in the Operating Agreement unless the Member has given the Company a Notice of a different address.

Section 1.36  "Offsettable Decrease" shall mean any allocation that unexpectedly causes or increases a deficit in a Member's or Assignee's Capital Account as of the end of the Taxable Year to which the allocation relates attributable to depletion allowances under Section

Diplomat NBD Hotels Operating Agreement

1.704(b)(2)(iv)(k) of the Regulations, allocations of loss and deductions under Section 704(e)(2) or 706 of the Code or Section 1.751-1 of the Regulations, or distributions that, as of the end of the Taxable Year, are reasonably expected to be made to the extent they exceed the offsetting increases to such Member's or Assignee's Capital Account that reasonably are expected to occur during or (prior to) the Taxable Years in which such distributions are expected to be made (other than increases pursuant to a minimum gain chargeback pursuant to sections 10.2 and 104 hereof).

**Section 1.37** " Operating Agreement" shall mean this  Operating Agreement including all amendments hereto adopted in accordance with Section 15.2 and the Act.

**Section 1.38** "Organization" shall mean any entity permitted to be a Member of a limited liability company under the Act.  The term "Organization" includes, without limitation, Companies (both non-profit and other Companies), Memberships (both limited and general), joint ventures, limited liability companies, and unincorporated associations, but does not include joint tenancies and tenancies by the entirety.

**Section 1.39**  "Organization Expenses" shall mean those expenses incurred in the organization of the Company, including but not limited to, the costs of preparation of this Operating Agreement and the Articles.

**Section 1.40**  "Person" shall include an individual, trust, estate, or any Organization.

**Section 1.41**  "Principal Place of Business" shall mean the principal office of the Company designated in Section 2.4, or any other place or places as the Manager(s) may from time to time deem advisable.

**Section 1.42**  "Property" shall mean any property real, personal or mixed, tangible or intangible, including money and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**Section 1.43**  "Regulations" shall mean the permanent, temporary, proposed, or proposed and temporary regulations issued by the Department of the Treasury that are promulgated under the Code as amended.

**Section 1.44**  "Related Person" shall mean a Person having a relationship to a Member that is described in Section 1.752-4(b) of the Regulations.

**Section 1.45**  "Substitute Member" shall mean an Assignee who has been admitted as a Member of the Company in accordance with Section 13.2.  Upon becoming a Member of the Company, such Assignee shall have all the rights of a Member as are described more fully in Section 13.2 hereof.

**Section 1.46**  "Taxable Year" shall mean the taxable year of the Company as determined pursuant to Section 706 of the Code.

**Section 1.47**  "Taxing Jurisdiction" shall mean the taxing jurisdiction of the Federal

Diplomat NBD Hotels Operating Agreement

Government and of any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

**Section 1.48** The term "transfer", as used herein, includes, but is not limited to, a gift, sale, exchange, hypothecation, assignment, pledge or other encumbrance of Ownership.

# ARTICLE II
# FORMATION OF COMPANY

**Section 2.1** Organization. On October 29th, 1999, the Members organized the Company pursuant to the provisions of the Act by filing the Articles with the Secretary of State.

**Section 2.2** Effective Date. This Operating Agreement is effective as of the 29th day of October, 1999.

**Section 2.3** Registered Agent and Office. The registered agent for the service of process and the registered office shall be that individual and location reflected in the Articles. The Members holding at least a majority of the Membership Interests of the Company may, from time to time, change the registered agent or office through appropriate filings with the Secretary of State. In the event the registered agent ceases to act as such for any reason or the location of the registered office shall change, the Manager(s) shall promptly designate a replacement registered agent or file a notice of change of address as the case may be. If the Manager(s) shall fail to designate a replacement registered agent or change of address of the registered office within five days after the registered agent ceased to act as such or the location of the registered office changed, as the case may be, any Manager, or Members holding a majority of the Membership Interests, may designate a replacement registered agent or file a notice of change of address.

**Section 2.4** Principal Place of Business. The Principal Place of Business of the Company is located at 2100 Parklake Drive, N.E., Suite A., Atlanta, Georgia 30345. The Company may locate its principal place of business at any other place or places as the Managers from time to time deem advisable.

# ARTICLE III
# BUSINESS OF COMPANY

**Section 3.1** Permitted Businesses. The business of the Company shall be:

(a) Provision of hotel acquisition, building, construction, ownership, lease, purchase, development, sale, management, operations, franchising, mortgages, insurance and merchant building services to its clients.

(b) To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

Diplomat NBD Hotels Operating Agreement

# ARTICLE IV
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

Rajesh C. Patel                          Mukesh C. Patel
2100 Parklake Drive, N.E.                2100 Parklake Drive, N.E.
Atlanta, Georgia 30345                   Atlanta, Georgia 30345

# ARTICLE V
## RIGHTS AND DUTIES OF MANAGERS

**Section 5.1**  Management.  The management of the business and affairs of the Company shall be vested in its Managers.  Except for situations in which the approval of the Members is expressly required by this  Operating Agreement, the Act, or by non-waivable provisions of applicable law, any Manager shall have full and complete authority, power and discretion to manage and control the business affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  At anytime when there is more than one Manager, any one Manager may take any action permitted to be taken by a Manager, unless the approval of more than one of the Managers or the Members is expressly required pursuant to this  Operating Agreement or the Act.

**Section 5.2**  Number, Tenure and Qualifications.  The Company shall have two Co-Managers.  The number of Managers of the Company shall be fixed from time to time by the affirmative vote or action of Members holding a majority of the Membership Interests of the Company.  The Manager shall hold office until the Manager's successor shall have been elected or designated and qualified.  A Manager need not be a resident of the State of Georgia or a Member of the Company.  The name and address of the Manager of the Company is as follows:

| NAME | ADDRESS |
|------|---------|
| Rajesh C. Patel | 2100 Parklake Drive, N.E.<br>Atlanta, Georgia 30345 |
| Mukesh C. Patel | 2100 Parklake Drive, N.E.<br>Atlanta, Georgia 30345 |

**Section 5.3**  Certain Powers of Managers.  Subject to the limitations on the power of the Manager contained in Section 5.4 below, any Manager shall have the power and authority, on behalf of the Company:

(a) To administer the day to day affairs of the Company;

(b) To do and perform any and all other acts as may be necessary or appropriate to the

Diplomat NBD Hotels Operating Agreement

conduct of the Company's business.

(c) sell all or substantially all of the Properties of the Company in accordance with Section 6.3;

(d) merge or consolidate the Company with or into one or more limited liability companies or other business entities in accordance with Section 6.4 below; and

(e) borrow money for the Company or, in connection therewith, encumber or grant security interests in the Company's Property to secure repayments of such borrowed sums in accordance with Section 6.5 below.

Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

**Section 5.4**   Limitation on Powers of Managers.   Notwithstanding anything to the contrary in this Article V, no Manager shall have the power or authority to do any of the following, which shall be reserved to the Members holding the requisite Membership Interests in the Company;

(a) amend the Operating Agreement in accordance with Section 15.1;

(b) admit Assignees as Substitute Members in accordance with Section 13.2;

(c) admit Additional Members in accordance with Section 13.3;

(d) continue the Company after a Dissociation Event in accordance with Section 14.3;

**Section 5.5**   Liability for Certain Acts.   Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Member of the Company. The Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

**Section 5.6**   Managers Have No Exclusive Duty to Company.   No Manager shall be required to manage the Company as such Manager's sole and exclusive function, and any Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of a Manager or to the income or proceeds derived therefrom. A Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

Diplomat NBD Hotels Operating Agreement

**Section 5.7** Property.  Any and all Company Property shall be held in the name of the Company.

**Section 5.8** Bank Accounts.  The Managers may from time to time open bank accounts in the name of the Company.

**Section 5.9** Records, Audits and Reports to be Maintained.  At the expense of the Company, the Managers shall maintain the records and accounts of all operations and expenditures of the Company.  The Company shall maintain the following records at the Principal Place of Business;

(a)  A current list of the full name and last known business or residence address of each Member;

(b)  A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any documents have been executed;

(c)  Copies of the Company's Federal, foreign, state and local income tax returns and reports, if any, for the three (3) most recent Taxable Years;

(d)  A copy of the  Operating Agreement including all amendments thereto;

(e)  Copies of any financial statements of the Company for the three (3) most recent years and all information relating to the capital accounts and capital contributions of each Member.

(f)  Any other records and accounts as the Members shall require the Company to maintain and other reasonable information regarding the affairs of the L.L.C.

**Section 5.10** Access to Records.  The records required to be maintained by the Company in this Article V, and any other books and records of the Company, wherever situated, are subject to inspection and copying at the reasonable request of, and at the expense of, any Member or the Member's agent or attorney during regular business hours of the Company.

**Section 5.11** Reports to Members.  The Manager shall furnish, or cause to be furnished, to each Member quarterly statements of the financial condition of the Company and an annual financial statement within sixty (60) days after the end of each fiscal year of the Company.  The Manager shall also provide all Members with those information returns required by the Code and the laws of all applicable local and foreign governments.

**Section 5.12** Accounts.  The Manager shall maintain a record of Capital Accounts for each Member and Assignee in accordance with Article IX.

**Section 5.13** Records of Membership Interests.  The Manager shall maintain a record of the Membership Interest held by each Member, as such Membership Interest shall be increased or decreased from time to time in accordance with this  Operating Agreement.

Diplomat NBD Hotels Operating Agreement

**Section 5.14**  Resignation.  Any Manager of the Company may resign at any time by giving ten (10) days prior written notice to the Members of the Company.  The resignation of any Manager shall take effect ten (10) days following the receipt of the notice or at such later time as shall be specified in the notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.15**  Removal.  At any meeting of the Members, all or any lesser number of the Managers may be removed, with or without cause, by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.

**Section 5.16**  Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company.  A Manager elected or designated to fill a vacancy shall be elected or designated for the unexpired term of such Manager's predecessor in office and shall hold office until the expiration of such term and until such Manager's successor shall be elected or designated and shall qualify or until the earlier of the death, resignation or removal of such Manager.

**Section 5.17**  Salaries.  The salaries and other compensation of the Manager(s) shall be fixed from time to time by an affirmative vote or action of Members holding at least a majority of the Membership Interests of the Company, and no Manager shall be prevented from receiving such salary by reason of the fact that the Manager is also a Member of the Company.

# ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS

**Section 6.1**  Member Management Rights.  Unless otherwise provided in this Operating Agreement or by non-waivable provisions of the Act, all Members (other than Assignees) who have not Dissociated shall be entitled to vote on any matter submitted to a vote of the Members.

**Section 6.2**  Liability of Members to Third Parties.  Unless otherwise provided by the Act, no Member shall be liable under any judgment, decree, or order of a court, or in any other manner, for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, or for the acts or omissions of any Member, Manager, agent or employee of the Company.

**Section 6.3**  Notification of Sale of the Company's Property.  The Manager shall notify the Members, of any sale, exchange or other disposition of the Company's Property.

**Section 6.4**  Notifiaction of Merger or Consolidation.  The Manager shall notify the Members of any merger or consolidation of the Company with or into one or more limited liability companies or other business entities formed or organized under the laws of the State of Georgia, any other state, the United States or any foreign jurisdiction, with the Company or the other business entity being the surviving entity.

Diplomat NBD Hotels Operating Agreement

**Section 6.5** Notification of Purchases and Borrowings. The Manager shall notify the Members of any purchase of Property and borrowing of money for the Company from banks, other lending institutions, another Manager, Members, or any Affiliate of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, hypothecate, encumber and grant security interests in the Property of the Company to secure repayment of the borrowed sums.

**Section 6.6** Conflicts of Interest.

(a) Any Member shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that would be beneficial to, the Company, it being expressly understood that the Members may enter into transactions that are similar to the transactions into which the Company may enter. Notwithstanding the foregoing, a Member shall account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member, without the consent of the other disinterested Members, in the conduct and winding up of the Company's business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b) Any Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers such Member's own interest. Any Member may lend money to and transact other business with the Company. The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to the Act or other applicable law. No transaction with the Company shall be voidable solely because a Member or an Affiliate of the Member has a direct or indirect interest in the transaction if (i) either the transaction is fair to the Company or (ii) the disinterested Members, in either case knowing the material facts of the transaction and the Member's interest, authorize, approve, or ratify the transaction.

# ARTICLE VII
## MEETINGS OF MEMBERS

**Section 7.1** Meetings. The Members shall meet at least annually, or more often as the Members may agree, for the purpose of reviewing the operations of the Company and its financial status. Such meetings may be in person or by telephone or video conference. A written report of such meetings shall be placed in the permanent record book of the Company. Neither regular nor special meetings of the Members shall be required in order to conduct the business and affairs of the Company or take any action with respect thereto; provided, however, that special meetings of the Members may be called for any purpose or purposes by any Member upon ten (10) days prior written notice to each Member of the Company. If no place for the meeting is designated as made, the place of meeting shall be the principal office of the Company in the State of Georgia.

**Section 7.2** Manner of Acting. The affirmative vote of Members holding at least a

Diplomat NBD Hotels Operating Agreement

majority of the Membership Interests of the Company shall be the act of the Members, unless the vote or action of a greater or lesser proportion or number of the Members is otherwise required by the Act, by the Articles or by this Operating Agreement.

