**IT IS ORDERED as set forth below:**



**Date: June 23, 2022**

_____
**Lisa Ritchey Craig**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | : | **CASE NUMBER** |
| | : | |
| RAJESH C. PATEL, | : | 16-65074 -LRC |
| | : | |
| | : | IN PROCEEDINGS UNDER |
| | : | CHAPTER 7 OF THE |
| DEBTOR. | : | BANKRUPTCY CODE |

## **O R D E R**

In this _Motion to Enforce Stay and for Award of Mandatory Sanctions Pursuant to 11 U.S.C. §362(k)_ (the "Motion," Doc. 135), filed by Rajesh C. Patel (the "Debtor"), Debtor asks the Court to sanction Hasmita Patel,[1] Mukesh Patel ("Mike Patel"), and Rishi Patel (collectively with Hasmita and Mike Patel, the "HP"), for continuing an arbitration

---

[1] Unfortunately, since the filing of the Motion, Hasmita Patel passed away.

proceeding against Debtor in violation of the automatic stay.[2]  The HP oppose the Motion

and seek annulment of the automatic stay (Doc. 145).

The Court held an evidentiary hearing, which began on January 31, 2020, was

continued to October 19, 2021, and concluded on October 22, 2021 (the "Evidentiary

Hearing").  The Court has jurisdiction over this core proceeding.  *See* 28 U.S.C. §§ 157;

1334, § 157(b)(2)(A), (G), and (O); *see also In re Combs,* 2006 WL 6591825, at *1

(Bankr. N.D. Ga. Nov. 20, 2006); *In re Howard*, 391 B.R. 511, 520 (Bankr. N.D. Ga.

2008).  Having considered the testimony of the witnesses, the exhibits, and the arguments

of counsel, the Court makes the following findings of fact and conclusions of law in

accordance with Rule 7052 and Rule 9014 of the Federal Rules of Bankruptcy

Procedure.[3]

## FINDINGS OF FACT

Prior to filing bankruptcy, Debtor and his brother, Mike Patel, created and

operated a successful hotel business that generated significant assets for both families.

Testimony of Debtor, Trial Transcript dated Oct. 19, 2021 (hereinafter "Vol. I"), at 128;

Mike Patel, Vol. I, at 60-61.  The Great Recession, however, resulted in the loss of many

---

[2] In the Motion, Debtor also asserted that the automatic stay extended to the rest of the SP.  The cases cited arose in the context of a Chapter 13 case.  The Court notes that, unlike a Chapter 13 case, in which § 1301 provides a "co-debtor" stay, Chapter 7 provides no similar protection for co-debtors.  Debtor also argued that the automatic stay applied to the rest of the SP because the claims were 'inextricably intertwined' with claims against Debtor.  The Court notes that any extension of the automatic stay to cover non-debtor parties would have had to have been ordered by this Court prior to the entry of the Award to be the basis of a finding of contempt.

[3] To the extent that any findings of fact constitute conclusions of law, they are adopted as such.  Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

of the business assets and the entry of multiple judgments against Debtor and Mike Patel.

Testimony of Debtor, Trial Transcript dated Oct. 20, 2021 (hereinafter "Vol. II"), at 2-36;

HP Exh. 27.  For these reasons, Debtor transferred all assets out of his name eight years

before filing bankruptcy and did not acquire more assets in his name. *Id*. Thereafter, the

two families—the HP and the Shama Parties (the "SP")—became involved in a series of

disputes.  Mike Patel, Vol. I, at 63-68; Debtor, Vol. I, at 120.  The SP were comprised of

Debtor, Jay Patel, Sonial Patel, Mayur Patel, Monica Patel, and Shama Patel.  Debtor,

Vol. I, at 146.

In 2015, the SP and the HP entered into a Release and Settlement Agreement (the

"RSA") to resolve certain issues.  Debtor, Vol. I, at 120; Testimony of Douglas Krevolin,

Trial Transcript dated Oct. 21, 2021 (hereinafter "Vol. III"), at 3-120; HP Exh. 3.  The

RSA was viewed as a "final financial divorce between [Debtor's] family and Mike's

family," that involved the transfer of various properties and assets between members of

Debtor's family and Mike's family in an effort to divide up assets that were "jointly

attained" by the two families through business dealings since 1981.  Debtor, Vol. I, at

121-22, 125; HP Exh. 3; Debtor, Vol. II, at 2-22; Douglas Krevolin, Vol. III, at 3-122.

Neither Debtor nor Mike Patel individually owned any assets at that time, however.

Debtor, Vol. II, at 2-26. On February 9, 2016, after further disagreements, the two groups

entered a First Amendment to Release and Settlement (the "First Amendment"), which

provided for the arbitration of certain disputes.  Debtor, Vol. II, at 2-24, 2-27 through 2-

29; Douglas Krevolin, Vol. III, at 3-125; Jay Patel, Vol. III, at 3-230; HP Exh. 4.  During the negotiations of the First Amendment, the SP wanted to include the arbitration provision and insisted on the designation of Hank Fellows (the "Arbitrator") as the arbitrator, and the parties so agreed.  Douglas Krevolin, Vol. III, at 3-153; Jay Patel, Vol. III, at 3-234.  Debtor did not own any of the businesses or properties at issue.  Debtor, Vol. II, at 2-38 through 2-43; Testimony of Jay Patel, Trial Transcript dated Oct. 22, 2021 (hereinafter "Vol. IV"), at 4-20.

In April 2016, the SP, including Debtor, initiated an arbitration between the SP and the HP with the Arbitrator.  Krevolin, Vol. III, at 3-154, 3-156; HP Exh. 68 (Arbitration Exh. 253); HP Exh. 6; Debtor, Vol. II, at 2-93; Rishi Patel, Vol. III, 3-9; Jeffrey Horst, Vol. III, at 3-106.  Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on August 30, 2016 (the "Petition Date").  Doc. 1; Debtor, Vol. I, at 140.  Neil C. Gordon (the "Trustee") was appointed as the Chapter 7 trustee.  After the Petition Date, on September 16, 2016, Jay Patel, Debtor's son, filed a civil action in Gwinnett Superior Court (the "Gwinnett Action") against Rishi Patel, Mike Patel's son, and in response, Rishi Patel filed a motion to dismiss, transfer venue or, alternatively, to compel arbitration on December 6, 2016.  Horst, Vol. IV, at 83; HP Exh. 7.  Jay Patel agreed to a dismissal of the Gwinnett Action on the condition that the claims therein be arbitrated.  HP Exh. 11.