**Section 7.3**  Action by Members Without a Meeting.  All actions with respect to the Company may be taken without a meeting of the Members; provided, however, that any action required or permitted to be taken at a special meeting of Members may be taken without a special meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote at a meeting of the Members and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

**Section 7.4**  Waiver of Notice.  When any Notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such Notice.  If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or Notice and at such meeting any lawful action may be taken.

# ARTICLE VIII
# INDEMNIFICATION

**Section 8.1**  Indemnification of Members, Managers, Etc.  The Company shall have the right to indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals (other than an action by or in the right of the Company), by reason of the fact that such Person is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such claim, action, suit or proceeding to the greatest extent permitted by the Georgia Limited Liability Company Act, or any other federal or state statute.

**Section 8.2**  Non-Exclusivity of Article.  The indemnification authorized in and provided by this Article VIII shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under any statute, rule of law, provision of articles of organization,  Operating Agreement, other agreement, vote or action of Members or by the Managers, or otherwise, both as to actions in such Person's official capacity and as to actions in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Member, Manager, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

**Section 8.3**  Insurance.  The Company may purchase and maintain insurance on behalf of

Diplomat NBD Hotels Operating Agreement

any Person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, Member, employee or agent of another limited liability company, Company, Membership, joint venture, trust or other enterprise against any liability asserted against such Person incurred by such Person in any such capacity arising out of such Person's status as such, whether or not the Company is required or permitted to indemnify such Person against such liability under the provisions of this Article VIII or any statute.

# ARTICLE IX
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

**Section 9.1**  Initial Capital Contributions.  The Initial Capital Contribution of (and Economic Interest allocated to) each Member is set forth on Exhibit "A" hereto and incorporated by reference herein.  No interest shall accrue on any Initial Capital Contribution and no Member shall have the right to withdraw or be repaid any Initial Capital Contribution, or to receive any distributions from the Company, except as provided in this Operating Agreement.

**Section 9.2**  Additional Capital Contributions.  The Members recognize that the income produced by the Company may be insufficient to pay the operating expenses of the Company.  In addition to the Initial Capital Contributions of the Members, each Member shall be required to make such Additional Capital Contribution as shall be determined by Members holding at least a majority of the Membership Interests of the Company from time to time to be reasonably necessary to facilitate the business needs of the Company, including, but not limited to, meeting the Company's operating expenses, funding the expansion of the Company's business, and the purchasing of any property reasonably necessary to the operation of the Company's business; provided, however, that the aggregate amount of Additional Capital Contributions in any calendar year shall not exceed $50,000, unless any excess is approved by Members holding at least two-thirds of the Membership Interests of the Company.  Upon making such a determination, the Company shall give Notice to each Member in writing at least ten (10) days prior to the date on which the Additional Capital Contributions are due.  Such Notice shall set forth the amount of Additional Capital Contribution needed, the purpose for which the contribution is needed, and the date by which the Member must contribute such Additional Capital Contribution.  Additional Capital Contributions shall be made in proportion to the Membership Interest then held by each of the Members.  No interest shall accrue on any Additional Capital Contribution and no Member shall have the right to withdraw or be repaid any Additional Capital Contribution except as provided in this Operating Agreement.

**Section 9.3**  Enforcement of Additional Capital Contributions.

(a)  In the event any Member (a "Delinquent Member") fails to make the Additional Capital Contribution required of that Member, the Members shall give the Delinquent Member Notice of such failure to make such Additional Capital Contribution.  If the Delinquent Members fails to make such Additional Capital Contribution (plus any costs associated with such failure to tender the Additional Capital Contribution and interest thereon at the Default Interest Rate) within ten (10) days of the giving of Notice, the Members may take such action, including, but

Diplomat NBD Hotels Operating Agreement

not limited to, enforcing the Delinquent Member's obligation to make such Additional Capital Contribution in a court of appropriate jurisdiction in the state in which the Principal Place of Business is located or the state reflected in Delinquent Member's address as set forth in Article IV.  Each Member expressly consents to the jurisdiction of such courts but only for the enforcement of the obligation to make Additional Capital Contributions under this Operating Agreement.  The Members, or any one or more of the Members, as the Members shall agree, may elect to contribute the amount of the Delinquent Member's Additional Capital Contribution, with those Members who contribute (Contributing Members to contribute additional amounts, in proportion to such Contributing Member's Membership Interest in the Company (not taking into account the Delinquent Member's Membership Interest) or in such other proportions as the Contributing Members shall agree to, that in the aggregate equal the amount of the Additional Capital Contribution not contributed by the Delinquent Member.

(b)  The Contributing Members shall have the option to treat the amounts contributed pursuant to Section 9.3(a) as (i) a loan from the Contributing Members to the Delinquent Members bearing interest at the Default Interest Rate and secured by the Delinquent Member's Economic Interest in the Company or (ii) as an Additional Capital Contribution of such Member. In the event that the Contributing Members elect to treat his contribution as a loan to the Delinquent Member, no adjustments shall be made to such Contributing Members' Capital Accounts, and their respective shares or allocations of Net Profits, Net Losses and Cash Flow shall remain the same; provided, however, that until the Contributing Members are fully repaid, the Contributing Members shall be entitled to all Distributions to which the Delinquent Member would have been entitled.  In the event that the Contributing Members elect to treat his contribution with respect to the Delinquent Member as an Additional Capital Contribution, such Members' Capital Accounts shall be adjusted in accordance with Section 9.4 below.

(c)  Notwithstanding this Section 9.3, no obligation to make an Additional Capital Contribution or any other obligation hereunder may be enforced by a creditor of the Company unless the Member expressly consents to such enforcement or to the assignment of the obligation to such creditor.

**Section 9.4**  Maintenance of Capital Accounts.  The Company shall establish and maintain Capital Accounts for each Member and Assignee.  Each Member's and Assignee's Capital Account shall be increased by (1) the amount of any money actually contributed by the Member or Assignee to the capital of the Company, (2) the fair market value of any Property contributed, as determined by the Company and the contributing Member or Assignee at arm's length at the time of contribution (net of any liabilities assumed by the Company or subject to which the Company takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Profits and of any separately allocated items of income or gain except adjustments required under Section 704(c) of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).  Each Member's or Assignee's Capital Account shall be decreased by (1) the amount of any money actually distributed to the Member or Assignee by the Company, (2) the fair market value of any Property distributed to the Member or Assignee by the Company (net of liabilities of the Company assumed by the Member or Assignee or subject to which the

Diplomat NBD Hotels Operating Agreement

Member or Assignee takes such Property within the meaning of Section 752 of the Code), and (3) the Member's or Assignee's share of Net Losses and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Member or Assignee to reflect the difference between the book value and tax basis of assets contributed by the Member or Assignee).