In March of 2017, the Arbitrator held a conference call with counsel for the parties

4

during which they discussed Debtor's active bankruptcy.  Horst, Vol. III, at 3-66.  Debtor

was represented by Buddy Parker ("Mr. Parker") as legal counsel during these exchanges.

Testimony of Wilmer Parker, III, Trial Transcript dated Jan. 31, 2020 (hereinafter "Vol.

A"), at 53, 61.  The Arbitrator asked counsel for legal research regarding the applicability

of the automatic stay to the non-debtor SP.  Horst, Vol. III, at 3-66.  On March 24, 2017,

Mr. Boutros, counsel for the HP, sent an email to the Arbitrator and copied counsel for

the SP, stating "[f]ollowing up on the conference call from this past Tuesday, we believe

the law permits the arbitration to move forward as to the other parties, and the bankruptcy

only acts as a stay as to [Debtor]. . . ."  Parker, Vol. A, at 66; Horst, Vol. III, at 3-63

through 3-64, Vol. IV, at 4-114 through 4-116; HP Exh. 16.  The email provided six

cases and the *Collier on Bankruptcy* treatise in support of that position.  HP Exh. 16.

Later that day, Mr. Boutros emailed the Arbitrator, copying counsel for the SP, with two

United States District Court decisions, one of which held that there was a stay as to

Debtor but not as to related parties in another case involving Debtor.  Parker, Vol. A, at

68-70; HP Exh. 17; Horst, Vol. IV, at 4-119.  Four days later, the Arbitrator emailed

counsel for the HP and the SP to inform them that he had determined that he could

proceed with the arbitration against the non-debtor parties. Horst, Vol. IV, at 4-120; HP

Exh. 18.

        The original arbitration agreement was prepared by the HP and approved by the

Arbitrator.  Horst, Vol. III, at 3-74.  It provided that the parties would share the expense

of the arbitration fee 50/50.  HP Exh. 10.  The SP revised the approved arbitration agreement to provide that the HP would have to pay the entire retainer fee to the Arbitrator without bringing it to the attention of the HP or the Arbitrator.  Parker, Vol. A, at 93-95; Debtor, Vol. II, at 2-45, 2-49; Horst, Vol. III, at 3-64, 3-74; HP Exh. 21.  The SP did not revise the approved version of the arbitration agreement to remove Debtor as a signatory or to change the scope of the arbitration—"all disputes between and among [the parties], including but not limited to, any and all disputes arising under or relating to the [RSA and/or the First Amendment] and any other issue either the [HP or the SP] raise." Horst, Vol. IV, at 4-107, 4-112; HP Exh. 21.  Debtor signed the SP's revised version of the arbitration agreement.  *Id.;* Debtor, Vol. II, at 2-48.  The Arbitrator detected the change to the retainer provision and required the SP to sign the approved version of the arbitration agreement.  Horst, Vol. III, at 3-74 through 3-75, Vol. IV, at 4-107, 4-109. Thereafter, Debtor signed the approved version of the arbitration agreement and, through his attorney, requested "a laptop hookup and screen to make his presentation."  Horst, Vol. IV, at 4-112; HP Exh. 22; HP Exh. 23.  Along with the SP's revised arbitration agreement, Mr. Parker had sent the Arbitrator his clients' list of issues for arbitration. Parker, Vol. A, at 92; HP Exh. 21.  The list of issues indicates that Debtor submitted affirmative claims against the HP.  Parker, Vol. A, at 95; HP Exh. 21; Debtor, Vol. II, at 2-105; HP Ex. 54; Horst, Vol. IV, at 4-122; HP Exh. 19.

Mr. Parker knew of Debtor's bankruptcy case prior to the arbitration hearing.

Parker, III, Vol. A, at 72-73.  He believed that Debtor's bankruptcy petition should stay the arbitration and he "thought, as a matter of law, an arbitration award could not be issued and collected on against" Debtor.  *Id*.  He intentionally did not assert any bankruptcy stay would preclude the arbitration when the topic repeatedly came up with the Arbitrator in conference calls and emails because he wanted to create a "poison pill" to invalidate the arbitration if his client did not prevail in it.  *Id*.  Similarly, at all relevant times, the HP, their counsel, and the Arbitrator were aware of Debtor's bankruptcy case.  Debtor, Vol. I, at 140; Rishi Patel, Vol. III, at 3-46; Horst, Vol. III, at 3-64, Vol. IV, at 4-116.  The HP did not file a motion for relief from the automatic stay prior to the Arbitration Hearing.  Horst, Vol. III, at 3-81.  The HP's counsel had no intention of pursuing claims against Debtor in the arbitration and, after communicating with the Arbitrator and counsel for the SP, understood that the HP were going to pursue affirmative claims against only the "remaining Shama parties."  Horst, Vol. IV, at 4-116, 4-120.  As counsel for the HP, Mr. Horst understood, after various communications with the Arbitrator and Mr. Parker "that the arbitration was going to go forward, the [HP] were not going to pursue any affirmative claims against [Debtor], they were going to pursue their claims against the remaining [SP]" and the SP, including Debtor, "were going to pursue their affirmative claims against the [HP] and that's the universe of the issues that [the Arbitrator] was going to be presented and decide in rendering an award."  Horst, Vol. IV, at 4-120 through 4-121.

7

On June 12 through June 14, 2017, the parties participated in an arbitration hearing (the "Arbitration Hearing").  Debtor, Vol. I, at 141; Horst, Vol. III, at 3-60.  The Arbitrator orally communicated that Debtor would not be the subject of claims in the arbitration.  HP Exh. 61.  The SP, including Debtor, were represented by Mr. Parker. Parker, Vol. A, at 53-54; Debtor, Vol. I, at 141-42; Debtor, Vol. II, at 2-46.  Debtor attended and participated in the Arbitration Hearing, passed out binders of documents, and gave his own opening statement.  Debtor, Vol. I, at 142; Parker, Vol. A., at 75; Horst, Vol. IV, at 4-117 through 4-118.  Debtor participated in the Arbitration Hearing to help his family and because he "had issues [he] wanted to pursue"—his "own affirmative claims."  Debtor, Vol. II, at 2-93, 2-223, 2-230.  In the arbitration, Debtor asserted at least $220,000 of prepetition claims that he personally held against the HP, that he did not disclose in his bankruptcy schedules, as well as a $600,000 claim against Mike Patel. Debtor, Vol. II, at 2-52 through 2-55, 2-58, 2-93 through 2-94, 2-98; HP Exh. 54; Parker, Vol. A, at 75.  Debtor originally listed claims in an unknown amount against Mike Patel and Rishi Patel but did not list such claims on his amended Schedule A/B, which he swore was accurate under penalty of perjury and to which he testified, under oath, were accurate at his § 341 meeting of creditors.  Debtor, Vol. II, at 2-56 through 2-57.[4]