**Section 9.5**  Distribution of Property.  If the Company at any time distributes any of its Properties to any Member or Assignee, the Capital Account of each Member or Assignee shall be adjusted to account for that Member's or Assignee's allocable share (as determined under Article X below) of the Net Profits or Net Losses that would have been realized by the Company had it sold the Properties that were distributed at their respective fair market values immediately prior to their distribution.

**Section 9.6**  Sale or Exchange of Interest.  In the event of a sale or exchange of some or all of a Member's or Assignee's Economic Interest in the Company, the Capital Account of the transferring Member or Assignee shall become the Capital Account of the Assignee acquiring such Economic Interest, to the extent it relates to the portion of the Economic Interest transferred.

**Section 9.7**  Compliance with Section 704(b) of the Code.  The provisions of this Article IX as they relate to the maintenance of Capital Amounts are intended, and shall be construed, and, if necessary, modified to cause the allocations of profits, losses, income, gain and credit pursuant to Article X to have substantial economic effect under the Regulations promulgated under Section 704(b) of the Code, in light of the Distributions made pursuant to Articles X and XIV and the Capital Contributions made pursuant to this Article IX.  Notwithstanding anything herein to the contrary, this  Operating Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member to make a Capital Contribution in excess of the Initial Capital Contribution made by that Member.

# ARTICLE X
# ALLOCATIONS AND DISTRIBUTIONS

**Section 10.1**  Allocations of Net Profits and Net Losses.  Except as may be required by Section 704(c) of the Code, and Sections 10.2, 10.4, and 10.5 of this Article X, Net Profits, Net Losses, and other items of income, gain, loss, deduction and credit shall be apportioned among the Members in proportion to the Membership Interest each Member holds as of the first day of the Taxable Year; provided, however, that if the Membership Interest held by any Member changes during the Taxable Year, or if any Additional Members are admitted during the Taxable Year, the Net Profits and Net Losses for each month of such Taxable Year shall be allocated among the Members in proportion to the Membership Interest each Member holds as of the first day of each such month, and each Member's share of the Net Profits and Net Losses for such Taxable Year shall be equal to the sum of his share of the Profits and Losses for each month during the Taxable Year.

**Section 10.2**  Company Minimum Gain Chargeback.  If there is a net decrease in

Diplomat NBD Hotels Operating Agreement

Company Minimum Gain for a Taxable Year, each Member must be allocated items of income and gain for that Taxable Year equal to that Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of the total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding Taxable Year. A Member's share of any decrease in Company Minimum Gain resulting from a revaluation of Company Property equals the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in Company Minimum Gain is caused by the revaluation. A Member is not subject to this Company Minimum Gain chargeback requirement to the extent the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in the debt instrument causing it to become partially or wholly a recourse liability or a Member Nonrecourse Liability, and the Member bears the economic risk of loss (within the meaning of Section 1.752-2 of the Regulations) for the newly guaranteed, refinanced, or otherwise changed liability.

Section 10.3  Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Taxable Year shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Liability with respect to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(b)(4) of the Regulations.

Section 10.4  Member Minimum Gain Chargeback.  If during a Taxable Year there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning of that Taxable Year must be allocated items of income and gain for that Taxable Year (and, if necessary, for succeeding Taxable Years) equal to that Member's share of the net decrease in the Member Minimum Gain. A Member's share of the net decrease in Member Minimum Gain is determined in a manner consistent with the provisions of Section 1.704-2(g)(2) of the Regulations. A Member is not subject to this Member Minimum Gain chargeback, however, to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Liability due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Company Nonrecourse Liability. The amount that would otherwise be subject to the Member Minimum Gain chargeback is added to the Member's share of Company Minimum Gain. In addition, rules consistent with those applicable to Company Minimum Gain and Company Minimum Gain chargeback shall be applied to determine the shares of Member Minimum Gain and Member Minimum Gain chargeback to the extent provided under the Regulations issued pursuant to Section 704(b) of the Code.

Section 10.5  Qualified Income Offset.  In the event any Member, in such capacity, unexpectedly receives an Offsettable Decrease, such Member will be allocated items of income and gain (consisting of a pro rata portion of each item of income and gain of the Company for the Taxable Year) in an amount and manner sufficient to offset such Offsettable Decrease as quickly as possible.

Section 10.6  Interim Distributions.  The Manager(s) shall determine the Cash Flow of the Company for each fiscal year and not cumulatively, and, as so determined, the Cash Flow

Diplomat NBD Hotels Operating Agreement

shall be distributed to the Members in the same proportion as the Net Profits and Net Losses are allocated between the Members under Section 10.1 above, subject to any adjustments pursuant to Article IX. The Cash Flow shall be distributed at the discretion of the Manager, but at least semi-annually.

    **Section 10.7** Limitations on Distributions. No Distribution shall be declared and paid unless, after the Distribution is made, the Property of the Company is in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

# ARTICLE XI
# TAXES

    **Section 11.1** Elections. The Manager may make any tax elections for the Company allowed under the Code or the tax laws of any Taxing Jurisdiction.

    **Section 11.2** Taxes of Taxing Jurisdictions. To the extent that the laws of any Taxing Jurisdiction so require, each Member requested to do by the Manager will submit an agreement indicating that the Member will make timely income tax payments to the Taxing Jurisdiction and that the Member accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest and penalties assessed on such income. If the Member fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax penalties and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Member shall be treated as a distribution for purposes of Article X. The Manager may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

    **Section 11.3** Tax Matters Member. The Members shall designate a Manager, or any Member, to act as the "tax matters Member" of the Company pursuant to Section 6231(a)(7) of the Code. Any Manager or Member so designated shall take such action as may be necessary to cause each Member (other than a Member who acts as the tax matters Member) to become a notice Member within the meaning of Section 6223 of the Code. Any Member who is designated tax matters Member may not take any action contemplated by Section 6222 through 6232 of the Code without the consent of the other Members.

    **Section 11.4** Accrual Method of Accounting. The records of the Company shall be maintained on an accrual method of accounting. It is intended that the Company will elect those accounting methods permitted under applicable law which provide the Company with the greatest tax benefits.

                  COMPANY CONFIDENTIAL

Diplomat NBD Hotels Operating Agreement

# ARTICLE XII
# OWNERSHIP RESTRICTION AND DISPOSITION OF ECONOMIC INTERESTS

**Section 12.1**  Limitations.  An Assignee of an Economic Interest under this Article XII shall have only those rights as described more fully in Section 13.1 hereof and shall have no right to become a Member of the Company or to participate in the management of the business affairs of the Company unless such Assignee is admitted as a Substitute Member in accordance with Section 13.2 of this Operating Agreement.

**Section 12.2**  Permitted Transaction.  The Economic Interest of any Member shall be transferable without the consent of the other Members if the transferee is a member of one Member's Immediate Family.