During the Arbitration Hearing, the HP did not pursue claims against Debtor,

---

[4]  Debtor later testified that he did not intend to remove claims against Mike Patel and Rishi Patel from Schedule A/B and that he did not sign the two amended Schedules A/B—HP Exhibits 28 and 29.  Testimony of Debtor, Vol. II, at 2-140, 2-142.  Debtor subsequently testified that he did in fact sign the amended schedules through his attorney, but that the deletion of the claims against Mike Patel and Rishi Patel was unintentional.  *Id.* at 2-226.

individually.   Horst, Vol. IV, at 4-127.   The exhibits used by the HP during their presentation related to the Myrtle Beach hotel, the Midland Bank loan assumption, the Delk Road project, warehouses, the Walton project,  Chelsea Capital Partners, 218 Capital Partners, Kisan, the Pell City hotel, Look Outdoor, LLC, the Hapeville Shopping Center, Alcovy, Budgetel Lodging, LLC, Carnegie, and claims stemming from a lawsuit filed by Jay Patel against Rishi Patel and a suit involving Prakesh Patel, none of which were properties, projects, or assets in which Debtor had any interest.  Horst, Vol. IV, at 4-136 through 4-140; HP Exh. 30; Jay Patel, Vol. IV, at 4-20.  Although the HP served extensive discovery requests on the SP, the SP did not produce documents to the HP prior to the Arbitration Hearing and did not produce documents to the HP at the Arbitration Hearing until the third day of the hearing.  Horst, Vol. IV, at 4-133 through 4-135; HP Exh. 33.  The SP did not serve discovery requests on the HP.  Horst, Vol. IV, at 4-134.

Following the Arbitration Hearing, the Arbitrator requested proposed findings of fact and conclusions of law.  Horst, Vol. III, at 3-99.  The HP submitted proposed findings of fact and conclusions of law (the "HP's Findings and Conclusions") that requested compensatory and punitive damages be awarded against the SP, and the definition of the SP for this purpose included Debtor without any "savings clause" that would have excluded Debtor from liability for any monetary award.  Horst, Vol. III, at 3-100 through 3-101. Mr. Parker submitted proposed findings of fact on behalf of the SP that did not assert that the automatic stay prevented Debtor's participation in the

9

Arbitration Hearing.  Parker, Vol. A, at 75.  Further, Mr. Parker submitted a rebuttal to the HPs' Findings and Conclusions that failed to raise the automatic stay.  Parker, Vol. A, at 75; Horst, Vol. IV, at 4-145.  Counsel for the HP and the SP met with the Arbitrator and had an additional opportunity to make further presentations.  Horst, Vol. IV, at 4-146.  Mr. Parker did not assert at that time that the automatic stay prevented Debtor's participation in the Arbitration Hearing.  Horst, Vol. IV, at 4-145.

On August 1, 2017, the Arbitrator ruled in favor of the HP and entered an award in favor of the HP on some of their claims (the "Arbitration Award").  Parker, Transcript, Vol. A, at 76; Debtor, Vol. I, at 146-48; Horst, Vol. III, at 3-108.  The Arbitration Award granted money damages against the SP in favor of the HP in the amount of $2,023,810.11.  Debtor, Vol. II, at 2-224; Rishi Patel, Vol. III, at 3-47; HP Exh. 33.  The Arbitration Award defined the SP to include Debtor and did not expressly state that Debtor was not a subject of monetary relief.  HP Exh. 33; Jay Patel, Vol. IV, at 4-19. Thereafter, Mr. Parker contacted the HP's counsel and requested a meeting.  Horst, Vol. IV, at 4-149.  On August 25, 2017, Debtor's bankruptcy counsel, along with Mr. Parker, met with the HP's counsel and told them that he would file the Motion and seek sanctions if the HP did not agree that the arbitration, in its entirety, was void. *Id*. at 4-150; Parker, Vol. A, at 58.   The same day, Debtor filed the Motion.   Debtor's bankruptcy counsel scheduled the Motion for hearing on September 19, 2017, but subsequently rescheduled

the hearing several times.[5]

During this time, counsel for the HP emailed the Arbitrator on September 13, 2017, requesting that the Arbitrator clarify his ruling to expressly state that Debtor was not liable for any monetary claims or relief granted in the Arbitration Award. Parker, Vol. A, at 76; Horst, Vol. IV, at 4-149 through 4-157; HP Exh. 37. The HP's counsel specifically asked the Arbitrator to amend the Arbitration Award to provide that the HP were proceeding against only the non-debtor SP, that "none of the monetary damages ordered against the [SP] applies to" Debtor, and that the HP would not undertake any efforts to collect from Debtor. Horst, Vol. IV, at 4-156 through 4-157; HP Exh. 37. Mr. Parker opposed that revision on behalf of Debtor and the other SP, arguing that no amendments should be made after entry of the award because the Arbitrator had retained jurisdiction to amend the Arbitration Award for only thirty days and more than 30 days had elapsed. Parker, Vol. A, at 78; Horst, Vol. IV, at 4-158; HP Exh. 38. The Arbitrator informed the HP and the SP in October 2017 that, in light of Mr. Parker's objection, the Arbitrator would take no further action with regard to the Arbitration Award. Horst, Vol.

---

[5] The Motion was served on the Chapter 7 Trustee and was initially supported by creditor RL BB-GA (Doc. 144). RL BB-GA, however, asserted that Debtor was complicit in the stay violations, such that his discharge should be denied, and requested that the proceeds from any sanctions be awarded to the bankruptcy estate to be distributed for the benefit of creditors. *See* Doc. 144. Beth Rogers, as counsel for the Chapter 7 Trustee and RL BB-GA, appeared at an initial hearing on March 8, 2018, asked the Court to continue the preliminary hearing to allow time for discovery and to finish up a mediation involving these parties. Based on the statements of counsel at this hearing, the Court expected the parties would submit a scheduling order that would provide for further discovery, followed by a request for an evidentiary hearing, but no further action was taken on the Motion until the HP filed a motion to dismiss the Motion for want of prosecution on September 9, 2018. *See* Docs. 139, 146, 150, 155, & 188; Audio Recording of Hearing, March 8, 2018, 11:52 a.m. Thereafter, Ms. Rogers has not participated further in these proceedings.