**Section 12.3**  Consent, Etc.  No Member or Assignee may Dispose of all or a portion of such Member's or Assignee's Economic Interest, except as permitted by Section 12.2 above, unless:

(a)  prior to the transfer, the Company receives, unless waived by the Member(s) in writing, an opinion of counsel satisfactory to the Member(s) that such Disposition is not subject to an effective registration under, or exempt from the registration requirements of, the applicable state and federal securities laws and such Disposition, alone or when combined with other transactions, would not result in a termination of the Company within the meaning of Section 708 of the Code;

(b)  prior to the Disposition, the Company receives from the transferee the information and agreements that the Member(s) may reasonably require, including, but not limited to any taxpayer identification number and any agreement that may be required by the Taxing Jurisdiction; and

(c)  the transferring Member or Assignee shall either:

(i)  first obtain the written consent of the other Members to such disposition; or

(ii)  comply with the provisions of Section 12.4 below.

**Section 12.4**  Restriction During Life. No Member shall transfer any portion or his entire share of Ownership unless the Member desiring to make the transfer (hereinafter referred to as the "Seller") first offers to sell the share of Ownership he wishes to transfer in accordance with subparagraph (a) below, and such offer is not accepted.

(a)  Offer by Seller. The Seller's offer to sell the share of Ownership shall be in writing and delivered to the Company and to the other Members. In the offer, the Seller shall offer to sell all the share of Ownership owned by the Seller or the portion of the share he wishes to transfer at the lesser of the purchase price offered to Seller in a bona fide offer from a third party or the price specified in section 12.6, or if there is no third party offer, at the price set by section 12.6 below,

Diplomat NBD Hotels Operating Agreement

and shall state the intention, if any, of the Seller to transfer his share of ownership and the name and address of such prospective Purchaser or Lienor, the percentage of share of Ownership involved in the proposed transfer, and the terms under which transfer is to take place.

(b)    Acceptance of Offer. Within thirty (30) days after receipt of such offer, the Company may, at its option, elect to purchase all or a part of the share of Ownership offered by the Seller. The Company shall exercise its election to purchase by giving written notice thereof to the Seller and to the other Members. If such offer is not accepted by the Company within said thirty (30) day period, the other Members may, within thirty (30) days after the expiration of said initial thirty (30) day period, at their option, purchase all or part of the share of Ownership offered by the Seller. The other Members shall be entitled to purchase in proportion to their ownership ownership. The other Members shall exercise their election to purchase by giving written notice thereof to the Seller and to the Company and to the other Members. The notice of election to purchase by the Company or by the other Members, as the case may be, shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of giving such notice.

(c)    Release from Restrictions.    If neither the Company nor the other Members elect to purchase the Seller's share of Ownership, the Seller may make a bona fide transfer to the prospective purchaser or lienor named in the offer, such transfer to be made only in strict accordance with the terms herein stated. However, if the Seller shall fail to make such transfer within thirty (30) days following the expiration of the time hereinabove provided for the election by the other Members of the Company, the share of Ownership shall again become subject to the restrictions of this Agreement as though they had never been so offered.

(d)    Termination of Employment: Any member whose employment in any capacity with the company or its subsidiaries terminates for any reason whatsoever, voluntarily or involuntarily, shall be considered as of the date of such termination of employment to have made an offer of all of his percentage of ownership subject to the terms of this Agreement, at the purchase price stated in section 12.6 below.

**Section 12.5**    Transfer on Bankruptcy, Death or Incompetency. If a Member of the Company dies, is adjudged by a court of competent jurisdiction to be incompetent to handle the Member's person or property  or upon the bankruptcy of a Member, the Member or his personal representative shall notify the Company and other Members. The Company shall have the option to purchase all of such Member's ownership and if the option is exercised, the Member or the trustee of the bankrupt Member or his personal representative shall sell to the Company all the share of ownership at the price determined in accordance with section 12.6 below. If such option is exercised, the Company shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after receipt of notice of the event. If the Company does not exercise its option to purchase, then all the other Members shall have the option to purchase such share, in proportion to their ownership percentage. The other Members shall notify the selling Member or trustee or personal representative in writing of the exercise of the option within thirty (30) days after the expiration of the initial 30-day period.

**Section 12.6**    Price of Ownership.  The price of the ownership shall be the value which is agreed upon between the selling Member or his trustee or personal representative and the

Diplomat NBD Hotels Operating Agreement

purchasing party, whether it be the Company or the Members. If the parties are unable to agree upon a purchase price, the purchase price shall be determined by an appraiser who regularly conducts business appraisals. If the parties are unable to agree upon one appraiser, each shall select an appraiser and the average of the two appraisals shall be the purchase price. The parties shall divide equally the expenses of the appraiser.

**Section  12.7**    Endorsement on Ownership Statement. Statements showing exact percentage sold or encumbered hereunder, properly endorsed to the Company or to the purchasing Member, as the case may be, shall be delivered by the transferor not later than the date of closing.

**Section 12.8**  Insurance. To insure or partially insure its obligation under this Agreement to purchase from the estate of a deceased Member the percentage owned by him prior to his death, the Company shall have the option to purchase policies of insurance covering the lives of each Member in any amount deemed desirable. In the event any Member ceases to be a Member of the Company, the Company shall terminate any such insurance on such Member's life and in the event any Member increases his holdings of the percentage of the Company, the Company shall procure and maintain, if so desired by it, additional insurance on the life of such Member proportionate to the increase in the holdings of such Member.

If the Company shall receive any proceeds of any policy on the life of the Decedent, such proceeds shall be used by the Company to pay the Decedent's Personal Representative to the extent of the purchase price of the Decedent's interest, such payment to be deemed made on account of such purchase price.

**Section 12.9**   Balance of Purchase Price. If the amount of any insurance proceeds is insufficient to pay the purchase price of any Decedent's interest, then the balance of the purchase price remaining after credit for any insurance proceeds shall be payable as follows: (50) % of the balance due to be paid shall be paid in cash, and the balance shall be represented by a promissory note executed by the purchaser payable in (18) installments, which note shall be secured by the Owenership interest of the deceased Member.

**Section 12.10** Limitation on Member's Right to Pledge Percentage. The restrictions of section 12.4 above shall not apply to encumbrances as collateral for a note or notes in favor of the company or any one or more of the other Members or in favor of a recognized lending institution, but only if the proceeds of such loan are used in their entirety to purchase percentage of the Company and the borrowing Member delivers to the Company and the other Member(s) the written commitment of the lender, in form acceptable to the Company that such lender will not dispose of such percentage without first affording the Company and the other Member(s) the right for a period of (30) days to purchase percentage at a price satisfactory to the Company and the other Member(s).