IV, at 161; HP Exh. 39. The Court agrees with the HP that Mr. Parker's true motivation

for opposing the amendment was that an amendment could negate the "poison pill" that

Mr. Parker wanted to use to undo the negative arbitration ruling as to Debtor's family

members and allow Debtor another opportunity to assert his own claims against the HP.

On October 31, 2017, Debtor and other members of his family filed a Petition to

Vacate the Arbitration Award in the DeKalb County Superior Court (the "Superior Court

Action"). Debtor, Vol. II, at 2-117; Horst, Vol. III, at 3-111; Jay Patel, Vol. IV, at 4-30;

HP Exh. 40. Debtor joined in the Superior Court Action "to protect [his] interest." *Id*. at

2-218. In the Superior Court Action, Debtor asserted that the Arbitration Award was

void *ab initio* as to all parties because it was a "flagrant violation of the automatic stay"

and represented to the court that his participation in the arbitration was not improper

because of "the existence of affirmative claims" of Debtor and his family against the HP.

*Id*.; Jay Patel, Vol. IV, at 4-32 through 4-33; Exh. 40. In response, on December 7, 2017,

the HP filed an answer stating that they were not seeking any monetary relief against

Debtor. Horst, Vol. III, at 3-112, 3-114; Vol. IV, at 4-163; HP Exh. 41, at 2 n.2, 26, 28.

The HP also filed a counterclaim seeking confirmation of the Arbitration Award to the

extent that it did not involve Debtor. Horst, Vol. III, at 3-113; Vol. IV, at 4-164; HP Exh.

41, at 46 (requesting that the court "confirm the [Arbitration] Award, subject to the

limitation that no relief if presently sought against [Debtor], and issue judgment thereon

instanter, subject to the limitation that no relief is presently sought against [Debtor]").

The HP made it clear in the consolidated pretrial order entered in the Superior Court Action and at a hearing held on September 10, 2018, that the HP were not seeking "affirmative relief against" Debtor and did not intend to seek collection of the Arbitration Award from Debtor.  Horst, Vol. IV, at 4-174 through 4-175; HP Exhs. 43 & 44, at 53-54. On September 17, 2018, the parties submitted post-hearing briefs in the Superior Court Action, and the HP, again, expressly stated that they were not seeking any monetary relief against Debtor and argued that the court could confirm the Arbitration Award as to all parties other than Debtor.  Horst, Vol. IV, at 4-177; HP Exh. 46, at 3, 11. On October 1, 2018, after hearing oral arguments and receiving post-hearing briefs, the Superior Court of DeKalb County issued its order denying the SP's motion to vacate and confirming the arbitration award (the "Superior Court Order").  Horst, Vol. IV, at 4-178 through 4-179.  The HP have not taken any action to seek monetary damages from Debtor in reliance upon the Superior Court Order. Horst, Vol. IV, at 216.  The SP, excluding Debtor, appealed the Superior Court Order.  Jay Patel, Vol IV, at 4-23.  The Georgia Court of Appeals remanded the Superior Court Order to the DeKalb Superior Court on October 21, 2019.  HP Exh. 53; Jay Patel, Vol IV, at 4-40.

At the hearing held on March 8, 2018, Debtor's former counsel requested the Court stay the enforcement of the Arbitration Award against the non-debtor parties, reiterating Debtor's argument that the automatic stay should be extended to protect assets of Debtor's family members because such assets were essentially Debtor's assets.  Audio

13

Recording of Hearing, March 8, 2018, 12:05 p.m.  The parties requested a continuance to conduct discovery.  On September 9, 2018, the HP filed a motion to dismiss the Motion for want of prosecution, which after a hearing on October 3, 2018, the Court denied.  On December 21, 2018, the HP filed a motion for summary judgment, asserting that the *Rooker-Feldman* doctrine and *res judicata* precluded the Court from redetermining the issue of whether the entry and confirmation of the Award violated the automatic stay (Doc. 212, the "SJ Motion").  The Court denied the SJ Motion, finding that under either doctrine, a state court's ruling is only preclusive if the judgment is valid and, in this case, the order confirming the Award was void to the extent it violated the automatic stay (Doc. 236, the "SJ Order").  In arriving at this conclusion, the Court noted that the Arbitration Agreement specifically identified Debtor as one of the parties subject to the arbitration and gave the Arbitrator authority to enter an award against Debtor.  Further, nothing in the language of the Award shielded Debtor from liability for the damages awarded against the SP.  At the conclusion of the SJ Order, the Court directed the parties to confer regarding any remaining discovery issues necessary, request a date for an evidentiary hearing, and submit a joint scheduling order for the completion of discovery and an evidentiary hearing on the Motion.

On January 10, 2020, the HP filed a pre-hearing brief, in which they outlined the facts and legal issues to be determined as: (1)  Whether any respondent committed a "willful" violation of the bankruptcy stay; (2) Whether the automatic stay should be

retroactively annulled "for cause" based on all of the facts and circumstances and as an appropriate remedy for Debtor's wrongful conduct; and (3) Whether Debtor suffered any cognizable damages from any stay violation. Doc. 252.  In response, Debtor asserted that the Court, in the SJ Order, had already determined that a stay violation had occurred, leaving the legal issues to be determined as whether the HP's violation was willful, whether Debtor incurred actual damages as a result of that violation, and whether Debtor may recover punitive damages due to the HP's conduct in obtaining stolen documents from computers of Debtor and/or his family member and using those documents during the Arbitration Hearing.  Doc. 256.

On May 24, 2021, the Court entered a consolidated pretrial order prepared by the parties (Doc. 302, the "PTO").  In the PTO, Debtor stated that he was seeking an award of damages under § 362(k), including punitive damages because the HP's actions were intentional and flagrant.  The HP outlined the relevant legal issues as: (1) whether the HP committed any "willful" violation of the automatic stay; (2) assuming the Court finds a stay violation that is not annulled, whether Debtor suffered any cognizable damages from the stay violation when he was not the party liable for attorney's fee related to the arbitration, he could have avoided any damages, the HP never collected any money or property from Debtor based on the Arbitration Award; and (3) annulment of the automatic stay based on all of the facts and circumstances of the case.  Debtor reserved the right to file a responsive brief in the event the HP filed a further "trial brief regarding

annulling the Stay," but did not raise an objection to the Court's considering the question of whether the automatic stay should be annulled.