**Section 12.11**  Company Restrictions After Purchase. So long as any part of the purchase price of a Members percentage sold in accordance with this Agreement remains unpaid, the Company shall not:

  A.  declare or pay bonuses to its members;

Diplomat NBD Hotels Operating Agreement

   B. reorganize its structure;

   C. merge or consolidate with any other Company, or sell any of its assets except in the regular course of business;

   D. increase the salary of any officer or executive employee of the Company;

   E. allow any of its obligations to become in default; or

   F. allow any judgments against the Company or any liens against the Company's property to remain unsatisfied.

So long as any part of such purchase price remains unpaid, the Transferor, or the Personal Representative of the Decedent shall have the right to examine the books and records of the Company from time to time and to receive copies of all accounting reports and tax returns prepared for the Company. If the Company breaches any of its obligations under this paragraph, the Transferor or the Personal Representative, in addition to any other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

**Section 12.12**  Purchase By Member. Whenever a Member purchases a percentage of ownership under this Agreement, such purchaser (unless he shall have paid the entire purchase price in cash) shall, following the delivery of the purchasing documents, execute and deliver at the same to the Seller as collateral security for the payment of the unpaid purchase price a formal payment resolution signed by the buyer, and approved by the other Members of the Company. The Membership Certificate shall be held in trust by the Company until the entire purchase price shall be paid. While such the Membership Certificate shall be so held as collateral security and so long as the Purchaser is not in default, the Purchaser shall be entitled to all voting rights with respect thereto. Interest earned shall not apply to reduction of the principal owed.

**Section 12.13**  Purchase By Company. Whenever the Company shall, pursuant to this Agreement, be required to purchase a percentage of the Company, the Members and the Personal Representative of any Decedent shall do all things and execute and deliver all papers as may be necessary to consummate such purchase. Any note required to be given hereunder by the Company as part of the purchase price shall be endorsed and guaranteed by the remaining or surviving Members, who shall not be discharged from such liability by reason of the subsequent extension, modification or renewal of any such note. Until all amounts due are paid,. Financing Statement (to be recorded) shall be delivered to Seller.

**Section 12.14**  Value of Purchase Price for Tax Purposes. It is understood that the purchase price, determined as set forth hereinabove, shall be the value of the purchased Ownership interest for all tax purposes. In the event such value is later increased by any federal or state taxing authority, any tax liability resulting from such increase shall be borne by the selling Member or his Personal Representative, as the case may be.

**Section 12.15**  Indebtedness of a Member. In the event that there is a purchase and sale of a Member's Ownership interest or a percentage thereof, pursuant to the provisions hereinabove, and there is any indebtedness owed by the selling Member or his estate to any party to this Agreement, then, notwithstanding the said provisions relating to the payment of the purchase price, and any amount to be paid for the Ownership interest being purchased shall be applied first

Diplomat NBD Hotels Operating Agreement

to reduce and satisfy any indebtedness owed by the Selling Member or his estate to any party under this Agreement.

**Section 12.16**  Default.  In the event of a default in the payment of any installment of the purchase price, the covenants and conditions of this Agreement, or any Security Agreement given to Sellers, Sellers may declare the entire unpaid portion of the purchase price to be immediately due and payable, and may proceed to enforce payment of same and to exercise any and all rights and remedies provided by the Uniform Commercial Code as well as any other rights and remedies either at law or in equity available to them, and Seller may assign, sell or transfer all or any part of the collateral in such manner, at such price, and on such terms and conditions as Sellers, in their sole and absolute discretion, may determine. Sellers or the Company shall have the right to purchase any or all of the collateral, apply any unpaid indebtedness on account thereof, and have a claim against Purchaser for the balance of such indebtedness in addition to any and all remedies available to them at law or in equity.

**Section 12.17**  Transfer Upon Dissociation of a Member:

(a)  Voluntary Dissociation by an Individual Member.  At least thirty (30) days prior to the time that a Member voluntarily Dissociates as a Member with the consent of the other Members in accordance with Section 14.1(a), such Member shall give Notice to the other Members and to the Company of such voluntary Dissociation, and upon expiration of ninety (90) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests in the Company or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all the Economic Interest then held by such Member. The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.6 above  and shall be paid in accordance with the provisions of Section 12.19 (b) below.

(b)  Dissociation other than for Death, Incompetency or Voluntary Dissociation.  In the event a Member shall Dissociate as a Member of the Company for any reason other than by reason of the death or incompetency of such Member or pursuant to Section 12.17 (a) above, then, within thirty (30) days after such Dissociation, the remaining Members, or any one or more of them, shall be obligated to purchase, on a basis pro rata to their Membership Interests or on such other basis as the remaining Members shall agree to, and the Dissociated Member shall be obligated to sell to the remaining Members, all of such Member's Economic Interest in the Company.  The purchase price to be paid by the remaining Members shall be determined in accordance with the provisions of Section 12.18 (b) below.

**Section 12.18**  Payment Period:

(a)  The aggregate purchase price due the estate, personal representative, conservator, or other legal representative of the deceased or incompetent Member for such deceased or incompetent Member's Economic Interest purchased pursuant to Section 12.5 above shall be paid in the following manner:

Diplomat NBD Hotels Operating Agreement

(i)  There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such deceased or incompetent Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the deceased or incompetent Member's estate, personal representative, conservator, or other legal representative.

(ii)  The remaining portion of the aggregate purchase price shall be paid in cash at the closing of such sale;

(b)  The aggregate purchase price due to any Dissociated Member under Section 12.6 above shall be paid in the following manner:

(i)  There shall first be credited against such purchase price the amount of any indebtedness due and payable to the Company by such Member. Such indebtedness shall be repaid out of the purchase price directly by the other Members and deducted from the amount otherwise payable to the Dissociated Member.

(ii)  There shall next be credited the amount of any expenses or damages incurred by the Company as a result of such Dissociation. Such amount is to be determined by the remaining Members of the Company.

(iii)  Fifteen percent (15%) of the remainder of such aggregate purchase price shall be paid in cash at the closing of such sale. The balance of the purchase price remaining after the initial payment shall be payable in five (5) equal annual installments, the first such installment being payable within twelve (12) months after the initial payment, and each of the remaining four (4) installments being payable annually thereafter until the balance of the purchase price is paid in full.

(iv)  The balance of such purchase price, after the initial payment, shall be represented by one or more non-negotiable promissory notes of the other Members delivered to the Dissociated Member, bearing interest at the higher of the then applicable federal rate or the prime rate of Haven Trust Bank then in effect, compounded semiannually, from the date of the initial payment. The promissory notes shall provide that the other Members shall have the privilege of prepaying all or any part of the purchase price at any time with interest to the date of prepayment, and that a default in the payment of any installment shall cause the remaining unpaid installments to become immediately due and payable at the option of the payee. The promissory notes shall be secured by the transferred Economic Interest.