## CONCLUSIONS OF LAW

"The automatic stay is considered 'one of the fundamental debtor protections provided by the bankruptcy laws,'" and one of its primary purposes is to provide the debtor "breathing room" upon filing a bankruptcy petition. *In re Chintella*, 2014 WL 3672882, at *3 (Bankr. N.D. Ga. June 20, 2014). It also "performs the important function of 'protect[ing] creditors by avoiding the piece-meal or distressed liquidation of the debtor's assets and a race to the courthouse, thus furthering administration of assets in an orderly fashion to achieve an equitable distribution within the framework of the Bankruptcy Code.'" *Howard*, 391 B.R. at 515. To that end, the automatic stay prevents the continuation of judicial proceedings, including an arbitration, regarding claims that arose prior to the bankruptcy against a debtor and the entry of an arbitration award against the debtor, as well as any attempt to collect a prepetition debt. 11 U.S.C. § 362(a)(1); § 362(a)(6); *see also Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006); *In re Kaiser Aluminum Corp.*, 303 B.R. 299, 303 (D. Del. 2003) (holding that the filing of a motion to compel arbitration violated § 362(a)(1)). Although § 362(a)(1) "does not stay claims, including counterclaims, brought by the debtor," *Mid Kansas Fed. Sav. & Loan Ass'n of Wichita By & Through Resol. Tr. Corp. v. Orpheum Theater Co.*, 151 B.R. 560, 563 (D. Kan. 1993), § 362(a)(3) stays any act that would

constitute an act to exercise control over property of a bankruptcy estate, *see* 11 U.S.C. § 362(a)(3); *see also In re Johnson*, 548 B.R. 770, 793 (Bankr. S.D. Ohio 2016). Accordingly, § 362(a)(3) prevents a Chapter 7 debtor from asserting or usurping control over claims that belong to the bankruptcy estate.  *In re Lickman*, 297 B.R. 162, 188 (Bankr. M.D. Fla. 2003); *In re Sofer,* 507 B.R. 444, 449 (Bankr. E.D.N.Y. 2014), aff'd sub nom. *Adar 980 Realty, LLC v. Sofer*, 2014 WL 3890110 (E.D.N.Y. Aug. 5, 2014), aff'd sub nom. *In re Sofer*, 613 F. App'x 92 (2d Cir. 2015) ("A debtor may be liable for violating the automatic stay."); *In re Tamarack Dev. Assocs., LLC,* 611 B.R. 286, 295–96 (Bankr. W.D. Mich. 2020) (noting that it "is self-evident that the filing and pursuit of causes of action belonging to the estate by an entity other than the trustee has the potential to adversely affect the estate and constitutes an improper exercise of control over property of the estate in violation of § 362(a)(3)" and, therefore, the Chapter 7 trustee "has the exclusive authority to pursue prepetition causes of action belonging to the debtor" and any "person or entity who asserts those causes of action violates the automatic stay").[6]  However, "[w]here claims by the debtor are not stayed by virtue of section 362(a)(1), defendants also are not stayed from defending themselves, pursuant to

---

[6] In the Motion, Debtor argues that "Debtor's participation in post-petition arbitration was not improper due to the existence of affirmative claims by Debtor and his immediate family against the [HP]. It is undisputed that the stay operates as a shield to prevent claims against a bankruptcy debtor, but does not stay affirmative claims by the debtor which would have the effect of increasing the size of the bankruptcy estate."  In support, Debtor cites *Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp*., 682 F.2d 446, 448 (3d Cir. 1982).  The Court does not disagree that, if Debtor had been a Chapter 11 debtor in possession, such as the debtor in the *St. Croix* case, Debtor would not have violated § 362(a)(3) by bringing claims of the bankruptcy estate.  Of course, those are not the facts of this case.  Rather, Debtor was a Chapter 7 debtor and pursued claims of the bankruptcy estate for his own benefit.

17

section 362(a)(3)." *Bioconvergence LLC v. Attariwala*, 2020 WL 1915269, at *4 (S.D. Ind. Apr. 20, 2020) (citing *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473 (D.C. Cir. 1991)) ("[S]omeone defending a suit brought by the debtor does not risk violation of § 362(a)(3) by filing a motion to dismiss the suit, though his resistance may burden rights asserted by the bankrupt."). "[A]cts taken in violation of the automatic stay are generally deemed void and without effect." *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984).

Additionally, if an individual is injured by a willful violation of the automatic stay, that person "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  A violation of the stay is willful "if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996); *see also In re Sehman*, 2022 WL 548000, at *3 (Bankr. N.D. Fla. Feb. 23, 2022) ("Specific intent to violate the automatic stay is not required for a showing of willfulness; it is sufficient that a party 'intentionally committed the violative act.'"); *In re Defeo*, 635 B.R. 253, 262 (Bankr. D.S.C. 2022) ("In other words, a willful violation of the automatic stay occurs if the creditor (1) knew the bankruptcy case existed and (2) intended to commit the act which violates the automatic stay.").  The plain language of § 362(k) also requires a causal connection between the stay violation and the injury sustained by the

party seeking damages.  *See In re Taylor*, 430 B.R. 305, 314 (Bankr. N.D. Ga. 2010)

("Actual damages are available only upon a showing that an individual suffered an

injury."); *In re Toppin*, 637 B.R. 88, 113 (Bankr. E.D. Pa. 2021) ("Section 362(k)(1)

conditions the recovery of actual damages, including attorneys' fees and costs, on an

individual being injured by a willful stay violation. This prerequisite is not only

statutorily mandated, but further serves courts' reluctance to foster a 'cottage industry

built around satellite fee litigation for willful stay violations' that cause no injury."); *In re

JTS/Simms, LLC*, 416 B.R. 772, 774 (Bankr. D.N.M. 2009) (stating that "it is appropriate

to determine if there are any injuries before delving into the willfulness of an alleged stay

violation").