(c)  The date of closing with respect to the sale of a Dissociated Member's Economic Interest in the Company pursuant to Sections 12.5 and 12.17 of this Article XII shall, unless a date is agreed to by the Dissociated Member and the remaining Members, be determined by the remaining Member or Members purchasing such Economic Interest and shall take place within sixty (60) days of the death, incompetency or other Dissolution Event which causes the Member to Dissociate from the Company.

Diplomat NBD Hotels Operating Agreement

## ARTICLE XIII
## ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

**Section 13.1**  Rights of Assignees.  Notwithstanding anything to the contrary contained in this Operating Agreement, the only rights which an Assignee of a Member pursuant to Article XII shall have are those rights associated with the Economic Interest received and such Assignee shall not receive any right to participate in the management of the business and affairs of the Company or to become a Member; provided, however, that in the event an Assignee is an existing Member of the Company, such Assignee shall receive all rights to participate in the management of the business and affairs of the Company incident to the transferred Economic Interest.  An Assignee is only entitled to receive the Distributions and return of capital, and to be allocated the Net Profits and Net Losses attributable to a transferred Economic Interest.

**Section 13.2**  Admission of Substitute Members.  An Assignee of an Economic Interest shall be admitted as a Substitute Member and entitled to all the rights of the Member who initially assigned the Membership Interests only with the unanimous written approval of the Members.  The Members may grant or withhold the approval of such admission in their sole and absolute discretion.  If so admitted, the Substitute Member has all the rights and powers and is subject to all the restrictions and liabilities of the Member originally assigning the Membership Interests.  The admission of a Substitute Member, without more, shall not release the Member originally assigning the Membership Interests from any liability to the Company that may have existed prior to the approval.

**Section 13.3**  Admission of Additional Members.  From the date of formation of the Company, any Person acceptable to the Members by their unanimous written approval may become Additional Members of the Company for such consideration as the Members shall determine, subject to the terms and conditions of this Operating Agreement.  No Additional Member shall be entitled to any retroactive allocation of income, gain, loss, deduction or credit by the Company.  The Members may, at their option, at the time the Additional Member is admitted, close the Company's books (as though the Company's Taxable Year had ended) or make pro rata allocations of income, gain, loss, deduction or credit to the Additional Member for that portion of the Company's Taxable Year in which the Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Regulations promulgated thereunder. Upon admission of an Additional Member, this Operating Agreement shall be amended in order to reflect such additional Member's Membership Interest in the Company.

## ARTICLE XIV
## DISSOCIATION, DISSOLUTION AND WINDING UP

**Section 14.1**  Dissociation.  A Person shall cease to be a Member upon the happening of any of the following Dissolution Events:

(a)  the withdrawal of a Member with the consent of Members holding at least a majority of the Membership Interests of the Company;

(b)  in the case of a Member who assigns all of his Membership Interest, by the

Diplomat NBD Hotels Operating Agreement

affirmative vote or action of the Members who have not assigned their Membership Interests and who hold at least a majority of the non-assigned Membership Interests of the Company;

(c) upon the Manager's receipt of Notice with respect to a Member who:

(i) makes an assignment for the benefit of creditors;

(ii) files a voluntary petition in bankruptcy;

(iii) files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(iv) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding in the nature of the proceedings listed in (iii); or

(v) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member of all or any substantial part of the Member's properties:

(d) in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person or property;

(e) in the case of a Member who is a trustee or is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(f) in the case of a Member that is a separate Organization other than a company, the dissolution and commencement or winding up of the separate Organization;

(g) in the case of a Member that is a company, the filing of articles of dissolution (or its equivalent) for the company or the revocation of its charter and the lapse of ninety (90) days after notice to the company of such revocation without a reinstatement of its charter; or

(h) in the case of an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

**Section 14.2**  Rights of Dissociating Member.  In the event a Member Dissociates from the Company and such Dissociation causes a Dissolution and winding up of the Company under this Article, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that any Distributions to which the Member would have been entitled shall be reduced by damages sustained by the Company as a result of the Dissolution and winding up.

**Section 14.3**  Term and Dissolution.  The Company shall be dissolved and its affairs wound up prior to such date, upon the first to occur of the following events (which, unless the Members agree to continue the business, shall constitute Dissolution Events):

Diplomat NBD Hotels Operating Agreement

    (a)  the written consent of Members holding a majority of the Membership Interests of the Company;

    (b)  the Dissociation of any Member as provided in Section 14.1 of this Article, unless (i) there are at least two remaining Members or at least one remaining Member and an Additional Member or Substitute Member is admitted in accordance with Article XIII hereof and (ii) the legal existence and business of the Company is continued with the unanimous consent of the Members within 90 days after such Dissociation.

    (c)  the merger of the Company where the Company is not the successor limited liability company in such merger or the consolidation of the Company with one or more limited liability companies or other entities.

    (d)  The issuance of a final Certificate of Termination of the Company by the Secretary of State of the State of Georgia.

    **Section 14.4**  Distribution of Assets on Dissolution.  Upon the winding up of the Company, Company Property shall be distributed in the following order:

    (a)  to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of Company Liabilities;

    (b)  to Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's Taxable Year in which the liquidation occurs.  Liquidation proceeds shall be paid within 60 days of the end of the Company's Taxable Year or, if later, within 90 days after the date of liquidation.  Such distributions shall be in cash or property or partly in both, as determined by the Members.

    **Section 14.5**  Winding Up and Certificate of Termination.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.  Upon the completion of winding up of the Company, a Certificate of Termination shall be delivered to the Secretary of State of the State of Georgia.  The Certificate of Termination shall set forth such information as is required by the Act.

    **Section 14.6**  Effect of Dissolution.  Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of, the Company business, but the Company is not terminated, but continues until the winding up of the affairs of the Company is completed and a Certificate of Termination with respect to the Company, or the equivalent, has been issued by the Secretary of State.

Diplomat NBD Hotels Operating Agreement

# ARTICLE XV
# AMENDMENT

**Section 15.1**  Amendment or Modification of Operating Agreement. This Operating Agreement may be amended or modified from time to time only by a written instrument adopted by all of the Members.

# ARTICLE XVI
# MISCELLANEOUS PROVISIONS

**Section 16.1**  Entire Agreement. This Operating Agreement constitutes the entire agreement among the parties. No party shall be bound by any terms, conditions, statements or representations, oral or written, not herein contained. Each party hereby acknowledges that in executing this Operating Agreement, such party has not been introduced, persuaded or motivated by any promise or representation made by any other party, unless expressly set forth herein. All previous negotiations, statements and preliminary instruments by the parties or their representatives are merged in this Operating Agreement.