Finally, under § 362(d), the Court may grant relief from the stay "by terminating,

annulling, modifying, or conditioning" the stay "for cause." [7]  11 U.S.C. § 362(d)(1); *see

also In re Chintella*, 2014 WL 3672882, at *8 (Bankr. N.D. Ga. June 20, 2014).   In

"appropriately *limited* circumstances," the Court may annul the stay—lift or terminate the

stay retroactively.  *Albany Partners*, 749 F.2d at 675 (emphasis in original).[8]  Before

---

[7] The Court rejects Debtor's argument that the Court should deny the request to annul the stay because the HP did not file a separate motion.  Section 362(d) provides that the Court may grant relief "upon request of a party in interest" and "after notice and a hearing."  11 U.S.C. § 362(d).  As the HP note, they made several requests for this relief, Debtor has been on notice of what the HP are seeking and the basis for that request for quite some time, as reflected by the docket and the pretrial order (Docs. 302, 355, 361, and 363), and there is no doubt that the Court held a hearing at which Debtor had sufficient opportunity to oppose the requested relief. Debtor has in no way been prejudiced by the HP's failure to file a separate motion.

[8] Debtor argues that this Court lacks the authority to "annul the stay retroactively."  In support, Debtor relies upon *In re Telles*, 2020 WL 2121254 (Bankr. E.D.N.Y. 2020), in which the court concluded that annulling the stay with regard to judicial acts taken with regard to property of the bankruptcy estate is contrary to the United States Supreme Court's ruling in *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 140 S. Ct. 696, 206

annulling the stay, some courts have required a showing of extreme or exceptional circumstances that warrant the extraordinary relief of annulment, generally focusing on the debtor's conduct and whether the party that violated the stay was aware of its existence. *See In re Soares*, 107 F.3d 96, 977 (1st Cir. 1997) (observing that "retroactive relief should be the long-odds exception, not the general rule," but noting that circumstances involving a debtor's bad faith may provide grounds for retroactive relief if the facts are "both unusual and unusually compelling"). Other courts have applied a "balancing of the equities" test. *See, e.g., In re Myers*, 491 F.3d 120 (3d Cir. 2007); *In re National Environmental Waste Corp.*, 129 F.3d 1052 (9th Cir. 1997). These courts consider whether the debtor engaged in inequitable conduct and whether the party accused of violating the stay was aware of the stay but balance these factors along with other factors, including whether the property is necessary for an effective reorganization; whether the court would have granted relief from the stay if a motion for relief had been timely filed prior to the stay violation; whether failure to grant retroactive relief will

---

L. Ed. 2d 1 (2020)). The Court finds more persuasive the reasoning of *In re Merriman*, 616 B.R. 381, 393 (B.A.P. 9th Cir. 2020), appeal dismissed, 2021 WL 3610895 (9th Cir. Feb. 26, 2021) ("We do not interpret *Acevedo* as pertaining to the bankruptcy court's power to annul the automatic stay under § 362(d)."); *see also* Drake, Bonapfel, & Goodman, Chapter 13 Practice & Procedure, § 15:9 ("Although an annulment order operates retroactively like a *nunc pro tunc* order, *Acevedo* does not prohibit such relief because the context of an annulment order is materially different from the jurisdictional principles involved in *Acevedo*."). The *Merriman* court reasoned that "Congress' decision to deploy four verbs to describe the various ways in which a bankruptcy court might grant relief from stay indicates an express decision to grant bankruptcy courts the broadest possible range of options in respect of the stay, including annulling it, which has the effect of treating it as if it had never existed." *Merriman*, 616 B.R. at 393. "This result is perfectly consistent with the requirement that, in the performance of its 'traffic cop' role, bankruptcy courts must have broad authority to determine the appropriate forum for dispute resolution, taking into account and giving full respect to the panoply of interests to be weighed and protected in these matters, as well as to the dignity and power of other judicial processes." *Merriman*, 616 B.R. at 394.

cause unnecessary expense to the creditor; and whether the creditor has detrimentally changed its position on the basis of its action.  *See In re Howard*, 391 B.R. at 518-19 (citing *In re Anderson*, 341 B.R. 365, 369-70 (Bankr. D.D.C. 2006)); *In re Merriman*, 616 B.R. 381, 390 (B.A.P. 9th Cir. 2020), appeal dismissed, 2021 WL 3610895 (9th Cir. Feb. 26, 2021) (applying a "balancing of the equities test" to determine whether to annul the stay to cure violation of the stay arising from litigation brought against debtor postpetition and considering "judicial economy, expertise of the state court, prejudice to the parties, and whether exclusively bankruptcy issues are involved").  "Consistent with § 362(g), 'the creditor seeking retroactive relief must first show the presence of circumstances warranting annulment of the stay, and the debtor then bears the ultimate burden of proving that the request for retroactive relief from the stay should be denied.'" *In re Schumann*, 546 B.R. 223, 229–30 (Bankr. D.N.M. 2016).

The Court concludes that the entry of the Arbitration Award and its confirmation violated § 362(a)(1) and (a)(6) because the face of the Arbitration Award purported to assess personal liability against Debtor in favor of the HP for prepetition claims and the Superior Court confirmed the Arbitration Award without indicating that it was modifying the Arbitration Award to exclude Debtor from liability for the monetary relief granted. Additionally, the entry of the Arbitration Award and the Confirmation Order violated § 362(a)(3) because the denial of prepetition claims that were property of Debtor's bankruptcy estate constituted an act to exercise control over property of the estate.

Debtor, rather than the HP, was responsible for this violation, as he was the party who exercised inappropriate authority over property of the estate when he pursued the claims. The HP were simply defending themselves. The Court further finds that the HP did not violate § 362(a)(3) by asserting claims against the SP because, based on Debtor's testimony, Debtor, and, thus his bankruptcy estate, had no ownership interest in the assets held by the SP.

In the Motion, Debtor asks the Court to declare that the Arbitration Award and the Confirmation Order are void and to award damages against the HP for the HP's violations of the automatic stay. The Court can deny both prongs of the requested relief if the Court finds cause to annul the stay. Having considered all the evidence and arguments, the Court agrees with the HP that the facts here present the type of limited circumstances that warrant annulment of the stay, regardless of whether the Court applies an "exceptional circumstances" test or a "balancing of the equities" test. The automatic stay should be annulled "for cause" to validate the HP's actions to obtain the Arbitration Award and the Confirmation Order and the entry of these orders to the extent that they exercised control over claims that were property of Debtor's bankruptcy estate.[9]

First, the Court acknowledges that, in most cases, annulling the stay will not be appropriate if a party violates the stay with knowledge of the bankruptcy case.