**Section 16.2**  Investment Representations. The undersigned Members acknowledge (i) that the Membership Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, the Georgia securities laws or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering, (ii) that the Company has relied upon the fact that the Membership Interests are to be held by each Member (or Assignee) for investment, and (3) that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member (or Assignee) with a view to distribution.

Accordingly, each Member hereby represents and warrants to the Company that such Member is acquiring the Membership Interest for such own Member's account for investment and not with a view to the resale or distribution thereof. Each Member agrees not to transfer, sell or offer for sale any or portion of such Member's Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and under any applicable state securities laws or unless the holder of such Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such transfer, offer or sale. Each Member acknowledges that the Company is under no obligation to register such Member's Membership Interest or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Membership Interest. Furthermore, each Member realizes that such Membership Interest is unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "Affiliate" of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three years.

Prior to acquiring a Membership Interest in the Company, each Member has made an

Diplomat NBD Hotels Operating Agreement

investigation of the Company and its business and has had made available to each such Member all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest. Each Member considers himself or itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

**Section 16.3** Rights of Creditors and Third Parties. This Operating Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. This Operating Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by the Act or other applicable statute, no such creditor or third party shall have any rights under this Operating Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

**Section 16.4** Interpretation. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing this Operating Agreement hereby agree to the terms and conditions contained herein, as it may from time to time be amended according to its terms. It is the express intention of the Members that this Operating Agreement and the Articles shall be the sole source of agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly incorporates Federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, the Operating Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of this Operating Agreement is prohibited or ineffective under the Act, the Operating Agreement shall be considered amended to the smallest degree possible in order to make the agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**Section 16.5** Governing Law. This Operating Agreement, and the application or interpretation hereof, shall be governed by its terms and by the laws of the State of Georgia, and specifically the Act, applied without respect to any conflicts-of-law principles.

**Section 16.6** Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**Section 16.7** Construction of Terms. Whenever used in this Agreement and when required by the context, the singular number shall include the plural and the plural the singular. Pronouns of one gender shall include all genders.

**Section 16.8** Captions. The captions as to contents of particular articles, sections or paragraphs contained in this Operating Agreement and the table of contents hereto are inserted for convenience and are in no way to be construed as part of this Operating Agreement or as a limitation on the scope of the particular articles, sections or paragraphs to which they refer.

Diplomat NBD Hotels Operating Agreement

**Section 16.9**   Waivers.   The failure of any party to seek redress for violation of or to insist upon the strict performance of any agreement or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 16.10**   Rights and Remedies Cumulative.   The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.   Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**Section 16.11**   Heirs, Successors and Assigns.   Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Section 16.12**   Counterparts.   This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

[SIGNATURES CONTINUE ON NEXT PAGE]

Diplomat NBD Hotels Operating Agreement

Approved this the 29th day of October, 1999.

_____
Rajesh C. Patel, Member

_____
Mukesh C. Patel, Member

Diplomat NBD Hotels Operating Agreement

# EXHIBIT "A"

## MEMBERSHIP INTERESTS

Mukesh C. Patel                    50%

Rajesh C. Patel                    50%

## CAPITAL ACCOUNT CONTRIBUTION

Summary of capital invested by each Member to date:

Mukesh C. Patel                    $1,000

Rajesh C. Patel                    $1,000

# EXHIBIT B



**SLOTKIN
LAW**

June 20, 2019

**VIA CERTIFIED MAIL, RETURN
RECEIPT REQUESTED &
U.S. MAIL**
Mr. Rajesh C. Patel
2253 Grady Ridge Trail
Duluth, Georgia 30097

**VIA CERTIFIED MAIL, RETURN
RECEIPT REQUESTED &
U.S. MAIL**
Mr. Mukesh Patel
2860 Cravey Drive, N.E.
Atlanta, Georgia 30345

RE:  Request Pursuant to O.C.G.A. § 14-11-312(2) for
Books and Records from Diplomat NBD Hotels, LLC

Dear Messrs. Patel and Patel:

This law firm represents Asvin Patel and Ashok Ranchod. As you know, Messrs.
Patel and Ranchod were members of Diplomat NBD Hotels, LLC. The purpose of this
letter is to make a formal demand, pursuant to O.C.G.A. § 14-11-312(2), for true and
complete information regarding the state of the business and financial condition of
Diplomat NBD Hotels, LLC. Specifically, Messrs. Patel and Ranchod request to inspect
the following categories of documents:

- All corporate organization documents; operating agreements; evidence of good
  standing; minutes of meetings of members, managers, or officers; corporate
  resolutions, actions, and consents, and other official corporate documents of any
  kind, together with any amendments thereto.
- The detailed general ledger for Diplomat NBD Hotels, LLC and financial
  statements, closing statements, balance sheets, tax returns and referenced
  schedules, and all supporting documentation, accounting work papers,
  correspondence and drafts.
- All documents and communications documenting, referencing, relating, or
  pertaining to the capital contributions made by each member in Diplomat NBD
  Hotels, LLC and any loans made by any members to Diplomat NBD Hotels, LLC.
- All documents and communications documenting, referencing, relating, or
  pertaining to any and all disbursements, compensation, wages, commissions, fees,
  or remuneration of any kind made to any member (or member's family) or
  manager of Diplomat NBD Hotels, LLC.
- Any and all documents and communications documenting, referencing, relating, or
  pertaining to any and all indebtedness incurred at any time by Diplomat NBD
  Hotels, LLC.
- All information relevant to the state of the business and financial condition of
  Diplomat NBD Hotels, LLC.

Mr. Rajesh C. Patel
Mr. Mukesh Patel
June 20, 2019
Page 2 of 2

- Any and all documents and communications documenting, referencing, relating, or pertaining to the sale of the Diplomat Amerisuites Hotel in April 2006.
- Any and all documents and communications documenting, referencing, relating, or pertaining to the purchase of the parking facility located at 218 Peachtree Street, Atlanta, Georgia 30303.
- Any and all documents and communications documenting, referencing, relating, or pertaining to the sale of Diplomat NBD Hotels, LLC's assets to 218 Capital Partners LLC.

Please provide us with a date and time within **seven days** of your receipt of this letter to inspect the documents listed above. If I do not hear from you within that timeframe, Messrs. Patel and Ranchod will have no choice but to file suit pursuant to O.C.G.A. § 14-11-313(3) to have a court order you, as managers of Diplomat NBD Hotels, LLC, to permit the inspection. Messrs. Patel and Ranchod will also seek all attorney's fees and costs incurred in filing such action, as permitted by the statute.

Sincerely,

F. Robert Slotkin, Jr.

cc:    John Calzaretto, Esq.
       Mr. Asvin Patel
       Mr. Ashok Ranchod