---

[9] As the Court finds cause to annul the stay, the Court need not consider any evidence presented regarding Debtor's entitlement to damages, including punitive damages. To the extent that evidence presented regarding the "stolen documents"—SP Exhs. 12-21—is relevant to the Court's decision to annul the stay, the Court concludes that Debtor's evidence regarding the "stolen documents" was insufficient to support a finding that the HP engaged in any wrongdoing with regard to these documents.

22

Continuing with collection activity with knowledge of the bankruptcy case generally reflects a disregard for the automatic stay, important rights of the debtor, and the authority of the Bankruptcy Court.   In this case, however, the HP did not intentionally disregard the automatic stay, while Debtor ignored the automatic stay and disregarded the right of the Trustee to decide whether to pursue Debtor's prepetition claims or settle them instead.   True, if either party had filed a motion for relief from the automatic stay for the arbitration to proceed, the parties could have avoided further litigation and the impact of the Arbitration Award and the Confirmation Order on property of Debtor's bankruptcy estate.   Yet, it is clear that the HP had no intention of obtaining an award of personal liability against Debtor.   The HP and their counsel all testified credibly that they expected Debtor would be excluded from personal liability for any amount of monetary relief; they tried to correct the Arbitration Award, but Debtor actively resisted such a correction because it would have eliminated Debtor's ability to undo the Arbitration Award against his family; and they never took any action to collect the amount awarded in the Arbitration Award from Debtor.   The evidence does not support a finding that the HP acted with a subjective intent to interfere with Debtor's "breathing spell" or to prejudice Debtor's creditors.   Rather, the evidence demonstrates that Debtor initiated the arbitration because he wanted to participate to bring claims against the HP for his own benefit. Debtor has made much of the fact that the HP could have simply sought relief from the automatic stay to continue the Arbitration.   While the Court would agree that it is always

23

a good idea to seek relief from the automatic stay, even if it is simply out of an abundance of caution, it was not unreasonable for the HP to believe that Debtor would not be personally liable for any amounts owed due to the HP's requests and prior conversations with the Arbitrator to make him aware of Debtor's bankruptcy case. The HP understood that Debtor had no ownership interest in the assets to be divided and that he had no way to pay any judgment. The only reasonable interpretation of the exchanges between the HP and the Arbitrator is that the Arbitrator understood Debtor was in bankruptcy and would not be the target of any claims but, based on the authorities provided by the HP, he could go forward with the arbitration to determine the HP's claims against the remaining SP and any claims that the SP, including Debtor, brought against the HP. For these reasons, the Court does not weigh the fact that the HP were aware of the bankruptcy case against annulling the stay under these unique facts.

Second, if the HP had sought prospective relief from the automatic stay to continue the arbitration, the Court would have granted it. This is an asset Chapter 7 case. If the HP had believed Debtor owed the HP some amount and had filed a motion for relief from the stay to liquidate those claims to enable them to receive a distribution from the estate, the Court would have granted the request to enable the HP to file a proof of claim against Debtor's bankruptcy estate. Judicial economy would have demanded such an outcome. The factors used to determine whether to allow litigation to proceed in a nonbankruptcy forum would have weighed heavily in favor of allowing the Arbitrator to

resolve questions concerning common facts and evidence against multiple parties, especially considering Debtor's desire to participate in the arbitration. The only prejudice to Debtor from proceeding therein would have been Debtor's time spent as a witness, which his own testimony makes clear he would have gladly given to protect his family's interests. The claims asserted by the HP during the Arbitration Hearing were purely state law claims brought by and against multiple, nondebtor parties arising from the transactions and operations of multiple, nondebtor business entities. There were no bankruptcy issues to be decided. Further, Debtor signed the arbitration agreement in which he agreed to arbitrate and later initiated the arbitration. Finally, allowing the HP to use arbitration to liquidate their claims against Debtor's estate would have recognized the important federal purpose in enforcing arbitration agreements and would have in no way interfered with the administration of the bankruptcy case. *See generally In re Zimmerman*, 341 B.R. 77, 79 (Bankr. N.D. Ga. 2006) (Bonapfel, J.); *In re Scott*, 608 B.R. 774, 778 (Bankr. S.D. Ga. 2019) (citing *In re Elec. Mach. Enter., Inc.*, 479 F.3d 791 (11th Cir. 2007)). In any event, as a practical matter, the bankruptcy case is over and the estate has been administered, such that annulling the stay will not reduce the share of funds going to any other creditor or result in payment of any dividend to the HP. Doc. 383 (Trustee's Final Report). Consistent with their repeatedly stated position that they were not seeking to hold Debtor liable, the HP simply ask the Court to annul the stay to validate any actions that may have caused the Arbitrator to name Debtor as a SP. Had

Debtor sought relief from the stay to bring his claims against the HP, the Trustee could have decided whether to abandon or pursue the claims, and the Court could have granted the relief if the Trustee had no opposition. Under the circumstances, the Court weighs the Trustee's lack of interest in the claims that the Arbitrator denied in favor of annulling the stay.

Third, the Court agrees with the HP that Debtor's conduct in this matter weighs heavily in favor of annulling the stay. In short, any outcome of these proceedings that permits Debtor or his family to profit from his actions would be unjust and would make a mockery out of the bankruptcy process. While Debtor suggests that allowing the HP's violations of the automatic stay to stand is an affront to the dignity of this Court and the automatic stay, the Court finds the opposite to be true. Debtor embarked on a calculated attempt to use the automatic stay to protect his family, usurp the Trustee's ability to liquidate property of the estate, and gain an unfair advantage against the HP. He and Mr. Parker knew that Debtor, personally, was not at risk of having to pay a dime as a result of the entry of any award by the Arbitrator because, first, the HP made it clear from the beginning that they were not seeking affirmative relief against Debtor, and second, his counsel believed that the automatic stay would prevent Debtor from being liable. And, as a practical matter, Debtor had taken steps years earlier to ensure that he was judgment proof. At that point, Debtor had nothing to lose and everything to gain by participating in the Arbitration Hearing. He proceeded with the hope that, if he and the SP were

successful, his family would benefit and he could keep the proceeds of his prepetition claims without using them to pay his creditors, and if not, he could run to this Court and cry foul to void the entire award. The Court will not allow Debtor to use the automatic stay as a "poison pill."[10]

As to prejudice to the HP if the stay is not annulled, it is obvious. All parties, including Debtor, wanted to resolve the disputes through arbitration. In reliance on Debtor's voluntary participation, the HP undoubtedly spent significant time, energy, and money. Not only would that investment be rendered worthless if the Court ruled in Debtor's favor, Debtor's continued prosecution of his unreasonable position throughout this litigation has forced the HP to defend themselves and has resulted in the commitment of the valuable resources of the state courts and this Court. Much, if not all, of the expense incurred by the HP and the time devoted by the judiciary following the entry of the Arbitration Award could have been avoided if Debtor had simply objected to the overinclusive definition of the SP or allowed the Arbitrator to amend the Arbitration Award to clarify that Debtor was not liable for the payment of any monetary award.

Finally, any harm to Debtor and the bankruptcy estate from annulling the stay is minimal. The Court notes that the HP are not asking for relief that would allow any findings of personal liability to stand against Debtor or his estate, as any such liability has

---

[10]  The HP have also argued that Debtor's failure to disclose in his Schedules a certain tract of real property in India should also be considered as a basis for annulling the stay. The Court finds it is unnecessary to do so, and, accordingly, declines to rule on whether certain documentary evidence relevant to Debtor's ownership of this land should be admitted into evidence.

27

been discharged and the HP have not filed a proof of claim in this case.  Doc. 391; Claims Registry.  The prepetition claims that the Arbitration Award denied were property of Debtor's bankruptcy estate from which Debtor should not have benefitted in any event. Annulling the stay will excuse the HP's actions so that Debtor and the remaining SP cannot profit from them.  Such relief is appropriate under the unique circumstances of this case.  Further, no evidence was presented that the bankruptcy estate has been harmed by the denial of Debtor's prepetition claims or that Debtor's creditors would benefit in any way if the Court refused to annul the stay.  While the Court does not doubt that Debtor or his family have spent great sums attempting to have the Arbitration Award set aside, such actions were not necessitated by the violation of the automatic stay, but rather were taken as part of a strategy to expand the automatic stay's protection to the other SP.

In closing, the Court finds it ironic that Debtor has come to this Court complaining repeatedly that the HP never moved for the relief from the automatic stay to pursue arbitration, when Debtor himself violated the stay by exercising control over property of the estate without obtaining relief from the stay and asserted claims that should have been brought or settled by the Trustee.  In his opening statement, Debtor's counsel took the HP to task for doing nothing to "ameliorate" the stay violation, yet the evidence shows that Debtor rejected the HP's attempts to clarify that the Arbitration Award did not establish liability against Debtor.  The Court might just as well ask why Debtor did not take steps to avoid having his claims, which were property of his estate, denied, or why he did not

prosecute the Motion as soon as it was filed. Having listened to more than four days of testimony and having reviewed the documentary evidence, the Court believes the answer is obvious—Debtor would do or say anything to help his immediate family and obtain revenge against his brother and his family.

The Court will not condone Debtor's conduct by allowing him to profit in any way from what occurred in this case. Both parties took actions that violated the automatic stay. The HP tried to avoid violating the stay and attempted to cure the violation, while Debtor's actions were calculated and intentional, as evidenced by his unabashed statement in the Superior Court Action that his participation at the Arbitration Hearing was justified and appropriate *because* he was asserting his own claims, which he admitted during the Evidentiary Hearing was undisclosed property of his bankruptcy estate. The HP's actions were basically harmless. In fact, they would have been harmless had Debtor taken advantage of the opportunity offered to allow the Arbitrator to correct the definition of the SP and clarify that Debtor was not personally liable for the award amount. Instead, he refused such relief in favor of litigating in an attempt to obtain an unwarranted advantage for his nondebtor, family members. Under these facts, neither party should obtain an advantage, and both parties should pay their own way, especially when, as here, there is no evidence of any harm to the bankruptcy estate and the bankruptcy estate will not benefit from any sanctions imposed. Finally, the Court notes that such a ruling is consistent with authority holding that annulment is an appropriate remedy when a debtor

engages in wrongful conduct, even if the creditor knew of the bankruptcy case when it took actions that violated the automatic stay. *In re Eastlick*, 349 B.R. 216, 228 (Bankr. D. Idaho 2004) (noting that debtor's participating in litigation and failure to bring the matter to the court's attention, as well as the serious consequences that could occur if the court did not annul the stay all led the court "to conclude in its discretion that the equities are best served by annulment of the stay"); *In re Myers*, 491 F.3d 120 (3d Cir. 2007), as well as cases that refuse to award damages to a party for stay violations under various equitable theories, including estoppel and waiver, *In re Paxton,* 596 B.R. 686 (Bankr. N.D. Calif. 2019); *In re Angelo*, 480 B.R. 70, 93 (Bankr. D. Mass. 2012) ("I agree that even the ugly enjoy the benefit of the stay, but I conclude that, in view of Angelo's conduct in this case, he may be estopped from invoking § 362(k)(1) to seek redress."), and cases that hold that the bankruptcy court has wide latitude to limit damages when a debtor has failed to fulfil his duty to mitigate his damages, *In re Parker*, 2021 WL 1090421, at *24 (N.D. Cal. Mar. 22, 2021), appeal dismissed sub nom. *In re Parker*, 2021 WL 5099605 (9th Cir. Aug. 26, 2021).

## CONCLUSION

For the reasons stated above, the Court will annul the automatic stay.

IT IS ORDERED that the HP's request to annul the automatic stay is **GRANTED**;

IT IS FURTHER ORDERD that Debtor's Motion to Enforce Stay and for Award of Mandatory Sanctions Pursuant to 11 U.S.C. §362(k) is **DENIED**.

## END OF DOCUMENT

**Distribution List**

Rajesh C. Patel
2253 Gradyridge Trail
Duluth, GA 30097

Frank B. Wilensky
Macey, Wilensky & Hennings, LLP
Suite 435
5500 Interstate Parkway North
Atlanta, GA 30328

Neil C. Gordon
Arnall, Golden & Gregory, LLP
Suite 2100
171 17th Street, NW
Atlanta, GA 30363

William D. Matthews
Arnall Golden Gregory LLP
Suite 2100
171 17th Street, NW
Atlanta, GA 30363

Michael D. Robl
Robl Law Group LLC
Suite 250
3754 LaVista Road
Tucker, GA 30084